## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FEDERAL TRADE COMMISSION, and
STATE OF FLORIDA

      Plaintiffs,

     v.

Boost Software, Inc., a Massachusetts
Corporation,

Vast Tech Support, LLC, a Florida limited
liability company,

OMG Tech Help, LLC, a Florida limited
liability company,

Success Capital, LLC, a Florida limited
liability company,

Jon Paul Holdings, LLC, a Florida limited
liability company,

Amit Mehta, individually and as an officer
of Boost Software, Inc.,

Elliot Loewenstern, individually and as a
Member of Vast Tech Support, LLC, OMG
Tech Help, LLC, and Success
Capital, LLC

Jon-Paul Vasta, individually and as a
member/officer of Vast Tech Support, LLC
and OMG Tech Help, LLC,

Mark Donohue, individually and as an
owner or officer of Vast Tech Support, LLC,

Defendants.

_14CV81397 KLR/JMH_

FILED BY _____ D.C.

NOV 10 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

Case No. _____

PLAINTIFFS FEDERAL TRADE
COMMISSION AND STATE OF
FLORIDA'S *Emergency* MOTION FOR AN EX
PARTE TEMPORARY
RESTRAINING ORDER AND
MEMORANDUM IN SUPPORT
THEREOF

__FILED UNDER SEAL__

TABLE OF CONTENTS

I.     INTRODUCTION                                                    1

II.    STATEMENT OF FACTS                                             4

       A.    DEFENDANTS                                               4

             1.    BOOST DEFENDANTS                                   4

             2.    VAST DEFENDANTS                                    5

       B.    DEFENDANTS' BUSINESS PRACTICES                           8

       C.    THE BOOST DEFENDANTS' DECEPTIVE PC
             HEALTHBOOST SYSTEM SCAN FLAGS ITEMS THAT
             DO NOT IMPACT COMPUTER PERFORMANCE                      10

       D.    THE VAST DEFENDANTS' DECEPTIVE PRACTICES                13

       E.    CONSUMER INJURY                                         26

III.   ARGUMENT                                                      26

       A.    THIS COURT HAS THE AUTHORITY TO GRANT THE
             REQUESTED RELIEF                                        26

       B.    PLAINTIFFS MEET THE STANDARD TO OBTAIN
             INJUNCTIVE RELIEF                                       28

       C.    AN *EX PARTE* TRO WITH ADDITIONAL EQUITABLE
             RELIEF IS NECESSARY TO STOP DEFENDANTS' UNLAWFUL
             CONDUCT AND PRESERVE EFFECTIVE FINAL RELIEF             39

       D.    AN ASSET FREEZE IS NECESSARY AGAINST THE VAST
             DEFENDANTS                                              41

       E.    THE COURT SHOULD APPOINT A TEMPORARY RECEIVER
             OVER THE VAST CORPORATE DEFENDANTS                      46

       F.    THE REQUESTED TRO SHOULD BE ISSUED *EX PARTE*           47

IV.  CONCLUSION                                                      50

ii

### Cases

*AT&T Broadband v. Tech Commc'n, Inc.*, 381 F.3d 1309 (11th Cir. 2004) ...................... 27

*Cenergy Corp.v. Bryson Oil & Gas PLC*, 657 F. Supp.867 (D. Nev. 1987) .................... 47

*FSLIC v. Dixon*, 835 F.2d 554 (5th Cir. 1987) .................................................. 41

*FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir.1989) ........................................ 36

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006)........................................ 28

FTC v. *Equifin International Inc.*, 1997 U.S. Dist. LEXIS 10288, *33, *43

(C.D. Cal. 1997) ................................................................................. 44

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993)............................................. 29, 30

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005) .................................. 29

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) .............................. 26, 27, 35, 41

*FTC v. IAB Mktg. Assocs.*, 746 F.3d 1228 (11th Cir. 2014) ................................ 28, 35, 41

*FTC v. Para-Link Int'l, Inc.*,  No. 8:00-CV-2114-T-17TBM, 2001 WL 1701537, at *6 (M.D. Fla.

Feb. 28, 2001) ................................................................................. 3

*FTC v. Peoples Credit First, LLC*, 2005 U.S. Dist. LEXIS 38545, 2005 WL 3468588 at *5 (M.D.

Fla. 2005) ......................................................................................28

*FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320 (M.D. Fla. 2010) ................. 29, 36

*FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) ......................... 29

*FTC v. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ........................................... 27

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ............................................. 29

*FTC v. Tashman*  318 F.3d 1273 (11th Cir. 2003) ............................................... 28

*FTC v. Transnet Wireless Corp.* 506 F. Supp. 2d 1247 (S.D. Fla. 2007). ........ 25, 29, 35,36

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) ........................... 27, 41, 46

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)............................... 28

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006)......................................... 29

iii

*FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012) .................... 21, 35

*FTC v. World Travel Vacation Brokers Inc., 861 F.2d, 1031* (7th Cir. 1988)................... 45

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989)......................................... 3

*In re Vuitton et Fils*, 606 F.2d 1 (2d Cir. 1979). ......................................................... 39, 47

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)............................................................. 29

*Nat'l Credit Mgmt. Group.*, 21 F. Supp. 2d (D.N.J 1998). ............................................... 46

*Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000).................................................... 28

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) ....................................................... 41

*SEC v. Capital Counsellors, Inc.*, 332 F. Supp. 291 (S.D.N.Y. 1991) ............................. 46

*SEC v. Keller Corp.*, 323 F.2d 397 (7th Cir. 1963) ......................................................... 46

*SEC v. Management Dynamics, Inc.*, 515 F. 2d 801 (2d Cir. 1975)................................. 39

*U.S. v. William Savran & Assocs.,* 755 F. Supp. 1165, 1182 (E.D.N.Y. 1991). ............... 41

**Statutes**

15 U.S.C. § 45(a) ................................................................................................. 3,26

15 U.S.C. § 53(b) ................................................................................................. 26

Fla. Stat. § 501.201 ............................................................................................. 3, 26

Fla. Stat. § 501.204 ............................................................................................. 32

**Rules**

16 C.F.R. § 310, ........................................................................................... 3,26,32,41

USCS Fed Rules Civ Proc P1 ............................................................................ 40

USCS Fed Rules Civ Proc R 65(b).................................................................. 27, 39, 43

## I.   INTRODUCTION

The Federal Trade Commission and the State of Florida respectfully request that the Court halt a multi-million dollar computer repair scheme that exploits consumers' fears about computer viruses, malware and other security threats.  The scheme starts with the Boost and Vast Defendants' Internet advertising for PC HealthBoost software.[1]  The Boost and Vast Defendants claim PC HealthBoost dramatically speeds up computers and prevents crashes, and offers a free system scan.  Upon downloading a free version of the product, the product automatically initiates a bogus computer system scan that invariably detects hundreds or thousands of purported "errors" in need of repair.  PC HealthBoost's bogus free scan falsely identifies innocuous and helpful files as "errors."  The Boost Defendants then offer consumers the opportunity to "fix" these errors by downloading the paid version of the software for $29.97.  After duping consumers into purchasing the paid version of PC HealthBoost, the software instructs consumers to call a toll free phone number to activate the product.

Lying in wait to receive consumers' calls are the Vast Defendants' telemarketers who tell more lies and extract additional money from unsuspecting consumers, many of whom are senior citizens.  Once they have consumers on the line, the telemarketers gain remote access to their computers and offer to perform a diagnostic scan, during which they open various programs and falsely claim that the information displayed by the

---

[1] As described in more detail in Section II below, the Boost Defendants include Boost Software, Inc. and Amit Mehta, and the Vast Defendants include Vast Tech Support, LLC, OMG Tech Help, LLC, Success Capital, LLC, Jon Paul Holdings, LLC, Elliot Loewenstern, Jon-Paul Vasta, and Mark Donohue.

programs show evidence of malware or "trace damage" to consumers' computers.  The telemarketers also falsely assert that the purported problems they have identified represent an immediate threat to the computers that can only be resolved by a trained technician.

Having tricked consumers into believing that their computers are riddled with problems and in imminent danger of crashing, the telemarketers then pitch the services of technicians, including repairs and long-term maintenance programs.  The Vast Defendants recommend and charge for repairs even when computers are in good working order and have no issues.  Through the course of the scheme, the Boost and Vast Defendants have caused more than $22 million in consumer injury.

Plaintiffs the Federal Trade Commission and the State of Florida ask this Court to enter an *ex parte* temporary restraining order and other ancillary relief to immediately halt the Boost and Vast Defendants' deceptive computer repair scheme.  Plaintiffs offer substantial evidence in support of this request, including consumer declarations, undercover buys by FTC investigators, a declaration from an employee of a computer security firm who also made an undercover buy,[2] a report by a computer expert, corporate records, a declaration from an accountant, and financial records, former employee

---

[2] Through our investigation, we identified Jerome Segura, an employee of Malwarebytes, a security software company, who shared with us a similar experience he had with the Vast Defendants.  Independent of the Plaintiffs, Mr. Segura made an undercover call to the Vast Defendants with a clean virtual computer image with no problems, delays or slowness.  Exhibit 2 Declaration of Jerome Segura (Segura Dec.).

declarations, a former trainee declaration and script from an individual who quit after one day upon realizing the operation was a scam.[3]

The Boost and Vast Defendants' scheme violates Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), as well as the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*  Plaintiffs request an *ex parte* temporary restraining order that enjoins the Boost and Vast Defendants from continuing their unlawful practices.  Plaintiffs also request ancillary equitable relief against the Vast Defendants including an asset freeze, the appointment of a temporary receiver, immediate access to relevant business premises and records, limited expedited discovery, and an order to show cause why a preliminary injunction should not issue.  The Vast Defendants have engaged in an egregious scam, two of the individual defendants have a history of injuring consumers, and there is a high likelihood of the dissipation of assets and the destruction of evidence.   Finally, the Plaintiffs seek to have the Boost Defendants turn over certain key documents prior to the Preliminary Injunction hearing.  All of this ancillary relief is necessary to preserve this Court's ability to provide effective final relief to the victims.

---

[3] Plaintiffs submit 3 volumes of exhibits in support of their Motion.  References to exhibits appear as "Ex. [number]."  Declarations are cited as "[name] Dec.," and, where appropriate, include citations to specific paragraphs ("¶") and pertinent attachments ("Att.").

## II.     STATEMENT OF FACT

### A.     DEFENDANTS

#### 1.     Boost Defendants

##### a)               Boost

Boost Software, Inc. ("Boost"), is a Massachusetts corporation with its principal place of business at 360 Newberry Street, Unit 411, Boston, Massachusetts, 02115.  It also has offices at 75 Arlington Street, Suite 500, Boston, Massachusetts, 02116 and in Naples, Florida.[4]  Boost advertises, markets, and sells PC HealthBoost software.[5]  Boost makes money from the sale of the paid version of PC HealthBoost and uses the software as a lead generator for Vast Tech Support, LLC.[6]  Boost transacts business in Palm Beach through using telemarketers at Vast, which is located in Delray Beach, Florida to activate its software, doing business with Vast including acting as a lead generator for the company, and marketing its software through Vast.[7]  Moreover, as described in more detail below in the business practices section, Boost Software participates in the computer repair scheme in this case which includes telemarketers at Vast whose principal place of business is in Delray Beach Florida.

---

[4] Ex. 16 Declaration of Reeve Tyndall (Tyndall Dec.) ¶ 12, Ex. 14 Declaration of Michael Kraemer (Kraemer Dec.) ¶ 29 (Attachment I, p. 1)
[5] Kraemer Dec. ¶ 17, ¶ 39, Att. J., P. 1 -2. Ex. 13 Declaration of Martha Vera (Vera Dec.)
[6] Ex. 5 Declaration of Adam Timmons (Ex. 5 Timmons Dec.) ¶13.  Boost staff have visited Vast Tech Support's sales floor and made random calls to Vast Tech Support's call center where the telemarketer performed their scripted bogus diagnostic scan.  *Id.*
[7] Ex. 5 Timmons Dec. ¶ 13.

### b)      Amit Mehta

Defendant Amit Mehta is the President and Treasurer of Boost.[8]  He is also a

Director of the company.[9]

### 2.      Vast Defendants

The Vast Defendants use a number of inter-connected limited liability companies

to engage in deceptive practices as a common enterprise.  The main, or umbrella

company, is Vast Tech Support, LLC ("Vast").  The founders, officers and principals of

Vast and the heads of the related companies are Elliot Loewenstern, Jon-Paul Vasta and

Mark Donohue.[10]

### a)      Company Defendants

### (1)      Vast and Its Managing Members

Vast is a Florida limited liability company with its principal place of business at

2855 S. Congress Avenue, Suite AB, Delray Beach, Florida, 33445.[11]  It has received

over 22 million dollars from consumers through its Canadian payment processor,

RevenueWire,[12] and uses telemarketers located in Delray Beach, Florida and Cebu City,

Philippines.[13]   Vast has operated under numerous dbas including OMG Tech Help, OMG

---

[8] Ex. 16 Tyndall Dec. ¶ 12.
[9] *Id.*  Defendant Mehta has appeared on Web-based presentations to potential Boost affiliates where he urged the potential affiliates to use advertising content like that used by the Vast Defendants on downloadsoftware.com which advertises PC HealthBoost.  Ex. 14 Kraemer Dec. ¶¶ 27-28.
[10] Ex. 16 Tyndall Dec. ¶ 20(a)-(c); Ex. 5 Timmons Dec. ¶ 12.
[11] Ex. 16 Tyndall Dec. ¶ 13.
[12] Ex. 15 Declaration of Tom Van Wazer (Van Wazer Dec.) ¶ 8 and Ex. 5 Timmons Dec. ¶ 22.
[13] Ex. 5 Timmons Dec. ¶ 5.

Total Protection, OMG Back Up, downloadsoftware.com, and softwaretechsupport.com.[14]

Vast is comprised of two companies that serve as its managing members: Success Capital, LLC ("Success Capital") and Jon Paul Holdings, LLC ("Jon Paul Holdings").[15]

### (2)      Success Capital

Success Capital is a Florida limited liability company with its principal place of business at 2855 S. Congress Avenue, Suite AB, Delray Beach, Florida, 33445.[16]  Success Capital has received over $355,000 from Vast.[17]

### (3)      Jon Paul Holdings

Jon Paul Holdings is a Florida limited liability company with its principal place of business at 18317 Fresh Lake Way, Boca Raton, Florida, 233498.[18]  John Paul Holdings has received over $375,000 from Vast.[19]

### (4)      OMG Tech

OMG Tech Support, LLC ("OMG Tech") is a Florida limited liability company with its principal place of business at 2855 S. Congress Avenue, Boca Raton, Florida, 33445.[20]

### b)      Individual Defendants

### (1)      Elliot Loewenstern

Defendant Loewenstern is a Member and Managing Partner of Vast, OMG Tech and Success Capital.[21]  He holds himself out as the CEO of Vast and OMG Tech.[22]

---

[14] Ex. 16 Tyndall Dec. ¶ 13.
[15] *Id.*
[16] *Id.* at ¶ 16.
[17] Ex. 15 Van Wazer Dec. ¶ 11.
[18] Ex. 16 Tyndall Dec. ¶ 17.
[19] Ex. 15 Van Wazer Dec. ¶ 10.
[20] Ex. 16 Tyndall Dec. ¶ 15.
[21] Ex. 16 Tyndall Dec. ¶ 18.
[22] *Id.* ¶¶ 20(a), 27; Ex. 14 Kraemer Dec. ¶ 24; Ex. 24 Declaration of Derek Booth p. 6.

Loewenstern has an office at the Vast business premises.[23]  He is also a regular presence on the telemarketing sales floor.[24]  Furthermore, Loewenstern registered various websites used by the Vast Defendants' scheme and pays for these and other Vast expenses with his corporate credit card.[25]  He resides in Boca Raton, Florida.[26]

Loewenstern has been the subject of actions by the Securities and Exchange Commission and the Financial Industry Regulatory Authority. [27] He is permanently barred from acting as a broker or otherwise associating with firms that sell securities to the public.[28]  He has also been a defendant in two criminal cases where he pled guilty.[29]

### (2)    Jon-Paul Vasta

Jon-Paul Vasta ("JP Vasta") is the President of Vast and OMG Tech.[30]  He has an office at Vast, and is a regular presence on the telemarketing sales floor.[31]  He drafted sales scripts used by Vast employees.[32]  JP Vasta has signatory authority over bank accounts titled in the names of Vast.[33]  JP Vasta identifies himself as the owner of Vast on bank account applications.[34]  He resides in Boca Raton, Florida.[35]

### (3)    Mark Donohue

Mark Donohue is the chief operating officer of Vast.[36]  He is also one of the three original founders of Vast, along with Loewenstern and JP Vasta.[37]  Mark Donohue has an

---

[23] Ex. 3 Declaration of Ramon Chevalier Dec. (Chevalier Dec.) ¶ 10 and Ex. 5 Timmons Dec. ¶ 6.
[24] Ex. 5 Timmons Dec ¶ 6.
[25] Ex. 16 Tyndall Dec. ¶ 21.
[26] *Id.* at ¶ 6.
[27] Ex. 16 Tyndall Dec. ¶ 3.
[28] Ex. 16 Tyndall Dec. ¶ 3.
[29] Ex. 16 Tyndall Dec. ¶ 4.
[30] Ex. 5 Timmons Dec. ¶ 6; Ex. 14 Kraemer Dec. ¶ 23.
[31] Ex. 5 Timmons Dec. ¶ 6.
[32] Ex. 5 Timmons Dec. ¶ 11.
[33] Ex. 16 Tyndall Dec. ¶ 20(b).
[34] *Id.*
[35] *Id.* at ¶ 11.
[36] Ex. 5 Timmons Dec. ¶ 6; Ex. 14 Kraemer Dec. ¶ 24.

office at Vast, and is a regular presence on the sales floor.[38]  Donohue has signatory authority over bank accounts titled in the names of Vast and identifies himself as the owner of Vast on those bank account applications.[39]  Donohue is the contact for LogMeIn, Inc., the company that allows the Vast Defendants to remotely control consumers' computers[40] and he has a Vast corporate card in his name that he uses to pay Vast's expenses.[41]  Defendant Donohue resides in Del Ray Beach, Florida, and his company, Mark Alexander Group, LLC has received more than $360,000 from Vast.[42]

**B.    Defendants' Business Practices**

1.    **PC HealthBoost Advertising**

PC HealthBoost is a registry software product marketed by the Defendants.[43] Since at least 2012, the Boost and Vast Defendants have marketed PC HealthBoost on websites and through pop up ads.[44]  One of the websites, pchealthboost.com, is owned and operated by the Boost Defendants.  The advertising contains the following statements and depictions among others:[45]

- Clean UP PC in Just a Couple Clicks

- Performance Boost:  In just a couple clicks dramatically increases PC Speed, performance, and stability.

---

[37] Ex. 5 Timmons ¶ 11.
[38] Ex. 5 Timmons Dec. ¶ 6, Ex. 3 Chevalier Dec. ¶ 11.
[39] Ex. 16 Tyndall Dec. ¶ 20(c).
[40] Ex. 16 Tyndall Dec. ¶ 23.
[41] *Id.*
[42] Ex. 16 Tyndall Dec. ¶ 11, Ex. 15 VanWazer Dec. ¶ 9.
[43] Ex. 14 Kraemer Dec. ¶ 27-28.
[44] Ex. 14 Kraemer Dec. ¶ 30 Att. J. Ex. 13 Vera Dec., Ex. 5 Timmons Dec. ¶¶ 13-15.
[45] Ex. 14 Kraemer Dec. ¶ 22 Att. O, p. 3.

- Protection Against PC Problems:  Repair & Prevent windows errors, pc crashes and freezes, blue screen errors, and much more.

The Vast Defendants own and operate downloadsoftware.com.  This website also markets PC HealthBoost and contains the following statements and depictions among others:

- Safely Speed Up Your PC by Up to 216%

- Slow PC? In less than 2 minutes, PC HealthBoost will significantly boost your PC speed and performance.  Your PC will be running like new again in 2 clicks of a mouse button.

- Prevent PC Crashes and Freeze

    PC Ever Crash or Freeze Up?  After running PC HealthBoost, your PC crashes and freezes will be gone, saving you months of headaches and frustration.[46]

The claim that PC HealthBoost significantly increases computer speed, however, is not accurate.[47]

---

[46] Ex. 14 Kramer Dec. ¶ 22.

[47] The typical consumer will not experience a significant boost in their computer's speed or performance after running PC HealtBoost.  Ex. 1 Expert Report of Edward Skoudis (Skoudis Expert Report). p. 15 -17.  Additionally, the vast majority of consumers whose computers are experiencing crashes and freezes would not have their problems solved by PC HealthBoost, according to expert Skoudis.  Id.  There are a large number of causes for system crashes and freezes that cannot by fixed by PC HealthBoost, such as failing computer components and electrical issues.  Id.

### C.   The Boost Defendants' Deceptive PC HealthBoost System Scan Flags Items That Do Not Impact Computer Performance

PChealthboost.com encourages consumers to download a free version of PC HealthBoost.[48] After consumers download the free program, PC HealthBoost automatically performs a "system scan" of consumers' computers.  This scan leads consumers to believe that their systems have numerous errors in need of repair. According to the FTC's expert Edward Skoudis who reviewed and analyzed the program, the scan results flag purported "errors" that have no material impact on performance.[49]

PC HealthBoost's bogus scan flags innocuous and beneficial files found on nearly every computer, such as the computers' temporary files and cookies.[50]  Moreover, the Boost Defendants' scan improperly identifies Windows DLLs (Dynamic Link Libraries) - computer code shared among programs - as "errors" to be removed.[51]  In addition to being false, the removal of Windows DLLs could potentially cause problems if a program needed the removed code to operate.[52]

---

[48] Consumers reach pchealthboost.com by going directly to the website.  Consumers who click on the Download PC HealthBoost Now option on downloadsoftware.com are also taken to the website pchealthboost.com.

[49] Ex. 1 Skoudis Expert Report. p. 10-15. Mr. Skoudis has 17 years' experience working in computer security and privacy issues for companies such as Bell Communications Research, SAIC, Global Integrity, and Predictive Systems. He is a co-founder of the information security consulting and research firm InGuardians, as well as the information security challenge and simulation development firm Counter Hack Challenges. Skoudis Dec. p. 2-3. Mr. Skoudis has previously served as an expert witness in other FTC cases including *FTC v. Pecon Software, Ltd., et al*, Civ. No. 12-CIV-7186 (S.D.N.Y. 2012).

[50] Ex. 1 Skoudis Expert Report p. 10 – 15.

[51] Ex. 1 Skoudis Expert Report p. 10.

[52] Applications can have pieces of code stored in "Dynamic Link Libraries," or DLLs. These DLLs can be shared amongst programs. In versions of Windows prior to XP (which was released in 2001), it was more common to have applications sharing DLL's, which could result in problems if one application removed shared DLL's that another program used. In the expert's testing of PC HealthBoost, he found that legitimate built-in

*(continued)*

Notably, the FTC made undercover buys of PC HealthBoost and ran it on computers without any performance problems and with malware protection.[53]  The results were eye opening.  PC HealthBoost claimed there were 424 problems with one computer, as shown in the following screenshot from one of the buys.[54]  See Image 1 below.



(Image 1)

---

Windows DLLs were marked as "Errors" to be removed, which could potentially cause further issues to computers using PC HealthBoost. Ex. 1 Skoudis Expert Report p. 10..
[53] Ex. 13 Vera Dec. ¶ 9, Att. A, p. 41.
[54] Ex. 14 Kraemer Dec. ¶ 10, Att. A, p. 2.  During the second and third undercover calls, PC HealthBoost's scan found 462 and 408 Ex. 13 Vera Dec ¶¶ 7, 16.

Once the Boost Defendants trick consumers into thinking that their computer has numerous "errors," they then instruct consumers to "Click 'Continue' to restore your PC to full health. (Recommended)," as shown in Image 1 above.[55]  When consumers click the "Continue" button, they learn that they must pay $29.97 for the "Registered" version of the program in order to fix the vast majority of the so-called "errors," as shown in Images 2 and 3 below.[56]  Consumers exposed to the proposed Defendants' false scans agree to pay the $29.97 fee for the program (or $43.94 for two years).[57]



(Image 2)

---

[55] Ex. 13 Vera Dec. ¶ 19, Attachment A, p. 21.
[56] Ex. 14 Kraemer Dec. ¶ 9, Att. A, p.6; Ex. 13 Vera Dec. ¶ 4 Att. F, pp. 8, 10.
[57] Ex. 14 Kraemer Dec. ¶ 17; Ex. 13 Vera Dec. ¶ 21, Att. F, p. 10.



(Image 3)

**D.     The Vast Defendants' Deceptive Practices**

    1.     **After Purchasing the Paid Version of PC HealthBoost, the Defendants Direct Consumers to Call Vast for Software Activation**

Consumers who purchase PC HealthBoost have already been deceived into believing that their computers have significant damage through a bogus "system scan." Moreover, they have already spent money for a product that does not improve their computer's speed or prevent crashes.[58]  However, the tech support scam has only just

---

[58] Ex. 1 Skoudis Expert Report , p. 15 – 17.

begun.  Using an unnecessary registration/activation process,[59] the Boost Defendants route their victims to the Vast Defendants' call center for the next phase of the scam.

Once consumers pay $29.97 for the full version of PC HealthBoost, the order confirmation states: "To activate your software, call us toll-free at the number above. Our certified technicians will securely connect to your PC and remotely activate your software for you.  At your request, we will diagnose your PC for other hard-to-identify problems."  *See* Image 4.[60]



---

[59] Ex. 14 Kraemer Dec. ¶ 11.
[60] Ex. 14 Kraemer Dec, ¶ 9, Att. A, p. 8.

(Image 4)

This toll-free number and others that appear on Defendants' order confirmation pages are owned by the Vast Defendants and route consumers to the Vast Defendants' call center, operated by OMG Tech.[61]

### 2. The Vast Defendants Scare Consumers into Buying Technical Support and Security Software Products

When consumers reach the call center, the Vast Defendants lead the consumer down a carefully scripted path that inevitably leads to the conclusion that the consumer's computer is in need of repair and requires more help than PC HealthBoost can provide.[62]

---

[61] Ex. 16 Tyndall Dec. ¶ 24.  In addition to the consumers directed to Vast by the Boost Defendants, the Vast Defendants also receive calls from consumers who have been tricked by bogus pop up messages that claim that a virus or Trojan has been detected on their computer or the consumer's malware protection software is out of date.  *See* Ex. 2 Segura Dec. ¶ 14, Ex. 5 Timmons Dec. ¶ 15, and Ex. 12 Declaration of Patricia Trussler (Trussler Dec.) ¶ 2.  According to Timmons, an ex-information technology employee for Vast, the Vast telemarketers treat these bogus pop ups as if they were legitimate, and immediately begin their bogus diagnostic process. Ex. 5 Timmons Dec. ¶ 15.  Moreover, statements made to the Delray Police Department by another ex-employee, McArdle, corroborate these types of practices.  In a November 2013 police interview, McArdle stated that the Vast Defendants used "homepage hi-jackers" that "switch a user's homepage to another home page when a user clicks on a game or link. The new homepage flashes ads that state the computer has several problems and suggest the user purchase [OMG Tech] software. Once the software is purchased the user is prompted to call [OMG Tech] to initiate the software. When the user calls he/she is connected to a sales representative who upsells the user into tech help with [OMG Tech]."  Ex. 16 Tyndall Dec. ¶ 19.
[62] Ex. 3 Chevalier Dec. ¶ 3 – 6. Ex. 14 Kraemer Dec. ¶ 13 – 15; Ex 5 Timmons Dec. ¶ 11 ("Vast sales reps use a bogus diagnostic and scare tactics.").

The Vast Defendants use scare tactics to upsell consumer services or products that cost hundreds of dollars, such as repairs and additional computer software.[63]

### a) Telemarketers Obtain Remote Access of Consumers' Computers

The Vast Defendants' telemarketers first direct the consumers to go to a website, such as their omg22.com site, and enter a code or download a software application that grants Vast telemarketers remote access to the consumers' computers.[64]  Armed with access, the Vast telemarketers are able to completely control the consumers' computers and can, for example, move the cursor, enter commands, run applications, and access stored information.[65]  Next, the Vast Defendants walk the consumer through a scripted "diagnostic process" that inevitably finds errors or problems.[66]  During their diagnostic process, the Vast Defendants use several common utility programs, including Event Viewer and Task Manager, to falsely represent to consumers that they have identified and detected performance or security problems on consumers' computers.[67]

### b) Event Viewer

According to the FTC's expert, the Event Viewer program that the representative shows almost always has a large number of event logs entries categorized as warnings and errors based on the normal functioning of a Windows computer system, no matter the

---

[63] Ex. 14 Kraemer Dec. ¶ 13, Ex. 13 Vera Dec. ¶¶ 19 - 21, Ex. 8 Declaration of Timothy Huff (Huff Dec.) ¶¶ 3—4, Ex. 9 Declaration of Mary Ann Littleton (Littleton Dec.) ¶ 8—9.

[64] Ex. 13 Vera Dec. ¶ 10, Attachment F, p. 12, Ex. 5 Timmons Dec. ¶ 11, Ex. 2 Segura Dec. ¶ 7.

[65] Ex. 1 Skoudis Expert Report p. 20.

[66] Ex. 14 Kraemer Dec., ¶ 12, Att. 8, p. 12 – 17, Ex. 13 Vera Dec. ¶¶ 13(a), 19(a) – (f), Ex. 2 Segura Dec. ¶¶ 11-13, Ex. 9 Littleton Dec. ¶ 8.

[67] Ex. 14 Kraemer Dec. ¶ 18, Ex. 13 Vera Dec. ¶ 19(b), Ex. 3 Chevalier Dec. ¶ 6.

actual state of the computer.[68] Such warnings and errors are due to routine activities on the computer system, and are present even if the machine is in perfect operating order. Events are categorized in a number of ways, including a red "X" or a yellow triangle, referred to as "errors" or "warnings." A sample screen shot of an Event Viewer log appears below:



(Image 5)

Despite their potentially alarming appearance, these messages are innocuous and are reported as part of normal day-to-day operations in modern operating systems.[71]   The Event Viewer commonly displays errors and warning which are not indicative of serious

---

[68] Ex. 1 Skoudis Expert Report, p. 6.
[71] Ex. 1 Skoudis Expert Report, p. 20.

issues.[72]  For example, an error may be reported if no Internet connection is available so

that a program terminated unexpectedly.[73]  Moreover, removing these error logs is not

effective, and may actually be harmful.[74]  After only a few short hours of normal, day-to-

day computer use, the Event Viewer will again contain new warning and error entries

associated with typical Windows activity.[75]  And, if there are actual problems in the

future, vital logs of activity will no longer be available to help resolve those issues.[76]

Yet, after directing consumers to the Event Viewer, the Vast Defendants claim, on the

basis of the Event Viewer "errors" and "warnings", that consumers' computers have

errors, trace damages or other issues that need to be repaired.[77]

     A former trainee at Vast filed a complaint against the company with the FTC,

complete with a Vast telemarketing script, because she asserted it was an unethical and

corrupt company. [78]  The script directs telemarketers to take consumers' computers to the

Event Viewer and tell them that "Each one of these errors and warnings are a red flag;

while it is normal to have a few, look at how many there are! (Pause). There are a

significant number of errors in the system." [79]  Moreover, when the trainee, who had

multiple Microsoft certifications, challenged the trainer about her mischaracterization of

the Event Viewer entries, the trainer told her that she was wrong, and that there was only

---

[72] *Id.*
[73] Ex. 1 Skoudis Expert Report, p. 20 – 21.
[74] Ex. 1 Skoudis Expert Report, p. 22 - 23.
[75] *Id.*
[76] *Id.*
[77] Ex. 14 Kraemer Dec. ¶¶ 13-15, Ex. 13, Vera Dec. ¶¶ 13(b), 19(b), Ex. 4 Guerrero Dec.
¶ 12, Att. B (script) pp. 4, 9 and 10, Ex. 2 Segura Dec. ¶ 12, Ex. 3 Chevalier Dec. ¶ 6, Ex.
Timmons Dec. ¶¶ 12, 19, , Ex. 11 Declaration of Sandra Spiller (Spiller Dec.) ¶ 3, Ex. 6
Declaration of Brandon Elkin (Elkin Dec.)  ¶¶ 17 and 18.
[78] Ex. 4 Guerrero Dec. ¶ 5, Att. B.
[79] *Id.* p. 14.

one answer to give consumers: their computer needed repairs.[80]  In addition, a former

Vast telemarketer states that he would go to Event Viewer[81] and would always find errors

on consumers' computers, and a former IT specialist for Vast states that he did not know

a single Vast telemarketer who knew or had been trained to know the meaning of the

Event Viewer errors and warnings.[82]

Moreover, FTC investigators and an employee of MalwareBytes, the creator and

marketer of the eponymously named anti-malware program, posed as consumers and

made undercover calls to and/or buys from the Vast telemarketing operation.[83]  Both the

FTC investigators and the MalwareBytes security specialist used computers without any

problems, and with spyware protection.[84]  There was nothing to repair on the computers,

but that did not stop the Vast Defendants from making misstatements in their pursuit of a

sale.[85]

True to form, the Vast Defendants displayed the Event Viewer to the investigators

showing a number of errors and falsely represented that their computers needed repairs.[86]

For example, a Vast telemarketer told an FTC investigator the following:  You have

about only eleven [errors and warnings] but either way you want to make sure that they

---

[80] Ex. 4 Guerrero Dec. ¶ 13.  Vast's trainer also made it clear that Vast's telemarketers were to leave their "tech and computer knowledge at the front door." *Id.* at ¶6.
[81] Ex. 3 Chevalier Dec. ¶ 6.
[82] Ex. 5 Timmons Dec. ¶ 17.
[83] Ex. 14 Kraemer Dec. ¶ 12, Ex. 13 Vera Dec. ¶¶ 9, 18, Ex. 2 Segura Dec.¶ 5.
[84] Ex. 20 Declaration of Tina Del Beccaro (Del Beccaro Dec.) ¶ 6, Ex. 14 Kraemer Dec. ¶7, Ex. 2 Segura Dec.¶ 4.
[85] This is not surprising since, according to ex-employee Timmons, "if a consumer with a brand new out of the box computer called Vast Tech, the sales representative would have run the bogus diagnostic and told the consumer, 'look at this, it is horrible!'" Ex. 5 Timmons Dec ¶ 17.  *See also*, Ex. 4 Guerrero Dec. ¶ 10, "there was only one answer we were supposed to give consumers- their computer needed repairs."
[86] Ex. 14 Kraemer Dec, ¶ 13, Ex. 13 Vera Dec. ¶¶ 19—20.

don't build up.  These are all recent.  This can be prevented as long as you have security"
and "Now you're seeing that the errors are occurring from not having a real-time
protection software, with the malware blocker and the hacker security.[87]  These
statements are false according to the FTC's computer expert.[88]  As previously noted, the
Windows Event Viewer program commonly displays errors and warnings which are not
indicative of serious issues.  Furthermore, mentioning security protection software
immediately after pointing out errors and warning is misleading because the
representative made no attempt to even identify the root causes of the warnings and
errors, according to the FTC expert.

 A Vast Telemarketer also told an FTC investigator that "you've had 25 errors on
your computer.  And it's okay to have a few of them, but over time, they could just build
up like a snowball effect like plaque would on our teeth.  Over time, they're just going to
build up and just cause more and more problems to your computer."[89]  Furthermore, a
Vast telemarketer showed the MalwareBytes security specialist 18 error and warning
entries in the Event Viewer logs and stated that, "You shouldn't have any critical errors
or warnings, because basically these are things that we call trace damages that are left
behind from past infections."[90]  The computers used by the FTC and the virtual machine
used by the Malwarebytes representative, however, did not need repairs.[91]

---

[87] Ex. 14 Kraemer Dec. ¶ 13, Ex. 13 Vera Dec. ¶ 19(c).
[88] Ex. 1 Skoudis Expert  Report, p. 20 – 23.
[89] Ex. 13 Vera Dec. ¶ 19(d).
[90] Ex. 2 Segura Dec. ¶ 12.
[91] Ex. 1 Skoudis Expert  Report, p. 23, Ex. 2 Segura Dec. ¶ 4.

Moreover, a Vast telemarketer issued a dire warning to an FTC investigator about malware with the following pitch: "Are you familiar with malware? It stands for malicious software. What it does is that it injects itself into the background on your system so that it can hide and, you know, steal information and passwords, copy down your keystrokes. ... all the signs are here."[92] The undercover machine used during the call did not have malware.[93]

Additionally, a Vast telemarketer told an undercover FTC investigator that "you have about only eleven [errors and warnings]. But either way, you want to make sure they don't build up. I mean, this is all recent. This can be prevented as long as you have security."[94] However, installing security software will in no way prevent Event Viewer warnings and errors from being logged on the machine.[95]

During the same undercover call, the Vast telemarketer opened the details on one of the Event Viewer errors (classified by Microsoft as "error 80242016"), as shown in Image 6:[96]

---

[92] Ex. 13 Vera Dec. ¶ 13(b).
[93] Ex. 1 Skoudis Expert Report p. 7.
[94] Ex. 14 Kraemer Dec. ¶ 13. Att. B p. 12, 5-10.
[95] Ex. 1 Skoudis Expert Report. p. 23.
[96] Ex. 1 Skoudis Expert Report, p. 24.



(Image 6)

While showing the undercover investigator this image on the screen, the Vast

telemarketer stated:

> You see this is one routine task that has not been updated.
> So it's letting you know security update.  You need to have
> security in the Internet Explorer.  That's why, again, you
> need to have security.  This is a registry error, okay, that
> comes from the Internet.  Let's see... this is like a routine
> task as well that didn't get completed.  So this is your
> example and this is your proof, okay.  So it's up to you
> what you want to do, but at this point you should be
> provided with technical support and security.[97]

The Event Viewer error highlighted by the Vast telemarketer, however, is not

"proof" that a computer needs "technical support and security."  Microsoft classifies the

"error" in question as a routine download interruption:

---

[97] Ex. 1 Skoudis Expert Report, p. 24.

> If you receive Windows Update error 80242016 while checking for updates, it might be caused by a connection interruption between your computer and the Windows Update servers.  Close Windows Update, wait 10 to 15 minutes, and then run Windows Update again.  You can also wait for Windows Update to run at its next scheduled time.[98]

As the FTC's expert notes:

> this error message was far more likely to be caused by a network issue, such as the customer disconnecting from a wireless network, unplugging their laptop, closing the lid and putting it to sleep, etc., as opposed to a lack of "security in your Internet" as the representative claimed.  Events of this kind, which may appear to consumers as indicative of a damaged system or infections … are in fact common.[99]

### c) Task Manager

The Vast Defendants also commonly use Task Manager, a built-in Windows utility that displays information about current programs, processes, and services running on a Windows computer, to convince consumers their computers need repair.  For example, a Vast telemarketer displayed the task manager and told an FTC undercover investigator the following:  "What some people don't know is when you remove software, it doesn't fully remove because there's things called 'trace elements and running services' that get left behind.  So even after you think you have deleted it, there's still bits and pieces of the software embedded into the system, and that's why your computer is a little slow at times.  This statement is flagrantly false according to the FTC's computer expert.[100]  The vast majority of uninstallation packages fully remove the

---

[98] Ex. 1 Skoudis Expert Report, p. 25.
[99] *Id.*
[100] Ex. 1 Skoudis Expert Report, p. 29.

associated software.[101]  Moreover, the number of processes running on a system is not a reliable indicator of the overall load of a computer.[102]

The Vast telemarketers also misuse the task manager to convince consumers they have too many processes or programs running.   The Vast Defendants' telemarketers claim that it there are too many processes running or that the processes are "jammed up in the background," no matter how many background processes are running on a consumer's computer.[104]  For example, during the call with the MalwareBytes security specialist, the Vast telemarketer opened the Task Manager, found 39 processes running and stated that this was too many.[105]  This is consistent with the Vast Defendants' script.[106]  The telemarketers statements about too many processes are even more egregious as most of the computer processor usage and many of the processes identified by Task Manager were caused by the Vast Defendants' diagnostic test software.[107]

### d)      Completing the Sale

Once the Vast Defendants have "identified" items that need "repair," they tell consumers that: (1) the computer could be repaired by a well-known, costly retailer that

---

[101] *Id.*
[102] *Id.*
[104] Ex. 13 Vera Dec. ¶ 13(a), Ex. 2 Segura ¶ 10.
[105] Ex. 2 Segura Dec. ¶ 10.  Computer technicians cannot truthfully claim that 39 processes is too many programs running in the background without examining the overall usage of the computer's central processing unit – CPU or Physical Memory usage – which in this case was only 32%.
[106] Script - "The higher the usage – the harder the computer is working. Your computer is currently running processes. Your computer is like an engine. Now, what happens if you over rev an engine? (PAUSE) Exactly, it could break!" [Emphasis original]  Skoudis debunks this patently false assertion.  Ex. 1 Skoudis Expert Report, p. 29.
[107] Ex. 5 Timmons Dec. ¶ 18.

will cause them to be without a computer for many days;[108] or (2) they could purchase technical support directly from the Vast Defendants and have their computer repaired the same day while the consumer sat in the comfort of their own home.[109]  The Vast Defendants then request payment information over the phone,[110] charging as much as $500 for unnecessary "repairs."[111]

After charging consumers, the Vast Defendants transfer them to a technician who allegedly makes repairs.[112]  In many cases, including the case of the FTC undercover calls, this so-called technician assistance was unnecessary.[113]  The FTC investigators used a computer that did not need repairs.[114]  Moreover, a number of consumers were worse off after purchasing PC HealthBoost and receiving services from a Vast technician.[115]

---

[108] Ex. 3 Chevalier Dec. ¶ 8, Ex. 4 Guerrero Dec. ¶ 13, Att. B, p. 13, Ex. 6 Elkin Dec. ¶ 23.
[109] Id.
[110] Ex. 10 Declaration of Louis Passano (Passano Dec.) ¶ 11, Ex. 4 Guerrero Dec. Att. B, p. 11.  See also, Ex. 16 Tyndall Dec. ¶ 25. The Vast Defendants do not have their own merchant account.  Instead, they process their over-the-phone payments via SafeCart a website owned by RevenueWire.  SafeCart purports to be a payment service or "online store" for "Downloadable" products, and as such RevenueWire does not identify its individual merchants to payment processors or acquiring banks (banks to allow entities access to bill credit and debit card transactions).  Yet, RevenueWire aggregates over-the-phone payments from the Vast Defendants with online transactions, including PC HealthBoost sales.  See, Ex. 13 Vera Dec.
[111] Vera or Kramer; Ex. 3 Chevalier Dec. ¶ 9, Ex. 4 Guerrero Dec. Att. B, p. 15.
[112] Ex. 14 Kraemer Dec. ¶ 15., Ex. 13 Vera Dec.
[113] Ex. 14 Kraemer Dec. ¶ 13 and Ex. 20 Del Beccaro Dec. ¶ 6.
[114] Ex. 20 Del Beccaro Dec. ¶ 6.
[115] Ex. 7 Declaration of Steven Hill (Hill Dec.) ¶ 5 (consumer could not access his word documents and had to reinstall the whole operating system); Ex. 8 Declaration of Timothy Huff (Huff Dec.) ¶  5 (consumer described his computer as "being on its knees," and running slower than before he received services).

### E.      Consumer Injury

The Boost and Vast Defendants' misrepresentations have caused millions of dollars in consumer injury.[116]  The Vast Defendants alone have received more than $22 million in unlawful proceeds through RevenueWire, their Canadian-headquartered payment processor.[117]  Furthermore, many of the Defendants' victims are senior citizens and, according to the disgusted trainee, the Vast trainer expressly told new employees that Vast targets seniors, "because they are the easiest to sell to."[118]

## III.   ARGUMENT

The Boost and Vast Defendants' practices violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the TSR, 16 C.F.R. Part 310, and the FDUTPA, Fla. Stat. § 501.201 *et seq.*  In order to stop these ongoing violations and preserve the possibility for the Court to provide restitution to victims of this scam, Plaintiffs seek an *ex parte* TRO halting the Boost and Vast Defendants' deceptive business practices and freezing the Vast Defendants' assets.  As set forth below, and supported by the Plaintiffs' evidence, there is ample basis for the entry of the proposed TRO.

### A.      This Court Has the Authority to Grant the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and this Court to grant, preliminary and permanent injunctions to stop violations of Section 5 of the FTC Act.  *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996).  The Court may also enter preliminary relief to preserve the possibility of providing effective final relief.  *Id.*  The Court's authority includes the power to grant "any ancillary relief

---

[116] Ex. 15 Van Wazer Dec. ¶ 8.
[117] Ex. 15 Van Wazer Dec. ¶ 8., Ex. 16 Tyndall Dec. ¶
[118] Ex. 4 Guerrero Dec. ¶ 7.

necessary to accomplish complete justice." *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431,

1434 (11th Cir. 1984) (quoting *FTC v. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982));

*see also Gem Merch Corp.*, 87 F.3d at 468-470; *AT&T Broadband v. Tech Commc'n, Inc.*,

381 F.3d 1309, 1316 (11th Cir. 2004).  The Court may also enter a temporary restraining

order or other preliminary relief to preserve the possibility of providing effective final

relief.  *Gem Merch. Corp.*, 87 F.3d  at 468-470; *U.S. Oil & Gas Corp.*, 748 F.2d at 1434;

Federal Rule of Civil Procedure 65(b).  Additionally, the Court's power to grant ancillary

relief is broad and may include an asset freeze to preserve assets for restitution to victims,

the appointment of a receiver, immediate access to business premises, and expedited

discovery – all forms of relief that courts in this District have granted in other cases

recently filed by the FTC.[119]

---

[119] *See, e.g., FTC v. Centro Natural Corp., et al.*, No. 14-CV-23879-CMA (S.D. Fla. Oct. 21, 2014) (entering *ex parte* TRO granting asset freeze, immediate access, expedited discovery and appointing receiver); *FTC v. Prime Legal Plans LLC, et al.*, No. 12-CV-61872-RNS (S.D. Fla. Sept. 24, 2012) (same); *FTC v. IAB Mktg. Assocs., LP, et al.*, No 12-CV-61830-RNS (S.D. Fla. Sept. 18, 2012) (same); *FTC v. Premier Precious Metals, Inc., et al.*, No. 12-CV-60504-RNS (S.D. Fla. Mar. 20, 2012) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver); *FTC v. VGC Corp. of Am., et al.*, No. 11-CV-21757-JEM (S.D. Fla. May 17, 2011) (entering *ex parte* TRO granting asset freeze, immediate access, and expedited discovery, and appointing receiver); *FTC v. Am. Precious Metals, LLC*, No. 11-CV-61072-RNS (S. D. Fla. May 10, 2011) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver); *FTC v. U.S. Mortg. Funding, Inc., et al.*, No. 11-CV-80155-JIC (S.D. Fla. Feb. 20, 2011) (entering *ex parte* TRO granting asset freeze, immediate access, and expedited discovery and appointing receiver); *FTC v. Timeshare Mega Media & Mktg. Group, Inc., et al.*, 10-CV-62000-WJZ (S.D. Fla. Oct. 20, 2010) (same); *FTC v. 1st Guar. Mortgage Corp., et al.*, No. 09-CV-61840-JJO (S.D. Fla. Nov. 25, 2009) (same);  *FTC v. First Universal Lending, LLC, et al.*, No. 09-CV-82322-WJZ (S.D. Fla. Nov. 19, 2009) (same); *FTC v. Kirkland Young, LLC, et al.*, No. 09-CV-23507-ASG (S.D. Fla. Nov. 19, 2009) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver).

Moreover, district courts in other Circuits have granted similar relief as requested with respect to the Boost Defendants in other FTC actions relating to  bogus computer scans. *See, FTC v. Maxtheater, Inc.*, No. 05-CV-0069-LRS (E.D. Wash. filed Mar. 8, 2005) (district court granted *ex parte* TRO with advertising prohibitions, an accounting, and record keeping requirements) and *FTC v. Trustsoft, Inc.*, Civ No. 05-1905 (S.D. Tex., filed May 31, 2005) (district court granted *ex parte* TRO with advertising prohibitions, an accounting, asset freeze, and immediate access to the business premises).

**B.     Plaintiffs Meet the Standard to Obtain Injunctive Relief**

To obtain injunctive relief, the FTC must show that (1) it is likely to succeed on the merits, and (2) injunctive relief is in the public interest. *IAB Mktg. Assocs.*, 746 F.3d at 1232. Unlike private litigants, the FTC does not need to prove irreparable injury to receive injunctive relief. *Id.; FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991).

**1.     Plaintiffs Have Demonstrated They Are Likely to Succeed on the Merits**

"To establish liability under section 5 of the FTCA, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman* 318 F.3d 1273, 1277 (11th Cir. 2003). Representations violate Section 5 if the FTC proves that, based on a common sense net impression of the representations as a whole, the representations are likely to mislead reasonable customers to their detriment. *See FTC v. Peoples Credit First, LLC*, 2005 U.S. Dist. LEXIS 38545, 2005 WL 3468588 at *5 (M.D. Fla. 2005). A determination of false advertising can be based upon visual representations. *FTC v. Cyberspace.com* 453 F.3d 1196, 1200 (9th Cir. 2006).

A misrepresentation is material if it involves facts that a reasonable person would consider important in choosing a course of action. *See Cyberspace.com* at 1201. "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material." *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007). Implied claims are also presumed material if there is evidence that the seller intended to make the claim, *see, e.g., Novartis*

*Corp. v. FTC*, 223 F.3d 783, 786-87 (D.C. Cir. 2000); *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992).  Moreover, in determining whether a solicitation is likely to mislead consumers, courts consider the overall "net impression" it creates.  *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1329 (M.D. Fla. 2010) (citing *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009)).

The FTC need not prove that the misrepresentations were done with an intent to defraud or deceive, or were made in bad faith.  *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005).  Nor does the FTC need to show actual reliance by consumers; it is enough that the representations were likely to be relied on by consumers acting reasonably under the circumstances.  *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266-67; *see FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) ("Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the goals of [Section 13(b)]."); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991).  "[A] presumption of actual reliance arises once the FTC has proved that the [d]efendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the [d]efendant's product." *Figgie Int'l*, 994 F.2d at 605-06.

> **a)      Defendants' Practices are Deceptive and Violate Section 5 of the FTC Act (Counts I and II)**

The Boost and Vast defendants make express representations to consumers that are deceptive and in violation of Section 5 of the FTC Act.  The Boost Defendants

represent that they have identified errors or warnings that will affect the performance of consumers' computers.  This is false, as described in detail in Section II(B) above.  For example, FTC investigators purchased and used PC HealthBoost on computers without problems or viruses; yet, the PC HealthBoost software showed numerous errors on the machines.[120]

The Vast Defendants represent to consumers that they have identified performance or security problems on consumers' computers, including errors, warnings, evidence of malware, or trace damage that will affect the performance or security of consumers' computers.   This is false, as described in Section II(B) above.  For example, the Vast telemarketers displayed the Event Viewer and claimed that computers had errors, trace damage, too many processes running, or malware.[121]  Event Viewer, however, commonly displays errors and warnings, which are not indicative of serious issues, but are instead innocuous.[122]  Errors and warnings are reported as part of normal day-to-day operations in modern operating systems.[123]  Moreover, the telemarketers made the statements in connection with their "diagnostic scans" of computers used by undercover FTC investigators and others that did not have problems, did not need repairs and did not have malware. [124]

---

[120] Ex. 14 Kraemer Dec. ¶ 10, Att. A, p. 2, Ex. 13 Vera Dec ¶¶ 7, 16.
[121] Ex. Chevalier Dec. ¶ 6, Ex. 4 Guerrero Dec. ¶ 12, Att. B (script) pp. 4, 9 and 10, Ex. 2 Segura Dec. ¶¶ 10, 12, 13, Ex. 9 Littleton Dec. ¶ 8,  Ex. 6 Elkin Dec. ¶¶ 17 and 18, Ex. 11 Spiller Dec. ¶ 3, Ex. 14 Kraemer Dec. ¶ 13, Ex. 13 Vera Dec. ¶¶ 13(a) – (b), 19(a) – (d), Ex. 5 Timmons Dec. ¶ 11.
[122] Ex. 1 Skoudis Expert Report, p. 34.
[123] *Id.*
[124] Ex. 20 Del Beccaro Dec. ¶ 6, Ex. 14 Kraemer Dec. ¶ 13.

The Defendants used these false representations to mislead consumers acting reasonably under the circumstances into paying for their software and repairs.[125]  It is reasonable for consumers to be misled by the Defendants' claims since the whole scheme is designed to prey upon consumers' lack of technical sophistication and consumers' concern about the operation of their computers.[126]  Both the Boost Defendants and the Vast Defendants go to great lengths to trick consumers into believing that their computers are in need of immediate repair.

Finally, the Defendants express, false representations are material.  The Defendants' claims go the core of consumers' concerns about their computers, and are designed to scare them into purchasing protection and repairs.

### b)  Vast Defendants Violate the Telemarketing Sales Rule (Count III)

The TSR prohibits any seller or telemarketer from making a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution.  16 C.F.R. § 310.3(a)(4).  The Vast Defendants are sellers or telemarketers as defined by the TSR because they arrange for the sale of goods or services.  16 C.F.R. §

---

[125] Ex. Chevalier Dec. ¶ 6, Ex. 4 Guerrero Dec. ¶ 12, Att. B (script) pp. 4, 9 and 10, Ex. 2 Segura Dec. ¶¶ 10, 12, 13, Ex. 9 Littleton Dec. ¶ 8,  Ex. 6 Elkin Dec. ¶¶ 17 and 18, Ex. 11 Spiller Dec. ¶ 3, Ex. 14 Kraemer Dec. ¶ 13, Ex. 13 Vera Dec. ¶¶ 13(a) – (b), 19(a) – (d), Ex. 5 Timmons Dec. ¶ 11. The salient issue in fraudulent-misrepresentation cases "is whether the seller's misrepresentations tainted the customer's purchasing decisions," not the value (if any) of the items sold. *IAB Mkt Assocs.* 746 F.3d at 1235 (internal citation omitted); *see also Figgie Int'l*, 994 F.2d at 606 ("The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each [product] that is not useful to them.").
[126] This is especially true for the seniors that the Vast Defendants target. *See* Ex. 5 Timmons Dec. ¶ 15 ("[M]any of the consumers that called Vast Tech due to the bogus warning pop ups were seniors, and/or had no computer knowledge.")

310.2(aa), (cc), and (dd). [127] Moreover, the TSR's prohibition against making false or misleading statements applies to all statements regarding upsells, whether the statements were made during an outbound call initiated by the telemarketer or, as here, an inbound call initiated by a consumer. 16 C.F.R. § 310.6(4). As explained above, the Vast Defendants have falsely stated that they have identified problems on consumers' computers. The Vast Defendants made these statements to induce consumers to purchase computer security or technical support services, and in fact consumers have purchased these services. Therefore, the Vast Defendants have violated the TSR.

**c)      Boost and Vast Defendants' Violations of the Florida Deceptive and Unfair Trade Practices Act (Count IV and V)**

Section 501.204 of the FDUTPA, Chapter 501, Part II, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. The same representations that violate Section 5 of the FTC Act also violate the Florida Deceptive and Unfair Trade Practices Act, which tracks the language of the FTC Act and prohibits deceptive acts or practices. In particular, the Boost Defendants falsely represent that they have identified errors or warnings that will affect the performance of consumers' computers. The Vast Defendants falsely represent that they have identified performance or security issues on consumers' computers, including errors, warnings, malware or trace damage that will affect the performance or security of consumers' computers.

---

[127] Consumers call the Vast telemarketers to activate Boost software. Vast uses these inbound calls to solicit consumers to purchase additional products and services, a solicitation know as an "upsell."

2.      **Injunctive Relief Is In the Public Interest**

To show that injunctive relief is in the public interest the Court must balance the equities between the public and private interest.  In balancing those equities, the public interest should receive greater weight. *World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989).  In this case, the equities tip decidedly in favor of entering the FTC's proposed TRO.  Defendants' practices have resulted in significant harm to consumers.  There is also a compelling interest in preserving the Vast Defendants' remaining assets for possible restitution to consumers victimized by this scam.  Defendants, on the other hand, have no legitimate interest in continuing their illegal activities or operating a business permeated by fraud. *See FTC v. Para-Link Int'l, Inc.*,  No. 8:00-CV-2114-T-17TBM, 2001 WL 1701537, at *6 (M.D. Fla. Feb. 28, 2001).  Because Defendants have no legitimate interest in continuing their scheme, and the harm to consumers is significant, this Court should find that injunctive relief is in the public interest.

a)      **Corporate Defendants Are Liable**

(1)      **Boost**

Boost is liable because it participated in the unlawful practices.  Boost represented that consumers' computers had performance or security problems that needed to be repaired through its scan of computers.  This representation is false.  For example, on all three FTC undercover calls, Boost's scan showed over 400 errors that needed repairs on undercover FTC computers that did not have any problems.  As described above, many of the "errors" identified by PC HealthBoost bogus scan had no material impact on performance.  Boost's advertising for PC HealthBoost is also false.  The software does not significantly increase PC speed for the typical consumer, and the vast majority of

consumers whose computers are experiencing crashes and freezes will not have their problems solved by PC HealthBoost.

### (2)     Vast, OMG Tech, Jon Paul Holdings and Success Capital

Vast is liable because it participated in the unlawful practices.  Vast is the managing member of OMG Tech, the call center in this case, as well as Download Software, LLC, which advertises, markets and sells PC HealthBoost through the website downloadsoftware.com.[128]  Vast has received over $22 million from the computer repair scheme.[129]

OMG Tech is liable as a participant in the scheme through the operation of the call center.  As described more fully above, the telemarketers in the call center made false representations that consumers' computers had performance or security problems and needed to be repaired.

Jon Paul Holdings and Success Capital are liable as participants because they are managing members of Vast, the central player in the scheme.[130]  Additionally, Jon Paul Holdings and Success Capital receive money from the scam and are liable to disgorge their ill-gotten gain.

### (3)     Common Enterprise

Vast, OMG Tech, Success Capital, and Jon Paul Holdings are also liable because they operate and function as a common enterprise that engages in the deceptive acts and practices and other violations of law alleged in this Complaint.  To determine if a common enterprise exists, courts consider various factors, including: (1) maintaining officers and employees in common; (2) operating under common control; (3) sharing of

---

[128] Ex. 16 Tyndall Dec. ¶ 14.
[129] Ex. 15 Van Wazer Dec. ¶ 8.
[130] Ex. 16 Tyndall Dec. ¶13.

office space; (4) operating the business through a maze of interrelated companies; (5) comingling of funds; and (6) sharing of advertising and marketing. *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012) (citations omitted). The Vast Corporate Defendants meet this test. The Vast Corporate Defendants conduct the business practices described in this Complaint through an interrelated network of companies that share owners,[131] officers,[132] locations,[133] individuals,[134] telephone numbers,[135] domain registrants,[136] bank signatories,[137] funds[138], and the home address and name of a founder of Vast matches the business address and name of JP Holdings.[139]

### b)  The Individual Defendants Are Personally Liable

Once the Plaintiffs establish an underlying violation of the FTC Act, an individual defendant will be held personally liable for injunctive relief and monetary restitution under the FTC Act if the individual (1) directly participated in the deceptive practices or had the authority to control them; and (2) had some knowledge of these practices. *Gem Merch. Corp.*, 87 F.3d at 470). The individual's authority to control the business practices may be shown by active involvement in the corporate affairs or making corporate policy, including taking on duties as a corporate officer. *Id.; IAB Mktg. Assocs.*, 746 F.3d 128, 1233 (11th Cir. 2014). An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely held corporation. *Transnet*

---

[131] Ex. 16 Tyndall Dec. ¶ 26.
[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] *Id.*
[136] *Id.*
[137] *Id.* at ¶ 20(a) – (c).
[138] Ex. 15 Van Wazer Dec. ¶¶ 9-11. (Mark Alexander Group, Jon Paul Holdings, and Success Capital received  $360,957, $375,646, and $355,456 respectively from Vast.)
[139] Ex. 16 Tyndall Dec. ¶ 26.

*Wireless Corp.* 506 F. Supp. 2d at 1270.  The individual defendants in this case are all officers or owners of one or more corporate defendants.

"The knowledge component does not require proof of a subjective intent to defraud; it may be satisfied by a showing of 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *Transnet Wireless Corp.* 506 F. Supp. 2d at 1270 (quoting *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 574 (7th Cir.1989)).  The knowledge element does not require the FTC to prove the individual defendant's subjective intent to defraud consumers.  *Id.* Furthermore, the degree of an individual's participation in the business is probative of his knowledge. *RCA Credit Servs.*, 727 F.Supp. at 1340, citing *Amy Travel Service, Inc.*, 875 F.2d at 572.  Each of the individual defendants have knowledge of illegal practices alleged in the Complaint.

(1)  <b>Amit Mehta</b>

Amit Mehta has the ability to control the Boost Defendants.  He is the President, Director and Treasurer of Boost, a closely held company.[140]  He also has knowledge of the deceptive claims.  Mehta has to know that the use of the software will routinely display errors on consumers' computers.  This is a central characteristic of his software, and the software was clearly designed to show numerous errors.  These error messages are false representations that computers have performance or security issues.  Mehta's active involvement in the business' operation, as President, Director and internet advertiser of the software, leads to the conclusion that he either knows that PC HealthBoost will routinely show a large number of errors on consumers' computers or is

---

[140] Ex. 16 Tyndall Dec. ¶ 12.

recklessly indifferent to the truth or falsity of his company's representations.  Under either scenario, he is liable.

### (2)      Elliot Loewenstern

Loewenstern has the ability to control the Vast Defendants.  He holds numerous positions in the various companies as a managing member and officer, is an owner, and is involved in the day-to-day operation of the business.[141]  Defendant Loewenstern is a Member and Managing Partner of Vast, OMG Tech and Success Capital.[142]  He holds himself out as the CEO of Vast and OMG Tech.[143]  Through Vast, he also controls DownloadSoftware.com which advertises PC HealthBoost on the website downloadsoftware.com.  Loewenstern identifies himself as the owner of Vast, Success Capital, and Download Software.com on bank account applications, and has registered Vast/OMG Tech websites, including www.omgtechhelp.com.  He also works and has an office in the OMG Tech call center.[144]  Loewenstern signs legal documents on behalf of Vast, OMG Tech, and Success Capital, including corporate filings and fictitious name applications.[145]  Finally, Loewenstern has signatory authority over bank accounts titled in the names of Vast, Success Capital, and DownloadSoftware.com, and pays Vast's bills.[146]

Loewenstern has knowledge of the deceptive practices in this case.  He is aware of the deceptive practices engaged in by the telemarketers who falsely represent that they have detected performance and security issues on consumers' computers.[147]  He has an office at Vast and is regularly on the telemarketing sales floor.[148]  He is also intimately

---

[141] Ex. 16 Tyndall Dec. ¶ 26, Ex. 5 Timmons Dec. ¶ 6, Ex. 3 Chevalier Dec. ¶ 10.
[142] Ex. 16 Tyndall Dec. ¶ 26.
[143] *Id.*
[144] Ex. 3 Chevalier Dec. ¶ 10.
[145] Ex. 16 Tyndall Dec. ¶¶ 18, 20(a).
[146] Ex. 16 Tyndall Dec. ¶¶ 20(a), 21.
[147] Ex. 16 Tyndall Dec. ¶ 27.
[148] Ex. 5 Timmons Dec. ¶ 6.

involved with the business as an officer, owner and participant in the daily operations of the Vast Defendants.[149]

### (3)    JP Vasta

JP Vasta has the ability to control the Vast Defendants.  JP Vasta is a founder of Vast.[150]   He is the President of Vast and OMG Tech.[151]  JP Vasta has signatory authority over bank accounts titled in the names of Vast and identifies himself as the owner of Vast on those bank account applications.[152] He has an office at the company.

JP Vasta knows about the telemarketers' deceptive practices at Vast.  He wrote the Vast telemarketing script.[153]  He also has an office at Vast and is a presence on the telemarketing salesroom floor where telemarketers make false claims that they have identified performance and security issues.[154]

### (4)    Mark Donohue

Donohue has the ability to control the Vast Defendants.  He is Vast's Chief Operating Officer, has an office at Vast, and is one of the founders of the company.[155] Moreover, Donohue has control over bank accounts at Vast.  He has signatory authority over bank accounts titled in the names of Vast and identifies himself as the owner of Vast on those bank account applications.[156]

Donohue has an office at Vast and is a regular presence on the telemarketing sales floor.[157]  He is also well aware of Vast's business practices because of his intimate involvement with the company, first as a founder and then as Chief Operating Officer.

---

[149] Ex. 16 Tyndall Dec. ¶ 26.
[150] Ex. 5 Timmons Dec. ¶ 12.
[151] Ex. 16 Tyndall Dec. ¶ 26.
[152] Ex. 16 Tyndall Dec. ¶ 20(b).
[153] Ex. 5 Timmons Dec. ¶12.
[154] Ex. 5 Timmons Dec. ¶ 6.
[155] Ex. 14 Kraemer Dec. ¶ 24, Ex. 5 Timmons Dec. ¶ 6, Ex. 3 Chevalier Dec. ¶ 10.
[156] Ex. 16 Tyndall Dec. ¶ 20(c).
[157] Ex. 5 Timmons Dec. ¶¶ 6, 12, Ex. 3 Chevalier Dec. ¶ 11.

**C.**     **An *Ex Parte* TRO With Additional Equitable Relief Is Necessary To Stop Defendants' Unlawful Conduct and Preserve Effective Final Relief**

As the evidence shows, Plaintiffs will succeed in proving that the Defendants are engaging in deceptive practices in violation of the FTC Act and the FDUTPA, and are violating the TSR, and that the balance of equities strongly favors the public interest. The whole tech support scheme is permeated by fraud. Preliminary injunctive relief is thus warranted. Federal Rule of Civil Procedure 65(b) permits this Court to grant a temporary restraining order on an *ex parte* basis if there is a clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is given. Fed. R. Civ. P. 65(b). *See also In re Vuitton et Fils*, 606 F.2d 1, 4-5 (2d Cir. 1979).

For at least the last two years, the Vast Defendant shave been engaged in a deceptive tech support scheme that has caused consumer injury. The Boost Defendants are their lead generators and use a bogus scan to direct consumers to the Vast Defendants. This conduct alone supports the inference that the Defendants will continue their illegal conduct absent a court order. *See SEC v. Management Dynamics, Inc.*, 515 F. 2d 801, 807 (2d Cir. 1975) ("the commission of past illegal conduct is highly suggestive of the likelihood of future violations").

In order to stop Defendants' unlawful activities and to preserve the Court's ability to grant the final relief sought, the Court should enter an *ex parte* TRO that: (1) prohibits Defendants from engaging in conduct that violates the FTC Act, the TSR and the FDUTPA; (2) freezes the Vast Defendants' assets; (3) appoints a temporary receiver over

the Vast Corporate Defendants; and (4) grants the Plaintiffs and the temporary receiver immediate access to the Vast Defendants' business premises.

The TRO also includes the required production of limited documents and information on an expedited basis for the preliminary injunction hearing. District courts are authorized to depart from normal discovery procedures and fashion discovery by order to meet discovery needs in particular cases. Fed. R. Civ. P. 1, 26(b), 34(b).

The Plaintiffs are not, at this time, seeking a receiver over the Boost Defendants. Instead, the turnover provision is the most efficient method to have relevant documents available for any Preliminary Injunction hearing. The Plaintiffs seek to have the Boost Defendants turn over key documents and information. These documents include: (1) sales and marketing materials; (2) customer lists and payment; (3) documents relating to the Boost Defendants' association with the Vast Defendants; (4) complaints; (5) accounting records; and (6) recordings of sales calls. The Order also requires the Boost Defendants to make available their computers and electronic data for inspection and copying.

The Plaintiffs also seek to obtain select financial information from the Defendants, in part, to identify accounts and sources of assets subject to a freeze. The Plaintiffs have attached to the proposed Order copies of financial statements to be completed by Defendants. The Plaintiffs also seek certain documents from banks, financial institutions and accounting firms on an expedited basis. It is necessary to know what assets a defendant has, and where they are, in order to effectuate any order freezing them. Courts in the Southern District of Florida have often granted the relief sought by

the Plaintiffs.[158]

All the requested discovery falls well within the Court's broad and flexible equitable authority to grant preliminary emergency relief in cases, like this, involving the public interest. *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *FSLIC v. Dixon*, 835 F.2d 554, 562 (5th Cir. 1987); *U.S. v. William Savran & Assocs.*, 755 F. Supp. 1165, 1182 (E.D.N.Y. 1991).

**D.    An Asset Freeze is Necessary Against the Vast Defendants**

The Eleventh Circuit has repeatedly upheld the authority of district courts to order an asset freeze to preserve the possibility of consumer redress. *IAB Mktg. Assocs.*, 746 F.3d at 1234; *Gem Merch. Corp.*, 87 F.3d at 469; *U.S. Oil & Gas Corp.*, 748 F.2d at 1434.

An asset freeze against the Vast Defendants is appropriate in light of the egregiousness of their scheme and their prior conduct.  It is likely that the Vast Defendants will hide or dissipate assets if given notice of the FTC's action and the requested relief.

First, the Defendants operate a massive computer repair scheme that is designed to separate consumers from their money through the use of misrepresentations.  They have already caused more than 22 million dollars in consumer injury through a web of lies and deceit.  Loewenstern, JP Vasta, and Donohue, and their affiliated companies,

---

[158] *See, e.g.*, *FTC v. Centro Natural Corp., et al.*, No. 14-CV-23879-CMA (S.D. Fla. Oct. 21, 2014) (entering *ex parte* TRO granting asset freeze, immediate access, expedited discovery and appointing receiver); *FTC v. FMC Counseling Services, Inc.*, No. 14-61545-CIV-ZLOCH (S.D. Fla. July 7, 2014) (*ex parte* temporary restraining order freezing assets, appointing receiver, authorizing expedited discovery and immediate access to business premises); *FTC v. 7051620 Canada, Inc.*, No. 1:14-cv-22132-FAM (S.D. Fla. June 11, 2014) (*ex parte* temporary restraining order freezing assets); *FTC v. Premier Precious Metals, Inc., et al.*, No. 12-CV-60504-RNS (S.D. Fla. Mar. 20, 2012) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver).

engaged in extensive fraudulent activities, and are likely to hide or dissipate assets when faced with a federal government lawsuit seeking to deprive them of their ill-gotten gain.

Second, Loewenstern and JP Vasta's prior conduct suggests they would dissipate assets, if given the opportunity. Loewenstern has been the subject of actions by the Securities and Exchange Commission and the Financial Industry Regulatory Authority.[159] He is permanently barred from acting as a broker or otherwise associating with firms that sell securities to the public.[160] He has also been a defendant in two criminal cases.[161] The first case involved securities fraud allegedly perpetrated by Loewenstern, one of the principals of Biltmore Securities, Inc. together with Jordan Belfort aka The Wolf of Wall Street.[162] In particular, the government charged Loewenstern with engaging in securities fraud schemes whereby Biltmore Securities, Inc., together with Stratton Oakmont, manipulated the prices of certain securities for the benefit of the principals of those firms.[163] The government also charged Loewenstern with conspiracy to launder money.[164] Loewenstern plead guilty.[165] In a second case, the government charged Loewenstern with conspiracy to commit securities and wire fraud along with unindicted co-conspirator Jordan Belfort.[166] Loewenstern plead guilty in this second case. Loewenstern received a sentence of five years' probation to run concurrently in both cases.[167]

Before founding Vast, JP Vasta worked for Inbound Call Experts, another computer repair scheme operating out of Boca Raton subject to an FTC and State of

---

[159] Ex. 16 Tyndall Dec. ¶ 3.
[160] *Id.*
[161] *Id.* at ¶ 4.
[162] *Id.* at ¶ 4(d). Belfort was not named as a co-defendant in this case.
[163] *Id. at* ¶ 4(b).
[164] *Id. at* ¶ 4(c).
[165] *Id. at* ¶ 4(e).
[166] *Id. at* ¶ 4(d).
[167] *Id. at* ¶ 4(e).

Florida enforcement action filed simultaneously with this case.[168]   Prior to Inbound Call Experts, JP Vasta was a sales agent for two Florida commodities scams that were sued by the Commodities Futures Trading Commission ("CFTC"):  Wilshire Investment Management Corporation, Inc. ("Wilshire")[169] and Hunter Wise Commodities, LLC ("Hunter Wise").[170]

In the Wilshire action, Judge Middlebrooks found the Wilshire defendants' unlawful behavior to be blatant, brazen, and repeated, and permanently prohibited the defendants from engaging in any commodity-related activity in the future.[171]  While not a named defendant in the action, the Court found that JP Vasta was an account executive at Wilshire who made misrepresentations exaggerating profit potential and downplaying risk.[172]  For example, Vasta told a consumer that with the approaching cold winter, heating oil was going to go "through the roof" and he could take advantage of the seasonal swing.  Later after the consumer lost money on the initial oil trades, Vasta promised the consumer that he would  break even on the soybean trade and would, most likely, recoup all of his losses and make money.[173]

After Wilshire was shut down in September 2009, JP Vasta re-emerged on the commodities fraud scene as the owner and president of Yorkshire Bullion, LLC, a sales agent and "Super Dealer" for Hunter Wise.[174]  In December 2012, the CFTC charged Hunter Wise and a number of its dealers with fraudulently marketing commodity contracts.  After a bench trial, Judge Middlebrooks found that the Hunter Wise defendants

---

[168] Ex. 5 Timmons Dec. ¶ 12, Ex. 16 Tyndall Dec. ¶ 7.
[169] *CFTC v. Wilshire Investment Management Corporation, Inc., et al.*, CASE NO. 04-80862-CIV -MIDDLEBROOKS/JOHNSON  (S.D. Fla. 2004).
[170] *CFTC v. Hunter Wise Commodities, LLC, et al.*, Case No. 12-81311-CIV-MIDDLEBROOKS/BRANNON (S.D. Fla. 2012).
[172] Ex. 16 Tyndall Dec. ¶ 8.
[172] Ex. 16 Tyndall Dec. ¶ 8.
[173] *Id.*
[174] *Id.* at ¶ 10.

had engaged in an unlawful scheme and obtained profits of $18 million.[175] Although

Yorkshire Bullion and JP Vasta were not named as defendants, they acted as sales

agents/"Super Dealers" for Hunter Wise and JP Vasta engaged in sales that followed the

same unlawful scheme described by Judge Middlebrooks.[176] In July 2010, when state

regulators showed up to conduct a compliance review of the business, they learned that

JP Vasta and Yorkshire Bullion had vacated their business premises in the middle of the

night.[177]

Third, the Vast Defendants: (1) move money outside of the United States through

the use of a Canadian company to process credit card charges, and (2) employ off shore

telemarketers.  If given notice of the action, the Vast Defendants may very well move

other funds outside of the US complicating recovery for injured consumers.

Fourth, the court in *FTC v. Equifin. International. Inc.*, stated that "the nature of

[an Internet marketing] business is such that Defendants *and their assets* could easily

vanish at a moment's notice, and Defendants could just as easily set up operations at

another location under a different name (all that is needed is a room, [computer] and

postal drop)." 1997 U.S. Dist. LEXIS 10288, *33, *43 (C.D. Cal. 1997) (emphasis

---

[175] *CFTC v. Hunter Wise Commodities, LLC, et al.*, Case No. 12-81311-CIV-MIDDLEBROOKS/BRANNON (S.D. Fla. 2012) DE 303 pp. 9,10 -Judge Middlebrooks found that Hunter Wise orchestrated a scheme in which so-called retail dealers (like JP Vasta's Yorkshire Bullion, LLC) served a sales function for Hunter Wise, soliciting customer accounts. The dealers advertised and claimed that they sold physical metals, including gold, silver, platinum, palladium, and copper, to retail customers on a financed basis, and forwarded customer funds to Hunter Wise, whose identity was not disclosed to the customers.  The Court found that the dealers claimed to arrange loans for the purchase of physical metals, advised customers that their physical metals would be stored in a secure depository, and then charged customers "exorbitant interest" on the purported loans and storage fees for the metals that had supposedly been purchased.  In fact, Judge Middlebrooks found that neither Hunter Wise nor any of the dealers purchased any physical metals, arranged actual loans for their customers to purchase physical metals, or stored physical metals for any customers participating in their retail commodity transactions – in other words, there was "no metal at the end of the rainbow." According to the Order, over 90 percent of the retail customers lost money. *Id.* p. 14.
[176] Ex. 25 Declaration of Michael Old ¶¶ 5 – 6, Ex. 16 Tyndall Dec. ¶ 10.
[177] Ex. 24 Declaration of Derek Booth p. 20.

added) (granting preliminary injunction with asset freeze against fraudulent telemarketers).

Finally, the FTC's experience with others engaged in similar deceptive schemes demonstrates a likelihood that Defendants would dissipate funds if given notice of this action.[178] Under these circumstances, the risk of dissipation is high, and a temporary asset freeze is therefore necessary to preserve the Court's ability to award consumer redress. An asset freeze is critical to preserve whatever funds remain so that they can be used to pay redress to consumers injured by the Vast Defendants' unlawful conduct, and the balance of equities favors such relief. Moreover, the freeze here should extend to individual assets as well as corporate assets, because – as demonstrated above – the Plaintiffs are likely to succeed in showing that the individual defendants are liable for restitution. *World Travel*, 861 F.2d at 1031. District courts in Florida have frozen defendants' assets in numerous FTC enforcement actions.[179]

### E.    The Court Should Appoint a Temporary Receiver Over the Vast Corporate Defendants

The Court should also appoint a temporary receiver over the Vast Corporate Defendants pursuant to the court's equitable powers under Section 13(b) of the FTC Act. Appointing a receiver is appropriate to preserve the potential for a complete remedy in

---

[178] *See* Declaration and Certification of Plaintiff FTC's Counsel Pursuant to Fed. R. Civ. P. 65(b) in Support of Plaintiffs' *Ex Parte* Motion for a Temporary Restraining Order (Rule 65 Dec.).
[179] *See, e.g., FTC v. FMC Counseling Services, Inc.*, No. 14-61545-CIV-ZLOCH (S.D. Fla. July 7, 2014) (*ex parte* temporary restraining order freezing assets, appointing receiver, authorizing expedited discovery and immediate access to business premises); *FTC v. 7051620 Canada, Inc.*, No. 1:14-cv-22132-FAM (S.D. Fla. June 11, 2014) (*ex parte* temporary restraining order freezing assets); *FTC v. Lanier Law LLC*, No. 3:14-cv-786-J-34PDB (M.D. Fla. July 9, 2014) (*ex parte* temporary restraining order freezing assets and immediate access to business premises); FTC v. Partners in Healthcare Association , Inc., No. 14-23109 (S.D. Fla. Aug. 25, 2014 (ex parte temporary restraining order freezing assets, appointment of receiver, immediate access to business premises, and expedited discovery.

this case.  It will serve to maintain the status quo, preventing the destruction of documents and the dissipation of assets while the case is pending.  *See U.S. Oil & Gas Corp.*, 748 F.2d at 1433-34; *SEC v. Capital Counsellors, Inc.*, 332 F. Supp. 291, 304 (S.D.N.Y. 1991); *Nat'l Credit Mgmt. Group*, 21 F. Supp. 2d at 463.

Such an appointment is particularly appropriate where, as here, Defendants' extensive illegal activity presents the likelihood of continued misconduct and the public faces a risk that the business may continue to operate unlawfully without a receiver's oversight.  *See SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963) (finding *prima facie* showing of fraud and mismanagement, absent insolvency, is sufficient basis for appointment of receiver.  The court stated "[I]t is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control.").

If the Vast Defendants are allowed to remain in control of their businesses, it is likely that evidence of their illegal acts will be destroyed and the fruits of their illegal activity will be misappropriated.  Loewenstern, for example, has been criminally convicted for securities fraud and money laundering.  And JP Vasta's company Yorkshire Bullion left in the middle of the night, right before a review by state regulatory authorities.  Individuals with these backgrounds, and who operate a multi-million dollar scam, should not be left in charge of the companies.  A receiver needs to be appointed to prevent the owners and operators of Vast from destroying documents and dissipating assets.

Appointment of a receiver is also a well-recognized, and awarded remedy, in FTC cases.  Courts have appointed receivers in numerous cases in the Southern District of Florida.[180]

**F.      The Requested TRO Should Be Issued *Ex Parte***

Defendants' widespread and persistent pattern of unlawful conduct demonstrates the need for *ex parte* relief.  Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders upon a clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is given.  Proper circumstances for *ex parte* relief include situations where notice would "render fruitless further prosecution of the action." *Vuitton,* 606 F.2d at 5.[181]  As demonstrated, Defendants are engaged in a deceptive scheme that exposes them to substantial potential monetary liability, and thus, they have every incentive to secrete recoverable assets and destroy documents if given notice of this action.

Additionally, as noted in the Rule 65(b) Declaration of Counsel, the FTC's experience has shown that, upon discovery of impending legal action, defendants engaged in similar schemes have dissipated assets and destroyed documents, especially remotely stored electronic documents.[182]  Consequently, providing notice of this action would likely impair the FTC's ability to secure relief by prompting concealment of assets, a result that would cause immediate and irreparable harm.  *See Cenergy Corp.v. Bryson Oil & Gas PLC*, 657 F. Supp. 867, 870 (D. Nev. 1987) ("[I]t appears proper to enter the TRO without notice, for giving notice itself may defeat the very purpose for the

---

[180] Supra notes 158 and 179.

[181] Local Rule 7.1(e) also allows the Court to grant an immediate hearing upon a showing of good cause.

[182] *See* Rule 65 Dec., filed herewith.

TRO."). This Court has repeatedly granted ex parte TROs requested by the FTC when faced with the possibility of dissipation of assets and documents.[183]

---

[183] *See, e.g., FTC v. Centro Natural Corp., et al.,* No. 14-CV-23879-CMA (S.D. Fla. Oct. 21, 2014) (entering *ex parte* TRO granting asset feeze, immediate access, expedited discovery and appointing receiver); *FTC v. Prime Legal Plans LLC, et al.,* No. 12-CV-61872-RNS (S.D. Fla. Sept. 24, 2012) (same); *FTC v. Premier Precious Metals, Inc., et al.,* No. 12-CV-60504-RNS (S.D. Fla. Mar. 20, 2012) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver); *FTC v. VGC Corp. of Am., et al.,* No. 11-CV-21757-JEM (S.D. Fla. May 17, 2011) (entering *ex parte* TRO granting asset freeze, immediate access, and expedited discovery, and appointing receiver); *FTC v. Am. Precious Metals, LLC,* No. 11-CV-61072-RNS (S. D. Fla. May 10, 2011) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver); *FTC v. U.S. Mortg. Funding, Inc., et al.,* No. 11-CV-80155-JIC (S.D. Fla. Feb. 20, 2011) (entering *ex parte* TRO granting asset freeze, immediate access, and expedited discovery and appointing receiver); *FTC v. Kirkland Young, LLC, et al.,* No. 09-CV-23507-ASG (S.D. Fla. Nov. 19, 2009) (entering *ex parte* TRO granting asset freeze and immediate access and appointing receiver).

IV.    **CONCLUSION**

Plaintiffs respectfully request that the Court grant their Motion and issue the proposed TRO in order to protect consumers from Defendants' unlawful practices and help ensure the possibility of effective final relief.

Dated:  NOVEMBER 10, 2014              Respectfully submitted,


JONATHAN E. NUECHTERLEIN
General Counsel


J. RONALD BROOKE, JR.
RUSSELL DEITCH
Special Florida Bar Number A5500529
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION
Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, DC 20580


Katherine A. Kiziah
Assistant Attorney General
Florida Bar Number 0017585
1515 N. Flagler Drive
Suite 900
West Palm Beach, Florida 33401
(561) 837-5007
Attorney for Plaintiff, State of Florida