# Exhibit 15

## DECLARATION OF THOMAS P. VAN WAZER
### Pursuant to 28 U.S.C. 1746

I, Thomas P. Van Wazer, declare and state that the following facts are known to me personally and that I am competent to testify about them:

1.     My name is Thomas P. Van Wazer. I am over 18 years of age and I am a citizen of the United States. I am a full-time, salaried employee of the Federal Trade Commission ("FTC") in Washington, D.C. My work address is 600 Pennsylvania Ave., N.W., Washington, D.C. 20580. I have worked at the FTC since May 2010.

2.     Since I started at the FTC in 2010, I have worked as a General Attorney – Forensic Accountant in the Bureau of Consumer Protection ("BCP"). In addition to my legal duties and responsibilities at the FTC, I provide forensic accounting assistance to BCP trial attorneys and investigators. I am a Certified Fraud Examiner and hold a Certificate in Forensic Accounting from the Georgetown University School of Continuing Studies. I also hold a Juris Doctor from the Georgetown University Law Center where I graduated *magna cum laude* and a Bachelor of Science degree in Economics from the University of Pennsylvania where I graduated from the Wharton School of Business with concentrations (majors) in Accounting and Finance.

3.     In my capacity at the FTC, I was assigned to work on an investigation involving, *inter alia*, the Massachusetts corporation Boost Software, Inc. and the Florida limited liability companies Vast Tech Support, LLC ("Vast Tech"), Success Capital LLC ("Success Capital"), and Jon Paul Holdings ("JP Holdings"). In connection therewith, I was asked to analyze, *inter alia*, the following Wells Fargo accounts held in the name of various entities, including: Vast Tech accounts ending in x4531 and x6883; a Success Capital account ending in x6669; and the Mark Alexander Group Inc. ("Mark Alexander Group") accounts ending in x6834 and x7717.

**EXHIBIT 15**
**FTC-VAST-000359**

4.  To conduct this analysis, I used, where appropriate, the Financial Investigations System ("FIS"), a financial investigation tool from Actionable Intelligence Technologies, Incorporated ("AIT"). My understanding is that a number of U.S. government agencies/organizations utilize FIS, including the Internal Revenue Service, the Federal Bureau of Investigation, the Organized Crime Drug Enforcement Task Force and a number of U.S. Attorney's offices. Among other things, FIS uses proprietary algorithms and OCR technology to convert bank statements from financial institutions into a database that can be searched, analyzed and used to issue a variety of reports and Microsoft Excel spreadsheets.

5.  In the instant matter, I used FIS to generate a chronological list of transactions for the accounts to be reviewed and exported the lists into Excel. I then re-organized, edited and sorted the lists in various ways to identify the sources of deposits into and the recipients of funds that were identifiable from the bank statements of the various accounts. I also sorted the chronological list by transaction type (i.e. checks paid, deposits) and generated totals for each transaction type. After sorting the transactions by transaction type, I manually input the payees for checks (when available) with large check paid totals as well as the sources of large deposits.

6.  The FIS OCR technology could not meaningfully read the Vast Tech account x4531 statements produced by Wells Fargo due to extremely poor copy quality. For this reason, I used a companion .dat file produced by Well Fargo to determine the sources and uses of funds for the Vast Tech x4531 account. My understanding is that the .dat file contained, *inter alia*, a list of all the transactions for the x4531 account. The .dat file was converted into an excel file to allow further analysis. I compared the list of transactions from the .dat file with the list transactions included in the bank statements to ensure completeness before determining the sources and uses of funds for the Vast Tech account x4531.

2

**EXHIBIT 15**
**FTC-VAST-000360**

7. The results of my analysis appear below. These results are organized by entity/individual of interest.

8. **Vast Tech:** Vast Tech received a total of $22,009,447 from Revenuewire between May 2012 and June 2014 (the "Vast Tech Time Period"). *See* Attachment A. Of that total, $19,496,068 was deposited into the Vast Tech Wells Fargo account ending in x4531 and $2,513,379 was deposited into the Vast Tech Wells Fargo account ending in x6883. *Id.*

9. **Mark Alexander Group:** In the Vast Tech Time Period, the Mark Alexander Group received a total of $360,957 from Vast Tech. *See* Attachment B. Of that total, $100,967 was received from the Vast Tech x6883 account and $260,000 was received from the Vast Tech x4531 account. *Id.*

10. **JP Holdings:** In the Vast Tech Time Period, JP Holdings received a total of $375,646 from Vast Tech. *See* Attachment B. Of that total, $89,146 was received from the Vast Tech x6883 account and $286,500 was received from the Vast Tech x4531 account. *Id.*

11. **Success Capital:** In the Vast Tech Time Period, Success Capital received a total of $355,456 from Vast Tech. *See* Attachment B. Of that total, $95,456 was received from the Vast Tech x6883 account and $260,000 was received from the Vast Tech x4531 account. *Id.*

12. **Mark Donohue:** In the Vast Tech Time Period, Mark Donohue received a total of $4,171 from the Vast Tech x6883 account. *See* Attachment B. Mark Donohue also received a total of $134,019 from the Mark Alexander Group Wells Fargo account ending in x6834 and $61,000 from the Mark Alexander Group Wells Fargo account ending in x7717. *Id.* Another $116,472 was paid out of the Mark Alexander account ending in x4834 for Mark Donohue American Express bills. In total, Mark Donohue received $315,663 from the Mark Alexander Group and Vast Tech. *Id.*

3

**EXHIBIT 15**
**FTC-VAST-000361**

13. **Jon-Paul Vasta:** In the Vast Tech Time Period, Jon-Paul Vasta received $14,476 from the Vast Tech x6883 account. See Attachment B. In that same time period, Eddie Vasta received $15,000 from the Vast Tech x6883 account, bringing the total funds received by the Vastas from Vast Tech to $29,476. *Id.*

14. **Elliot Loewenstern:** In the Vast Tech Time Period, Elliot Loewenstern received $415 from the Vast Tech x6883 account and $4,699 from the Vast Tech x4531 account. *See* Attachment B. Between November 2012 and June 2014, Elliot Loewenstern also received $102,253 from the Success Capital Wells Fargo account ending in x6669. *Id.* In addition to these direct payments to Elliot Loewenstern, there were several other payments made to entities that I was advised are owned and controlled by Elliot Loewenstern or were for his apparent benefit: Power Source Marketing received $9,716 from the Vast Tech x6883 account and HMFUSA.com (Hyundai Motor Finance) received $6,000 from the Vast Tech x4531 account. Thus, the total funds received by Elliot Loewenstern from Vast Tech and Success Capital -- companies that I was advised are part of a common enterprise -- was $123,084. *Id.*

15. **EBUS Inc.:** In the Vast Tech Time Period, EBUS INC. received a total of $626,638 from the Vast Tech x4531 account. *See* Attachment B.

16. **BMW FINANCIAL:** In the Vast Tech Time Period, BMW Financial received a total of $15,300 from the Vast Tech x4531 account. *See* Attachment B.

17. **AUDI FINANCIAL:** In the Vast Tech Time Period, Audi Financial received a total of $14,025 from the Vast Tech x4531 account. *See* Attachment B. Audi Financial also received $8550 from the Mark Alexander Group account ending in x6834. Thus, the total funds received by Audi Financial from Vast Tech and the Mark Alexander Group was $22,575. The total automotive payments, including Audi and BMW, were at least $37,875. *Id.*

4

**EXHIBIT 15**
**FTC-VAST-000362**

I declare under penalty of perjury that the foregoing is true and correct.

Thomas P. Van Wazer

Date: 11/4/2014

5

**EXHIBIT 15**
**FTC-VAST-000363**

Van Wazer Declaration - Attachment A

## Revenuewire Deposits into Vast Tech Wells Fargo Accounts

| Incoming Deposits from Revenuewire | | |
|---|---|---|
| Vast Tech WF Account x4531 | | 19,496,068.81 |
| Vast Tech WF Account x6883 | | 2,513,379.04 |
| Total Deposits from Revenuewire | | 22,009,447.85 |

**EXHIBIT 15**
**FTC-VAST-000364**

Van Wazer Declaration - Attachment B

Vast Tech Support - Summary of Outgoing Funds to Entities/Individuals of Interest from Various Wells Fargo Accounts

| Entity/Individual | Vast Tech - WF Account x6883 | Vast Tech - WF Account x4531 | SuccessCap'l - WF x6669 | Mark Alexander Group - WF x6834 | Mark Alexander Group - WF x6834 | Totals |
|---|---|---|---|---|---|---|
| Mark Alexander Group Total | 100,967.43 | 260,000.00 | | | | 360,967.43 |
| Mark Donohue Amex Pymts | | | | 116,472.31 | | 116,472.31 |
| Mark Donohue | 4,171.92 | | | 134,019.39 | 61,000.00 | 199,191.31 |
| Mark Donohue Total | | | | | | 315,663.62 |
| Jon-Paul Holdings Total | 89,146.36 | 286,500.00 | | | | 375,646.36 |
| Jon-Paul Vasta Total | 14,476.80 | | | | | 14,476.80 |
| Eddie Vasta Total | 15,000.00 | | | | | 15,000.00 |
| Vasta Total | | | | | | 29,476.80 |
| Success Capital | 95,456.77 | 260,000.00 | 102,253.22 | | | 355,456.77 |
| | | | | | | 355,456.77 |
| Elliot Loewenstern Total | 415.00 | 4,699.54 | | | | 107,367.76 |
| HMFUSA.com (Hyundai Motor Finance) Elliot Lowenstern | | 6,000.00 | | | | 6,000.00 |
| Elliot Loewenstern (Power Source Marketing) Total | 9,716.32 | | | | | 9,716.32 |
| Loewenstern Total | | | | | | 123,084.08 |
| EBUS INC | | 626,638.55 | | | | 626,638.55 |
| BMW FINANCIAL | | 15,300.00 | | | | 15,300.00 |
| AUDI FINANCIAL | | 14,025.00 | | 8,550.84 | | 22,575.84 |
| Automotive Total | | | | | | 37,875.84 |

EXHIBIT 15
FTC-VAST-000365

# Exhibit 16

## DECLARATION OF REEVE TYNDALL

### PURSUANT TO 28 U.S.C. § 1746

I, Reeve Tyndall, hereby state that I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify as follows:

1.      I am a United States citizen and over 18 years of age.  I work as an Investigator for the Federal Trade Commission ("FTC") in the Bureau of Consumer Protection's Division of Marketing Practices.  My office address is 600 Pennsylvania Avenue, NW, Washington, DC 20580.

2.      As part of my work, I investigate persons and entities who may be violating the FTC Act and other laws enforced by the FTC.  The following declaration outlines the results of my investigation of Vast Tech Support LLC, et al.

### BACKGROUND OF INDIVIDUAL DEFENDANTS

**Elliot Loewenstern**

3.      On October 4, 1993, the Securities and Exchange Commission (SEC) filed a civil lawsuit against Elliot Loewenstern as a principal of Biltmore Securities, Inc., alleging violations of the Securities Act of 1933 (0:93-cv-06837-JAG).  In 1995, Mr. Loewenstern consented to an Order containing findings that Biltmore violated anti-fraud provisions of the federal securities laws and that Loewenstern failed to reasonably supervise trading activity.  The Order further suspended Mr. Loewenstern for twelve months.  Mr. Loewenstern is permanently barred from acting as a broker or otherwise associating with firms that sell securities to the public by the Financial Regulatory Authority.  An SEC News Digest related to this case is **Attachment A**.

4.      On July 25, 2000, the United States Attorney General filed two related criminal complaints against Mr. Loewenstern for his involvement with Biltmore Securities, Inc.  (Cr. No.

**EXHIBIT 16**
**FTC-VAST-000366**

00-685 JG and 00-783).  Documents related to these cases are **Attachment B.**  According to publicly filed documents:

   a) Mr. Loewenstern was the Secretary, Treasurer, and Chief Financial Officer of Biltmore Securities, Inc., and supervised Biltmore's securities trading department and sales force.

   b) Biltmore and another company, Stratton Oakmont, Inc., participated jointly in the fraudulent sale of securities.

   c) Mr. Loewenstern committed securities fraud and participated in a conspiracy to launder money.

   d) The case against Mr. Loewenstern and Biltmore related to another case, US v. Jordan Belfort.  Jordan Belfort is also known as the "Wolf of Wall Street."

   e) In June 2001, Mr. Loewenstern entered into a plea agreement whereby he agreed to serve five years' probation and forfeit $1,000,000 cash and real property in located in Boca Raton, Florida.

5.   After his experience in the telemarketing of securities, Mr. Loewenstern appears to have moved into the telemarketing of other goods and services.  According to a biography posted on the corporate website for Power Source Marketing, a company owned and operated by Mr. Loewenstern (A copy of which is attached hereto as **Attachment C**):

> Elliot Loewenstern, a Graduate of SUNY at Buffalo with a BS in Management and a concentration in Finance, has vast experience in the Financial Services Industry, having grown and operated various multimillion dollar firms.
>
> Most recently, Mr. Loewenstern was also the founder and CEO of E management Group which grew from a startup small business in 2000 into the 3rd largest DISH Network Retailer in the United States. E Management Group had over 150 employees in South Florida, activating over 75k satellite television customers a year. The company was sold to Dish Network's largest dealer Infinity Sales Group in 2008.
>
> In addition to 10 years of experience in the satellite industry with Dish Network and DIRECTV, his marketing expertise have been in lead generation in industries that include diabetes, education and back to school lead generation, home security, consumer and corporate debt settlement, travel, voice over IP

2

**EXHIBIT 16**
**FTC-VAST-000367**

services, identity theft protection programs, and any consumer based marketing programs.

6. In May 2005, Mr. Loewenstern purchased a single family, detached home in Boca Raton, Florida for $2,162,500. According to property records, the home is 6,803 square feet with six bedrooms and eight bathrooms. The home is located in a gated community and has a private swimming pool. A copy of said property records is attached hereto as **Attachment D**.

**Jon-Paul Vasta**

7. Mr. Vasta, worked for Inbound Call Experts, another computer repair telemarketer operating out of Boca Raton. A copy of a payroll check from Inbound Call Experts to Mr. Vasta that I received from Bank of America is attached hereto as **Attachment E**.

8. On September 14, 2004, the Commodities Futures Trading Commission filed a civil lawsuit against Wilshire Investments Management Corporation for the fraudulent sale of commodity options. Court documents indicate that Mr. Vasta worked as an Account Executive at Wilshire Investments. The CFTC filed two statements from victims of Wilshire Investments that mention Mr. Vasta by name. Mr. Vasta told one consumer that with the approaching cold winter, heating oil was going to go "through the roof" and that he could take advantage of the seasonal swing. After the consumer lost money on the initial oil trades, Vasta promised the consumer that he would break even on the soybean and would recoup all of his losses or make money. A copy of the selected court documents is attached hereto as **Attachment F**.

9. On December 5, 2012, the Commodity Futures Trading Commission filed a civil lawsuit against Hunter Wise Commodities LLC for violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (9:12-cv-81311-DMM (SD Fla. 2012)). The complaint alleged that Hunter Wise Commodities engaged in illegal, off-exchange, financed commodity transactions involving precious metals with retail customers. The complaint further alleged that

**EXHIBIT 16**
**FTC-VAST-000368**

Hunter Wise Commodities engaged in fraudulent marketing to retail customers of precious metals. Hunter Wise Commodities was subsequently ordered to pay $52.6 million in restitution to defrauded customers and ordered to pay a civil monetary penalty of $55.4 million. A copy of documents related to this case is attached hereto as **Attachment G**.

10.     During the course of my Investigation, I learned that Mr. Vasta owned and operated Yorkshire Bullion LLC, a telemarketing firm that marketed commodity transactions for Hunter Wise Commodities. FTC Staff obtained documents from the CFTC related to Yorkshire Bullion's relationship with Hunter Wise Commodities. According to the documents, the two companies entered into a contract to market precious metals in September 2009. From approximately 2009 through 2012, Yorkshire Bullion telemarketed gold, silver, platinum, palladium, and copper, to retail customers on a financed basis, and forwarded customer funds to Hunter Wise, whose identity was not disclosed to the customers. Yorkshire Bullion was identified as a Super Dealer" for Hunter Wise. A copy of selected documents the FTC received from the CFTC related to Yorkshire Bullion is attached hereto as **Attachment H**.

11.     Jon-Paul Vasta currently resides in Boca Raton, Florida. Mr. Vasta's residential address is the same as the business address for Jon Paul Holdings (see infra paragraph 17). Mark Donohue currently resides in Delray Beach, Florida.

### BACKGROUND OF CORPORATE DEFENDANTS

12.     Boost Software, Inc. ("Boost") is a Massachusetts corporation with its principal place of business at 360 Newberry Street, Unit 411, Boston, Massachusetts, 02115. It also has an office at 65 Arlington Street, Suite 500, Boston, Massachusetts, 02116. Amit Mehta is the President, Treasurer, and a Director of Boost. An official copy of the Boost's incorporation record is attached hereto as **Attachment I**.

**EXHIBIT 16**
**FTC-VAST-000369**

13.     Vast Tech Support, LLC ("Vast"), is a Florida limited liability company with its principal place of business at 2855 S. Congress Avenue, Suite AB, Delray Beach, Florida, 33445. Its managing members are Success Capital, LLC and Jon Paul Holdings, LLC. Vast also does business as OMG Total Protection, OMG Back Up, Downloadsoftware.com, and Softwaretechsupport.com. A certified copy of Vast's incorporation record and fictitious business name applications is attached hereto as **Attachment J.**

14.     DOWNLOADSOFTWARE.COM, LLC is a Florida limited liability company with its principal place of business at 2855 S. Congress Avenue, Suite AB, Delray Beach, Florida, 33445. Its sole managing member Vast Tech Support, LLC. A certified copy of DOWNLOADSOFTWARE.COM's incorporation record is attached hereto as **Attachment K.**

15.     OMG Tech Help, LLC ("OMG Tech") is a Florida limited liability company with its principal place of business at 2855 S. Congress Avenue, Boca Raton, Florida, 33445. Elliot Loewenstern is an owner and a managing member of OMG Tech Help. A certified copy of OMG Tech's incorporation record is attached hereto as **Attachment L.**

16.     Success Capital, LLC ("Success Capital") is a Florida limited liability company with its principal place of business at 2855 S. Congress Avenue, Suite AB, Delray Beach, Florida, 33445. Elliot Loewenstern is an owner and a managing member of Success Capital. A certified copy of Success Capital's incorporation record is attached hereto as **Attachment M.**

17.     Jon Paul Holdings, LLC ("Jon Paul Holdings") is a Florida limited liability company with its principal place of business at 18317 Fresh Lake Way, Boca Raton, Florida 33498. A certified copy of Jon Paul Holdings' incorporation record is attached hereto as **Attachment N.**

18.     Elliot Loewenstern ("Loewenstern") is the CEO of Vast and OMG Tech, a managing member of Success Capital, and the Managing Partner of Vast (supra paragraphs 10 and 13).

**EXHIBIT 16**
**FTC-VAST-000370**

Loewenstern signs legal documents on behalf of Vast, OMG Tech, and Success Capital, including corporate filings and fictitious name applications (supra paragraph 10-13).

19.     During the course of my investigation, I received a file on OMG Tech Support from the Delray Police Department.   In a November 2013 police interview, an ex-employee told the Delray PD that Vast Tech Support used "homepage hi-jackers" that "switch a user's homepage to another home page when a user clicks on a game or link. The new homepage flashes ads that state the computer has several problems and suggest the user purchase [OMG Tech] software. Once the software is purchased the user is prompted to call [OMG Tech] to initiate the software. When the user calls he/she is connected to a sales representative who upsells the user into tech help with [OMG Tech]." A copy of these reports is attached hereto as **Attachment O**.

## BANK RECORDS

20.     I examined documents the FTC received from Wells Fargo and Bank of America. According to the documents (attached hereto as **Attachment P**)

a) Elliot Loewenstern has signatory authority over bank accounts titled in the names of Vast Tech Support, LLC, DOWNLOADSOFTWARE.COM, LLC, and Success Capital, LLC.  Loewenstern identifies himself as the owner of Vast and Success Capital.

b) Jon Paul Vasta has signatory authority over bank accounts titled in the name of Vast. Vasta identifies himself as the owner of Vast on bank account applications.

c) Mark Donohue has signatory authority over bank accounts titled in the names of Vast and identifies himself as the owner of Vast on those bank account applications.

d) Amit Mehta has signatory authority over a bank account titled in the names of Boost Software, Inc. Mehta identified himself as the owner of Boost Software, Inc.

**EXHIBIT 16**
**FTC-VAST-000371**

## PAYMENT OF INVOICES / VENDORS

21.    During the course of my investigation, I examined documents the FTC received from third parties pursuant to Civil Investigative Demands. According to documents obtained from GoDaddy.com, Elliot Loewenstern paid to register the domain *OMGTechHelp.com*, among others, using an American Express credit card. According to documents obtained from American Express, the card used to pay GoDaddy.com is a corporate credit card in the name of Vast Tech Support. Mr. Loewenstern is a signatory. Mr. Loewenstern appears to use the credit card to pay other Vast Tech Support expenses, including FedEx shipping. A copy of documents from GoDaddy.com and American Express showing this transaction is attached hereto as **Attachment Q.**

22.    According to documents obtained from Wells Fargo, Elliot Loewenstern wired funds from Vast Tech Support LLC to EBUS, Inc. Skyrise 2, 12th Floor CEBU IT Park, Cebu, Philippines. A copy of these wire receipts is attached hereto as **Attachment R.**

23.    According to documents obtained from LogMeIn, Inc., a remote computer login provider, Mark Donohue is the primary contact for OMG Tech Help. Mr. Donohue, or someone acting on his behalf, paid for services using a credit card ending in X1001. A copy of a summary sheet from LogMeIn showing this information is attached hereto as **Attachment S.**

24.    According to documents obtained from Five9, Inc., Vast Tech Support purchased phone toll-free phone numbers, including phone number (855) 290-9302, through Five9 since at least February 2012. Elliot Loewenstern is listed as the primary contact. A copy of selected documents from Five9 is attached hereto as **Attachment T.**

**EXHIBIT 16**
**FTC-VAST-000372**

## REVENUEWIRE

25.    During the course of my investigation, I examined documents the FTC received from

Chase Paymentech.  Based upon those documents and other information I concluded that the

Vast Defendants do not have their own merchant account.  Instead, they process their over-the-

phone payments via SafeCart, a website owned by Revenuewire, a Canadian payment processing

entity.  SafeCart/Revenuewire purports to be a payment service or "online store" for

"Downloadable" products (**Attachment U - CPS-001-0000071 page 1**), and as such it appears

that it does not identify its individual merchants to payment processors or acquiring banks (banks

that allow entities access to bill credit and debit card transactions).  Yet, according to Chase

Paymentech documents I examined, SafeCart/RevenueWire appears to aggregates over-the-

phone payments from the Vast Defendants with online transactions, including PC HealthBoost

sales.  I also examined a spreadsheet that summarized transactions for certain billing descriptors

operated by Safecart.com, an online payment system.  I noted $2.2 million in transactions for the

billing descriptor SAFECART.COM*PC HEALTH from January – July 2014.  A copy of this

spreadsheet is attached hereto as **Attachment U**.

## COMMON ENTERPRISE

26.    Based on my five years of experience as an investigator at the Federal Trade

Commission, the individual and corporate defendants named in this case appear to operate as a

common enterprise.  The Vast Corporate Defendants conduct the business through an

interrelated network of companies including Vast Tech Support, DOWNLOAD

SOFTWARE.COM, OMG Tech Help, Success Capital, and Jon Paul Holdings. Many of which

share common owners and officers.  As noted previously, Elliott Loewenstern is an officer of

Vast and Success Capitol and I have been informed that he also claims to be the CEO of OMG

8

**EXHIBIT 16**
**FTC-VAST-000373**

Tech Help. Similarly, I understand that JP Vasta claims to be the president of both Vast and

OMG Tech Help, and as previously noted, Jon Paul Holdings business address is his home.

Furthermore, as noted previously, the Vast Corporate defendants appear to share resources. Vast

Tech Support, DOWNLOADSOFTWARE.COM, OMG Tech Help, Success Capital share the

same office space at 2855 S. Congress Blvd, and as shown in the Five 9, GoDaddy, and

American Express records, they appear to share telephone numbers and domain registrants. And

the individual defendants are intimately involved with the day to day operations of the Vast

Corporate Defendants.

## MALWAREBYTES

27.     During the course of my investigation, I examined emails the FTC received from

Malwarebytes, a provider of anti-malware software. On August 14, 2014, Malwarebytes

suspended Vast / OMG Tech Support from using its services due to "an abnormally large

number of customer complaints." Malwarebytes also publishes a blog warning consumers about

tech support scams. Mr. Loewenstern emails Malwarebytes, "We do not use scare tactics or

advertise our tech company. It blacklists our business." Mr. Vasta and Mr. Donohue are carbon

copied. A copy of the forwarded emails the FTC received from Malwarebytes is **Attachment V.**


I declare under penalty of perjury that the foregoing is true and correct.

Executed on Nov. 7    , 2014 in Washington, DC.


Reeve Tyndall

**EXHIBIT 16**
**FTC-VAST-000374**

# sec news digest

Issue 95-128                                               July 5, 1995

## COMMISSION ANNOUNCEMENTS

### RICHARD ROBERTS ANNOUNCES INTENTION TO RESIGN

Richard Y. Roberts today announced his intention to resign as a Commissioner of the United States Securities and Exchange Commission effective July 15, 1995. Upon leaving the SEC, Commissioner Roberts will become an Executive Vice President of Princeton Venture Research ("PVR"), a consulting firm, and a managing director of PVR Securities, a securities firm specializing in raising venture capital for high technology companies. Both companies are headquartered in Princeton, New Jersey, and Mr. Roberts will be opening an office in Washington, D.C., for the two companies.

Mr. Roberts stated: "I have thoroughly enjoyed my four plus years at the Commission. It was exciting to strive both to protect investors and to maintain our securities markets as the greatest in the world. The experience was memorable, and it was a privilege to work with the outstanding individuals employed at the Commission. I now look forward to joining PVR and working in the securities industry."

Chairman Arthur Levitt said: "Commissioner Roberts' leadership at the Commission has been extraordinary. Long before anyone else, he focused his energies on reforming the municipal securities market, and it is largely due to his efforts that we have made such progress in increasing the market's disclosure, transparency and integrity. In addition to his dedication to investor protection, Rick's sense of humor, his perspective, and his good nature have made working at the SEC a more rewarding experience for all Commission employees. He will be greatly missed."

### COMMISSION SOLICITS PUBLIC COMMENT ON PROPOSAL BY AZX, INC. TO OPERATE ARIZONA STOCK EXCHANGE DURING REGULAR TRADING HOURS

The Commission is publishing notice soliciting public comment on whether the Commission should amend its order granting AZX an exemption from registration as an exchange to reflect AZX's proposed operation during regular trading hours.

Publication of the notice is expected in the Federal Register during the

**Attachment A, p. 1**          **EXHIBIT 16**
**FTC-VAST-000375**

week of July 10.   (Rel. 34-35922)

---

ENFORCEMENT PROCEEDINGS

---

WARREN RAWLS, CPA, SANCTIONED

The Securities and Exchange Commission has instined administrative proceedings against Warren L. Rawls, chief financial officer of Littlefield, Adams & Company (LFA) pursuant to Section 21C of the Securities Exchange Act of 1934 and Rule 2(e) of the Commission's Rules of Practice.

According to the Commission's Order Instituting Proceedings, shortly after joining the company in January 1994, Rawls, a Certified Public Accountant, learned that LFAA's president and chief executive had previously deceived the conpany's independent auditors concerning LFA's receipt of consulting fee income in a material amount.  Rawls failed to disclose what he had learned to the auditors and, in order to prevent the auditors from discovering that the CEO had lied to them, Rawls falsely described the nature and circumstances underlying a receivable in LFA's books and records.  Rawls thereafter signed LFA's 1993 Annual Report filed with the Commission on Form 10-K and provided the auditors with a management representation letter which contained both false and misleading statements and omissions concerning LFA's receipt of consulting fee income.

The Commission sumultaneously accepted an Offer of Settlement submitted by Rawls pursuant to which, without admitting or denying the Commission's findings, Rawls consented to the entry of a Commission Order which finds that Rawls willfully violated Rules 13b2-1 and 13b2-2 under the Exchange Act and that he caused violations of Exchange Act Sections 13(a), 13(b)(2)(A) and (B), and Rules 12b-20 and 13a-1.  The Order requires Rawls, pursuant to Section 21C of the Exchange Act, to cease and desist from committing or causing any violation and from committing or causing any future violation of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act, and Rules 12b-20, 13a-1, 13b2-1 and 13b2-2 thereunder.  The Order also denies Rawls, pursuant to Rule 2(e) of the Commission's Rules of Practice, the privilege of appearing or practicing as an accountant before the Commission for two years, after which time he may apply to resume such practice or appearance on such conditions as the Commission may impose.  (Rels. 34-35892; AAER-684)

NASD ACTION AGAINST PATRICIA SMITH SUSTAINED

The Commission has found that Patricia H. Smith of Hanover, Pennsylvania, formerly a salesperson with NASD members Buckhead Financial Corporation and American Capital Corporation, as well as non-member C.I.C. Financial Group, Inc., violated just and equitable principles of trade.  The NASD found that Smith submitted applications to purchase securities that listed her as the representative involved

**Attachment A, p. 2**          **EXHIBIT 16**
**FTC-VAST-000376**

when the transactions in fact had been solicited by non-registered salespersons.  Smith was censured, fined $7,500, suspended in all capacities for 15 days, and required to requalify by examination before being registered in any capacity.

The Commission found that on four separate occasions, Smith affirmatively misled her employing broker-dealer regarding the identity of the soliciting salesperson.  Smith did not deny that she engaged in misconduct but argued that the fine was excessive.  The Commission disagreed and observed that the NASD registration requirement "provides an important safeguard in protecting public investors" and, consequently, "'strict adherence' to that requirement is 'essential.'" (Rel. 34-35898)

COMMISSION SUSTAINS NASD DISCIPLINARY ACTION AGAINST ROBERT GARDNER

The Commission has sustained the disciplinary action taken by the NASD against Robert Lester Gardner of Castaic, California, a former salesman for NASD member Toluca Pacific Securities Corp.  The NASD had censured Gardner, fined him $50,000, suspended him from association with any member firm for 30 days, and ordered him to requalify by examination as a general securities representative.

The Commission found that Gardner purchased, without his customer's authorization, 50,000 shares of Cannon Pictures, Inc. for $16,502.75.  When the customer complained about the unauthorized transaction, Gardner falsely represented that it was a mistake and then later attempted to convivce the customer to accept the trade.  In sustaining the sanctions imposed, the Commission concurred with the NASD's assessment that these actions were "egregious violations of the duty of good faith and fair dealing owed by a representative to his customer."  (Rel. 34-35899)

ORDER INSTITUTING ADMINISTRATIVE PROCEEDINGS AGAINST BILTMORE SECURITIES, INC., ET AL.

The Commission announced the institution of public administrative proceedings pursuant to the Securities Exchange Act of 1934 against Biltmore Securities, Inc. ("Biltmore"), a Florida corporation and registered broker-dealer, Elliot Loewenstern of Boca Raton, Florida, Richard Bronson of North Miami Beach, Florida and Alexander Barletta of Miami, Florida.  The Commission also instituted cease and desist proceedings pursuant to the Exchange Act and the Securities Act of 1933 against Biltmore and Barletta.

The Commission simultaneously accepted offers of settlement submitted by the respondents whereby they consented to an Order containing findings that Biltmore and Barletta violated the anti-fraud provisions of the federal securities laws, and that Loewenstern and Bronson failed reasonably to supervise.  The Order also censures Biltmore, suspends Barletta for a period of twelve months, suspends Bronson and Loewenstern from association in a supervisory capacity for staggered twelve month terms and requires Biltmore and Barletta to cease and desist from violating the anti-fraud provisions.

A final judgment entered in a related civil action, SEC v. Biltmore

Securities, Inc., et al., No. 93-6837 (S.D. Fla.), requires Biltmore to disgorge $1 million and to implement compliance related recommendations of a consultant appointed by the Court.  (Rel. 34-35900)

---

## INVESTMENT COMPANY ACT RELEASES

---

MAXIM SERIES FUND, INC.

An order has been issued under Sections 6(c) and 17(b) of the Investment Company Act exempting Maxim Series Fund, Inc., (Fund) from the provisions of Sections 17(a)(1) and 17(a)(2) of the Act to the extent necessary to permit the exchange of shares between portfolios of the Fund.  (Rel. IC-21176 - June 30)

PAINE WEBBER GROUP INC.

A notice has been issued giving interested persons until July 26 to request a hearing on an application filed by Paine Webber Group., et al. under Section 2(a)(9) of the Investment Company Act.  General Electric Company (GE) acquired securities of Paine Webber Group Inc. (PWG) that, upon conversion of certain of such securities into common stock, would result in GE owning more than 25% of PWG's outstanding voting securities.  The PWG securities owned by GE are subject to certain restrictions, obligations, and prohibitions as described in a stockholders agreement.  Applicants request an order declaring that the presumption of control by a greater than 25% shareholder under Section 2(a)(9) of the Act has been rebutted.  The order would be effective for so long as the stockholders agreement remains in full force and effect without any amendment that would materially reduce the restrictions, obligations, and prohibitions with respect to GE's ownership of PWG's securities.  (Rel. IC-21177 - June 30)

PIONEER MONEY MARKET ACCOUNT, INC.

A notice has been issued giving interested persons until July 25 to request a hearing on an application filed by Pioneer Money Market Account, Inc. for an order under Section 8(f) of the Investment Company Act declaring that applicant has ceased to be an investment company. (Rel. IC-21178 - June 30)

PIONEER AMERICA FUND, INC.

A notice has been issued giving interested persons until July 25 to request a hearing on an application filed by Pioneer America Fund, Inc. for an order under Section 8(f) of the Investment Company Act declaring that applicant has ceased to be an investment company.  (Rel. IC-21179 - June 30)

**Attachment A, p. 4**          **EXHIBIT 16**
                                **FTC-VAST-000378**

EOC:MLA
F.# 1999R01326

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ELLIOT LOEWENSTERN,

         Defendant.

- - - - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. 00-685 (JG)
(T. 15, U.S.C.,
§§ 78j(b) and 78ff;
T. 18, U.S.C.,
§§ 982, 1956(h), 2 and
3551 et seq.)

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION

      At all times relevant to this Information, unless otherwise indicated:

The Brokerage Firms

      1.  Biltmore Securities, Inc. ("Biltmore") was a broker-dealer of securities registered with the United States Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers, Inc. ("NASD").  Biltmore's principal place of business was located in Fort Lauderdale, Florida.  Biltmore employed traders, who purchased and sold securities on behalf of Biltmore's own accounts.  Biltmore also employed stock brokers, known as registered representatives, who sold securities to Biltmore's clients.  At various times relevant

2

to this Information, Biltmore employed as many as approximately 150 brokers.

2.     Stratton Oakmont, Inc. ("Stratton Oakmont") was a broker-dealer registered with the SEC and the NASD.  Stratton Oakmont's principal place of business was located in Lake Success, New York.  Jordan Belfort, Daniel Porush and another individual (collectively referred to as the "Stratton Oakmont Principals") owned a controlling percentage of Stratton Oakmont's stock.

The Defendant

3.     The defendant ELLIOT LOEWENSTERN was the Secretary, Treasurer and Chief Executive Officer of Biltmore, and supervised its securities trading department and sales force. LOEWENSTERN was also one of two principal shareholders who, together, owned a controlling percentage of Biltmore's stock. The other principal and owner of Biltmore ("the Biltmore Principal") was also responsible for its overall management.

4.     In or about January 1992, the defendant ELLIOT LOEWENSTERN, together with the Biltmore Principal, purchased Biltmore with the assistance of the Stratton Oakmont Principals in exchange for LOEWENSTERN's and the Biltmore Principal's agreement that Biltmore would participate in Stratton Oakmont's fraudulent sales of securities.

3

## COUNT ONE
(Securities Fraud)

5.    The allegations contained in paragraphs 1 through 4 are realleged and incorporated herein.

6.    In or about and between 1992 and 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ELLIOT LOEWENSTERN, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in contravention of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), and (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of securities of Judicate, Inc. ("Judicate") and Licon International, Inc. ("Licon") and by use of instruments of communication in interstate commerce and the mails.

7.    It was a part of the scheme that in or about and between 1992 and 1995, both dates being approximate and inclusive, the defendant ELLIOT LOEWENSTERN, together with

4

others, caused Biltmore to purchase significant quantities of securities that had been underwritten by Stratton Oakmont and entities controlled by the Stratton Oakmont Principals and thereafter to sell the securities to Biltmore customers at inflated prices that were unrelated to the value of the securities.  These securities purchases included securities issued by Judicate and Licon.

8.    It was further a part of the scheme that the defendant ELLIOT LOEWENSTERN, together with others, caused Biltmore to make materially false and fraudulent misrepresentations and omissions about, among other things, the plan for distributing the Judicate and Licon securities offered for sale.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

### COUNT TWO
(Conspiracy To Launder Money)

9.    The allegations contained in paragraphs 1 through 4 and 6 through 8 and the Information captioned United States v. Elliot Loewenstern, Criminal Docket No. 00-621 (JGK)(annexed hereto), which was filed in the United States District Court for the Southern District of New York on June 5, 2000, and transferred to the United States District Court for the Eastern District of New York pursuant to Rule 20 of the Federal Rules of

5

Criminal Procedure (the "Southern District of New York Information") are realleged and incorporated herein.

10. In or about and between January 1992 and December 1997, both dates being approximate and inclusive, within the Eastern District of New York, the Southern District of New York and elsewhere, in connection with the transactions described in Count One of this Information and the Southern District of New York Information, the defendant ELLIOT LOEWENSTERN, together with others, did knowingly and intentionally conspire to engage in monetary transactions in and affecting interstate and foreign commerce in criminally derived property that was of value greater than $10,000 and that was derived from specified unlawful activity, namely, fraud in the sale of securities, in violation of Title 18, United States Code, Section 1957.

11. It was an object of the conspiracy that the defendant ELLIOT LOEWENSTERN, together with others, received millions of dollars in proceeds of the fraudulent schemes described in Count One and the Southern District of New York Information, and used those proceeds to purchase for his and others' benefit real and personal property.

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

6

## MONEY LAUNDERING FORFEITURE

12.    The allegations contained in paragraphs 9 through 11 are realleged and incorporated herein.

13.    As a result of the offense charged in Count Two of this Information, the defendant ELLIOT LOEWENSTERN shall forfeit pursuant to Title 18, United States Code, Section 982(a)(1) to the United States any property, real and personal, involved in such offense, and any property traceable to such property, namely, the following property as listed below:

    (a)  All right, title and interest in the premises and real property located at 17308 Whitehaven Drive, Boca Raton, Florida 33496-5923, Lots 422 & 423 St Andrews Country Club, PL 6, Palm Beach, Assessor's Parcel No. 00-42-46-33-07-000-4220, held in the names of Elliot and Shelley Loewenstern, as of the date that the defendant executes this agreement, except that the defendant and his family may elect to continue to reside at the premises until nine months after the date of the defendant's guilty plea so long as the defendant promptly pays all carrying costs associated with the maintenance of the premises, including but not limited to upkeep, mortgage, taxes, and insurance for the premises. Upon the sale of the above-described property, the United States shall satisfy the outstanding mortgage payable in the amount of $941,530 currently held by Washington Mutual Savings Bank; and

    (b)  The sum of ONE MILLION DOLLARS ($1,000,000.00) in United States currency.

14.    If as a result of any act or omission of the defendant ELLIOT LOEWENSTERN, any property forfeitable pursuant to Title 18, United States Code, Section 982:

    a.    cannot be located upon the exercise of due diligence;

7

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

the United States, pursuant to Title 18, United States Code, Section 982(b)(1), will seek to forfeit any other property of the defendant ELLIOT LOEWENSTERN up to the value of any property described in paragraph 14(a) through (e).

(Title 18, United States Code, Section 982)

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

In the United States District Court

for the ___SOUTHERN___ District of ___NEW YORK___

United States of America

v.

__ELLIOT LOEWENSTERN__

Criminal No. __00 CR. 621 (JGK)__

Consent to Transfer of Case

for Plea and Sentence

(Under Rule 20)

I, __ELLIOT LOEWENSTERN__, defendant, have been informed that a ___INFORMATION___ (indictment,

information, complaint) is pending against me in the above designated cause. I wish to plead ___GUILTY___

(guilty, nolo contendere) to the offense charged, to consent to the disposition of the case in the ___EASTERN___

District of __NEW YORK__ in which I __WILL BE ARRESTED__ (am under arrest, am held) and to waive

trial in the above captioned District.

Dated: __June 16__, 19__ __00__ at _____

(Defendant) __ELLIOT LOEWENSTERN__

(Witness) _____

(Counsel for Defendant) __LANCE CROFFOOT—SUEDE__

Mary Jo White, U.S. Attorney

By: _____
W. Ilian F. Johnson   AUSA
United States Attorney for the
SOUTHERN
NEW YORK   District of

Approved

_____
Marce L. Adelman, AUSA for
United States Attorney for the
EASTERN
NEW YORK   District of

Attachment B, p. 8

EXHIBIT 16

FTC-VAST-000386

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          FILE UNDER SEAL

        -v-                       INFORMATION

ELLIOT LOEWENSTERN,                00 Cr.

                Defendant.    :



- - - - - - - - - - - - - - - - - - - x

**00CRIM.0621**

COUNT ONE

(Conspiracy To Commit Securities and Wire Fraud)

Relevant Persons and Entities

        The United States Attorney charges:

        1.    At all times relevant to this Information,

Biltmore Securities, Inc. ("Biltmore") was a broker-dealer of

securities registered with the United States Securities and

Exchange Commission ("SEC") and the National Association of

Securities Dealers, Inc. ("NASD").  Biltmore's principal place of

business was located in Fort Lauderdale, Florida.  Among its

other businesses, Biltmore underwrote initial public offerings of

securities ("IPOs"), was a "market maker" in various securities,

and offered a variety of brokerage services to customers located

throughout the United States.  At various times relevant to this

Information, Biltmore employed as many as approximately 150

brokers.

        2.    At all times relevant to this Information, ELLIOT

LOEWENSTERN, the defendant, was the Secretary, Treasurer and

**Attachment B, p. 9**              **EXHIBIT 16**
                                    **FTC-VAST-000387**

Chief Executive Officer of Biltmore, and supervised its securities trading department and sales force.   LOEWENSTERN was also one of two principal shareholders who, collectively, owned a controlling percentage of Biltmore's stock.

3.   At all times relevant to this Information, another principal and owner of Biltmore ("the Biltmore Principal") was also responsible for its overall management.

### The Biltmore "House Stock" Scheme

4.   At all times relevant to this Information, Biltmore purchased and sold securities on behalf of its retail customers, who maintained brokerage accounts at Biltmore.   From time to time, ELLIOT LOEWENSTERN, the defendant, and the Biltmore Principal, designated certain securities as "House Stocks."   The House Stocks were generally either: (1) securities which were the subject of underwritings in which Biltmore participated; (2) securities for which Biltmore acted as a market maker; or (3) securities in which LOEWENSTERN, the Biltmore Principal, and certain associates, beneficially owned substantial positions.   In general, the House Stocks were issued by "small cap" companies and start-up ventures with limited revenues and little operating history.

5.   At various times relevant to this Information, ELLIOT LOEWENSTERN, the defendant, the Biltmore Principal, and certain associates, orchestrated a fraudulent scheme involving

2

the purchase and sale of House Stocks to Biltmore's customers. LOEWENSTERN and the Biltmore Principal carried out this scheme by using a variety of fraudulent methods to induce Biltmore customers to purchase House Stocks, often at inflated prices, and thereafter to restrict the customers' ability to sell those House Stocks.  Specifically, LOEWENSTERN, the Biltmore Principal, and others caused Biltmore's brokers to engage in intensive, high-pressure telephone sales campaigns to attract new customer accounts.  Generally, the Biltmore brokers were instructed to solicit potential customers to open new accounts at Biltmore by fraudulently recommending that those customers first purchase the stocks of well-established, "blue chip" companies traded on major securities exchanges (the "First Trade").  In truth and in fact, the Biltmore brokers' primary purpose in recommending potential clients conduct the First Trade was not a good faith belief in the investment prospects of those stocks.  Instead, the Biltmore brokers primarily recommended such trades as a means of persuading potential new customers to establish accounts and send money to those accounts at Biltmore as a prelude to inducing clients to engage in subsequent transactions involving House Stocks.

6.   Following the First Trade, ELLIOT LOEWENSTERN, the defendant, the Biltmore Principal, and the Biltmore brokers induced customers to execute a second trade consisting of the purchase of a House Stock (the "Second Trade").  Following the

3

Second Trade, virtually all subsequent trades executed on behalf of Biltmore customers were solicited trades of House Stocks, which LOEWENSTERN and the Biltmore Principal knew were not always in the customers' best interest.

7.    In order to further effect this fraudulent scheme, ELLIOT LOEWENSTERN, the defendant, and the Biltmore Principal instructed the Biltmore brokers to resist most unsolicited attempts by customers to sell a House Stock, and to persuade such customers to retain the House Stocks in their portfolios, regardless of the desires or best interests of the customer, or whether the House Stock had appreciated in value since its purchase.

8.    From time to time, if a broker failed to persuade a customer not to sell a House Stock, ELLIOT LOEWENSTERN, the defendant, the Biltmore Principal, or their agents, reassigned the customer to another Biltmore broker (the "Replacement Broker"). The Replacement Broker was directed to convince the customer not to sell the House Stock. If successful, the Replacement Broker, and not the original broker, kept the customer as a client and spilt commissions earned on the account with the original broker.

9.    At all times relevant to this Information, in order to ensure that Biltmore's brokers concentrated almost exclusively on selling Biltmore House Stocks, and sold as many of these securities as possible, ELLIOT LOEWENSTERN, the defendant,

4

and the Biltmore Principal paid Biltmore brokers higher commissions for selling House Stocks than for selling any other securities.  Biltmore also offered the lure of partnership to its most successful brokers.  At no time was it disclosed to Biltmore customers that Biltmore brokers received higher compensation for the sale of House Stocks than for other securities.

### The Biltmore Initial Public Offering Schemes

10.  At all times relevant to this Information, Stratton Oakmont, Inc. ("Stratton Oakmont") was a broker-dealer registered with the SEC and the NASD.  Stratton Oakmont's principal place of business was located in Lake Success, New York.  Stratton Oakmont's business and affairs were controlled by Jordan Belfort and Daniel Porush, co-conspirators not named as defendants herein.

11.  At all times relevant to this Information, Monroe Parker Securities, Inc. ("Monroe Parker") was a broker-dealer registered with the NASD, with its principal place of business in Purchase, New York.  Monroe Parker was managed by Bryan Herman and Alan Lipsky, co-conspirators not named as defendants herein. From January 1993 through July 1994, Herman and Lipksy operated a branch office of Biltmore that was located in Purchase, New York.

12.  As set forth more fully below, ELLIOT LOEWENSTERN, the defendant, and the Biltmore Principal used the Biltmore House Stock Scheme, as described in paragraphs 4 through 9, above, in

5

connection with the IPOs of securities in which Biltmore participated as an underwriter.  As described below, LOEWENSTERN and the Biltmore Principal, in order to enrich themselves and others, employed the House Stock scheme to create market demand for securities involved in IPOs underwritten by Biltmore and to facilitate Biltmore's domination and control of the market for those securities.

13.  In or about January 1992, ELLIOT LOEWENSTERN, the defendant, together with the Biltmore Principal, purchased Biltmore with the assistance of Belfort and Porush in exchange for LOEWENSTERN's and the Biltmore Principal's agreement that Biltmore would participate in Stratton Oakmont's fraudulent sales of securities in connection with IPOs and other securities transactions.

14.  At various times between in or about 1993 and in or about 1997, Biltmore participated, along with Monroe Parker and Stratton Oakmont, in underwriting the IPOs of certain securities.  In some instances Biltmore served as the lead underwriter and, in other instances, Biltmore participated in a selling group lead by Monroe Parker or Stratton Oakmont.  From in or about 1993 through in or about 1995, Biltmore depended heavily upon Stratton Oakmont, and its principals Belfort and Porush, in obtaining underwriting business.  Beginning in or about 1994,

6

Biltmore developed its own underwriting clientele and, from 1994 through 1997, acted as underwriter or co-underwriter for the selling group for the IPOs for the following issuers (collectively "the Issuers"), among others:

| Issuer | Approximate Offering Date |
| --- | --- |
| CSI Computer Specialists, Inc. | July 1995 |
| Select Media Communications, Inc. | August 1994 |
| Czech Industries, Inc. | June 1995 |
| Hemispherix BioPharma, Inc. | November 1995 |
| Terrace Holdings, Inc. | December 1995 |
| TMCI Electronics, Inc. | March 1996 |
| Hirel Holdings, Inc. | July 1996 |
| The Harmat Organization, Inc. | September 1996 |
| Hertz Technology Group, Inc. | November 1996 |
| Sun Hill Industries, Inc. | November 1996 |
| Questron Technology, Inc. | March 1997 |
| PC411, Inc. | May 1997 |
| Casco International, Inc | November 1997 |

15.   From time to time, in connection with certain planned IPOs, ELLIOT LOEWENSTERN, the defendant, together with the Biltmore Principal, met with Belfort, Porush, Lipsky, Herman, and others in advance of the issuance of the Issuers' securities unlawfully to prearrange the manner in which the shares of the Issuers' securities would be distributed.  These prearrangements among the underwriters were undisclosed and included, among other

7

matters, the price at which the stock would be issued, the amount

of stock that would be controlled by each firm, the price at

which each firm would sell the stock that it controlled into the

aftermarket and the amount of stock that would be sold into

accounts which were beneficially controlled by Belfort and/or

Porush.

### The Scheme to Mask Belfort's Participation in the IPOs

16.   Before certain IPOs, ELLIOT LOEWENSTERN, the

defendant, along with the Biltmore Principal, met with Belfort,

among others, and unlawfully agreed to certain undisclosed pre-

arrangements concerning the manner in which the shares of the

Issuers' stock would be distributed.   Specifically, the

participants agreed to distribute shares of the Issuers' stock to

accounts which were beneficially owned and controlled by Belfort

(the "Belfort Nominee Accounts").

17.   At various times relevant to this Information,

ELLIOT LOEWENSTERN, the defendant, and the Biltmore Principal,

entered into secret and unlawful agreements with Herman, Lipsky,

Belfort, and others known and unknown, pursuant to which Biltmore

agreed to generate substantial profits for Belfort.

Specifically, LOEWENSTERN and the Biltmore Principal agreed with

Herman and Lipsky that Monroe Parker would be included in the

selling group for certain Biltmore IPOs, in which capacity Monroe

Parker received allocations of securities for resale at the time

8

of the IPOs.  It was understood among the parties, however, that Monroe Parker would receive those IPO allocations only as a nominee for Belfort, and would place those securities in accounts controlled, directly or indirectly, by Belfort or for his benefit.  In each IPO, the market price of the securities rapidly increased during aftermarket trading as a result of manipulative transactions involving Biltmore, Monroe Parker and others.  After the market price increased, the Belfort Nominee Accounts sold the securities they received during the IPO to Monroe Parker for a substantial profit.  Monroe Parker, in turn, resold the securities to Biltmore, which then sold the securities to its customers at the market price.

18.  By including Monroe Parker in the selling group of certain of its IPOs, ELLIOT LOEWENSTERN, the defendant, and the Biltmore Principal were able to create the false illusion of a wider distribution of the IPO securities, when in truth, a large portion of certain Biltmore IPOs were allocated to entities controlled by Belfort.

19.  With respect to Biltmore IPOs, ELLIOT LOEWENSTERN, the defendant, the Biltmore Principal, and others, caused the Issuers, Biltmore and others to make materially false and fraudulent misrepresentations and omissions about, among other things, the plan for distributing the Issuers' securities offered for sale, the relationship between Biltmore, Stratton Oakmont, and Monroe Parker, Belfort's beneficial ownership of more than

9

five percent of certain of the Issuers' equity securities, and

the use of the nominees to funnel the illegal profits to Belfort.

**The Schemes to Benefit LOEWENSTERN and the Biltmore Principal**

20.  With respect to certain of the Biltmore IPOs,

ELLIOT LOEWENSTERN, the defendant, the Biltmore Principal, and

others, arranged for the Issuers to make available additional

equity securities to investors who, at the direction of

LOEWENSTERN, the Biltmore Principal, and their associates,

provided bridge financing to the Issuers in the form of short-

term loans that were to be repaid with interest from the proceeds

of the IPO (the "Bridge Lenders").

21.  With respect to certain of the IPOs, at the

direction of ELLIOT LOEWENSTERN, the defendant, the Biltmore

Principal, and others, the Issuers registered for sale at the

time of the IPO additional equity securities owned by insiders of

the Issuers (the "Insiders"), and the Bridge Lenders, among

others.

22.  With respect to certain of the IPOs, ELLIOT

LOEWENSTERN, the defendant, the Biltmore Principal, and others,

caused the Issuers to include in the offering memorandum and

prospectuses for the IPOs a so-called "lock-up" agreement.  Under

that agreement, the Bridge Lenders and the Insiders represented

to the investing public that they would not sell their shares in

the market for a substantial period of time following the

**Attachment B, p. 18**             **EXHIBIT 16**
                                    **FTC-VAST-000396**

effective date of the IPO, unless they first obtained the written consent of Biltmore.  In fact, however, prior to each IPO, LOEWENSTERN knew and intended that Biltmore would offer to release the Bridge Lenders and the Insiders from the terms of the lock-up agreement within days, if not hours, after each IPO was completed, so long as the Bridge Lenders and Insiders agreed to sell their securities to Biltmore at prices substantially lower than the prevailing market price.  As LOEWENSTERN well knew and intended, most Bridge Lenders and Insiders would and did agree to sell their securities to Biltmore in exchange for a release from the lock-up agreements.  LOEWENSTERN and the Biltmore Principal then caused Biltmore brokers to sell those securities to retail customers at the prevailing market price.  As a result, Biltmore earned as gross profits the difference between (a) the price at which it purchased the stock from the Bridge Lenders and the Insiders and (b) the artificially inflated prices at which the securities were sold to Biltmore customers.

23.  In all Biltmore IPOs, ELLIOT LOEWENSTERN, the defendant, and the Biltmore Principal allocated substantial quantities of the securities in the offerings to certain preferred customers (the "Flippers").  LOEWENSTERN and the Biltmore Principal allocated the securities to the Flippers with the knowledge and expectation that the Flippers would resell those securities to Biltmore shortly after trading in the aftermarket had commenced, at prices substantially below the

11

price for the securities that LOEWENSTERN and the Biltmore Principal expected to establish in the aftermarket for the securities following the respective IPOs.

24.   Biltmore and Monroe Parker dominated and controlled the aftermarket trading in certain IPOs that each had underwritten.  According to rules and regulations of the NASD, when a market maker dominates and controls the market for a specific security, it is limited in the amount by which it can "mark-up" the price of the security sold to its customer.  The general rule is that the amount of the "mark-up" is limited to five percent of the market maker's "contemporaneous cost."  Both Biltmore and Monroe Parker, however, had very inexpensive "contemporaneous costs" for large quantities of securities held in their inventories, due in part to the fact that both firms repurchased stock from Bridge Lenders, Insiders, and Flippers, at prices far below the prevailing market prices for those securities.

25.   Generally, under NASD rules and regulations, where a dominating and controlling market maker can demonstrate a prevailing market price that is higher than its "contemporaneous cost," that market maker may be permitted to charge that prevailing market price, plus a lawful "mark-up," when selling securities to its customers.  One method by which a dominating and controlling market maker may be able to demonstrate a prevailing market price that is greater than its contemporaneous

12

cost is by looking to the price of trades of a security between market makers ("interdealer trades"). Where the price of such interdealer trades is higher than a market maker's "contemporaneous cost," the market maker may be permitted to charge a "mark-up" based upon the price of the interdealer trades on sales to its customers, rather than one based upon the market maker's "contemporaneous cost."

26.   In order to circumvent the restrictions on the amount of "mark-ups" that Biltmore and Monroe Parker could charge, ELLIOT LOEWENSTERN, the defendant, the Biltmore Principal, Herman and Lipsky, from time to time during the relevant period of the Information, entered into a nondisclosed prearrangement prior to certain Biltmore IPOs pursuant to which Monroe Parker agreed to make an interdealer purchase of approximately 100,000 shares of aftermarket stock from Biltmore at the prevailing market price. Similarly, prior to certain Monroe Parker IPOs, LOEWENSTERN and the Biltmore Principal entered into a nondisclosed prearrangement with the principals of Monroe Parker under which Biltmore agreed to make an interdealer purchase of approximately 100,000 shares of aftermarket stock from Monroe Parker at the prevailing market prices. These trades were done solely for the purpose of fraudulently creating the appearance of an interdealer market at the prevailing market price, which would in turn enable Biltmore and Monroe Parker to use these interdealer trades as a basis upon which to charge a

13

higher price for those securities that it sold to its customers in the aftermarket.

## THE CONSPIRACY

27.  From in or about 1993 through in or about December 1997, in the Southern District of New York and elsewhere, ELLIOT LOEWENSTERN, the defendant, and the Biltmore Principal, together with others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offense offenses against the United States, to wit, to commit:  (a) securities fraud, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; and (b) wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

28.  It was a part and an object of the conspiracy that ELLIOT LOEWENSTERN, the defendant, the Biltmore Principal, and their coconspirators, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, would and did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by:  (a) employing devices, schemes, and artifices to

14

**Attachment B, p. 22**                    **EXHIBIT 16**
**FTC-VAST-000400**

defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person in connection with the purchase and sale of securities, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Wire Fraud

29.   It was further a part and an object of the conspiracy that ELLIOT LOEWENSTERN, the defendant, the Biltmore Principal, and their coconspirators, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme and artifice, among other things, to:  (a) deprive a broker's client of the intangible right to a broker's honest services; (b) violate a broker's duty to disclose to his client all material facts concerning securities transactions in the client's account; and (c) obtain the client's money and property, would and did transmit and cause to be transmitted by means of wire communications in interstate commerce, signs, signals, pictures, and sounds for the purpose of executing such scheme and

15

artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

<div align="center">

**MEANS AND METHODS OF THE CONSPIRACY**

</div>

30. Among the means and methods by which ELLIOT LOEWENSTERN, the defendant, the Biltmore Principal, and their coconspirators would and did carry out the conspiracy were the following:

a. LOEWENSTERN, the Biltmore Principal, and their coconspirators, directed Biltmore brokers to use high-pressure telephone sales tactics to sell House Stocks to, and purchase House Stocks from, their customers, despite the fact that the transactions were not suitable for, or not in the best interest of, those customers.

b. LOEWENSTERN, the Biltmore Principal, and their coconspirators unlawfully created extraordinary demand for the securities of certain IPOs by, among other things, dominating and controlling the market for those securities during and after the IPOs and by engaging in deceptive acts and practices in connection with the sales of securities of the IPOs.

c. LOEWENSTERN, the Biltmore Principal, and others entered into a series of undisclosed pre-arrangements with Belfort in advance of Biltmore IPOs, according to which Biltmore distributed Issuers' IPO stock to the Belfort Nominee Accounts.

<div align="center">

16

</div>

    d.    LOEWENSTERN and the Biltmore Principal reached an illegal, undisclosed pre-arrangement with Herman, Lipsky, Belfort, and others, to allocate shares of certain Biltmore IPOs to Belfort, through Monroe Parker and the Belfort Nominee Accounts controlled by, or for the benefit of, Belfort.

    e.    LOEWENSTERN, the Biltmore Principal, and their coconspirators caused Biltmore to effect sales of securities of certain issuers in amounts substantially greater than Biltmore maintained in its proprietary account, and caused Biltmore to cover those sales by releasing the Bridge Lenders and Insiders from their respective lock-up agreements, thus allowing Biltmore to purchase those securities at prices below the then prevailing market price for those securities, thereby earning substantial profits for Biltmore.

    f.    LOEWENSTERN, the Biltmore Principal, and their coconspirators caused Biltmore to allocate large quantities of shares of IPOs to the Flippers, knowing that the Flippers would resell their IPO shares back to Biltmore shortly after trading in the aftermarket began, thereby enabling Biltmore to earn large profits when it sold those shares to Biltmore's customers when the price of the IPOs increased substantially in the first day of trading as a result of Biltmore's manipulative conduct.

    g.    LOEWENSTERN, the Biltmore Principal, and their coconspirators, entered into illegal interdealer trades

17

**EXHIBIT 16**

FTC-VAST-000403

with Monroe Parker following certain IPOs underwritten by Biltmore and Monroe Parker, in order to fraudulently charge illegal "mark-ups" of the prices of securities that Biltmore and Monroe Parker sold to their customers in aftermarket trading.

## OVERT ACTS

31.  In furtherance of said conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.  In or about July 1995, in Purchase, New York, ELLIOT LOEWENSTERN, the defendant, and the Biltmore Principal caused Biltmore to allocate 100,000 units of an IPO underwritten by Biltmore of the securities of CSI Computer Specialists, Inc. ("CSI"), to Monroe Parker, which in turn, allocated those shares to two nominee accounts controlled by Belfort.

b.  In or about July 26, 1995, in Purchase, New York, Herman caused Monroe Parker to repurchase 50,000 shares of CSI common stock from a nominee account controlled by Belfort, for resale to Biltmore and LOEWENSTERN.

c.  On or about December 6, 1995, in Purchase, New York, LOEWENSTERN, and the Biltmore Principal caused Biltmore to allocate 125,000 units of an IPO underwritten by Biltmore, consisting of securities issued by Terrace Holdings, Inc. ("Terrace Holdings"), to Monroe Parker, which in turn, allocated the units to two of the Belfort Nominee Accounts.

18

**Attachment B, p. 26**        **EXHIBIT 16**
FTC-VAST-000404

d.   In or about November 1995, LOEWENSTERN caused attorneys at a law firm located in New York, New York to prepare a prospectus for the IPO of Terrace Holdings, Inc., which disclosed the existence of an eighteen-month lock-up agreement concerning certain selling security-holders but which falsely and fraudulently failed to disclose LOEWENSTERN's plan to release the lock-up agreement in order to induce certain selling-security holders to sell their securities to Biltmore at below-market prices.

e.   In or about December 1995, in Purchase, New York, Herman caused Monroe Parker to repurchase 25,000 shares of Terrace Holdings common stock from an account controlled by Belfort for resale to Biltmore and LOEWENSTERN.

f.   On or about May 8, 1996, in Purchase, New York, LOEWENSTERN caused Biltmore to purchase 90,000 shares of Big City Bagels, Inc. common stock from Monroe Parker.

g.   On or about April 30, 1997, in Purchase, New York, LOEWENSTERN caused Biltmore to purchase 100,000 shares of All Communications Corp. common stock from Monroe Parker.

19

h.    On or about September 23, 1997, in Purchase,
New York, LOEWENSTERN caused Biltmore to purchase 100,000 shares
of Isonics Corp. common stock from Monroe Parker.

(Title 18, United States Code, Section 371.)

_Mary Jo White_

MARY JO WHITE
United States Attorney

20

EXHIBIT 16
FTC-VAST-000406



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

One Pierrepont Plaza
Brooklyn, New York 11201

Mailing Address:    147 Pierrepont Street
Brooklyn, New York 11201

July 10, 2000

**TO BE FILED UNDER SEAL**
The Honorable John Gleeson
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  United States v. Elliot Loewenstern
Criminal Docket Number 00-685 (JG)

Dear Judge Gleeson:

The government respectfully submits this letter to
request that the Court relate the above-captioned case to the
cases in United States v. Jordan Ross Belfort and Daniel Mark
Porush, Criminal Docket No. 98-859 (JG), United States v. Dennis
Gaito, Criminal Docket No.99-1167 (JG) and United States v.
Steven Madden, Criminal Docket No. 00-601(JG), pursuant to Local
Rule 50.3(c) of the Local Rules Governing Division of Business
Among District Judges.

The government designated this case as a related case
because we believe that "a substantial saving of judicial
resources is likely to result from assigning this cases to" Your
Honor for the following reasons.

The present case involves charges relating to
securities fraud schemes perpetrated by the defendant Elliot
Loewenstern, one of the principals of the brokerage firm Biltmore
Securities, Inc. ("Biltmore"), together with Jordan Belfort and
Daniel Porush, the principals of the brokerage firm Stratton
Oakmont ("Stratton"). Specifically, Loewenstern is charged with
engaging in securities fraud schemes whereby Biltmore, together
with Stratton, manipulated the prices of certain securities for
the benefit of the principals of those firms.

The Belfort, Porush, Gaito and Madden cases all involve
charges relating to the manipulations of the prices of certain
securities issued by Stratton. The facts underlying these
securities fraud schemes are the same as the facts underlying the
securities fraud schemes charged against Loewenstern. In
addition, all of these cases involve overlapping witnesses and

**Attachment B, p. 30**                    **EXHIBIT 16**
FTC-VAST-000407

2

documentary evidence, such as voluminous trading records, prospectuses, allocation sheets and bank statements.

In light of this, we believe that Your Honor's familiarity with the facts and the evidence would result in a substantial savings of judicial resources in ruling on matters of relevancy, on Rule 404(b) applications, <u>Giglio</u>, and other matters requiring familiarity with the underlying factual background of this case. In addition, this Court would be greatly advantaged in making certain determinations relevant to sentencings, such as loss calculations and roles in the conspiracy, by presiding over all related cases.

For these reasons, the government respectfully submits that this case is related to the <u>Belfort</u>, <u>Porush</u>, <u>Gaito</u> and <u>Madden</u> cases for the purposes of Rule 50.3(c).

Because the above-captioned case has been filed under seal, the government respectfully requests that this letter be filed under seal.

Respectfully yours,

LORETTA E. LYNCH
United States Attorney

By:  _Michele L. Adelman_
Michele L. Adelman
Assistant U.S. Attorney

CC:  Lance Croffoot-Suede, Esq.

**Attachment B, p. 31**

**EXHIBIT 16
FTC-VAST-000408**

**PROCESS RECEIPT AND RETURN**
*See Instructions for "Service of Process by the U.S. Marshal"*
*on the reverse of this form.*

U.S. Department of Justice
United States Marshals Service

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| United States of America | CR-00-0685 (Gleeson, J.) |
| DEFENDANT | TYPE OF PROCESS |
| Elliot Lowenstern | Preliminary Order of Forfeiture |

**SERVE** ➡

NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC., TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN

Wachovia Bank Check Nos. 5000149811 & 5000149812, each in the amount of $500,000.00

ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*

**AT**   225 Cadman Plaza East, Room G-80, Brooklyn, New York 11201-1818

SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW:

| | |
|---|---|
| LORETTA E. LYNCH<br>United States Attorney's Office - EDNY<br>One Pierrepont Plaza, 16th Floor<br>Brooklyn, New York 11201<br>Attention: AUSA Richard Weber | Number of process to be served with this Form - 285 |
| | Number of parties to be served in this case |
| | Check for service on U.S.A. |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available For Service):*

Fold                                                                                           Fold

Please arrange for the above-referenced bank checks to be deposited into the seized asset ~~service~~ holding account until further order of the Court.

*Order is Sealed.*

FBI Case No. 196C-NY-224496

| Signature of Attorney or other Originator requesting service on behalf of: *Richard Weber* ☒ PLAINTIFF ☐ DEFENDANT | TELEPHONE NUMBER (718) 254-6033 | DATE 05/17/01 |
|---|---|---|

**SPACE BELOW FOR USE OF U.S. MARSHAL ONLY — DO NOT WRITE BELOW THIS LINE**

| I acknowledge receipt for the total number of process indicated. *(Sign only first USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin No. 53 | District to Serve No. 53 | Signature of Authorized USMS Deputy or Clerk | Date 5/18/01 |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served, ☐ have legal evidence of service, ☒ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above or on the individual, company, corporation, etc., shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc., named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | ☐ A person of suitable age and discretion then residing in the defendant's usual place of abode. |
|---|---|
| Address *(complete only if different than shown above)* | Date of Service 5/18/01   Time   am / pm |
| | Signature of U.S. Marshal or Deputy |

| Service Fee | Total Mileage Charges *(including endeavors)* | Forwarding Fee | Total Charges | Advance Deposits | Amount owed to U.S. Marshal or | Amount of Refund |
|---|---|---|---|---|---|---|
| | | | | | | |

**REMARKS:**   $2,503,805.66 received on 4/30/01 and deposited in the seized asset deposit fund acct

Two $500,000.00 totaling $1,000,000.00 received 5/18/01 and deposited in the seized asset deposit fund acct

| PRIOR EDITIONS MAY BE USED | **1. CLERK OF THE COURT** | FORM USM-285 (Rev. 12/15/80) |
|---|---|---|

Attachment B, p. 32

**EXHIBIT 16**
FTC-VAST-000409

KAM:RW
F.# 1999V03694

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X

**TO BE FILED UNDER SEAL**

UNITED STATES OF AMERICA,

                Plaintiff,

    -against-

ELLIOT LOEWENSTERN,

              Defendant.

------------------------------X

PRELIMINARY ORDER
OF FORFEITURE

00 Cr. 685(JG)

       **WHEREAS**, in an Information filed on June 27, 2000, in

the above-captioned action, the United States charged the

Defendant, ELLIOT LOEWENSTERN with securities fraud and

conspiring to engage in monetary transactions, in violation of

Title 15 U.S.C. § 78j(b) and 78ff and Title 18 U.S.C. § 1957; and

       **WHEREAS**, in the forfeiture count of the Information,

the United States sought forfeiture of all property, real and

personal, involved in the above-referenced offenses and any

property traceable to such property; and

       **WHEREAS**, the Defendant entered into a plea agreement

with the United States in which the Defendant pled guilty to the

Information; and

       **WHEREAS**, on July 25, 2000, the Court accepted the

Defendant's guilty plea; and

       **WHEREAS**, by virtue of the Defendant pleading guilty and

**Attachment B, p. 33**

**EXHIBIT 16**
**FTC-VAST-000410**

entering into the Plea Agreement, the United States is now

entitled to a criminal forfeiture judgment, pursuant to 18 U.S.C.

§ 982(a)(1), and Rule 32.2 of the Federal Rules of Criminal

Procedure;

Accordingly, it is hereby **ORDERED, ADJUDGED AND DECREED**:

1. That based upon the plea agreement, the United

States is hereby authorized to seize and fully liquidate in

accordance with law from the Defendant, Elliot Loewenstern, the

property listed below, subject to the provisions of 18 U.S.C. §

982:

      a.    All right, title and interest in the premises and
real property located at 17308 Whitehaven Drive,
Boca Raton, Florida 33496-5923, Lots 422 &423 St.
Andrews Country Club, PL 6, Palm Beach, Assessor's
Parcel No. 00-42-46-33-07-000-4220, held in the
names of Elliot and Shelley Loewenstern, as of the
date that the defendant executes the Cooperation
Agreement; and

      b.    The sum of One Million dollars ($1,000,000.00) in
United States Currency.

2. That pursuant to 21 U.S.C. § 853(n)(1), as

incorporated by 18 U.S.C. § 982, the United States Marshals

Service shall forthwith cause to be published, upon the unsealing

of this Order, in accordance with the custom and practice in this

district in a newspaper of general circulation in the area in

which the forfeited property is located, notice of this order,

notice of the United States' intent to dispose of the property in

such manner as the United States may direct and notice that any

person, other than the Defendant, having or claiming a legal

interest in any of the above-referenced forfeited funds must file a petition with the Court within (30) days of the final publication of notice or of receipt of actual notice, whichever is earlier.

3.    This notice shall state that the petition shall be for a hearing to adjudicate the validity of the petitioner's alleged interest in the funds, shall be signed by the petitioner under penalty of perjury, and shall set forth the nature and extent of petitioner's right, title or interest in the funds and any additional facts supporting the petitioner's claim and the relief sought.

4.    The United States may also, to the extent practicable, provide direct written notice to any person known to have an alleged interest in the funds that are subject to the Order of Forfeiture, as a substitute for published notice as to those persons so notified.

5.    That upon adjudication of all third-party interests, this Court will enter a Final Order of Forfeiture pursuant to 21 U.S.C. § 853(n), as incorporated by 18 U.S.C. § 982, in which all interests will be addressed.

6.    That the Clerk of the Court shall forward six (6) Certified copies of this Order to the United States Attorney's Office, One Pierrepont Plaza, 16th Flr., Brooklyn, New York 11201, ATTN: Assistant United States Attorney Richard Weber.

8.    The United States Marshals Service, the Securities

Exchange Commission, the Defendant and his attorney may be

served with copies of this sealed order.


SO ORDERED:
Dated: Brooklyn, New York
       May 8 , 2001


                                    s/JG
                         _____
                         HONORABLE JOHN GLEESON
                         UNITED STATES DISTRICT JUDGE


                         A TRUE COPY
                         ATTEST 3/9/2001
                         DATE
                         BY Vivian Klein
                                           CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

BEFORE: HON. JOHN GLEESON DATE: 7-30-04 _____ TIME: ___ _____

DOCKET# CR-00-783 & CR-00-685          TITLE: USA vs LOEWENSTERN

COURT REPORTER: TONY MANCUSO          DEPUTY CLERK: TERESA HENRY

INTERPRETER: _____          AUSA: ____ DAVID PITOFSKY _____

DEFT NAME: ELLIOT LOEWENSTERN          ATTY: IRA SORKIN & KENNETH LEVINE
x present   x on bail   __ in custody                x present   __ not present

### CRIMINAL CAUSE FOR SENTENCING

✓ Case called.      __ Defendant present with counsel.

__ Defendant present without counsel.      __ Counsel present without defendant.   __ Interpreter present

✓ Sentencing proceedings held.      __ Sentencing adjourned to_____

__ Fatico hearing scheduled for _____      __ Fatico hearing held.

__ The Court finds a factual basis for the plea of guilty made before the Magistrate Judge, and accepts the plea

__ The defendant is sentenced on count (s) _____ to the custody of the Attorney General or his
authorized representative for a period of _____

to be followed by a _____ year period of supervised release, with special conditions

_____

                                        and CONT 1 IN CR-00-783
✓ __ The defendant is sentenced on count (s) 1 + 2 ____ to a 5 ____ year term of probation. to RUN
                                                                        Concurrently
✓ The defendant is to pay a special assessment of $ 300.00 _____

__ Execution of the sentence is stayed until _____

__ The defendant is to surrender directly to the institution designated by the Bureau of Prisons on _____

__ Defendant remanded      __ On motion of Government, all remaining counts of Indictment are dismissed.

✓ The defendant is advised by the Court of the right to appeal and the right to counsel for that appeal.

_____

_____

This is Google's cache of http://www.wemanagemedia.com/aboutus.htm. It is a snapshot of the page as it appeared on Oct 19, 2014 08:57:30 GMT. The current page could have changed in the meantime. Learn more
Tip: To quickly find your search term on this page, press **Ctrl+F** or **⌘-F** (Mac) and use the find bar.

Text-only version



HOME | ABOUT US | OUR MISSION | BUSINESS STRATEGY | OUR TEAM | OUR SERVICES | CLIENTS | AFFILIATES | CONTACT US

## Elliot Loewenstern
*Chief Executive Officer*

*Elliot Loewenstern is the founder and Managing Partner of Power Source Marketing.*

*Elliot Loewenstern, a Graduate of SUNY at Buffalo with a BS in Management and a concentration in Finance, has vast experience in the Financial Services Industry, having grown and operated various multimillion dollar firms.*

*Most recently, Mr. Loewenstern was also the founder and CEO of E management Group which grew from a startup small business in 2000 into the 3rd largest DISH Network Retailer in the United States. E Management Group had over 150 employees in South Florida, activating over 75k satellite television customers a year. The company was sold to Dish Network's largest dealer Infinity Sales Group in 2008.*

*In addition to 10 years of experience in the satellite industry with Dish Network and DIRECTV, his marketing expertise have been in lead generation in industries that include diabetes, education and back to school lead generation, home security, consumer and corporate debt settlement, travel, voice over IP services, identity theft protection programs, and any consumer based marketing programs.*



*Gary R. Nikolits, CFA*
**Property Appraiser**
Palm Beach County

Homestead Exemption 

Location Address █████████████

Municipality UNINCORPORATED

Parcel Control Number 00-42-47-05-01-000-0020

Subdivision LONG LAKE ESTATES PL 1

Official Records Book 18659　　　Page 1135

Sale Date MAY-2005

Legal Description LONG LAKE ESTATES PLAT 1 LT 2

| Owners | Mailing address |
|---|---|
| LOEWENSTERN ELLIOT A & LOEWENSTERN SHELLEY | ███████ BOCA RATON FL 33496 1928 |

| Sales Date | Price | OR Book/Page | Sale Type | Owner |
|---|---|---|---|---|
| MAY-2005 | $2,162,500 | 18659 / 1135 | WARRANTY DEED | LOEWENSTERN ELLIOT A & |
| MAR-2001 | $2,014,360 | 12358 / 0134 | WARRANTY DEED | COLLEY JERRY E & |
| APR-1999 | $510,000 | 11046 / 1925 | WARRANTY DEED | GRACE PTRSHP I |
| JUN-1994 | $505,000 | 08319 / 0371 | WARRANTY DEED | |
| AUG-1992 | $385,000 | 07368 / 1100 | WARRANTY DEED | |

] 2

| Exemption Applicant/Owner | Year | Detail |
|---|---|---|
| LOEWENSTERN ELLIOT A & | 2014 | |

Number of Units 1　　*Total Square Feet 9750　　　　Acres 1.01

Use Code 0100 - SINGLE FAMILY　　Zoning RE - Residential Estate ( 00-UNINCORPORATED )

| Tax Year | 2014 | 2013 | 2012 |
|---|---|---|---|
| Improvement Value | $1,038,556 | $893,770 | $950,779 |
| Land Value | $512,663 | $512,663 | $732,375 |
| Total Market Value | $1,551,219 | $1,406,433 | $1,683,154 |

All values are as of January 1st each year

| Tax Year | 2014 | 2013 | 2012 |
|---|---|---|---|
| Assessed Value | $1,427,529 | $1,406,433 | $1,683,154 |
| Exemption Amount | $50,000 | $50,000 | $50,000 |
| Taxable Value | $1,377,529 | $1,356,433 | $1,633,154 |

| Tax Year | 2014 | 2013 | 2012 |
|---|---|---|---|
| Ad Valorem | $26,088 | $25,777 | $31,467 |
| Non Ad Valorem | $406 | $397 | $373 |
| Total tax | $26,494 | $26,174 | $31,840 |

**Attachment D, p. 1**　　　　　　　　**EXHIBIT 16**

FTC-VAST-000416



Amount:    $1,000.00         Sequence Number: 8500004602
Account:   ████6736          Capture Date:   02/02/2012
Bank Number: 84301767        Check Number:   277

INBOUND CALL EXPERTS, LLC
635 SE 10TH ST STE B
DEERFIELD BCH, FL 33441-5607

**WCMA**® Working Capital Management℠ Account          277

87-176/843

1/27/2012
DATE

PAY TO THE
ORDER OF    JP Vasta                                    $ 1,000.00

One Thousand & 00/100                                   DOLLARS

ᴹᴸ Merrill Lynch

Bank of America

MEMO    Pay

Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 02/02/2012 | 00659228358l000 | 84301767 | Undetermined | N | | BANK OF AMERICA, NA |
| 02/02/2012 | 631781516800000 | 81000045 | Undetermined | N | | FEDERAL RES BANK OF |
| 02/01/2012 | 000000582264548 | 122105278 | Rtn Loc/BOFD | Y | | WELLS FARGO BANK, NA |
| 02/02/2012 | 631749446300000 | 61000146 | Undetermined | N | | FEDERAL RES BANK OF |

MC_ICF005330
**EXHIBIT 16**
**FTC-VAST-000418**

FILED by ___ D.C.
ELECTRONIC

**Aug 1 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 04-80862-CIV-MIDDLEBROOKS/JOHNSON

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| Wilshire Investment Management Corporation, | ) |
| National Commodities Corporation, Inc., Andrew | ) |
| Alan Wilshire, Eric Scott Malcolmson, and James | ) |
| Joseph Russo, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## NOTICE OF FILING

Pursuant to the Court's Orders dated December 2, 2004 and February 14, 2005, plaintiff

Commodity Futures Trading Commission ("Commission" or "CFTC"), files the narrative

testimony of the following witnesses:

     (1)    Dennis Albrecht

     (2)    Charles Bolam

     (3)    Kirsten Bradford

     (4)    Michael Carlson

     (5)    Doreen Daidone

     (6)    Tony Del Duco

     (7)    Lacey Dingman

     (8)    Duane Dipert

     (9)    Bruce McLean

     (10)   Daniel McNamee

**Attachment F, p. 1**

**EXHIBIT 16**
**FTC-VAST-000419**   59/cj

(11)   Matthew Pendell

(12)   John Stevens

(13)   Vilia Sutkus-Kiela

(14)   George Tracy


The Commission intends to present the testimony of Andrew Wilshire, Eric Malcolmson, James Russo, and Steve Zander but, because the Commission is unable to script testimony from those it expects to be hostile witnesses, the Commission is not preparing their narrative direct testimony at this time.

Dated:  August 1, 2005

By: _Rachel Entman_

Rachel Entman, Florida Special Bar No. A5500862
rentman@cftc.gov
Allison Lurton, Florida Special Bar No. A5500935
alurton@cftc.gov
Commodity Futures Trading Commission
1155 21st Street NW
Washington, DC  20581
(202) 418-5000 (telephone)
(202) 418-5523 (facsimile)

Attorneys for Plaintiff

2
**Attachment F, p. 2**

**EXHIBIT 16**
**FTC-VAST-000420**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___ day of August 2005, a true copy of the

foregoing NOTICE OF FILING has been served by Federal Express to the following persons:

Attorney for Defendants

R. Lawrence Bonner
Homer Bonner
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, FL 33131

Rachel Entman

## DIRECT TESTIMONY OF MICHAEL CARLSON

1.      I am over 21 years of age and live at Carrollton, Texas.  Prior to my investment with Wilshire Investment Management ("WIM"), I had no commodities trading experience.

2.      Around February 2003, I began searching the Internet for information about commodities futures and options trading.  During this search, I submitted my contact information on WIM's website, and was contacted a few days later by an account executive named Jon Vasta ("Vasta").

3.      During our initial conversations, Vasta told me that if I opened an account at WIM, we would make a lot of money together.   He asked me "How would you like me to send you a $100,000?"

4.      During February 2003, Vasta recommended that I purchase unleaded gasoline options for two reasons.  First, the war in Iraq had recently begun and Vasta claimed that prices were going to skyrocket.  Second, Vasta claimed that with the summer months approaching, there would be a greater demand for gasoline as more people traveled, and that this demand would drive up the value of gasoline options.  He said this typically happened every year.

5.      In discussing risk, Vasta stated that while there was risk in trading futures and options, but in this case, he did not feel the purchase of gasoline options were risky due to the fact that the value of gasoline options went up every year during the summer.

6.      On February 15, 2003, I opened an account with WIM and sent an initial investment of $10,000.  Vasta used this initial investment to purchase May unleaded call options.

7.      When I received my statement for these transactions, I noticed that my commissions were very high.  When I brought this to Vasta's attention, he indicated that he had

6

**Attachment F, p. 4**                    **EXHIBIT 16**
                                                                    **FTC-VAST-000422**

been purchasing unleaded call option spreads, and that spreads required the purchase of multiple

contracts, and therefore I was charged multiple commissions.

8.     Prior to this conversation, Vasta had never mentioned the term "spread" to me or

explained that I would be charged multiple commissions for one set of trades. Despite my

uncertainty about his trading, Vasta assured me that the spreads were for my benefit, and

protected me from suffering a complete loss of my investment. He also gave me a credit of

$1000 towards the purchase of additional futures positions.

9.     Following my initial investment, and based on Vasta's continuous requests for

more money to trade, I sent an additional $55,000 to WIM over the course of the next month.

Vasta used this money to purchase more unleaded gasoline call spread options.

10.     After some successful trading, I told Vasta that I wanted to withdraw funds from

account equaling my original investment, and use the profits I had made to continue trading.

Vasta strongly recommended against withdrawing any funds. When I told him I was very

concerned about losing my original investment, he said, "we will not let that happen." Based on

Vasta's recommendation I did not withdraw any funds from my account.

11.     As May and June 2003 arrived, my account began to suffer losses. When I called

Vasta to discuss the losses in my account, and discuss the possibility of closing my account,

Vasta recommended that I continue to hold my positions.

12.     I finally was able to close my account in July 2003, and WIM returned my

remaining balance of $199. In total, I had lost $41,883 trading and paid $22,918 in

commissions.

13.     I filed a grievance with WIM's futures commission merchant and was able to

obtain approximately half of my commissions back from WIM.

**EXHIBIT 16
FTC-VAST-000423**

## DIRECT TESTIMONY OF TONY DEL DUCO

1.      I am over 21 years of age and live in Shermans Dale, Pennsylvania.  Prior to my investment with Wilshire Investment Management ("WIM"), I had spent approximately six months trading commodities.

2.      In March 2000, I received an unsolicited phone call from Jon Vasta ("Vasta"), an account executive at WIM.  Prior to Vasta's call, I had never met him or heard of WIM.

3.      Vasta wanted me to open an account with WIM, and was recommending that I purchase soybean, corn, crude oil, and heating oil options.

4.      Vasta told me that if I invested with him, I would make money.  He said, "trust me, I won't let you down."

5.      With regard to his heating oil recommendation, Vasta claimed there was a cold winter coming up, heating oil was going to go "through the roof," and that I would be able to take advantage of this seasonal swing.

6.      Based on Vasta's representations, I decided to open an account with WIM in March 2000.  Had Vasta or someone else at WIM told me about how their other customers' accounts were doing, it would have influenced my investment decisions.

 From the time I opened my account, until I closed it in September 2002, I invested approximately $50,000.

**EXHIBIT 16**
**FTC-VAST-000424**

7.      My initial trades with Vasta lost money. Despite these losses, he continually called me and suggested I purchase more options. Vasta continually pressured me to buy more options even after I told him that I was uncomfortable investing more money.

8.      He claimed that the options I had already purchased were about to expire worthless, and that if I did not buy more options and establish new positions, I would lose everything.

9.      Vasta recommended that I purchase additional options in soybeans. He said at the very least I would break even on the soybean trade, and that most likely, I would recoup all my losses and make some money.

10.     While my account was open, I also had several conversations with WIM president Andrew Wilshire ("Wilshire"). At one point, Wilshire said that while his trading strategy was working for others, it just didn't work out for me.

11.     Like Vasta, Wilshire assured me that WIM's other clients were making money, and that I would too if I stuck it out.

12.     Losses in my account continued to accumulate despite Vasta's and Wilshire's assurances. Whenever I discussed closing the account, they constantly said that if I stayed with them, they would make the money I lost back.

13.     After losing approximately $50,000, I finally closed my account in September 2002.

**Attachment F, p. 7**                                **EXHIBIT 16**

**FTC-VAST-000425**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 04-80862-CIV-MIDDLEBROOKS/JOHNSON

COMMODITY FUTURES TRADING
COMMISSION,

    Plaintiff,

vs.

WILSHIRE INVESTMENT MANAGEMENT
CORPORATION, NATIONAL COMMODITIES
CORPORATION, INC., ANDREW ALAN
WILSHIRE, ERIC SCOTT MALCOLMSON and
JAMES JOSEPH RUSSO,

    Defendants.

_____/

DEC 0 5 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.

## TRIAL ORDER

THIS CAUSE comes before the Court upon a Complaint, [DE #1], filed on September

14, 2004. In the Complaint, Plaintiff, the Commodity Futures Trading Commission ("CFTC"),

alleges that Defendants violated the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C.

§§ 1 *et seq.*, and applicable CFTC Regulations. Specifically, the CFTC alleges that Defendants

violated 17 C.F.R. § 33.10(a) & (c) (2003) which makes it unlawful

> for any person directly or indirectly: (a) To cheat or defraud or
> attempt to cheat or defraud any other person; . . . (c) To deceive or
> attempt to deceive any other person by any means whatsoever in or
> in connection with an offer to enter into, the entry into, the
> confirmation of the execution of, or the maintenance of, any
> commodity option transaction.

*Id.*

By allegedly violating the CFTC's regulations on commodity transactions, the CFTC

maintains that Defendants also violated 7 U.S.C. § 6c(b) (2002) which provides that

1

**Attachment F, p. 8**

**EXHIBIT 16**
**FTC-VAST-000426**

> no person shall offer to enter into, enter into or confirm the execution
> of, any transaction involving any commodity regulated under this
> Act . . . contrary to any rule, regulation, or order of the Commission
> prohibiting any such transaction or allowing any such transaction
> under such terms and conditions as the Commission shall prescribe.

*Id.*

A four-day bench trial in this matter was held from August 8-11, 2005. During that time, the Court heard argument by the parties and testimony from multiple witnesses. The Court has reviewed the record, including the trial transcript, all evidence admitted at trial, the parties' post-trial filings, and is otherwise fully apprised in the premises.

## I. FINDINGS OF FACT

The evidence at trial consisted mostly of testimony by nine clients of Wilshire Investment Management Corporation (WIM), two auditors from the National Futures Association (NFA), and Defendants Eric Scott Malcolmson ("Malcolmson"), James Joseph Russo ("Russo"), and Andrew Wilshire ("Wilshire"). The most telling aspect of the trial was the defendants' testimony. While it is understandably difficult to confront testimony by several investors about events transpiring years before, the defendants' testimony was simply not credible. They emphatically claimed that all the testimony of the investors was false. Although several of the investors had no previous experience in trading commodities or options, the brokers claimed that these novices always insisted on making their own decisions about trades and that many of the losses occurred when the investors disregarded their advice.

The Defendants would rarely answer a question directly. Rather than answer the question asked, a defendant would provide a torrent of jargon about "trading strategies," "systematic approaches," "computer generated signals," and "technical analysis."

2

**Attachment F, p. 9**                    **EXHIBIT 16**
**FTC-VAST-000427**

The defendants claimed to be unable to remember when they had last read their deposition testimony, when they had made changes in their written direct testimony, or even what they had said moments before. Yet the defendants insisted that not only was the investors' testimony untrue, but that the defendants' accurately remembered all of the detailed conversations with their clients. While the defendants adamantly denied promising their clients high profits, suggesting that their other clients had been very successful, downplaying the risks of commodity trading, or using seasonal information to suggest profit potential, the investors' testimony consistently indicated otherwise. Indeed, the pattern established by the investors' testimony, despite the defendants' protestations, is undeniable.

The Court must first determine what specific statements were made to each investor by Defendants Russo, Malcolmson, and Wilshire. Based on the trial testimony, the Court finds the following:

### a. Tony Del Duco

Mr. Del Duco was initially contacted by Jon Vasta, a WIM account executive, who wanted him to open an account with WIM. Vasta told Mr. Del Duco that if he invested with Vasta, he would "make money." Vasta specifically referenced the approaching cold winter and said, because of this, heating oil was going to go "through the roof" and Mr. Del Duco could take advantage of the "seasonal swing." Later, after losing money on the initial heating oil trades, Vasta told Mr. Del Duco that he should purchase additional options in soybeans. Vasta promised that Mr. Del Duco would "at the very least" break even on the soybean trade, and would most likely recoup all his losses and make some money. Mr. Del Duco also had several conversations with Andrew Wilshire. During at least one conversation, Wilshire assured Mr. Del Duco that

3

**EXHIBIT 16**
**FTC-VAST-000428**

WIM's other clients were making money and Mr. Del Duco would too if he "stuck it out." Wilshire also promised that if Mr. Del Duco stayed with WIM, the company would make Mr. Del Duco's money back for him.

### b. Daniel McNamee

Mr. McNamee received a phone call from James Russo, an Associated Person ("AP") of WIM, after responding to an Internet "pop-up" ad for educational materials on commodity trading. Russo indicated that he specialized in options trading and that these options entailed "little or no risk unless the trader was a complete moron." Russo also indicated that options trading had an infinite "upside" and that profits were almost "guaranteed." Furthermore, Russo claimed that "all his clients" who closely follow his recommendations realize significant profits in short periods of time. Over the course of several months, Russo constantly called Mr. McNamee, pressuring him to invest and suggesting that options trading would fund both Mr. McNamee's retirement and his children's education "within a few months." After Mr. McNamee opened an account at WIM, he spoke with Andrew Wilshire, who assured him that Russo was one of his best traders. Russo recommended investing in Japanese Yen, assuring Mr. McNamee that it was a "sure thing" and a "home run." When this investment failed, in May 2002, Russo encouraged McNamee to purchase crude oil options because Iraq was going to embargo oil sales to the U.S.

### c. Dennis Albrecht

Mr. Albrecht received a call from Eric Malcolmson, another WIM AP, after contacting WIM on the Internet. Malcomson said that he had just helped another client double or triple his investment. Mr. Albrecht had no experience in trading commodities or options. In January

4

2002, based on Mr. Malcolmson's advice, Mr. Albrecht invested first $5,000 and later an additional $15,000 in Japanese Yen. By March 2002, Mr. Albrecht had lost all but $23.94.

### d. Doreen Daidone

Ms. Daidone received a phone call from Malcolmson in 2000. Malcolmson repeatedly told her "I know I can make you money" and represented that he had been very successful making other clients rich through commodities trading. Malcolmson suggested investing in natural gas because as the winter wore on and grew colder people would use more gas for heat. He also told Ms. Daidone not to worry about risk and continually emphasized profit potential. After Ms. Daidone's initial investment disappeared, and she indicated a desire to close her account, Malcolmson state "I will make your money back."

### e. Charles Bolam

Mr. Bolam also dealt with Eric Malcolmson. Malcolmson suggested that his experience and guidance would greatly reduce the risk of options trading. He encouraged Mr. Bolam to invest immediately because "time [was] critical" to take advantage of a record low in Japanese Yen. Malcolmson said that Mr. Bolam could make a large return immediately and insisted that he would miss a great opportunity if he did not invest immediately. Malcolmson did not address his clients' losses and only spoke about potential gains.

### f. Bruce McLean

Malcolmson contacted Mr. McLean in April 2001. Malcolmson claimed that WIM's "great research team" had produced a winning trade percentage of 75%-80%, and that Malcolmson's own clients were making a lot of money. In fact, Malcolmson told Mr. McLean he could expect to double his investment in a short period. After opening his account, Mr.

**Attachment F, p. 12**                    **EXHIBIT 16**
                                           **FTC-VAST-000430**

McLean claims that Malcolmson purchased several options without authorization, resulting in a loss of most of the account.

### g. Duane Dipert

Mr. Dipert dealt with Russo and Michael Pucci, another account executive at WIM. Mr. Dipert invested $7,000 in September 2001 based on Russo's representation that he could make $30,000 and "retire early." After losing that $7,000, Mr. Dipert continued to invest with Pucci. In June 2002, Pucci made six unauthorized trades in Mr. Dipert's account which eventually wiped out Mr. Dipert's account.

### h. George Tracy

Mr. Tracy had an account with Malcolmson. Malcolmson encouraged Mr. Tracy to add more money to his account, stating that WIM clients had made a lot of money. Malcolmson recommended purchasing heating oil options immediately, before winter arrived in the northeast, because prices would go up in the winter.

### i. John Stevens

Mr. Stevens received a call from Malcolmson in September 2000. Malcolmson described himself as "very successful" and described WIM as one of the most successful trading firms. Malcolmson claimed to have a "proven method" for making profitable trades, and that he could double or triple Mr. Stevens' investment in a short time. Malcolmson also claimed to have turned $5,000 and $10,000 accounts into $100,000 accounts. While acknowledging that commodities trading involved some risk, Malcolmson described his method as "fool-proof."

Despite the frequent statements to these nine customers indicating that WIM clients made lots of money and that WIM brokers had methods and experience that limited the risk of trading

6

commodities, the vast majority of WIM clients lost money. In fact, from September 2000

through September 2004, approximately 87% of WIM clients closed their accounts with a loss.

*See Pl. Ex. 16.* During this period, Malcolmson and Russo's clients did even worse, losing

money 88% and 89% of the time, respectively. *Id.* The largest gain any of Malcolmson's

accounts closed with between 2000 and 2003 was $8,231.57; the largest gain by any of Russo's

accounts was $4,192,73. *Pl. Ex. 16*, pp. 6, 9. Neither Malcolmson nor Russo nor any other WIM

representative ever disclosed the firm's track record or the individual AP's track record to their

clients.

In December 2003, Vilia Sutkus-Kiela and Matthew Pendell of the NFA met with

Andrew Wilshire in connection with an NFA audit of WIM. Ms. Sutkus-Kiela and Mr. Pendell

also conducted an exit interview with Wilshire on March 15, 2004 before issuing their audit on

March 24, 2004. They presented the audit's conclusions to Mr. Wilshire, including concerns that

WIM's sales solicitations were misleading and likely to deceive the public.

## II.  ANALYSIS OF LIABILITY

### A. MALCOLMSON AND RUSSO

In a similar enforcement case brought by the CFTC, the Eleventh Circuit noted that the

CFTC must prove three elements to establish liability for fraud: (1) the making of a

misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3)

materiality.[1] *See Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321

---

[1]The Eleventh Circuit also explicitly noted that "unlike a cause of action for fraud under the common law of Torts, "reliance" on the representations is not a requisite element in an enforcement action. *R.J. Fitzgerald*, 310 F.3d at n.6.

7

(11th Cir. 2002), *citing Hammond v. Smith Barney Harris Upham & Co.*, [1997-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) 24,617 (CFTC Mar.1, 1990); *CFTC v. Trinity Finan. Group, Inc.*, Comm. Fut. L. Rep. 27,179 (S.D. Fla. Sept. 29, 1997), *aff'd in relevant part by CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir. 1999).

### 1. Making of a Misrepresentation, Misleading Statement, or Deceptive Omission

In *R.J. Fitzgerald*, the Eleventh Circuit noted that "whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *R.J. Fitzgerald*, 310 F.3d at 1328. That Court found liability for statements overemphasizing profit potential and downplaying risk. These statements included telling customers that "huge profits" of "200 to 300%" and that customers needed act immediately because the market might "never" present such an opportunity again. *Id.* at 1329. The Court also noted that both the Court and the CFTC had previously condemned "linking profit expectations on commodities options to known and expected weather events, seasonal trends, and historical highs." *Id.* at 1330.

Russo and Malcolmson made several misrepresentations and misleading statements that exaggerated profit potential and downplayed risk, similar to those condemned in *R.J. Fitzgerald*. Russo told Daniel McNamee that his suggested investments had "infinite upside," that profits were "almost guaranteed," and that investing in Yen was a "sure thing." He even went so far as to say that options trading entailed "little or no risk unless the trader was a complete moron." Russo told Duane Dipert that he could make $30,000 off of a $7,000 investment and "retire early."

Malcolmson told Dennis Albrecht and John Stevens that he had helped clients "double or

8

triple" their money and had turned $5,000 and $10,000 accounts into $100,000, even though 88%

of his clients had lost money between 2000-2004 and the largest gain any of his clients had

experienced was approximately $8,000.  He guaranteed Doreen Daidone and John Stevens that

he would make them money.  He also suggested, to Charles Bolam, Bruce McLean, and John

Stevens that his experience, research methods, and trading techniques would limit their risk, even

going so far as to call his method "fool-proof."  Finally, in direct contravention of previous Court

and CFTC rulings, Malcolmson suggested to clients that they could make substantial profits by

relying on seasonal trends and historical prices.  For example, he told Doreen Daidone and

George Tracy that natural gas and heating oil options (respectively) would increase as winter

wore on.  Just as the commercial in *R.J. Fitzgerald* told customers that they needed to act

immediately to take advantage of a unique opportunity for gains in the corn market, Malcolmson

told Charles Bolam that "time [was] critical" to take advantage of record lows in Japanese Yen.

    The Defendants argue that their exuberant descriptions of profit potential were balanced

by the risk disclosure documents that each customer signed and by the fact that each customer

makes the ultimate decision of whether or not to place a trade.  However, the Eleventh Circuit

has consistently held that general risk disclosure statements cannot balance out clearly

misleading statements. *See CFTC v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir.1999) ("We seriously

doubt whether boilerplate risk disclosure language could ever render an earlier material

misrepresentation immaterial."); *Clayton Brokerage Co. of St. Louis v. CFTC*, 794 F.2d 573,

580-81 (11th Cir. 1986) ("presentation of the risk disclosure statement does not relieve a broker

of any obligation under the [Act] to disclose all material information about risk to customers.");

*JCC, Inc. v. CFTC*, 63 F.3d 1557, 1569-70 (11th Cir. 1995).  Nor can the defendants hide behind

9

**Attachment F, p. 16**      **EXHIBIT 16**
**FTC-VAST-000434**

the investment "decisions" of mostly novice investors led to believe that their broker's recommendations are fool-proof. Such a finding would fly in the face of the Act and its implementing regulations.

In addition to making misrepresentations and misleading statements, Russo and Malcolmson admittedly never disclosed that 88% and 89% of their customers, respectively, and 87% of WIM's customer overall, lose money. *R.J. Fitzgerald* found that omitting such dismal results (95% in that case), particularly in conjunction with exaggerated statements of profit potential, made the solicitations fraudulent as a matter of law. 301 F.3d at 1332-33. The Court stated that it is "misleading and deceptive to speak of 'limited risk' and '200-300' percent profits without also telling the reasonable listener that the overwhelming bulk of firm customers lose money." *Id.* at 1333 (citations omitted). Defendants here argue that more than 50% of all commodities trades, by necessity, end in a loss. However, the *R.J. Fitzgerald* Court specifically indicated that it is not how well a particular firm has fared in comparison to other that matters; rather the proper focus is on what a reasonable investor would want to know before investing. *Id.* Therefore, Malcolmson and Russo's failure to disclose their firm's poor trading record constitutes a deceptive omission.

### 2. Scienter

For federal securities fraud, scienter includes both intent to deceive and "severe recklessness." *Bryant v. Avado Brands, Inc*, 187 F.3d 1271, 1282 (11th Cir. 1999). This requirement can be met "when Defendant's conduct involves 'highly unreasonable omissions or misrepresentations...that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it.'" *R.J. Fitzgerald*, 310 F.3d

10

at 1328 (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). In *R.J. Fitzgerald*, the Court found the defendants, who were federally registered professionals knowledgeable of the commodities markets, were reckless in linking profit expectations to seasonal trends, suggesting that the market could be timed to generate large profits, and inflating profit expectations while downplaying risks.

Again, Malcolmson and Russo's actions are closely analogous to the unacceptable behavior in *R.J. Fitzgerald*. As described above, they similarly made the type of statements listed in *R.J. Fitzgerald* and consistently condemned by the Eleventh Circuit and the CFTC. Some of the statements chronicled earlier are so outrageous that Malcolmson and Russo must have known they were misleading their customers, or, at the very least, that there was a high probability of harm. Malcolmson and Russo are federally registered professionals and profess to be knowledgeable in commodities trading and familiar with their industry's solicitation requirements. In light of this experience and knowledge, virtually guaranteeing profits, making recommendations based on seasonal trends, and misrepresenting their past success records constitutes an extreme departure from the standards of ordinary care.

### 3. Materiality

A representation or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment. *R.J. Fitzgerald*, 301 F.3d at 1328-29 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972); *R&W Technical Servs., Ltd. v. CFTC*, 205 F.3d 164, 169 (5th Cir. 2000)).

One cannot seriously dispute that the misrepresentations and omissions Malcolmson and Russo made are material. Exaggerated statements of profit potential and suggestions that current

11

conditions offer unique opportunities to profit would undoubtedly heavily influence a reasonable

investor's decision to invest. *R.J. Fitzgerald*, 301 F.3d at 1330; *In re JCC, Inc.*, [1992-1994

Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,080 (CFTC May 12, 1994), *aff'd, JCC, Inc. v.*

*CFTC*, 63 F.3d 1557 (11th Cir. 1995). Therefore, Malcolmson and Russo have clearly violated 7

U.S.C. § 6c(b) and 17 C.F.R. § 33.10.

### B. WILLSHIRE INVESTMENT MANAGEMENT CORPORATION

WIM is vicariously liable for the violations of its employees. Under Section 2(a)(1)(B) of

the CEA, 7 U.S.C. §2(a)(1)(B)

> [t]he act, omission, or failure of any official, agent, or other person acting for
> any individual, association, partnership, corporation, or trust within the scope
> of his employment or office shall be deemed the act, omission, or failure of
> such individual, association, partnership, corporation, or trust, as well as of
> such official agent, or other person.

Malcolmson and Russo made their fraudulent solicitations within the scope of their employment

with WIM. As described in the findings of fact, at least one other WIM AP, Jon Vasta, made

similar fraudulent misrepresentations to clients in the scope of his employment. The Defendants

do not dispute that WIM is liable for these individuals' acts, other than to dispute the finding of

an underlying violation. As the Court has found that WIM's employees have violated the Act,

WIM is similarly liable.

### C. ANDREW WILSHIRE

The CFTC seeks to hold Andrew Wilshire personally liable as "controlling person."

Under Section 13(b) of the CEA, 7 U.S.C. §13c(b),

> Any person who directly or indirectly, controls any person who has violated
> any provision of this chapter or any rules, regulations, or orders issued pursuant
> to this chapter may be held liable for such violation in any action brought by
> the Commission to the same extent as the controlled person. In such action,

12

the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting violation.

The CFTC also asserts that Wilshire violated 17 C.F.R. §166.3 by failing to "diligently supervise" his APs. The parties do not dispute that Andrew Wilshire qualifies as a controlling person. He is President and CEO of WIM, hires new APs and brokers, supervises training, monitors solicitations, and is responsible for ensuring compliance with the CFTC's rules and regulations. However, the parties do dispute whether Wilshire acted in good faith or knowingly induced violations of the CEA and whether he diligently supervised his subordinates.

To show knowing inducement of conduct violating the CEA, the CFTC must "show that the controlling person had actual or constructive knowledge of the core activities that constitute the violation and allowed them to continue." *JCC*, 63 F.3d at 1568; *In re Spiegel*, [1987-1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,103 at 34, 767 (CFTC Jan. 12, 1988). To demonstrate constructive knowledge, the CFTC must show that Wilshire "lack[ed] actual knowledge only because he consciously avoid[ed] it." *JCC*, 63 F.3d at 1569; *In re Spiegel*, [1987-1990 Transfer Binder] ¶ 24,103 at 34, 767.

In *JCC*, the Eleventh Circuit upheld a finding of knowing inducement where the defendant was actively involved in training and monitoring sales personal, personally hired many of the APs, monitored sales solicitation efforts, and prepared sales scripts. There was also evidence that several employees had reported illegal marketing behavior to the defendant and that the defendant's only response was to fire one offender eight months later.

Although not identical, the facts in this case are very similar to *JCC*. Wilshire was admittedly responsible for hiring, training, and monitoring WIM's APs. His post-trial brief even

13

argues that he takes an "active role" in ensuring his APs' compliance with NFA and CFTC rules. He had notice, at least, of Jon Vasta's and Eric Malcolmson's violations through speaking with Tony Del Duco and John Stevens. Yet, he punished neither Mr. Vasta nor Mr. Malcolmson. Furthermore, Wilshire himself indicated that he does not accurately inform his customers of his firm's loss rate, implying that other WIM APs' failure to disclose such information was condoned, if not expressly encouraged. Finally, the extent and obviousness of the soliciting violations found by the Court simply belie any argument that Wilshire did not know what was occurring. Given Wilshire's own assertions about how extensively he monitors his brokers, he must have either known what their tactics were or, at the very least, been willfully blind. These facts indicate that Wilshire is liable not only as a "controlling person," but also for failure to diligently supervise.

## D. NATIONAL COMMODITIES CORPORATION, INC. (NCCI)

The CFTC seeks to hold National Commodities Corporation, Inc. (NCCI) liable for WIM's violation of the CEA based on a Guarantee Agreement between NCCI and WIM. In September 2000, NCCI and Wilshire entered into a Guarantee Agreement. In pertinent part, the Guarantee Agreement states:

> [NCCI] guarantees performance by [WIM] of, and shall be jointly and severally liable for, all obligations of the introducing broker under the Commodities Exchange Act, as it may be amended from time to time, and the rules, regulations and orders which have been or may be promulgated thereunder with respect to the solicitation of and transactions involving all commodity customer, option customer, foreign futures customer and foreign options customer accounts of [WIM] entered into on or after the effective date of this agreement.

Pl. ex. 13. While the Defendants do not dispute the existence of this agreement or the language contained therein, they argue that NCCI did not agree to accept responsibility for intentional or

14

willful misconduct. However, the Defendants do not point to any additional language in the agreement, any external evidence, or any principle of law to support its contention that the agreement does not cover willful or intentional misconduct.

The agreement clearly indicates that NCCI is "jointly and severally liable for *all obligations* of [WIM] under the Commodities Exchange Act..." (emphasis added). Nothing in the agreement suggests any distinction between willful violations of WIM's obligations versus merely negligent violations. The Defendants give no reason why the plain meaning is incorrect other than their conclusory statement that the agreement did not apply to willful acts. Therefore, NCCI is jointly and severally liable for WIM's violations.

### III. REMEDIES

#### A. INJUNCTION

The CFTC asks this Court to enter an injunction against the Defendants, prohibiting future violations of the CEA and barring them from engaging in any commodity-related activity, including soliciting customers and funds. In determining whether an injunction is appropriate, the Court should consider past illegal conduct and the likelihood of future violations. *See, e.g. Sidoti*, 178 F.3d at 1137.

An injunction is appropriate in this case. As detailed above, the Defendants violated the CEA in dealing with at least nine customers. The violations included acts by multiple brokers at multiple times. More importantly, with respect to the potential for future violations, the Defendants have not acknowledged any wrongdoing, insisting rather that their sales tactics were completely legitimate. In fact, the lack of candor which they demonstrated at trial belies any

15

**EXHIBIT 16**
**FTC-VAST-000440**

intent of making good faith efforts to comply with restrictions in the future.

Defendants Malcolmson, Russo, Wilshire, and WIM are specifically enjoined from violating section 4c(b) of the CEA (7 U.S.C. §6c(b)) and 17 C.F.R. §33.10(a)-(c). However, because the violations were blatant, brazen, and repeated, a more extensive injunction is justified. *See CFTC v. Noble Wealth Data Information Svcs., Inc.*, 90 F.Supp.2d 676 (D. Md. 2000). Therefore, Defendants Malcolmson, Russo, Wilshire, and WIM are further enjoined from engaging in any commodity-related activity, including soliciting new customers.

## B. RESTITUTION

The CFTC seeks restitution to compensate the customers defrauded by the Defendants. The Court has authority to order restitution under the "ancillary relief" provision in 7 U.S.C. §13a-1. *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 583-584 (9th Cir. 1984); *CFTC v. Midland Rare Coin Exchange, Inc.* 71 F.Supp.2d 1257, 1264 (S.D. Fla. 1999).

The CFTC seeks restitution for all customer losses from 2000 through September 2004, a total of over $6 million. The Defendants object that the CFTC has only presented evidence of fraudulent conduct with regards to nine customers and that the Court cannot presume, based on these few customers, that all WIM customers lost their money due to fraudulent solicitations. The CFTC argues that reliance can be presumed, either because all WIM solicitations omitted disclosure of WIM's track record or because Malcolmson and Russo's solicitations are so similar and consistent that they amount to "systematic and pervasive fraud."

The Court cannot infer, based on the evidence presented, that every WIM customer was harmed by a fraudulent solicitation. First, this case is not "primarily" an omissions case in which the Court can presume reliance. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128

16

(1972); *Waters v. Int'l Precious Metals Corp*, 172 F.R.D. 479, 485 (S.D. Fla. 1996). While the Defendants' failure to disclose WIM's investment track record is certainly a significant part of the Court's fraud finding, the affirmative misrepresentations the Defendants made regarding profit potential, risk, and seasonal trends make this at least a mixed case of misrepresentation and omission. *See In re Amerifirst Securities Litigation*, 139 F.R.D. 423, 430 n.4 (S.D. Fla. 1991); *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594 (S.D. Fla. 1991).

Second, the evidence presented at trial was not sufficient to find that the wrongdoing was so systematic and pervasive in WIM that every customer was harmed by fraudulent solicitation. The CFTC tries to analogize to other non-class action cases where the Court has presumed pervasive fraud based on the testimony of a handful of customers. However, in these cases, the fraudulent acts were, by their nature, more certainly a part of every transaction. In *CFTC v. Noble Wealth*, the evidence indicated that Noble Wealth conducted all of their trades outside the interbank market where it was supposed to place orders. 90 F.Supp.2d 676 (D. Md. 2000). In *FTC v. Figgie Int'l Inc.*, the finding of fraudulent misrepresentation and omission was based on standardized sales presentations and company produced promotional materials. 994 F.2d 595 (9th Cir. 1993). Here, the testimony presented primarily concerned two brokers. While the customers' testimony here did exhibit certain commonalities among Russo and Malcolmson's fraudulent tactics, there is little indication like in *Noble Wealth* or *Figgie* that similar tactics were necessarily a part of each WIM solicitation.[2]

---

[2]In addition to the nine testifying customers, the CFTC entered into evidence an audit report by the NFA which recounted complaints from other WIM customers. These complaints indicated additional misrepresentations by Russo and Malcolmson and similar misrepresentations by other WIM APs not named in this suit. However, the summaries of statements by WIM customers in the NFA report are inadmissible hearsay. The audit itself is hearsay, which the CFTC argued is admissible under three possible exceptions: the "public records" exception, the "business records" exception, and the "residual exception." Under the business records and residual exceptions, the statements recounted in the audit report would still constitute hearsay within hearsay.

Rather, this case is much closer to *CFTC v. Matrix Trading Group, Inc*, 2002 WL 31936799 (S.D. Fla., Oct. 3, 2002). In *Matrix*, the CFTC presented testimony from several defrauded customers who indicated common misrepresentations in sales solicitations. Indeed, the *Matrix* misrepresentations were virtually identical to those presented in this case. In *Matrix*, the CFTC only requested, and the Court only granted, restitution for the sixteen customers who testified at trial. *Id* at \*13-14. A similar remedy is appropriate here.

Restitution should be awarded to each of the following individuals[3] in the following amounts, representing their total losses[4]:

1)    Tony Del Duco: $88,103.17

2)    George Tracy: $14,546.35

3)    John Stevens: $4,988.11

4)    Doreen Daidone: $4,559.89

5)    Bruce McLean: $2,929.57

6)    Charles Bolam: $4,905.00

7)    Dennis Albrecht: $19,976.06

---

The public records exception, Fed.R.Evid. 803(8) does allow factual findings within government reports to be admitted. However, even assuming the NFA is a public agency under Fed.R.Evid. 803(8), the report does not present factual findings. Rather it simply recounts statements by WIM customers. Rule 803(8) only covers information based on the knowledge or observations of the writer. *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994). Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible. *U.S. v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983); *Parsons v. Honeywell, Inc.* 929 F.2d 901, 907 (2d Cir. 1991). Therefore, the Court cannot consider the customer statements in the audit report for the truth of their contents and cannot use those statements as additional evidence of pervasive fraud.

[3]Duane Dipert entered into a settlement agreement with WIM, Wilshire, Russo, Michael Pucci, and NCCI in December 2002. Under this agreement, Mr. Dipert received $7,000.00 and agreed to release the other parties from any claims. Although the Plaintiff's evidence indicates that Mr. Dipert lost $9,908.22, the Court must respect this private agreement and consider Mr. Dipert adequately compensated.

[4]These figures are taken from Plaintiff's Exhibit 16 and the testimony of Lacey Dingman

**Attachment F, p. 25**                    **EXHIBIT 16**
                                           **FTC-VAST-000443**

8)     Daniel McNamee: $7, 883.84

## C. CIVIL PENALTIES

The CFTC also asks the Court to impose civil penalties on the Defendants. The Court

has authority to impose "on any person found in the action to have committed any violation a

civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to

the person for each violation." 7 U.S.C. §13a-1(d)(1). As with its restitution argument, the

CFTC urges the Court to base the civil penalties based on the Defendants' total earnings from all

customers from 2000-2004. However, the statute specifically ties the civil penalty to specific

violations. As articulated above, the Court cannot presume violations beyond those on which it

heard evidence.

The Plaintiffs presented some evidence regarding the amount of commissions and fees

paid by each of the testifying customers. The testifying customers apparently paid approximately

$53,291.36 in commissions and fees. However, it is difficult to discern how particular

commissions were divided amongst the defendants. In any event, it does not appear that triple

the benefit from the testifying customers to any individual defendant exceeded $100,000.

The violations in this case were blatant. As noted above, the Defendants are unapologetic

and brazen and display little intention of changing. Therefore, imposing the maximum fine

allowed is justified. Malcolmson, Russo, Wilshire, and WIM will be fined $100,000 each.

The CFTC also seeks a separate fine against NCCI based on their contract with WIM.

However, as the CFTC itself points out, NCCI is not liable for any of its own conduct; NCCI is

only involved because of the contract making it "jointly and severally liable for, all obligations of

the introducing broker [WIM] under the Commodities Exchange Act." It is inappropriate to

19

**EXHIBIT 16**
**FTC-VAST-000444**

impose a separate fine on NCCI.  Rather, NCCI is jointly and severably liable for WIM's fine.

**D. DISGORGEMENT**

Finally, the CFTC seeks disgorgement of all the Defendants' ill-gotten gains.

Disgorgement is a valid remedy for CEA violations.  *See, e.g., CFTC v. British American Options Corp*, 788 F.2d 92, 93-94 (2d Cir. 1986).  However, the civil penalty imposed above is sufficient to ensure that the Defendants did not profit from defrauding the testifying customers.

An additional order for disgorgement is not necessary.

**ORDER**

In light of the foregoing, it is **ORDERED AND ADJUDGED** that:

1.) Defendants' Motion to Exclude Plaintiff's Claim for Restitution **[DE #44]** is **DENIED**;

2.) Plaintiff's Motion to Exclude Certain of Defendants' Trial Exhibits **[DE #45]** is **GRANTED**;

3.) Defendants' Requests for Hearing on Motions in Limine **[DE #49 & #51]** are **DENIED AS MOOT**.

4.) The relief of injunction, restitution, and civil penalty requested in the Plaintiff's Complaint is **GRANTED** as outlined above.

DONE AND ORDERED in Chambers at West Palm Beach, Florida this 5 day of December, 2005.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record

20

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 12-81311-CV-MIDDLEBROOKS/BRANNON

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

      Plaintiff,

vs.

HUNTER WISE COMMODITIES, LLC, *et al.*,

      Defendants.

_____/

### OPINION AND ORDER

THIS CAUSE comes before the Court for final disposition of the issues presented during

a bench trial held from February 26, 2014 through February 28, 2014 and March 3, 2014.

Plaintiff United States Commodity Futures Trading Commission ("CFTC") alleges that

Defendants[1] violated several sections of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 1,

*et seq.*, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act

("Dodd-Frank")[2] and CFTC Regulations. The trial in this matter focused primarily on Hunter

Wise, Mr. Jager, and Mr. Martin, whom the CFTC asserts led a commodities scheme that

---

[1] For purposes of this Order, "Defendants" consist of the Entity Defendants, which are Hunter
Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, and Hunter
Wise Trading, LLC, (collectively, "Hunter Wise"), C.D. Hopkins Financial, LLC and Hard Asset
Lending Group, LLC, (collectively, "CD Hopkins"), Blackstone Metals Group, LLC,
("Blackstone"), Newbridge Alliance, Inc., ("Newbridge"), United States Capital Trust, LLC
("USCT") and Lloyds Commodities, LLC, Lloyds Commodities Credit Company, LLC, Lloyds
Services, LLC, (collectively, "Lloyds") as well as individual Defendants David A. Moore,
Chadewick Hopkins, Baris Keser, John King, Harold Edward Martin Jr, and Fred Jager. "Dealer
Defendants" refers to CD Hopkins, Blackstone, Newbridge, and USCT.

[2] As discussed in more detail below, Dodd-Frank became effective on July 16, 2011 and granted
the CFTC new authority over certain leveraged, margined, or financed commodity transactions
with retail customers, including authority to prohibit fraud in connection with such transactions
in interstate commerce.

1

SCANNED

EXHIBIT 16
FTC-VAST-000446

involved misrepresenting the nature of precious metals transactions with retail customers[3] and that resulted in losses totaling millions of dollars.[4]

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). All proposed findings of fact and conclusions of law inconsistent with those set forth herein are rejected.

## I.   FACTUAL BACKGROUND

Hunter Wise "investors are not players in the casino, instead they own the casino. . . . Put another way, our investors are not betting on the horses; we own the race track [sic]. The point is

---

[3] A "retail customer" is a non-eligible contract participant. An "eligible contract participant" means, in pertinent part:

(A) acting for its own account –

    (xi)   an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of –

        (I)   $10,000,000; or

        (II)   $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual

7 U.S.C. § 1a(18)(A)(xi). Therefore, a retail customer is an individual who does not have amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual. *Id.*

[4] Lloyds Commodities, LLC, Lloyds Commodities Credit Company, LLC, Lloyds Services, LLC, Mr. Burbage, and Mr. Gaudino settled the claims against them and, on February 5, 2014, the Court entered a Consent Order. (DE 254). The Court also entered a Consent Order as to: (1) Newbridge and Mr. King (DE 289) and (2) USCT and Mr. Moore (DE 288). The Court shall enter default judgment against CD Hopkins and Mr. Hopkins and Blackstone and Mr. Keser under separate Order.

2

that we control the process, and stand to make money no matter where the markets shift."[5] E-mail from Jager to Pandora Pang (June 1, 2008) (CFTC Ex. 180 at 1). This statement embodies Mr. Jager and Mr. Martin's intentions, their understanding of what Hunter Wise stood for, and how they, and Hunter Wise investors, profited on the backs of approximately 3,200 retail customers who lost over $52 million from July 16, 2011 through February 25, 2013. In their minds, they unreasonably believed that the house always wins.

### A. The Casino – Its Owners and Its Dealers

Mr. Jager and Mr. Martin's "casino" was a well-planned and executed scheme dealing with financed, off-exchange commodities transactions that they orchestrated using retail customers, the Dealer Defendants, non-party dealers, and metals Suppliers.[6] Hunter Wise's business model revolved around the supposed buying and selling of precious metals, including gold, silver, platinum, palladium, and copper. Hunter Wise claimed to purchase and sell these precious metals from several Suppliers.

Hunter Wise was originally a California limited liability company started in July 2007, but it has been a registered Nevada limited liability company since October 2010. It maintains business addresses in Las Vegas, Nevada and Irvine, California. Mr. Martin is the registered agent. He and Mr. Jager are managers and members of Hunter Wise Commodities. Hunter Wise Commodities is the sole member of both Hunter Wise Credit, LLC and Hunter Wise Trading, LLC. Hunter Wise Commodities, Hunter Wise Credit, and Hunter Wise Trading all share the same business address in Las Vegas and the same mailing address in Irvine. Hunter Wise

---

[5] The Hunter Wise "investors" Mr. Jager mentions do not include the retail customers, who entered into Hunter Wise's precious metals transactions, but those who invested in Hunter Wise.
[6] For purposes of this Order, "Suppliers" includes A-Mark Precious Metals, Inc. ("A-Mark"), Standard Bank, PLC ("Standard Bank"), and Natixis Commodity Markets Ltd. ("Natixis").

3

**EXHIBIT 16**
**FTC-VAST-000448**

Services also shares the Irvine mailing address.[7] Mr. Martin and Mr. Jager are the sole members and managers of Hunter Wise Services, LLC and are the Chief Operating Officer and Chief Executive Officer of Hunter Wise Services, respectively. Both Mr. Martin and Mr. Jager testified at trial.

Mr. Martin has thirty-five years of experience in the precious metals industry. His precious metals experience includes working at Monex Precious Metals, formerly Pacific Coast Coin Exchange, Unimet Credit Corporation, where he was in charge of business development for the buying, selling, and financing of precious metals.[8] Mr. Martin founded and was president of Capital Asset, which was in the business of buying, selling, and financing commodities transactions through a network of dealers. The dealers would find customers and send them to Capital Asset. An outside investor eventually terminated him from that company. Capital Asset was his last venture in commodities until 2006, when he and Mr. Jager decided to develop the business plan for Hunter Wise.

Mr. Jager has experience in the securities market as well. Prior to working for Hunter Wise Commodities, Mr. Jager ran, and continues to run, Hunter Wise Securities, a securities firm that is registered by the Financial Industry Regulatory Authority. Mr. Jager put in the seed capital for Hunter Wise and he was responsible for raising the equity capital for Hunter Wise.

---

[7] In my February 19, 2014 Order on the Parties' Motions for Summary Judgment ("February 19, 2014 Order") (DE 281), I found that Hunter Wise operated as a common enterprise. (DE 281 at 19). Although Mr. Martin ran the business's day-to-day operations, Mr. Jager's position within Hunter Wise demonstrated that he had knowledge of and directed the economic aspects of the entity. Therefore, I found that Mr. Martin and Mr. Jager controlled Hunter Wise. *Id.*

[8] As discussed in further detail below, due to a Consent Order Mr. Martin entered into because of his conduct at Unimet, Mr. Martin was permanently enjoined from making misrepresentations and omitting disclosures related to material facts regarding information relevant to a customer's decision to enter into an investment in commodities. *See* Consent Order as to Defendants E. Keith Owens, Ed Martin, and Ed Myers, CFTC Ex. 159, *Federal Trade Commission v. Unimet Credit Corp.*, No. 92-5759 (C.D. Cal., Dec. 20, 1994).

4

Although he had no prior experience in the precious metals industry, Mr. Jager was crucial to Hunter Wise's success because he provided important contacts and determined the strategic direction of the corporation, all in partnership with Mr. Martin.

In addition, two other key employees testified during the trial: Sylvia Williams and Steve Fitch. Ms. Williams was Hunter Wise's Director of Operations. She reported directly to Mr. Martin. Mr. Fitch was responsible for interfacing with the dealers. He offered dealer training and knew what services Hunter Wise offered to the dealers. According to Hunter Wise's records, Hunter Wise received retail customers from over 110 dealers. Summary Exhibit – Hunter Wise Dealer Loss Reports (with Customer Names) by Dealer (July 2011-present), CFTC Ex. 67. Both employees testified to Hunter Wise's operations in the commodities industry.

On December 5, 2012, the CFTC filed the Complaint (DE 1) in the instant action, alleging thirteen Counts[9] against Defendants for Dodd-Frank violations.[10] The CFTC seeks injunctive and equitable relief and penalties under the Act.

---

[9] The Counts against Hunter Wise, Mr. Jager, and Mr. Martin consisted of:

1. Count One, violations of Section 4(a) of the Act, 7 U.S.C. § 6(a), through illegal, off-exchange transactions against all Defendants;
2. Count Two, violations of Section 4b of the Act, 7 U.S.C § 6b(a), against Hunter Wise, Mr. Martin, and Mr. Jager;
3. Count Three, violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Rule 180.1, 17 C.F.R. § 180.1, against Hunter Wise, Mr. Martin, and Mr. Jager;
4. Count Twelve, violations of Section 4d of the Act, 7 U.S.C. § 6d(a), for failure to register against Hunter Wise, Mr. Martin, and Mr. Jager; and
5. Count Thirteen, aiding and abetting under Section 13(a) of the Act, 7 U.S.C. § 13c, against Hunter Wise, Mr. Martin, and Mr. Jager.

(Compl., DE 1). For each of the individual, non-entity Defendants and for each of the Counts, the Complaint alleges control person liability pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

[10] Dodd-Frank expanded the CFTC's jurisdiction by including Section 2(c)(2)(D) to the Act, 7 U.S.C. § 2(c)(2)(D), which provides, in pertinent part:

**Attachment G, p. 5**          **EXHIBIT 16**
                               **FTC-VAST-000450**

On December 6, 2012, the CFTC filed a Motion for Preliminary Injunction (DE 4) seeking to enjoin the Defendants from offering and executing illegal retail commodity transactions. On February 22, 2013, after the Court held a hearing on the Motion for Preliminary

---

**(D) Retail commodity transactions**

**(i) Applicability**

Except as provided in clause (ii), this subparagraph shall apply to any agreement, contract, or transaction in any commodity that is –

**(I)**   entered into with, or offered to (even if not entered into with), a person that is not an eligible contract participant or eligible commercial entity; and

**(II)**   entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

**(ii) Exceptions**

This subparagraph shall not apply to –

**(I)**   an agreement, contract, or transaction described in paragraph (1) or subparagraphs (A), (B), or (C), including any agreement, contract, or transaction specifically excluded from subparagraph (A), (B), or (C);

**(II)**   any security;

**(III)**   a contract of sale that -

**(aa)**   results in actual delivery within 28 days or such other longer period as the Commission may determine by rule or regulation based upon the typical commercial practice in cash or spot markets for the commodity involved; or

**(bb)**   creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively, in connection with the line of business of the seller and buyer[.]

7 U.S.C. § 2(c)(2)(D). For a more detailed discussion regarding Dodd-Frank's changes to the Act and the requirement that retail commodity transactions occur on a regulated exchange, see the Court's February 19, 2014 Order. (DE 281).

6

**EXHIBIT 16**
**FTC-VAST-000451**

Injunction, the Court issued an Order Temporarily Appointing Special Corporate Monitor. (DE 77).[11] The Court issued an Order on Plaintiff's Motion for Preliminary Injunction (DE 78) on February 26, 2013, finding that the CFTC has jurisdiction over the commodities transactions at issue in the instant matter and was entitled to a preliminary injunction and other equitable relief. The Court also reaffirmed the Special Monitor's authority as it relates to the corporate Defendants.[12] (*See* DE 78. at 33-37).

The Court entered an Order on the Parties' Motions for Summary Judgment on February 19, 2014. (DE 281). In the February 19, 2014 Order, the Court granted summary judgment in favor of the CFTC and against the Hunter Wise Defendants as to Count One of the Complaint, violations of Section 4(a) of the Act: illegal, off-exchange transactions; and Count Twelve of the Complaint, violations of Section 4d of the Act for failure to register. Therefore, the Court need only address Count Two, violations of Section 4b of the Act[13] by cheating, defrauding, or

---

[11] Melanie Damian, the Court-appointed Special Monitor, testified during the trial regarding Hunter Wise's margin trading accounts, the losses to retail customers due to Hunter Wise's scheme, and Hunter Wise's profits.

[12] On April 15, 2014, the Eleventh Circuit affirmed the Court's Order on Plaintiff's Motion for Preliminary Injunction. *CFTC v. Hunter Wise Commodities, LLC*, -- F.3d --, 2014 WL 1424435, *12 (11th Cir. 2014) (hereinafter, "*Hunter Wise*"). In its opinion, the Eleventh Circuit: (1) found no error with the Court's factual findings and agreed with its legal conclusions; (2) held that the CFTC had enforcement authority over the disputed precious metal transactions and that no exceptions applied; and (3) affirmed the Court's grant of preliminary injunction because the CFTC had pleaded a prima facie case of a violation of the Act. *Id.* at *12.

[13] Section 4b of the Act states, in pertinent part:

    (a) **Unlawful actions**

        It shall be unlawful–

    . . .

    (2)    for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that

attempting to cheat or defraud retail customers in connection with retail commodities transactions; Count Three, violations of Section 6(c)(1) of the Act[14] and Regulation 180.1[15] by

---

<div style="margin-left:2em">

is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market–

(A)    to cheat or defraud or attempt to cheat or defraud the other person;

(B)    willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C)    willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

</div>

7 U.S.C. § 6b(a)(2).
[14] Section 6(c)(1) of the Act provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with ... a contract of sale of any commodity in interstate commerce ... any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate.

7 U.S.C. § 9(1).
[15] Rule 180.1 reads, in pertinent part:

> (a) It shall be unlawful for any person, directly or indirectly, in connection with any ... contract of sale of any commodity in interstate commerce ... to intentionally or recklessly:
>
> > (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
> >
> > (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
> >
> > (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

**EXHIBIT 16**
**FTC-VAST-000453**

employing a scheme or artifice to defraud in connection with contracts of sale of commodities; and Count Thirteen, aiding and abetting under Section 13(a) of the Act, 7 U.S.C. § 13c(a).[16] The CFTC alleges that Mr. Martin and Mr. Jager developed a scheme using Hunter Wise's corporate web to defraud over 3,200 retail customers and resulted in the retail customers losing over $52 million from July 16, 2011 through February 25, 2013.

### B. The Casino's Operations

Hunter Wise's scheme was a multi-level model. First, the Dealer Defendants would contact and solicit novice and amateur investors to enter into financed commodities transactions using Hunter Wise's documents and training material to guide them. Next, the dealers would send the retail customers' funds to Hunter Wise, who would in turn distribute the dealers' applicable share of the fees and interest. Lastly, Hunter Wise would use the remaining funds to enter into margin trading transactions with the metals Suppliers. Hunter Wise steered and controlled every aspect of this process.

#### (1)   The Retail Customers' Interactions with the Dealer Defendants and Hunter Wise

Because of the Dealer Defendants' misrepresentations, these investors, i.e., the retail customers, thought they were purchasing precious metals from the Dealer Defendants on a

---

17 C.F.R. § 180.1.

[16] Section 13(a) of the Act provides, in relevant part:

> Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a).

9

financed basis. For example, the Dealer Defendants' websites claimed that retail customers would be buying metals, but that the metals would be stored in a depository, which would require a storage fee. *See, e.g.*, Blackstone Website, CFTC Ex. 52 at 4. The Dealer Defendants claimed that once the retail customers submitted a down payment, the retail customers would receive a loan to cover the rest of the cost of buying the metals. The retail customers were charged exorbitant interest on these purposed loans.[17]

Retail customers expected to reap the benefits of their investment in these metals commodity transactions. Hunter Wise's own training materials, which it offered to Dealer Defendants to use on retail customers, claimed that trading in precious metals was a "medium risk investment" and that retail customers saw "over 300% return." CFTC Ex. 112 at 7, 12. Further, the Hunter Wise-created training materials promised "physical ownership" of the metals that were liquid and would "always have value." *Id.* at 31.

The retail customers entered into several agreements with the Dealer Defendants– agreements that were prepared by Hunter Wise. A Customer Loan, Security & Storage Agreement provided that its purpose was to:

> set forth the terms under which [the dealer] will lend to Borrower, from time to time, physical commodities (the "Commodity Loans"), and sums of money to purchase physical commodities (the "Cash Advances"), including, but not limited to, delivery to a depository, costs, fees, storage, collateral, security interest, certain risks and costs associated with each loan transaction.

Customer Account Agreement Template, CFTC Ex. 150 at 4 (hereinafter, "Loan Agreement"). From this Loan Agreement, the retail customers were led to believe that the interest they were paying was for the loans their dealers financed for these transactions and that metals stored on behalf of the retail customers actually existed.

---

[17] As described below, the retail customers did not actually own any metals and Hunter Wise never executed any loans.

**Attachment G, p. 10**          **EXHIBIT 16**
                                **FTC-VAST-000455**

As part of the scheme, Hunter Wise created templates and issued documents on the Dealer Defendants' behalf through its online database called the "portal." Hunter Wise maintained and controlled this "portal," which allowed dealers and retail customers to access their account and transaction information and allowed the Dealer Defendants to prepare reports on their retail customers. Hunter Wise generated the account documents that were given to retail consumers, even though they were on the Dealer Defendants' letterhead and appeared to be from the Dealer Defendants. The documents included Trade Confirmation notices, tax forms, Notices of Transfers, and account statements. Further, Hunter Wise provided training materials and other services that the Dealer Defendants used to solicit retail customers and maintain their accounts in order to continue the scheme. *See* Fitch Testimony, Feb 27-28, 2014, Mar. 3, 2014. All of these documents contained misleading statements or deceptive omissions regarding whether the retail customers actually owned precious metals.

Through the portal or discussion with their dealers, the retail customers thought they were able to buy and sell metals. If their trading equity fell below a certain percentage, they would get a margin call and they would have to deposit more money into their account. If their position fell to an even lower equity percentage, part of the retail customers' account would be liquidated until there were enough funds in the account so that the equity percentage would be over the margin call amount. Hunter Wise had the ability to impose margin calls and liquidate retail customers' positions.

### (2) *Hunter Wise's Management of the Dealer Defendants*

It is apparent that the whole scheme would fall apart without Hunter Wise's ever-present oversight. For example, Frank Gaudino, the owner of Lloyds Commodities, testified regarding how much he and the Dealer Defendants depended on Hunter Wise to operate the scheme.

**Attachment G, p. 11**            **EXHIBIT 16**
                                   **FTC-VAST-000456**

Lloyds was responsible for recruiting the dealers who solicited the retail customers for Hunter Wise. All of Lloyds' dealers used Hunter Wise's services. *See* Gaudino Testimony, Mar. 3, 2014.

Lloyds served as an intermediary between Hunter Wise and the Dealer Defendants; it provided no other services to the dealers. *Id.* Although Lloyds would find dealers to do business with Hunter Wise, it was Hunter Wise that ran the background checks on those dealers to ensure their credibility. It was Hunter Wise that would develop the ticket number with a price for all transactions for Lloyds to relay to the dealers, and the dealers to the retail customers. It was Hunter Wise that provided the services Lloyds claimed it provided in its promotional brochures, which were identical to those claimed in Hunter Wises' own promotional brochures. *Compare* Lloyds Promotional Brochure, CFTC Ex. 105 *with* Hunter Wise Promotional Brochure, CFTC Ex. 151. In addition, it was Hunter Wise that Lloyds depended on to purchase the metals and to provide confirmation to retail customers that the metals existed. Similar to the identical promotional brochures, Lloyds simply rebranded the contents of a Hunter Wise Newsletter that confirmed the metals inventory and sent it to its customers under Lloyds' logo. *Compare Transfer Notices*, Hunter Wise Newsletter, July 20, 2011, CFTC Ex. 118 with E-mail *with* Lloyds Newsletter (Aug. 23, 2011) (CFTC Ex. 119).

Sylvia Williams, a former employee and owner of Lloyds Asset Management and a former broker-dealer for Hunter Wise through Universal Clearing Firm S.A. and Barclay Metals, Inc., also testified about how much control Hunter Wise had over its dealers. *See* Williams Testimony, Feb. 27, 2014. Retail customers' account statements were sent directly from Hunter Wise to the customers. Her Florida-based corporation, Barclay Metals, did not execute the loans it purported to offer its clients; she admitted, "We didn't have that kind of money." *Id.* at 18:6-12. Instead, Barclays looked to Hunter Wise to control the lending and deal with the metals.

Hunter Wise representatives, Jay Bruce Grossman, its legal counsel,[18] and Joe De Dios, its Director of U.S. Development, confirmed that Hunter Wise "absolutely" had the metals. *Id.* at 13:12-14:2. Ms. Williams recalled Mr. Grossman insisting that she provide his phone number to her brokers and then to the retail customers so that he could confirm Hunter Wise's ownership of the metals to them. *Id.*

The Dealer Defendants sent the deposits and other funds provided by the retail customers, as well as their account information, directly to Hunter Wise or to Lloyds, who would then send it to Hunter Wise. No matter the intermediary, however, the retail customers' funds would end up in Hunter Wise's accounts.

### (3) *Hunter Wise's Transactions with the Metals Suppliers*

While Hunter Wise was directing its brokers and dealers to cheat the retail customers, it was also using the retail customers' funds to execute another level of its scheme. Instead of buying precious metals on a financed basis in the retail customers' name, as they were told and as they agreed to, Hunter Wise took the customers' money, provided the Dealer Defendants with their share,[19] and bought their own precious metals on a financed basis from the Suppliers. These margined trading transactions allowed Hunter Wise to offset its risk and use its downstream

---

[18] Mr. Grossman and his law firm, J.B. Grossman, P.A., were also legal counsel and the registered agent for Lloyds. During the early stages of this suit, Mr. Grossman appeared as counsel for Hunter Wise. However, in the Court's September 6, 2013 Order Granting Plaintiff's Motion to Disqualify J.B. Grossman and J.B. Grossman, P.A. as Counsel (DE 210), the Court found that, pursuant to Florida Bar Rule 4-1.9, a conflict of interest existed, and Mr. Grossman and his law firm were disqualified from representing Mr. Martin and Mr. Jager in this matter. (DE 210 at 10). I will discuss Mr. Grossman's involvement in more detail below.

[19] The Dealer Defendants would receive half of the price spread, interest on loans that they never disbursed, and service fees. Hunter Wise would receive the full commission charged, a percentage of the retail customers' first deposit, as well as the remaining price spread, interest, and service fees.

clients'[20] money to do so. The agreements Hunter Wise entered into with the Suppliers and their representatives made it clear that Hunter Wise did not in fact own the metals in these margin trading accounts. Delivery of the metals on the retail customers' behalf, whether deferred or not, did not occur. *See* Fitch Testimony, Feb. 28, 2014.

Hunter Wise claims that it owned the metals in the Suppliers' possession, but, in actuality, the evidence shows that Hunter Wise owned an interest in metals and was subject to a margin call, just like its retail customers. Mr. Martin and Mr. Jager tried to compare its margin trading activity to a mortgage. However, with a mortgage an individual receives ownership and actual delivery occurs. A bank may foreclose on a home only if the individual stops paying. Here, transfer of ownership and actual delivery of the metals never occurred. If Hunter Wise's accounts fell below a certain equity level, Hunter Wise would have to invest more money or risk losing it all. There was no transfer of ownership to the downstream clients. Paper confirmations without true ownership, and the risk of losing their investments if margin calls occurred, made the transactions Hunter Wise offered entirely different from mortgages.

### C. The Deceived Patrons - The Retail Customers

It seems that patrons of Las Vegas casinos would fare better than the retail customers who were caught up in Hunter Wise's scheme. While Hunter Wise was celebrating its gains, over 90% of the retail customers in the scheme lost money between July 16, 2011 and February 25, 2013.[21]

Hunter Wise, Lloyds, and the Dealer Defendants neither purchased precious metals on the retail customers' behalf, disbursed loan funds to finance the portion of the purchase price

---

[20] Mr. Steve Fitch, Director of Dealer Training at Hunter Wise, agreed that he would consider the retail customers to be "downstream clients" of Hunter Wise. *See* Fitch Testimony, Feb. 27, 2014.
[21] According to its records, Hunter Wise made over $18 million from July 16, 2011 and February 25, 2013 through spread charges, interest, and service fees.

14

**EXHIBIT 16**
**FTC-VAST-000459**

remaining, nor delivered metals to the retail customers. Yet, the retail customers paid fees and interest on the mistaken belief that the Defendants had done all these things for the retail customers' benefit.

Victims of the scheme, Hunter Wise's downstream clients, testified to losing thousands of dollars of their life savings. For example, Dagmar McElroy testified during her deposition that her USCT dealer, "Mr. Lepore," informed her that she would not be charged any fees, aside from an initial 10% charge, and that the silver she was purchasing would be stored in a facility in her name. McElroy Depo. at 9:10–10:1. Ms. McElroy invested $28,000.00 in silver, gold, and palladium. Although she had access to her online account, Ms. McElroy explained that the statements were confusing and that it was easier to speak with her broker about the status of her metals. Never did her broker inform her about her losses. Ms. McElroy checked her account in February 2012, and she testified to being "absolutely floored" that she was charged over $15,000.00 in commission fees and over $900 in interest. *Id.* at 27:22-25. After demanding that her account be closed, Ms. McElroy received a check for only $3,457.87, which amounted to $24,542.13 in losses.

Another victim, John Wimberly, stated his dismay at the magnitude of his losses and his frustration with Newbridge. In a certified letter addressed to the "Newbridge Alliance Bookkeeping Dept." and dated February 23, 2012, Mr. Wimberly wrote:

> Apparently, the principals [sic] of leverage were never made clear to me. I invested twenty[-]eight thousand dollars. At the end, I should have been in control of eleven hundred fifty ounces of silver valued at $33.40 per ounce. That equals thirty[-]eight thousand four hundred ten dollars.
>
> Now when I close out my account, you are sending me a hand written [sic] check for eight thousand four hundred eleven dollars and sixty[-]five cents. I am returning this check. I have no intention of cashing this (or any other check) without a written, detailed explanation of where nineteen thousand five hundred eighty[-]eight dollars and thirty[-]five cents of my money went.

15

**EXHIBIT 16**
**FTC-VAST-000460**

Letter from Wimberly to Newbridge (Feb. 23, 2012) (CFTC Ex. 36). Mr. Wimberly, an unsophisticated investor who receives Social Security checks and a VA pension, depended on Newbridge dealer Clifford Cheek to direct him toward successful investments. *See* Wimberly Testimony, Feb. 26, 2014. While there were risks in investing in silver, Mr. Cheek convinced him that silver was undervalued and would only go up. Mr. Wimberly believed he would be making money by buying metals through Newbridge, as Mr. Cheek promised. Unfortunately, that was not the case.

Mr. Fitch testified that it would be "odd" for a dealer to disappear, *see* Fitch Testimony, Feb. 28, 2014, yet that is exactly what happened when some of the victims sought explanations about their losses and the return of their money from dealers. William Metzger, a retiree of the real estate business, testified to receiving a "Position Reconciliation" statement from the Delaware Depository Service Company ("DDSC") dated September 14, 2011 that stated, "Hunter Wise Services, LLC'S [sic] records reflect that as of 9/14/2011 your current position(s) with C.D. Hopkins Metals Division are" a purchase of thirty ounces of gold. CFTC Ex. 44. Based on information Hunter Wise provided, Mr. Metzger was the "beneficial owner of" gold. *Id.*

Yet Mr. Metzger never received the gold or silver he supposedly owned. In December of 2012, when Mr. Metzger asked Blackstone dealer Mukarram Mawjood to deliver his metals, Mr. Mawjood talked him out of that request, even though Mr. Metzger had already lost approximately $7,000 of the $20,000 he had invested. Mr. Metzger was convinced by Mr. Mawjood that there was money to be made in these transactions, and gave Mr. Mawjood sixty more days to turn the investment around.

At the end of the sixty days, Mr. Mawjood was nowhere to be found. Mr. Metzger called and left him messages, but he did not return Mr. Metzger's calls. After a few weeks, Mr. Metzger learned Mr. Mawjood's voice mailbox was full and he never spoke to Mr. Mawjood again. With no metals in his name, the last statement he received listed his balance at $7.975.66, considerably less than the $20,000 he had invested. Metzger Blackstone Account Statement (Jan. 2013) (CFTC Ex. 41 at 9).[22]

Hunter Wise provided the tools for the Dealer Defendants to misrepresent the type of transaction into which the retail customers were entering. From training manuals, scripts, and videos[23] to documents confirming the existence of metals on their behalf, Hunter Wise controlled every aspect of the downstream client deception, yet it did not disclose its involvement to the customers. Furthermore, it used the retail customers' funds to purchase margin trading accounts that did not guarantee the existence of the commodities. Hunter Wise knew there were no metals in its possession, knew no loans existed though it charged interest, and knew there was no actual delivery of the metals within the twenty-eight day period. In order to make a bigger profit, Hunter Wise willingly defrauded its customers.

### D. Dodd-Frank Warnings from Hunter Wise's Counsel

As Dodd-Frank neared implementation, Hunter Wise sought ways of continuing to defraud retail customers even though Hunter Wise's illegal operations would soon be under the CFTC's jurisdiction. Hunter Wise hired several attorneys to advise it on its scheme and on the

---

[22] Three additional retail customers, Patricia Mercaldo, Andrew Burk, and Robert Bauman testified during the trial. The Court reviewed the deposition testimonies of the retail customers that were designated by the Parties as well.

[23] Mr. Mawjood testified, "When I first came into this business at Lloyds Asset Management, they introduced me to a series of videos that Hunter Wise had, and it broke down exactly how the financed product work[s], where a client has to put a certain down payment." Mawjood Depo., (DE 191-1 at 49:18-24).

implications of Dodd-Frank. During the relevant period, Hunter Wise's former counsel included John Giovannone ("Giovannone") formerly of Greenberg Traurig; Timothy Carey ("Carey") of Winston and Strawn, and formerly of Dewey & LeBoeuf; and Jay Bruce Grossman ("Grossman") of J.B. Grossman PA or the former firm Grossman Greenberg. Prior to and after Dodd-Frank became effective, Hunter Wise's counsel explained to Mr. Jager and Mr. Martin the serious legal issues associated with Hunter Wise's operations. While Mr. Giovannone was more adamant about Hunter Wise, Mr. Jager, and Mr. Martin's civil and criminal liability, Mr. Carey, and even Mr. Grossman, indicated that Hunter Wise documents and actions would violate Dodd-Frank.

### (1) *Mr. Giovannone's Dodd-Frank Warnings*

As the July 16, 2011 date for Dodd-Frank to become effective approached, Mr. Martin and Mr. Jager received strong warnings from Mr. Giovannone regarding Dodd-Frank's impact on Hunter Wise. For example, on June 24, 2011, Mr. John Giovannone sent an e-mail to Mr. Martin and Mr. Jager with clear and concise recommendations regarding their scheme:

1. Hunter Wise should stop accepting new purchase orders on or before close of business on [Friday,] July 15, 2011. I think the odds are against Hunter Wise being able to successfully defend a CFTC enforcement action attacking its current method of doing business under Sections 4(a) and 4(b) of the CE Act.

2. You should consider stopping acceptance of new purchase orders now and giving your customers notice that they will have to to [sic] liquidate their existing positions before July 15 or you will liquidate their positions on that date. This is the safe and most conservative approach.

3. In the alternative, you may wish to permit your customers to maintain their current positions until they choose to liquidate them. However, I cannot at this time predict whether the CFTC will consider that a breach of the CE Act or not.

4. If Ed was in fact successful in getting Standard Bank to agree to provide you with the financing you require to effect substituted delivery within 28 days of sale, we should rush to get that put into place before July 18. Even then, there

> is still the question of whether the CFTC would permit you to maintain your current customer positions after July 15 because they will not have featured delivery within the required 28 days.

E-mail from Giovannone to Jager and Martin (June 24, 2011) (CFTC Ex. 187 at 3). Mr. Giovannone's analysis included his belief that:

> [T]he CFTC plans to bring a series of enforcement actions as early as [Monday,] July 18 against every company in the precious metals industry which continues to offer precious metals for sale on a margined or financed basis on that date unless delivery is made, at least on a substituted basis to a depository which issues the equivalent of an non-negotiable warehouse receipt to the ultimate customer, within 28 days of the sale.

*Id.* at 2. Thus, Mr. Giovannone raised the red flag regarding the impact Dodd-Frank would have on Hunter Wise. Under the Dodd-Frank amendments to the Act, Hunter Wise would be brought under the CFTC's jurisdiction and would risk a suit brought by the CFTC. Hunter Wise was not actually delivering metals to retail customers and it was not providing non-negotiable warehouse receipts to retail customers within twenty-eight days, as Dodd-Frank required. Mr. Giovannone's recommendations were unequivocal: Hunter Wise had to shut down or change its operations by July 15, 2011, if not before, in order to avoid liability.

Although Mr. Giovannone's recommendations were unambiguous, Mr. Martin sent an e-mail that same day asking, "Am I correct that John is essentially suggesting that we close the company?" *Id.* at 1. Mr. Jager's response confirmed he and Mr. Martin understood Hunter Wise counsel's legal advice by stating, "That, in my opinion, as the purveyor of the worst case scenario, was essentially his opinion." *Id.* Mr. Martin and Mr. Jager understood Mr. Giovannone's statements that the Dodd-Frank enforcement authority jeopardized Hunter Wise's business activities. In fact, they recognized they could no longer continue their scheme.

**Attachment G, p. 19**                                    **EXHIBIT 16**
FTC-VAST-000464

Yet, when Mr. Giovannone sent an e-mail to Mr. Martin and Mr. Jager about three weeks later seeking to determine whether they had implemented any of his recommendations, he learned that very little had changed. *See* E-mail from Giovannone to Martin (July 12, 2011) (CFTC Ex. 169 at 5). On July 12, 2011, as opposed to heeding Mr. Giovannone's warnings, Mr. Martin stated that he and Mr. Jager would refuse to close down the company if they were unable to reach a deal with a United States depository to receive actual delivery of metals within the twenty-eight day period pursuant to Dodd-Frank. In response to Mr. Martin's statement that they were willing to violate the law instead of shutting Hunter Wise down, Mr. Giovannone was even more adamant about his analysis: "If you cannot be sure that you can get delivery in place within the 28 day period, i.e., by August 15, you should shut down until you are. You could personally be guilty of a felony!" *Id.*

That same day, after reviewing Mr. Giovannone's warnings about the potential for criminal charges being brought against them for their actions, Mr. Jager sent an e-mail to Mr. Martin stating that on Friday, July, 15, 2011, "we decide if we shut down the entire company, or as John [Giovannone] says[,] 'we risk it[.]'" E-mail from Jager to Martin (July 12, 2011) (CFTC Ex. 189 at 1). Mr. Jager was keenly aware of the choices available to them and the consequences of continuing to operate. Perhaps even more aware of the consequences was Mr. Martin, who wrote in an e-mail to Mr. Jager, "With any luck we will have adjoining cells." *Id.*

(2) *Mr. Carey and Mr. Grossman's Advice*

Mr. Giovannone was not alone in advising Mr. Jager and Mr. Martin about Hunter Wise's legal issues. Mr. Carey and Mr. Grossman's discussions with Mr. Jager and Mr. Martin also provided ample reasons why Hunter Wise's operations and business plan would be illegal once Dodd-Frank came into effect.

20

For example, Mr. Carey testified that towards the beginning of his representation, which began in May 2011, he informed Mr. Martin and Mr. Jager that Hunter Wise's agreements with the dealers were troublesome and inconsistent with Hunter Wise's actual practices. *See* Carey Depo. at 170: 14-17. The agreements, which included the trading agreements, the loan agreements, and administrative service agreements, did not describe accurately the way Hunter Wise transacted its business, but Hunter Wise nevertheless continued to use them and share them with the dealers, who, in turn, provided them to the retail customers. *Id.* at 18-24.

Mr. Carey advised Mr. Martin that he did not understand why Mr. Martin believed Hunter Wise had stored metals with each of the Suppliers "given what seemed to be the book entry obligations as opposed to something [he] could hold in [his] hand." *Id.* at 142:11-17. In an e-mail to Mr. Jager, on August 3, 2011, Mr. Carey advised him about a discussion Mr. Carey had had with Mr. Martin and noted that "getting the notes from the [Suppliers] from whom [Mr. Jager] purchase[d] that there [was] metal behind their sales" would confirm that they actually had metal stored for Hunter Wise's retail customers.

Instead of obtaining "notes" as Mr. Carey advised, Mr. Martin and Mr. Jager had DDSC issue Position Reconciliation forms to retail customers that only "confirm[ed] . . . that the products exist[ed] and that on the books of your Collateral Manager, Hunter Wise Services, LLC, your client, [sic] is identified as the beneficial owner of that collateral." *Transfer Notices*, Hunter Wise Newsletter, July 20, 2011, CFTC Ex. 118. The DDSC's Position Reconciliation forms troubled Mr. Carey. He advised, "it would be a good idea that if you're going to confirm that some amount of physical metal occurs that someone is doing more than writing that on a piece of paper and has some basis on which to make the statement." Carey Depo. at 152:12-21. Mr. Carey questioned the Position Reconciliation notice's language and Mr. Jager and Mr.

**Attachment G, p. 21**   **EXHIBIT 16**
**FTC-VAST-000466**

Martin's decision to have DDSC issue them in light of the fact that neither DDSC, nor anyone else for that matter, had verified the existence of the metals.

Hunter Wise's other counsel, Mr. Grossman, understood that Hunter Wise's scheme did not result in Hunter Wise actually having physical inventory and he advised Mr. Martin and Mr. Jager as such; it was his belief that there was "no metal at the end of the rainbow." Taped call between Grossman and Gaudino (July 21, 2011 at 3:24 p.m.) (CFTC Ex. 225). In July 2011, Mr. Grossman stated that he had explained to Mr. Martin that the metals did not exist; Hunter Wise merely had offset hedging. _Id._[24]

In regards to the Transfer of Commodity form Hunter Wise sent out to the retail customers, Mr. Grossman explained that the form "lays out exactly what is being held, how and for whom. It nowhere says that HW and any of HW's customer dealers is (though they may be) holding any physical product that is required to meet obligations to HW's dealer customers or ultimately the retail customer." E-mail from Grossman to Martin (July 24, 2011) (CFTC Ex. 238). Mr. Grossman goes on to advise his clients,

> [T]here is a marked difference between explaining how Hunter Wise trades the derivative and physical markets to provide an assured ability to meet any and all

---

[24] Mr. Grossman's actions suggest his role was more akin to an active participant in the fraud rather than disinterested counsel. For example, as noted previously, Sylvia Williams testified that Mr. Grossman told her Hunter Wise "absolutely" had metals and that he would confirm that fact to her customers. However, in a recorded telephone conversation, he told Frank Gaudino there were no metals. Then, he told me during the preliminary injunction hearing that Hunter Wise possessed metals. Furthermore, throughout the Eleventh Circuit oral arguments, when the panel asked Mr. Grossman to explain where it could find evidence on the record that Hunter Wise possessed metals, he continually shifted positions and refrained from answering direct questions. In one such instance, Judge Stanley Marcus asked Mr. Grossman, "Did they ever have in their hot little hands, possession of a single piece of metal?" Oral Argument at 8:09, Hunter Wise, 2014 WL 1424435 (11th Cir. 2014). Mr. Grossman answered yes, but went on to claim only that Hunter Wise would provide metals to all retail customers who requested them. In other exchanges, he told the Eleventh Circuit that the agreements between Hunter Wise and the Suppliers purportedly gave Hunter Wise possession, even when he had previously stated otherwise. His conduct in this matter merits scrutiny by the Florida Bar and regulatory authority.

22

**EXHIBIT 16**
**FTC-VAST-000467**

customer trade claims no matter where a particular precious and industrial market may trend and, on the other hand providing assurances to your customer dealer's retail clients that you are holding 'physical inventory' which may be taken to mean specific inventory.

*Id.* at 2. Months later, Mr. Grossman acknowledged that stating Hunter Wise had metals stored on its behalf would "almost [be] an untruth," even though Mr. Martin sought to make such a declaration. Taped Call Between Grossman and Gaudino (Nov. 21, 2011 at 11:45 a.m.) (CFTC Ex. 227).

Ultimately, Mr. Martin and Mr. Jager chose to ignore Mr. Giovannone's warnings, as well as Mr. Carey and Mr. Grossmans' advice regarding Dodd-Frank's requirements and Hunter Wise's misleading statements and deceptive omissions. Hunter Wise continued operating after July 16, 2011.

### E. *Prior Knowledge of the Scheme's Regulatory Implications*

#### (1) *Not His First Rodeo - Mr. Martin's Consent Order*

As Mr. Giovannone was providing legal advice to Mr. Martin and Mr. Jager regarding the Dodd-Frank issues that existed at Hunter Wise, Mr. Martin seemed to believe that his thirty-five year history in the precious metals industry made him better suited to analyze Dodd-Frank's implications. In response to Mr. Giovannone's e-mail asking Mr. Jager and Mr. Martin whether they had implemented the recommendations he had made regarding Hunter Wise's operations, Mr. Martin stated, "Been doing this since 1977. This is not my first rodeo." E-mail from Martin to Giovannone (July 13, 2011) (CFTC Ex. 169 at 1).

Indeed, it was not. Mr. Martin was an executive at Unimet when, due to the actions of Mr. Martin and other representatives, the Federal Trade Commission ("FTC") commenced an action in the United States District Court, Central District of California, against Unimet Credit Corporation, Unimet Trading Corporation, and four individual defendants, including Mr. Martin.

**EXHIBIT 16**
**FTC-VAST-000468**

*See* Compl., CFTC Ex. 158, *FTC v. Unimet Credit Corp.*, No. 92-5759 (CD Cal., Sept. 23, 1992). In *Unimet*, Mr. Martin and two other defendants stipulated to the entry of a Consent Order. *See* Consent Order as to Defendants E. Keith Owens, Ed Martin, and Ed Myers, CFTC Ex. 159, *Unimet*, No. 92-5759 (CD Cal., Dec. 20, 1994). The Consent Order enjoined Mr. Martin from "providing substantial assistance to any commodities retailer whom [he knows] is failing to disclose any material fact, including[,] but not limited to[,] the true amount of commissions and fees." *Id.* at 6. The Consent Order permanently restrained Mr. Martin from misrepresenting the "degree of risk associated with an investment in commodities; the likelihood that a consumer would earn a profit on an investment"; and the amount of fees or any other material fact objectively material to a consumer's decision to invest in a commodity or other investment offering. *Id.* at 5. Mr. Martin received and agreed to abide by the Consent Order, which detailed what would constitute fraud and explained what he was permanently enjoined from doing.

Here, Mr. Martin and Mr. Jager developed the Hunter Wisc scheme to insulate them from retail customers' claims. Mr. Martin and Mr. Jager seemed to believe that if they were not directly soliciting clients, even as they were committing fraud, they could not be liable for their losses. They intended to hide behind a cloak of anonymity as they were pulling the strings.

### (2) *Regulatory Problems that Implicated Hunter Wise*

Aside from Mr. Martin's personal experience with regulatory agencies regarding fraud in precious metals transactions, Mr. Martin and Mr. Jager were made aware of the issues with the Hunter Wise scheme through lawsuits that directly, or by implication, related to Hunter Wise's actions in dealer fraud.

(a)     Article Regarding Commodities Fraud Cases in Florida

Mr. Martin and Mr. Jager were made aware of the CFTC's expanded jurisdiction as early as March 2011. On March 23, 2011, Chris Jain, an attorney, forwarded to Mr. Martin and Mr. Jager an article that discussed the many victims who were taken advantage of by unscrupulous brokers and dealers. Jon Burstein, *Little Regulation, Lots of Risk Can Leave Gold Investors on Shaky Ground*, Sun Sentinel, March 19, 2011, CFTC Ex. 168 (hereinafter, "*Little Regulation*"). Although much of the article focused on the fact that precious metal businesses and transactions conducted in Florida have gone unregulated, the author advised readers of the pending federal regulatory changes associated with Dodd-Frank. Immediately following the discussion of the criminal history of two individuals who solicited retail customers in Hunter Wise's scheme, *see* Martin Depo. Feb. 26, 2014, the article explained:

> More federal oversight of the gold firms appears to be on the horizon when a new law takes effect in July. Companies that sell precious metals in leveraged deals will have to deliver the gold within 28 days to the customer or a location where the metals are easily accessible so the buyer can verify that they actually exist. If the gold isn't physically delivered, the transaction will fall under CFTC jurisdiction, and companies and their brokers will need to be federally licensed to work in commodities.

*Little Regulation*, at 5. Mr. Martin and Mr. Jager received this explanation of Dodd-Frank's implications more than four months before its implementation.

(b)     Federal Trade Commission's Action Against 20/20

In April 2011, the CFTC filed an action against 20/20 Trading Company, Inc., 20/20 Precious Metals, Inc., and its officers (collectively, "20/20") in the United States District Court for the Central District of California. *See 20/20* Compl. CFTC Ex. 182, *CFTC v. 20/20*, No. 11-000643 (CD Cal. Apr. 26, 2011). The Complaint alleged that from January 2006 through the filing of the action, in April of 2011, 20/20 "had cheated and defrauded customers and

25

prospective customers by lying about the likelihood of profiting, and concealing the near

certainty of substantial losses, when investing with" 20/20. *Id.* at 2 ¶ 1. The *20/20* Complaint

sought to hold 20/20 liable for defrauding retail customers out of at least $4 million in losses.

Mr. Giovannone mentioned the *20/20* Complaint in an e-mail to Mr. Martin and Mr.

Jager on May 3, 2011, claiming that it was "imperative" that they speak with him. *See* E-mail

from Giovannone to Martin and Jager (May 3, 2011) (CFTC 182 at 1). On May 13, 2011, he

forwarded the *20/20* Complaint to Mr. Martin and Mr. Jager and directed that they read

paragraphs 56 and 60 of the Complaint in particular. Paragraph 56 reads, in pertinent part,

"When a customer sends 20/20 Metals funds to purchase physical metals, 20/20 Metals wires

those funds to a third party, [Hunter Wise,] and uses them to enter into leveraged transactions in

the name of 20/20 Metals." *20/20* Compl., CFTC Ex. 182 at 21 ¶ 56. Paragraph 60 states,

> Additionally, 20/20 Metals misrepresents how customer funds are being used.
> Specifically, 20/20 Metals misrepresents that it purchases physical metals, that
> title has passed to the customer, and that the metal is stored in a secure depository.
> Since 20/20 Metals only has an account with [Hunter Wise] in which it enters into
> leveraged transactions in its own name, not the name of the customer, the
> customer has no right to any metals and title to any metals that might be
> purchased does not pass to the customer."

*Id.* at 22 ¶ 60.

Mr. Carey testified that Hunter Wise initially retained him and his former law firm,

Dewey & LeBoeuf, in May of 2011 because of the *20/20* action. *See* Carey Depo., at 19:7-12.

Hunter Wise's concerns regarding the implications of the *20/20* action seemed to increase even

further after the court-appointed Receiver in the *20/20* matter filed a Report with the trial court.

The Report stated that after investigating and interviewing relevant individuals, he was not "able

to obtain and examine the evidence to verify the existence, ownership[,] and safekeeping of the

precious metals purchased and held in the customer's accounts." *Id.* at 27:18-22; *see also* E-mail

**EXHIBIT 16**
**FTC-VAST-000471**

from Martin to Carey (May 23, 2011) (CFTC Ex. 183 at 1) ("[T]he Receiver, after three weeks of trying, has been unable to find evidence that product exists.").

Upon learning of the Receiver's findings, Mr. Jager sent an e-mail to Mr. Martin, Mr. Carey, and Mr. Grossman relaying his concern for Hunter Wise's future. Mr. Jager wrote, "This is really crushing news[,] which is angering on many levels. That would seem to indicate that the next shoe to drop is with [Hunter Wise, if] they indeed do believe there is no product." *Id.*

<div align="center">(c)    Florida Office of Financial Regulation's Action against Midas</div>

A month after the FTC filed the *20/20* Complaint, in late June 2011, the Florida Office of Financial Regulation ("FOFR") requested documents from Hunter Wise in relation to its criminal investigation of Midas Asset Management, another Hunter Wise dealer. Mr. Grossman explained that a FOFR representative, "Ms. Gromnicki," asked, "Where is the depository facility where the precious metal is stored." E-mail from Grossman to Martin (July 5, 2011) (CFTC Ex. 234 at 1). According to Mr. Grossman, Ms. Gromnicki had posed that important question to him on numerous occasions. Mr. Martin responded to Mr. Grossman's e-mail that same day, writing, "I believe our response to the question of where the metal is stored needs to be carefully thought out." *Id.*

### *F. Betting the House*

Mr. Martin and Mr. Jager bragged about owning the casino, controlling the process, and the ability to "make money no matter where the markets shift." E-mail from Jager to Pandora Pang (June 1, 2008) (CFTC Ex. 180 at 1). They received legal advice and warnings regarding Hunter Wise's Dodd-Frank violations and fraudulent conduct. Yet, they purposefully decided to risk criminal and civil liability by continuing Hunter Wise's fraudulent and illegal operations.

<div align="center">27</div>

<div align="center">**Attachment G, p. 27**       **EXHIBIT 16**</div>
<div align="right">**FTC-VAST-000472**</div>

Approximately 3,200 retail customers lost over $52 million because of Hunter Wise's scheme. The house cannot win when, in violation of the law, the game is rigged.

## II.   STATUTORY BACKGROUND

Section 742 of the Dodd-Frank Act expanded the scope of the CFTC's jurisdiction to include financed commodity transactions with consumers, thereby granting the CFTC the power and authority to ensure that transactions involving commodities were to be executed on an exchange and subjecting such transactions to the anti-fraud provisions of the Act and Commission Regulations.

Count Two of the Complaint alleges that Hunter Wise, Mr. Martin, and Mr. Jager committed fraud in violation of Section 4b of the Commodity Exchange Act. Section 4b(a)(2) of the Act states, in relevant part:

> **(a) Unlawful actions**
>
> It shall be unlawful–
>
> . . .
>
> (2)   for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market–
>
> > (A)   to cheat or defraud or attempt to cheat or defraud the other person;
> >
> > (B)   willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]
> >
> > (C)   willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

7 U.S.C. § 6b(a)(2).

Count Three alleges that Hunter Wise, Mr. Martin, and Mr. Jager committed fraud under Section 6(c)(1) of the Act and Commission Regulation 180.1. Section 6(c)(1) and Commission Regulation 180.1 were meant to "augment the [CFTC's] existing authority to prohibit fraud and manipulation." Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398, 41401 (July 14, 2011). Section 6(c) of the Act is codified in 7 U.S.C. § 9(1), and provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with . . . a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate.

7 U.S.C. § 9(1).

> Commission Regulation 180.1, states, in pertinent part:

> (a) It shall be unlawful for any person, directly or indirectly, in connection with any . . . contract of sale of any commodity in interstate commerce . . . to intentionally or recklessly:

>> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

>> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

>> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 180.1.

Count Thirteen of the Complaint claims that Hunter Wise, Mr. Martin, and Mr. Jager aided and abetted the violations of the Act that were committed by other defendants in the instant matter. Section 13(a) of the Act states, in pertinent part:

**EXHIBIT 16**
**FTC-VAST-000474**

Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a).

## III.   LEGAL ANALYSIS

"The [Act] is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *CFTC v. RJ Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002), *cert. denied*, 124 S.Ct. 808 (2004).

### A.   *Section 4b of the Act - Fraud*

Count Two of the Complaint alleges that Hunter Wise, Mr. Martin, and Mr. Jager committed fraud in violation of Section 4b of the Commodity Exchange Act. A defendant is liable under Section 4b(a) of the Act if the CFTC demonstrates: (1) that a misrepresentation, misleading statement, or omission was made; (2) with scienter; and (3) that the misrepresentation, statement, or omission was material. *Id.* at 1328. Failure to establish any one of these elements is dispositive and would preclude the CFTC's fraud claims. *Id.*

#### (1) *Misrepresentations, Misleading Statements, or Omissions*

In the face of strong evidence showing otherwise, Mr. Martin and Mr. Jager argue that Hunter Wise did not make misrepresentations or deceptive omissions. "Whether a misrepresentation has been made depends on the overall message and the common understanding of the information conveyed." *Id.* (internal quotations omitted). Courts may find that when an individual drafts and distributes promotional and training material that is relayed to retail

EXHIBIT 16
FTC-VAST-000475

customers that claims little to no risk in commodities transactions, the individual has acted fraudulently. *See Clayton Brokerage Co. v. CFTC*, 794 F.2d 573, 580-81 (11th Cir. 1986). In addition, claiming that a retail customer will profit from certain market trends, without advising the customer of the likelihood of that not occurring is material and deceptive. *In re JCC*, [1992–1994 Transfer Binder] (CCH) Comm. Fut. L. Rep. ¶ 26,080 at 41,576 (CFTC 1984), *aff'd sub num. JCC Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995).

Here, Hunter Wise misrepresented facts about the precious metals transactions it oversaw. In particular, it directly and indirectly led the retail customers to believe metals were stored on their behalf. Hunter Wise prepared and distributed documents, including account statements, Transfer of Commodities forms, and trade confirmation notices, to the retail customers confirming the existence of the metals, the loans, and the purchases. Hunter Wise failed to inform the parties that the metals it purchased were on a financed basis, it did not own the metals, and the metals, if there were any at all, were not in the retail customers' names.

Evidence demonstrating Hunter Wise's conduct comes specifically from the Position Reconciliation statement William Metzger received from DDSC, which stated, "Hunter Wise Services, LLC'S [sic] records reflect that as of 9/14/2011 your current position(s) with C.D. Hopkins Metals Division are" a purchase of thirty ounces of gold. DDSC Position Reconciliation Statements, CFTC Ex. 44. Accordingly, as confirmed by information Hunter Wise provided, Mr. Metzger was the owner of the gold. In fact, Mr. Metzger did not own any gold since the gold did not exist; neither Hunter Wise nor his dealer bought gold in his name. Yet, Hunter Wise provided information to DDSC that misled Mr. Metzger, and others, to think they had.

As to the issue of omissions, the Eleventh Circuit, in *R.J. Fitzgerald*, found that claiming the certainty of receiving huge profits in the precious metals industry without informing the

31

**EXHIBIT 16**
**FTC-VAST-000476**

prospective retail customers that "95 per cent of the firm's clientele lost money in the types of investments being advertised" was an omission that was fraudulent as a matter of law. 310 F.3d at 1332. In the instant matter, Hunter Wise tracked everything that went on with the retail customers' transactions. As Mr. Mawjood confirmed, nothing about a trade or account was official until it got to Hunter Wise. Mawjood Dep., (DE 191-1 at 56:12-20). Hunter Wise kept and managed meticulous records of all its downstream clients through the portal. Even with its knowledge of the clients' losses, Hunter Wise never updated the training materials or promotional brochures to indicate how poorly its downstream customers were doing in these commodities transactions. It did not modify those documents even as it continued to offer the documents to the dealers for their use to solicit prospective retail customers.

Hunter Wise investors, Mr. Jager, and Mr. Martin pocketed the interest Hunter Wise charged customers for loans it agreed to, but never did, provide, as well as the fees it charged for the storage of metals that did not exist. Hunter Wise did not inform its clients how it was using the funds it received. Instead of applying the funds to pay off interest on real loans or buying and storing metals, Hunter Wise used the funds to offset its obligations. The fees retail customers paid reduced their account funds greatly. Hunter Wise continued to charge interest and storage fees, even though the charges were for nonexistent services.

Mr. Martin and Mr. Jager, through Hunter Wise, willfully misrepresented or made omissions about the precious metal transactions at issue in this case. In addition, based on its misleading statements and willful omissions, I find that Hunter Wise provided an "overall message" that was in violation of Sections 4b. The evidence shows that Hunter Wise misled and deceived the retail customers into entering into its precious metals scheme.

(2)   *Scienter - "With any luck we will have adjoining cells."*

To prove scienter, the CFTC must show that the "[d]efendant intended to defraud, manipulate, or deceive, or [that the d]efendant's conduct represents an extreme departure from the standards of ordinary care." *R.J. Fitzgerald*, 310 F.3d at 1328. Conduct involving "highly unreasonable omissions or misrepresentations ... that present a danger of misleading [retail customers] which is either known to the Defendant or so obvious that [the] Defendant must have been aware of it" have been found to meet the scienter requirement. *Id.* (internal quotation omitted).

Mr. Martin had day-to-day oversight over Hunter Wise's operations. Mr. Jager had the authority to sign contracts for Hunter Wise, helped with the strategic planning, and provided the contacts and capital necessary to keep the business running. To argue that they believed in good faith that Hunter Wise was making loans to the dealers or retail customers, that they owned any metals, and that their documents were not fraudulent is implausible. They were too knowledgeable and too involved in the process to plead ignorance. Hunter Wise acted recklessly and intentionally to deceive and defraud the retail customers.

Hunter Wise was the mastermind behind the multi-level scheme. Mr. Jager and Mr. Martin could have corrected the misrepresentations and deceptive omissions in the agreements they entered into with the dealers, the training materials it provided the dealers, and the many documents Hunter Wise sent to the retail customers, including the Position Reconciliation notices, the Transfer of Commodity forms, trade confirmations, and account statements. Hunter Wise allowed its dealers to defraud the retail customers and prospective customers they solicited for Hunter Wise's benefit. Since Hunter Wise oversaw all transactions, Mr. Jager and Mr. Martin had the ability to inform retail customers of the misrepresentations and deceptive statements, but

failed to do so. Instead, Hunter Wise continued the fraud on the customers while it reaped the benefits of their losses.

### (a)    Hunter Wise's Reliance Claims

Mr. Jager and Mr. Martin seek to absolve themselves by claiming they reasonably relied on sources that allegedly affirmed Hunter Wise's scheme did not fall under the CFTC's jurisdiction because the transactions did not involve leveraged contracts or because the actual delivery exception and the line of business exception of the Act applied.[25] They claim that they relied on: (1) Hunter Wise's counsel; (2) the CFTC's 1985 Interpretative Letter, Bank Activities Involving the Sale of Precious Metals, Comm. Fut. L. Rep. (CCH) ¶ 22,673 (CFTC Aug. 6, 1985) (hereinafter "1985 Interpretative Letter"); and (3) the London Bullion Market Association and the Foreign Exchange Committee's 1994 International Bullion Master Agreement (hereinafter, "Master Agreement").

### (i)    The Plain Meaning of the Act is Unambiguous

Before delving into their reliance claims, I first note that none of Mr. Jager and Mr. Martin's claims can be found reasonable because the plain meaning of the statutory language is unambiguous, as the Eleventh Circuit found in *Hunter Wise*, -- F.3d --, 2014 WL 1424435 (11th Cir. 2014). In *Hunter Wise*, the Eleventh Circuit analyzed the Act's wording, as well as Mr. Jager and Mr. Martin's arguments, to reach its findings.

As to the "leveraged or margined basis" or financed transaction on a similar basis language of Dodd-Frank, *see* 7 U.S.C. § 2(c)(2)(D)(i)(II), the Eleventh Circuit found that "leveraging refers generally to the ability to control high-value amounts of a commodity or a security with a comparatively small value of capital, known as the margin." *Hunter Wise*, at *5

---

[25] In my February 19, 2014 Order, I found that the exceptions under the Act did not apply to Hunter Wise's scheme. (DE 281).

(noting *Glossary*, Commodity Future Trading Commission, http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/index.htm (last visited Feb. 11, 2014)). The Eleventh Circuit stated that "Hunter Wise defined leverage similarly in a memorandum to its holding company's potential investors; it explained its operations by describing leverage as 'the use of a smaller amount of capital to do the work of a much larger amount.'" *Id.* (quoting Business Overview of Hunter Wise Commodities, LLC (DE 4-4 at 21)). In addition, the Eleventh Circuit found that Mr. Martin and Mr. Jager's attempt to read a specific durational requirement and to expand the definition of a "leverage contract" under 7 U.S.C. § 23[26] to the Dodd-Frank

---

[26] 7 U.S.C. § 23 provides, in pertinent part:

**(a) Margin accounts or contracts and leverage accounts or contracts prohibited except as authorized**

Except as authorized under subsection (b) of this section, no person shall offer to enter into, enter into, or confirm the execution of, any transaction for the delivery of any commodity under a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or under any contract, account, arrangement, scheme, or device that the Commission determines serves the same function or functions as such a standardized contract, or is marketed or managed in substantially the same manner as such a standardized contract.

7 U.S.C. § 23(a). As the Eleventh Circuit explained, under CFTC regulations,

[A] leverage contract has standardized terms and conditions and is "for the long-term (ten years or longer) purchase . . . or sale" of a leverage commodity by a leverage customer. 17 C.F.R. § 31.4(w). A leverage transaction, by extension, is a deal to exchange a leverage contract. 17 C.F.R. § 31.4(x). Martin and Jager insist the terms "leverage account" or "leverage contract," as used in 7 U.S.C. § 23 and defined in 17 C.F.R. § 31.4(w), and "contracts . . . entered into . . . on a leveraged . . . basis," as used in 7 U.S.C. § 2, have the same meaning and durational requirement.

*Hunter Wise*, at *4-5. Therefore, Mr. Martin and Mr. Jager were incorrect in arguing that since Hunter Wise's transactions mature in four years, the transactions do not constitute "leveraged" transactions or transactions financed on a similar basis, and that § 2(c)(2)(D) is inapplicable to Hunter Wise's operations. *Id.* at 5.

**Attachment G, p. 35**

**EXHIBIT 16**
**FTC-VAST-000480**

amendment in § 2(c)(2)(D), "tenuous, at best." *Id.* If Mr. Martin and Mr. Jager's suggested analysis applied, then § 23 would render § 2(c)(2)(D) meaningless; Section 2(c)(2)(D) would "only give[] the Commission authority over what § 23 already prohibits." *Id.* Lastly, even though it found the statutory text unambiguous and reviewing agency interpretation and legislative history was unnecessary, the Eleventh Circuit noted that both sources "harmonize[d]" with and "complement[ed]," respectively, its findings.[27]

As to the "actual delivery" exception, 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa), the Eleventh Circuit again applied the ordinary meaning of the term to hold that "delivery must be *actual*." *Hunter Wise*, at *9 (emphasis in original). The Eleventh Circuit explained, "The sequence of events contemplated by Martin and Jager – in which the electronic transfer of documents indicating control or possession effectuates delivery without physical transfer of the commodity – is by any definition constructive, rather than actual." *Id.* (citing *Black's Law Dictionary* 494 (9th ed. 2009) (defining "constructive delivery" as "[a]n act that amounts to a transfer of title by operation of law when actual transfer is impractical or impossible")). The Eleventh Circuit also found that other sources of analysis, including the CFTC's own interpretation, were unnecessary "because 'actual delivery' unambiguously excludes the constructive delivery Martin and Jager argue occurred." *Id.* at *10.[28]

---

[27] After *de novo* review, the Eleventh Circuit affirmed the legal conclusion in this Court's February 26, 2013 Order on Plaintiff's Motion for Preliminary Injunction that § 2(c)(2)(D) covers the transactions in dispute in this matter. *Hunter Wise*, at *6.
[28] The Eleventh Circuit found that "[b]ased on [this Court's] sound factual finding and after *de novo* review," this Court's February 26, 2013 Order on Plaintiff's Motion for Preliminary Injunction's "legal conclusion that the exception did not apply was not erroneous." *Hunter Wise*, at *7. The Eleventh Circuit also found that my finding that the enforceable obligation to deliver exception, *see* 7 U.S.C. § 2(c)(2)(D)(ii)(III)(bb), did not apply was not an error of law since I found that Hunter Wise did not own the metals. *Hunter Wise*, at *8.

**Attachment G, p. 36**          **EXHIBIT 16**
**FTC-VAST-000481**

For the same reasons, I find that Mr. Martin and Mr. Jager's claimed reliance on other sources to determine whether Hunter Wise's scheme, which involved misrepresentations and deceptive omissions, violated the Act is unreasonable. The plain reading of the statute demonstrates that the CFTC has jurisdiction over Hunter Wise and that Hunter Wise committed fraud that triggered CFTC enforcement proceedings.

### (ii)    Hunter Wise's Counsel

Mr. Martin and Mr. Jager claim that Hunter Wise's legal counsel advised them that Hunter Wise owned and possessed metals and that the transactions it engaged in did not violate the Act. In light of all the evidence to the contrary, their purported reliance on counsel is disingenuous.

In the weeks leading up to July 16, 2011, the date the Dodd-Frank amendments to the Act became enforceable, Mr. Jager and Mr. Martin received clear warnings from Hunter Wise counsel Mr. Giovannone that Hunter Wise's operations were illegal under Dodd-Frank. Mr. Giovannone, in no uncertain terms, told Mr. Jager and Mr. Martin to shut down Hunter Wise until it complied with the Act. *See* E-mail from Giovannone to Jager and Martin (June 24, 2011) (CFTC Ex. 187 at 3). After learning that Mr. Martin and Mr. Jager had not acted upon the plans he had recommended to keep Hunter Wise from violating the law, he warned them that they could face criminal liability if they continued Hunter Wise's operations. *See* E-mail from Martin to Giovannone (July 12, 2011) (CFTC Ex. 169 at 4). Mr. Martin and Mr. Jager intentionally ignored Mr. Giovannone's advice, and they acted recklessly in continuing to defraud the retail customers after Dodd-Frank became effective.

Hunter Wise's other counsel warned Mr. Jager and Mr. Martin that Hunter Wise's documents regarding Hunter Wise owning and storing metals were false. *See* Taped Call

Between Grossman and Gaudino (Nov. 21, 2011 at 11:45 a.m.) (CFTC Ex. 227). Mr. Grossman explained to Hunter Wise the difference between the arrangement it had with the metal Suppliers (i.e., margin trading accounts meant to offset Hunter Wise's obligations to the retail customers) and possessing physical metals. E-mail from Grossman to Martin (July 24, 2011) (CFTC Ex. 238). Mr. Carey questioned Mr. Martin, in particular, about why he believed Hunter Wise had stored metals with each of the Suppliers "given what seemed to be the book entry obligations as opposed to something [he] could hold in [his] hand." Carey Depo. at 142:11-17.

Even Hunter Wise's counsel Mr. Carey, whom Mr. Jager and Mr. Martin claimed to rely on for their understanding of Dodd-Frank, testified that Mr. Martin's belief that Hunter Wise owned metals was wrong. Had he simply spoken to the metals Suppliers, Mr. Carey stated, Mr. Martin would have had to accept what everyone else already knew to be true: no metals existed. *See* Carey Depo. 62:19-24. The Suppliers' representatives confirmed the obvious understanding that Hunter Wise was trading in margin accounts. Ownership and delivery did not occur until Hunter Wise paid in full for the metals. The existence of Hunter Wise's trading accounts, with margin calls, counters Mr. Martin and Mr. Jager's unreasonable claim that it had the inventory on hand to deliver metals to retail customers.

Mr. Carey wrote a legal memorandum that he sent to Mr. Jager and Mr. Martin on August 11, 2011 in regards to Dodd-Frank enforcement. *See* Carey Depo. 146:22-147:17. Mr. Carey premised his analysis on certain material assumptions that were incorrect and that greatly influenced his finding that the Act did not apply to Hunter Wise. For example, the memorandum "anticipates," without investigating, that all of the dealers Hunter Wise dealt with were "eligible contract participants" and, therefore, not retail customers. *Id.* at 149:17-150:22. He was not aware that only after Hunter Wise received the retail customers' funds did Hunter Wise generate

an account for the retail customers and sent back the dealers' cut of the funds. *Id.* at 151:3-13. Further, Mr. Carey assumed that "Hunter Wise's contracts [were] not executed on a leveraged or margined basis." *Id.* at 153:19-155:14. Since Hunter Wise did interact with retail customers through the portal website and the dealers depended on Hunter Wise for financial aid and services, Hunter Wise knew Mr. Carey's assumptions were inaccurate.

Mr. Martin and Mr. Jager cite to legal analysis of Dodd-Frank prepared by Mr. Grossman on June 23, 2011 to support its legal reliance claim.[29] E-mail from Grossman to Jager and Martin (June 23, 2011) (Hunter Wise Ex. 54). Mr. Grossman represented Hunter Wise, Lloyds, and individual dealers, as well as Mr. Jager and Mr. Martin, individually, and his fingerprints are all over this scheme. Both his factual statements and legal opinions lack credibility.[30] Moreover, he explicitly noted in an e-mail that the plain meaning of the Act was the primary resource. *Id.* at 1. Considering the fact that the Eleventh Circuit found the statutory language unambiguous, it is unreasonable for Mr. Martin and Mr. Jager to claim to have believed Mr. Grossman's strained interpretation rather than the plain language of the Act.

Even assuming Mr. Jager and Mr. Martin believed Mr. Grossman's June 23, 2011 evaluation that the CFTC had no jurisdiction over Hunter Wise under Dodd-Frank, Mr. Grossman's analysis a month later calls into question their claims of good faith reliance. While editing the Transfer of Precious and Industrial Metal notice, which were meant to replace the Transfer of Commodity notice Hunter Wise sent to retail customers, Mr. Grossman explained that the form "lays out exactly what is being held, how and for whom. It nowhere says that HW and any of HW's customer dealers is (though they may be) holding any physical product that is

---

[29] Because Mr. Jager and Mr. Martin failed to show that Mr. Grossman was unavailable to testify at trial, Mr. Grossman's deposition was not admitted at trial.
[30] For further discussion of Mr. Grossman's contradictory and questionable conduct as Hunter Wise's counsel, see *supra* note 24.

required to meet obligations to HW's dealer customers or ultimately the retail customer." E-mail from Grossman to Martin (July 24, 2011) (CFTC Ex. 238). Mr. Grossman goes on to clarify that Hunter Wise was trading to offset its obligations; it was not in possession of any metals. *Id.* at 2. Furthermore, Mr. Grossman stated that the Position Reconciliation statement from DDSC could "potentially" be misleading to retail customers since it suggests Hunter Wise has physical metals and DDSC gives assurances of the commodities' existence without seeing them. *Id.* Mr. Grossman, knowing that there was "no metal at the end of the rainbow," advised Hunter Wise that it "would be better . . . to [provide] that honest explanation rather than some third parties' assurance that the account paper work designating a complete hedge balanced trading position exists." *Id.* Hunter Wise received an evaluation of what Hunter Wise's scheme really was, even from Mr. Grossman, yet it chose to ignore it.

Hunter Wise's counsel made Mr. Martin and Mr. Jager aware of the legality issues the precious metals transactions and language in Hunter Wise's documents presented. They were on notice of the deception, yet they decided to risk it, laughed about having "adjoining cells," and continued to mislead and deceive customers. There was no metal "at the end of the rainbow"— only offsetting transactions. Rather than rely upon the advice of counsel, Mr. Jager and Mr. Martin ignored it.

On top of the clear warnings and explanations from Hunter Wise's counsel, Mr. Martin's own statements contradict his claim that he actually believed that Hunter Wise possessed metals. In late June 2011, the FOFR served Hunter Wise with a subpoena for documents that related to its criminal investigation of one of Hunter Wise's dealers, Midas Asset Management. In explaining the request to Mr. Martin, Mr. Grossman stated that FOFR asked for the location of the allegedly stored metals. E-mail from Grossman to Martin (July 5, 2011) (CFTC Ex. 234 at 1).

**Attachment G, p. 40**

**EXHIBIT 16**

**FTC-VAST-000485**

The same day, Mr. Martin responded to Mr. Grossman, copying Mr. Carey, stating, "I believe our response to the question of where the metal is stored needs to be carefully thought out." *Id.* Mr. Martin's hesitancy to respond belies any claim that he actually believed Hunter Wise or its customers actually possessed anything.

<div align="center">(iii)    The CFTC's 1985 Interpretative Letter</div>

To argue that they believed that they held title to the metals because of the CFTC's 1985 Interpretative Letter is highly unreasonable. The CFTC issued the 1985 Interpretative Letter after an unnamed bank requested legal clarification of potential liability under the Act regarding its proposed transaction. The CFTC explained,

> A bank transaction involving the purchase and sale of precious metals to be settled in two business days with the bank receiving payment in full from a dealer who would resell the metals to its own retail customer with direction for the bank to transfer ownership and title to the metals to the purchaser's name, would not be a leverage contract within the meaning of Commission Reg. § 31.4(w).

*Id.* at 1. The CFTC's 1985 Interpretative Letter was issued twenty-five years before Dodd-Frank was passed. It could not possibly interpret the impact Dodd-Frank would have on the legality of Hunter Wise's scheme.

In the 1985 Interpretative Letter, the CFTC found that the transaction was not a leveraged transaction under Regulation § 31.4(w). As the Eleventh Circuit found in *Hunter Wise*, a leveraged transaction under Regulation § 31.4(w) and under § 2(c)(2)(D)(i)(II) were not the same. Dodd-Frank broadened the CFTC's jurisdiction to include financed commodity transactions with consumers. *See* 7 U.S.C. § 2(c)(2)(D)(i)(II). Under the Dodd-Frank amendments, if the retail consumer was entering into a financed transaction, then the CFTC had

<div align="center">41</div>

jurisdiction over the transaction; there were no time requirements as under Regulation § 31.4(w).[31]

### (iv)    The Master Agreement

Mr. Jager and Mr. Martin failed to show how it was reasonable to rely on the Master Agreement to determine that the "actual delivery" exception applied to Hunter Wise's scheme. The Master Agreement was established so that parties seeking to enter precious metal transactions could use a uniform template. It provides no discussion of the legality of the transactions in the United States and does not detail how government regulators would enforce their laws. Moreover, the 1994 Master Agreement explains neither the CFTC's jurisdiction nor the legality of Hunter Wise's conduct, in light of the Dodd-Frank amendments. Therefore, to rely on a private agreement between two parties to determine whether Dodd-Frank applies to their scheme is highly unreasonable.

### (b)    Previous Allegation of Fraud against Mr. Martin

That Mr. Martin had previous dealings with the FTC, a federal regulatory agency, regarding fraud at a precious metals firm further supports the indication that he was knowledgeable of the types of information and conduct that would constitute commodities fraud. The FTC alleged that Unimet, where Mr. Martin worked as an executive, defrauded its retail customers by "falsely representing, directly or by implication, that an investment in precious metals or currencies financed by defendants is low in risk" and "that it is highly likely that an

---

[31] Simply reading the 1985 Interpretative Letter disproves Mr. Martin and Mr. Jager's good faith reliance claim. In the Letter, the CFTC found that these transactions were not subject to regulation by the CFTC as "'transactions involving contracts of sale of a commodity for future delivery' as that term is used in Section 2(a)(1)(A) of the Act." *See* 1985 Interpretative Letter at 3. However, under the Act, the CFTC may regulate these transactions as "if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery." 7 U.S.C. § 2(c)(2)(D)(iii). The plain language of the statute makes clear that the 1985 Interpretative Letter's findings would not apply.

**Attachment G, p. 42**                    **EXHIBIT 16**
**FTC-VAST-000487**

investor will earn a high profit on an investment in precious metals or currencies financed by defendants within a few months of the time of the investment is made." Compl. CFTC Ex. 158, *FTC v. Unimet*, No. 92-5759, 7 ¶ D-E (CD Cal., Sept. 23, 1992). The FTC's action against Mr. Martin concluded with a Consent Order that permanently enjoined him from misrepresenting and failing to disclose material facts pertinent to a customer's decision to enter into any commodities transaction. *See* Consent Order as to Defendants E. Keith Owens, Ed Martin, and Ed Myers, CFTC Ex. 159, *Federal Trade Commission v. Unimet Credit Corp.*, No. 92-5759 (CD Cal., Dec. 20, 1994). The Consent Order also prevented Mr. Martin from helping others misrepresent and omit material facts to customers as well. *Id.*

Despite this Consent Order, of which Mr. Jager was aware, Mr. Martin entered into the Hunter Wise scheme to defraud retail customers. Mr. Martin and Mr. Jager attempted to remove Hunter Wise from direct interface with retail customers to insulate themselves from violating Mr. Martin's Consent Order and the Act.

<div align="center">(c)    <u>General Disclosure Agreements</u></div>

During the victims' testimony at trial, Mr. Jager and Mr. Martin pointed out that the retail customers signed documents that contained a risk disclosure, which in turn would indicate lack of scienter. The Eleventh Circuit has held, however, that a general disclosure is not enough when the defendant's overall message constitutes fraud. *R.J. Fitzgerald*, 310 F.3d at 1329-31 (citing *CFTC v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir. 1999) ("We seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial.")). A retail customer cannot be accurately informed of the transaction when Hunter Wise's overall message was one of large profit gains and guaranteed metals. The misrepresentations and

<div align="center">43</div>

omissions by Hunter Wise and the Dealer Defendants were too prevalent to overcome a general risk disclosure and an agreement to pay fees.

For all the aforementioned reasons, I find that Mr. Jager and Mr. Martin knew Hunter Wise's omissions and misrepresentations regarding the disputed transactions in this matter presented a danger of misleading retail customers. Therefore, the CFTC has met its burden in proving the scienter element under Section 4b of the Act.

(3)   *Materiality*

The last element of a fraud claim is whether the misrepresentation, statement, or omission was material. "A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald*, 310 F.3d at 1328-29 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972); *R&W Technical Servs., Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000)). Misleading information regarding the safety of the investment would be deemed material. *See, e.g., Clayton Brokerage Co. v. CFTC*, 794 F.2d 573, 580–81 (11th Cir. 1986) ("the risk inherent in [commodity futures] trading is a material fact"). In *R.J. Fitzgerald*, the Eleventh Circuit found that failing to inform potential customers that nearly all of a firm's retail customers had lost money was material because a reasonable investor would want to know such information before investing. 310 F.3d at 1332.

Hunter Wise made numerous misrepresentations and deceptive omissions in connection with the sale of precious metals. A potential retail customer would find it to be a material fact that almost all of Hunter Wise's customers lost money. It failed to disclose in its training manuals and the documents it sent to retail customers the risk inherent in the precious metal

**Attachment G, p. 44**                              **EXHIBIT 16**
FTC-VAST-000489

investments into which it knew retail customers were entering. As testified to by several Hunter Wise victims, this information was undoubtedly material.

Hunter Wise knowingly misrepresented the type of arrangement it had made with the metals Suppliers. Even though they were informed by Hunter Wise's counsel and they confirmed in e-mail communications that no metal existed on Hunter Wise's behalf, or on anyone else's behalf for that matter, Mr. Martin and Mr. Jager sought to deceive retail customers by wording their documents in such a way to make it seem like Hunter Wise had metals. Hunter Wise continued to send out Trade Confirmations and Position Reconciliation statements stating that retail customers owned metals.

Hunter Wise described its offsetting margin accounts as owning and delivering metal on its clients' behalf. Mr. Martin and Mr. Jager were aware this description was false. Retail customers thought they were purchasing metals. They were told they owned the metal and that, because storage was more efficient, they paid a storage fee to have the dealers and Hunter Wise keep their metals safe. Undoubtedly, knowing that they were not buying materials would have been crucial information to have and to consider. Perhaps some retail customers would have entered into this precious metals transactions with Hunter Wise had they known the true risk involved and the type of scheme Hunter Wise had set up. However, because Hunter Wise did not provide them with material information, the retail customers entered into these investments blindly, without an accurate and complete picture of the transaction. As a result, the "materiality" requirement is met.

Accordingly, the CFTC has met its burden in proving Hunter Wise is liable for fraud under Section 4b of the Act.

**B. Section 6(c)(1) of the Act and Commission Regulation 180.1 - Fraud**

Count Three alleges that Hunter Wise committed fraud under Section 6(c)(1) of the Act and Commission Regulation 180.1, which makes it "unlawful for any person, directly or indirectly, to use or employ . . . in connection with . . . a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device." 7 U.S.C. § 9(1). Because of the similarities between Section 6(c)(1) of the Act and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the CFTC decided to "model final Rule 180.1 on [the Securities and Exchange Commission ("SEC")] Rule 10b-5. To account for the differences between the securities markets and the derivatives markets, the Commission will be guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5."[32] Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41399, 41401 (July 14, 2011). A defendant is liable for a Securities Exchange Act Section 10(b) violation if the SEC proves: "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Goble*, 682 F.3d 934, 942-43 (11th Cir. 2012) (internal quotation omitted).[33] I will apply the same legal standard for

---

[32] In accordance with *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Court should defer to an agency's interpretation of statutory language developed through rulemaking and case-by-case adjudication when Congress has given the agency the authority to administer the statute. *Mazariegos v. Office of U.S. Attorney Gen.*, 241 F.3d 1320, 1327 n.4 (11th Cir. 2001) ("Under *Chevron*, where Congress in a statute has not spoken unambiguously on an issue, the interpretation of the statute by an agency entitled to administer it is entitled to deference so long as it is reasonable. *Chevron* deference may be applied to agency interpretations arrived at through informal adjudication."). Congress granted the CFTC the authority to promulgate rules and regulations for Section 6(c)(1), *see* 7 U.S.C. § 9(1), and to enforce the Section, *see* 7 U.S.C. § 9(4)(A). Under its authority, the CFTC issued Commission Regulation 180.1. The CFTC's reliance on SEC Rule 10b-5 appears reasonable.

[33] The SEC is not required to prove reliance, damages, and loss causation. *See Goble*, 682 F.3d at 943 (citations omitted).

**Attachment G, p. 46**                    **EXHIBIT 16**
                                           **FTC-VAST-000491**

violations of Section 6(c)(1) of the Act. Accordingly, the CFTC must prove that Hunter Wise made (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter.

Because I found that Hunter Wise, through Mr. Jager and Mr. Martin, made material misrepresentations and materially misleading omissions with scienter regarding the risk of the commodities transactions, I need only determine whether it did so in connection with the purchase or sale of commodities. Again, I use Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 as a guide. Section 10(b)'s "in connection with" requirement "should be construed not technically and restrictively, but flexibly to effectuate [its] remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (internal quotations omitted). The "purchase" of security may involve a change of ownership or a promise to purchase a security. *See Goble*, 682 F.3d at 946. A defendant who accepted payment and then failed to deliver the security to a customer is liable under Rule 10b-5. *Id.* (citing *Grippo v. Perazzo*, 357 F.3d 1218, 1223-24 (11th Cir. 2004)). The Court may look to whether the defendant's action "would . . . impact an investor's decision to purchase a security." *Id*; *see also SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) (holding that a Rule 10b-5 violation exists "whenever assertions are made . . . in a manner reasonably calculated to influence the investing public").

In the commodities context, I must determine whether Hunter Wise's conduct was in connection to the retail customers' decision to enter into the subject transactions. The CFTC has proven that Hunter Wise made countless misrepresentations and deceptive omissions in connection with the sale of the precious metals. As mentioned above, Hunter Wise, through Mr. Martin, Mr. Jager, its representatives, and the documents it provided to its dealers and sent to retail customers, confirmed falsely that it had physical metals for its customers and failed to

disclose Hunter Wise's involvement in the scheme. Hunter Wise failed to disclose that it only had "paper entries" regarding its inventory. Further, its documents and training material fraudulently claimed success in these transactions, even when Hunter Wise's own accounting showed that over 90% of its customers were losing money. Hunter Wise misrepresented the rate of return and risk of the transactions. Victims of Hunter Wise's scheme testified that this information would have influenced their decision to purchase commodities. Therefore, the CFTC's allegations satisfy the "in connection with" requirement.

Accordingly, the CFTC has met its burden in proving Hunter Wise is liable for fraud under Section 6(c)(1) of the Act and Commission Regulation 180.1.

### C. *Section 13(a) of the Act - Aiding and Abetting the Violations of the Act*

Count Thirteen of the Complaint claims that Hunter Wise aided and abetted the violations of the Act that were committed by other defendants in the instant matter. Therefore, because of Hunter Wise's actions, it is liable under Section 13(a) of the Act. 7 U.S.C. § 13c(a). A defendant will be found liable if it "knowingly associates [itself] with an unlawful venture, participates in it to bring it about, and seeks by [its] actions to make it succeed." *CFTC v. Trinity Fin. Grp., Inc.*, 1997 WL 820970 (S.D. Fla. Sept. 29, 1997) (internal quotations omitted), *rev'd on other grounds sub nom. CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir. 1999); *see also Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987) (finding that section 13(a), like in criminal law, "requires not only knowledge of the principal's objective but a desire to help him attain it").

**Attachment G, p. 48**                    **EXHIBIT 16**
**FTC-VAST-000493**

(1)   *Primary Violation*

The Court found previously that Lloyds and the Dealer Defendants violated Section 4(a) of the Act.[34] Lloyds acted as Hunter Wise's intermediary in the scheme. It accepted the information and funds the Dealer Defendants obtained from the retail customers in these commodities transactions and shared them with Hunter Wise. The Dealer Defendants helped further Hunter Wise's scheme by making material misrepresentations and failing to disclose material information to the retail customers, whom they solicited for Hunter Wise.

(2)   *Aider and Abettor's Knowledge of the Primary Violation*

Mr. Martin and Mr. Jager claim they were in charge of the scheme. In an e-mail boasting about Hunter Wise's business, Mr. Jager explained that Hunter Wise "investors are not players in the casino, instead they own the casino. . . . Put another way, our investors are not betting on the horses; we own the race track [sic]. The point is that we control the process, and stand to make money no matter where the markets shift." E-mail from Jager to Pandora Pang (June 1, 2008) (CFTC Ex. 180 at 1). Hunter Wise masterminded and facilitated this process of cheating retail customers.

Mr. Jager and Mr. Martin seem to argue that, because their Dealer Purchase & Sale Agreement and the Dealer Loan, Security & Storage Agreement disclaimed an agency relationship, they are not liable for assisting the Dealer Defendants in violating the Act. They claim that the Dealer Defendants had complete autonomy over their interactions with the retail customers. The evidence presented at trial exposes the inherent fallacies in their arguments. An agency relationship does not have to exist to find Hunter Wise liable for systematically

---

[34] As noted previously, on February 5, 2014, the Court entered a Consent Order as to Lloyds. (DE 254). The Court also entered a Consent Order as to (1) Newbridge (DE 289) and (2) USCT (DE 288). The Court shall enter default judgment against CD Hopkins and Blackstone under separate Order.

49

**EXHIBIT 16**
                                          **FTC-VAST-000494**

defrauding their downstream customers out of their funds. In fact, the Dealer Defendants had to inform Hunter Wise representatives of their retail customers' initial trades. This requirement was so because a retail customer's account could not be created until Hunter Wise set the prices and received the funds.

One of the "features" that Hunter Wise offered was that it would "generate[] all trade-related customer correspondences under a 'White Label' arrangement. . . . As an added bonus, both [the] Dealer and Client Portals are also branded with [the Dealer's] company name and logo." Hunter Wise's Dealer Portal User Guide, CFTC Ex. 126 at 4. Through Hunter Wise's maintenance of the portal website, through which Hunter Wise generated and sent documents to the retail customers, Hunter Wise was able to lead customers into believing there were metals stored on their behalf. During his deposition, Mr. Mawjood, a non-party dealer in this matter, confirmed how deceptive this "White Label" feature was in transactions. Mr. Mawjood stated, "Every - - every item that gets sent out to your individual clients ultimately comes from Hunter Wise." Mawjood Dep. (DE 191-1 at 170:16-18). Even more telling, Mr. Mawjood noted, "I never understood why they would use Blackstone Metals Group or any other name, because whenever we would ask that question, in the end it's Hunter Wise that's doing it, and that's why I never understood that." *Id.* at 174: 18- 175: 22.

Mr. Mawjood also testified that Hunter Wise would set the interest amounts on the purported loans and fees Hunter Wise and the Dealer Defendants would charge retail customers. *Id.* at 134:1-7 (stating that fees were set "by Hunter Wise directly. And then whatever is communicated, [Blackstone Metals Group owner Baris Keser] would probably have agreed with it"). Hunter Wise knew that the Dealer Defendants were lying to retail customers, as it was Hunter Wise that created the forms and material the Dealer Defendants used to do so.

**Attachment G, p. 50**                    **EXHIBIT 16**
FTC-VAST-000495

(3)    *Aider and Abettor Intentionally Assisted in the Primary Violation*

Sylvia Williams, a former broker-dealer in Hunter Wise's scheme, and Frank Gaudino, owner of Lloyds, Hunter Wise's intermediary between it and the Dealer Defendants, both testified to how Hunter Wise helped and managed the scheme. Ms. Williams received aid from Hunter Wise's representatives on how to establish a foreign corporation so that she could be a Hunter Wise broker-dealer in Florida. Ms. Williams testified that her company depended on Hunter Wise for its anti-money laundering documents, compliance manuals, and related services. Williams Testimony, Feb. 27, 2014 (DE 300 at 24:16-23). She explained that her company only had approximately $100,000 in capital because Hunter Wise received all of the retail customers' money and she "would request a wire be sent back that was due back to [her] as far as the commissions and the service and any interest." *Id.* at 30:1-3. Mr. Gaudino testified about looking to Hunter Wise to provide the services Lloyds promoted as its own.

These witnesses described how Hunter Wise's conduct not only aided the Dealer Defendants' violations, but controlled their ability to execute them as well. Without Hunter Wise's help, the Dealer Defendants would not have been able to cheat the victims in this action. As the leader of the scheme, Hunter Wise did more than what its agreements with the dealers described. While Hunter Wise sought to hide behind the curtain of its dealers, the evidence shows Hunter Wise was conducting the entire orchestra. Indeed, the dealers played to the tune Hunter Wise chose, at its direction. Now it refuses to face the music.

Accordingly, the CFTC has met its burden in proving Hunter Wise is liable for fraud under Section 13(a) of the Act.

**Attachment G, p. 51**                                    **EXHIBIT 16**
FTC-VAST-000496

**D. *Controlling Persons***

The CFTC seeks to hold Mr. Jager and Mr. Martin liable for Hunter Wise's conduct because they controlled the corporation. In my February 19, 2014 Order (DE 281), I found Mr. Jager and Mr. Martin liable as controlling persons of Hunter Wise. According, I find that they are liable under Section 13c(b), 7 U.S.C. § 13c(b) as to Counts Two, Three, and Thirteen of the Complaint. Section 13c(b) explains:

> Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts or acts constituting the violation.

7 U.S.C. § 13c(b). The Eleventh Circuit has noted that Section 13(b) of the Act is "about power and imposing liability for those who fail to exercise it to prevent illegal conduct." *R.J. Fitzgerald & Co.*, 310 F.3d at 1334. The "fundamental purpose" of the statute is "to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *Id.* (quoting *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995)). Under Section 13(b), to demonstrate that an individual defendant had control over the entity requires the CFTC to show the controlling individual: (1) had control and (2) lacked good faith or knowingly induced the acts constituting the violation. *See* 7 U.S.C. § 13c(b); *In re First Nat'l Trading Corp.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,142, at 41,787 (CFTC July 20, 1994), *aff'd without opinion sub nom.*, *Pick v. CFTC*, 99 F.3d 1139 (6th Cir. 1996).

As to the first prong, to establish control, the CFTC must show the individual possessed general control over the operation of the entity principally liable. *See R.J. Fitzgerald & Co.*, 310

**Attachment G, p. 52**                    **EXHIBIT 16**
                                        **FTC-VAST-000497**

F.3d at 1334. The Court may find control exists where evidence demonstrates that the individual is an officer, founder, principal, or the authorized signatory on the company's bank accounts. *See In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep (CCH) 24,103, at 34767 (CFTC Jan. 12, 1988). As to the second prong, the CFTC must show the individual either lacked good faith or knowingly induced the acts. To establish good faith, the CFTC must show that the individual failed to maintain a "reasonably adequate system of internal supervision and control" or did not oversee the system "with any reasonable diligence." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993) (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)). To establish the "knowing inducement" element, the CFTC has the burden of showing that "the controlling person had actual or constructive knowledge of the core activities that constitute the violations at issue and allowed them to continue." *JCC, Inc.*, 63 F.3d at 1568 (quoting *In re Spiegel*, 24,103, at 34,767). Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *In re Spiegel*, 24,103, at 34,767. Courts have found that constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *See JCC, Inc.*, 63 F.3d at 1568. To support a finding of constructive knowledge, the CFTC must show that a defendant "lacked actual knowledge only because he consciously avoided it." *Id.* at 1569 (citations omitted).

The CFTC alleges that Mr. Jager and Mr. Martin controlled and knowingly induced the conduct of Hunter Wise. Mr. Jager was the Chairman and Chief Executive Officer of Hunter Wise, and Mr. Martin was the President and Chief Operating Officer. Although Mr. Martin oversaw the day-to-day business operations, Mr. Jager's position within Hunter Wise demonstrates he had knowledge of and "direct[ed] the economic aspects" of the entity. *Apache Trading Corp.* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) 25,251, at 38,795

(CFTC Mar. 11, 1992). Both individuals were authorized to, and did, enter into agreements with the Suppliers for Hunter Wise's margin trading transactions. In signing the agreements and trading with the Suppliers, Mr. Jager and Mr. Martin were aware, or purposely avoided becoming aware, that Hunter Wise did not own or acquire the commodities. Furthermore, Hunter Wise counsel informed Mr. Martin and Mr. Jager of the differences between owning metal fully and the offset trading Hunter Wise was conducting with the Suppliers. As such, I find that the CFTC has met its burden in showing that Mr. Jager and Mr. Martin controlled Hunter Wise and knowingly induced Hunter Wise to violate Section 4(a) of the Act.

## IV.   RELIEF REQUESTED / DAMAGES

Because Hunter Wise committed fraud and aided others in violating the Act, the CFTC seeks a Court order authorizing: (1) a permanent injunction and trading and registration ban; (2) restitution; and (3) a Civil Money Penalty ("CMP") against Hunter Wise, Mr. Jager, and Mr. Martin.

### A. *Permanent Injunction and Trading and Registration Ban*

The Act allows a district court, "upon a proper showing," to grant a permanent injunction. *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008). In reviewing the grant of an injunction, "the ultimate test ... is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Id.* (internal quotation omitted) (citing *Sidoti*, 178 F.3d at 1137). Specifically, the following factors should be considered:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

**Attachment G, p. 54**                                    **EXHIBIT 16**
                                                          **FTC-VAST-000499**

*SEC v. Carriba Air, Inc.,* 681 F.2d 1318, 1322 (11th Cir. 1982).

As to the first and second considerations, Hunter Wise's conduct was egregious and recurrent. For over a year and a half, Hunter Wise made material misrepresentations about the precious metal transactions, the risk involved, and the success of the investment, while, at the same time, using the funds to buy precious metals from the Suppliers on its own behalf. Hunter Wise did not use the retail customers' funds as they were supposed to be used: to buy precious metals on their behalf with loans. As I noted previously, the scheme Mr. Jager and Mr. Martin developed was calculated to deceive retail customers.

The evidence the CFTC presented at trial demonstrates that Hunter Wise acted with a high degree of scienter. It was aware that it was misleading its downstream customers, that it was not allocating the funds to purchase precious metals on the retail customers' behalf, that its training and promotional material were wrong, and that no loans were disbursed for the customers. It supported and controlled the Dealer Defendants and Lloyds in their solicitation of retail customers, took a commission, and received fees from every customer that was misled.

Furthermore, Mr. Jager and Mr. Martin have not recognized any wrongdoing. The likelihood of future violations is strong, especially because Mr. Jager and Mr. Martin argue that their conduct in defrauding retail customers out of millions of dollars was legitimate and both were aware of Mr. Martin's *Unimet* Consent Order prohibiting the exact fraud he committed here.

Therefore, I find that a permanent injunction is appropriate because Hunter Wise, Mr. Jager, and Mr. Martin's actions were repeated, callous, and blatant.

**FTC-VAST-000500**

**B. *Restitution / Disgorgement***

The record contains sufficient evidence of the losses from Hunter Wise's actions.[35] Only sixty-four customers out of 3,283 total customers achieved a profit during their transactions through Hunter Wise between July 16, 2011 and February 25, 2013. Hunter Wise, on the other hand, benefitted greatly from these transactions. The CFTC seeks restitution from Hunter Wise, Mr. Martin, and Mr. Jager for proximately causing the retail customers' losses.

Under Section 6(c) of the Act, the Court is authorized to order restitution. *See* 7 U.S.C. § 13a-1. Section 6(c) allows the CFTC to request equitable remedies "on any person found in the action to have committed any violation," including:

(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and

(B) disgorgement of gains received in connection with such violation.

7 U.S.C. § 13a-1(d)(3).

The systematic and pervasive nature of Hunter Wise's fraud necessitates restitution not only for the retail customers who testified to the losses they sustained due to Hunter Wise's scheme, but for all of Hunter Wise's customers as well. Hunter Wise developed a scheme that failed to disclose material information about the commodities transactions into which retail customers were entering. During the relevant period, Hunter Wise acted intentionally in deceiving the retail customers by generating and sending documents that misrepresented and omitted information regarding Hunter Wise's margin trading accounts with the metals Suppliers, the loans Hunter Wise offered, the high risks and low payouts involved in the transactions, and

---

[35] Mr. Martin and Mr. Jager attempted to argue that Special Monitor Melanie Damien's calculation of the losses, which the CFTC relied upon to calculate the retail customers' total losses, was incorrect. After reviewing the evidence and testimony, however, I find that the CFTC's calculations accurately reflect the losses sustained by the retail customers.

Hunter Wise's ownership of metals on the retail customers' behalf. Hunter Wise oversaw the whole scheme; a customer account could not be created without Hunter Wise's approval. It received the retail customers' funds and dispersed the dealers' profits, keeping the majority of the funds for itself. Without correcting the material information, retail customers faced the certain loss of the money they invested, and over 90% of them did, in fact, lose their funds.

Therefore, I find that restitution for all retail customer losses is an appropriate remedy, for which Hunter Wise, Mr. Martin, and Mr. Jager are jointly and severally liable.

### C. *Civil Money Penalty*

Along with restitution, the CFTC seeks a CMP against Hunter Wise, Mr. Martin, and Mr. Jager. The Court's authority to impose a CMP comes from Section 6c(d)(1), which provides that a monetary penalty "in the amount of not more than the higher of $100,000 or triple the monetary gain" may be imposed for each violation against any person found to violate the Act. 7 U.S.C. § 13a-1(d)(1)(A). The $100,000 amount was increased to $140,000 per violation, as adjusted for inflation. *See* 17 C.F.R. § 143.8. The district court's imposition of the civil penalty must be "rationally related to the offense charged or the need for deterrence." *CFTC v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008).

Hunter Wise engaged in a well-thought out scheme to defraud approximately 3,200 retail customers, and it received $18,481,964.13 in profit due to spread charges, interest on loans Hunter Wise never executed, and fees for services Hunter Wise did not provide. *See* Summary Exhibit - Defendants' Financed Transactions with Retail Customers, CFTC Ex. 69. Because of its conduct, a CMP is warranted against Hunter Wise. The CMP against Hunter Wise is $55,445,892.39, which represents the product of triple Hunter Wise's monetary gain. Mr. Martin and Mr. Jager are jointly and severally liable for the CMP as controlling persons.

               **EXHIBIT 16**
**FTC-VAST-000502**

## V.   CONCLUSION

Based upon the Court's findings set forth above, the CFTC has established by a preponderance of the evidence that Hunter Wise, Harold Edward Martin, Jr., and Fred Jager committed fraud and aided and abetted Lloyds and the Dealer Defendants in defrauding the retail customers. For these reasons, Judgment is due to be entered in favor of the CFTC as to Counts Two, Three, and Thirteen of the Complaint. Judgment will be entered in favor of the CFTC against the Hunter Wise Defendants by separate order.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this _15_ day of May, 2014.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:     Counsel of Record
               Melanie E. Damian, Special Monitor and Corporate Manager
               John A. King, II, *pro se* Defendant
               Chadewick Hopkins, *pro se* Defendant

58

**Attachment G, p. 58**                    **EXHIBIT 16**
                                           **FTC-VAST-000503**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 12-81311-CV-MIDDLEBROOKS/BRANNON

UNITED STATES COMMODITY FUTURES        :
TRADING COMMISSION,                    :
                                       :
     Plaintiff,                     :
                                       :
vs.                                    :
                                       :
HUNTER WISE COMMODITIES, LLC, *et al.*,  :
                                       :
     Defendants.                    :
_____/  :

### ORDER OF FINAL JUDGMENT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTY AND OTHER EQUITABLE RELIEF

     Final judgment is hereby **ENTERED** in favor of Plaintiff United States Commodity

Futures Trading Commission ("CFTC") and against Defendants Harold Edward Martin, Jr., Fred

Jager, Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC,

and Hunter Wise Trading, LLC (collectively the "Hunter Wise Defendants") on Counts 1, 2, 3,

12 and 13 of the Complaint.

     It is hereby **ORDERED AND ADJUDGED** as follows:

### I.    PERMANENT INJUNCTION

     1.    Based upon and in connection with this Court's Findings of Fact and Conclusions

of Law, the Court's February 19, 2014 Order Granting Summary Judgment to Plaintiff on Counts

1 and 12 of the Complaint (DE 281), and pursuant to Section 6c of the Commodity Exchange

Act, as amended ("Act"), 7 U.S.C. § 13a-1 (2012), the Hunter Wise Defendants are

**PERMANENTLY RESTRAINED, ENJOINED AND PROHIBITED** from directly or

indirectly:

**EXHIBIT 16**
**FTC-VAST-000504**

a. Offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in retail commodity transactions in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a);

b. Cheating, defrauding, or attempting to cheat or defraud any person, in or in connection with a retail commodity transaction in violation of Section 4b(a)(2)(A) of the Act, 7 U.S.C. § 6b(a)(2)(A);

c. Willfully making or causing to be made any false report or statement in or in connection with a retail commodity transaction in violation of Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B);

d. Willfully deceiving or attempting to deceive by any means whatsoever any person in or in connection with a retail commodity transaction in violation of Section 4b(a)(2)(C) of the Act, 7 U.S.C. § 6b(a)(2)(C);

e. Employing or attempting to employ any manipulative device, scheme or artifice to defraud in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Commission Regulation 180.1, 17 C.F.R. § 180.1 (2013);

f. Making or attempt to make any untrue or misleading statement of a material fact, or omitting a material fact necessary in order to make the statements made not misleading in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Commission Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2);

g. Engaging, or attempting to engage in, any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in violation

2

**Attachment G, p. 60**                    **EXHIBIT 16**
                                           **FTC-VAST-000505**

of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Commission Regulation 180.1(a)(3), 17 C.F.R. § 180.1(a)(3).

2.      The Hunter Wise Defendants also are **PERMANENTLY RESTRAINED, ENJOINED AND PROHIBITED** from directly or indirectly:

a.      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a);

b.      Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R. § 1.3(hh) (2013)) ("commodity options"), security futures products, swaps (as that term is defined in Section 1a(47) of the Act, 7 U.S.C. § 1a(47), and as further defined by Regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx)), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts"), for their own personal account or for any account in which they have a direct or indirect interest;

c.      Having any commodity futures, options on commodity futures, commodity options, security futures products, forex contracts and/or swaps traded on their behalf;

d.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps;

**Attachment G, p. 61**                    **EXHIBIT 16**
**FTC-VAST-000506**

e.  Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, forex contracts and/or swaps;

f.  Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and/or

g.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a) exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

## II.    RESTITUTION AND CIVIL MONETARY PENALTY

### A.  Restitution / Disgorgement

3.  The Hunter Wise Defendants are jointly and severally liable for restitution. The Hunter Wise Defendants shall **PAY** restitution in the amount of fifty-two million, six hundred forty-three thousand, three hundred ninety-nine dollars and nineteen cents ($52,643,399.19) ("Restitution Obligation").

4.  The Hunter Wise Defendants shall pay the Restitution Obligation, plus post-judgment interest, within **ten (10) days** of the date of the entry of this Order. If the Restitution Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006).

4

5. The Court-appointed Special Monitor and Corporate Manager, Melanie Damian ("Monitor"), is granted full authority to act as an equity receiver for the Hunter Wise entity defendants. The Monitor shall pursue and collect restitution payments from the Hunter Wise Defendants and make distributions as set forth below.

6. The Hunter Wise Defendants shall make Restitution Obligation payments under this Order to the Monitor in the name "Hunter Wise Settlement/Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Monitor at the office of Damian & Valori LLP, 1000 Brickell Avenue, Suite 1020, Miami, Florida 33131 under cover letter that identifies the paying Defendant and the name and docket number of this proceeding. The paying Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

7. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to the Hunter Wise Defendants' customers or may defer distribution until such time as the Monitor deems appropriate. The Monitor shall propose a distribution plan to the Court within **sixty (60) days** of the entry of this Order. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for civil monetary penalty payments set forth in Part B. below.

**Attachment G, p. 63**                          **EXHIBIT 16**
                                                  **FTC-VAST-000508**

8.   The Hunter Wise Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify the customers to whom the Monitor, in her sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. The Hunter Wise Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment, or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

9.   Until discharged by the Court, the Monitor shall provide the CFTC at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

10.   The amounts payable to each customer shall not limit the ability of any customer to prove that a greater amount is owed by Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

11.   Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of the Hunter Wise Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by the Hunter Wise Defendants to ensure continued compliance with any provision of this Order and to hold the Hunter Wise Defendants in contempt for any violations of any provision of this Order.

**Attachment G, p. 64**                    **EXHIBIT 16**
**FTC-VAST-000509**

12. To the extent that any funds accrue to the U.S. Treasury for satisfaction of the Hunter Wise Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.   Civil Monetary Penalty**

13.   The Hunter Wise Defendants jointly and severally shall **PAY** a civil monetary penalty of fifty-five million, four hundred forty-five thousand, eight hundred ninety-two dollars and thirty-nine cents ($55,445,892.39) ("CMP Obligation"), which represents triple the monetary gain received by the Hunter Wise Defendants by reason of their wrongdoing in this action.

14.   The Hunter Wise Defendants shall pay the CMP Obligation, plus post-judgment interest, within **ten (10) days** of the date of the entry of this Order. If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006).

15.   The Hunter Wise Defendants shall pay their CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN:  Accounts Receivables – AMZ 340
> E-mail Box:  9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

7

If payment by electronic funds transfer is chosen, the paying Defendant shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those instructions. The paying Defendant shall accompany payment of the CMP Obligation with a cover letter that identifies the Hunter Wise Defendant and the name and docket number of this proceeding. The paying Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**C.  Provisions Related to Monetary Sanctions**

16. Partial Satisfaction: Any acceptance by the CFTC or the Monitor of partial payment of the Hunter Wise Defendants' Restitution Obligation or CMP Obligation shall not be deemed a waiver of the Hunter Wise Defendants' obligation to make further payments pursuant to this Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

## III.       MISCELLANEOUS PROVISIONS

17.  Notice:  All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to CFTC:

> Rosemary Hollinger
> Deputy Director
> U.S. Commodity Futures Trading Commission
> 525 W. Monroe, Suite 1100
> Chicago, Illinois 60661

Notice to Defendants Harold Edward Martin and Fred Jager:

> Harris L. Kay, Jeffry Henderson
> Henderson & Lyman
> 175 West Jackson Boulevard
> Suite 240
> Chicago, IL 60604

Notice to the Hunter Wise entities:

**EXHIBIT 16**
**FTC-VAST-000511**

Melanie Damian, in her capacity as Corporate Manager
Damian & Valori LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131

All such notices to the CFTC shall reference the name and docket number of this action.

18.   Change of Address/Phone:   Until such time as the Hunter Wise Defendants satisfy in

full their Restitution Obligation and CMP Obligation as set forth in this Order, the Hunter Wise

Defendants shall provide written notice to the CFTC by certified mail of any change to their

telephone numbers and mailing addresses within **ten (10) calendar days** of the change.

19.   Invalidation:   If any provision of this Order or if the application of any provision or

circumstance is held invalid, then the remainder of this Order and the application of the provision

to any other person or circumstance shall not be affected by the holding.

20.   Waiver:   The failure of any party to this Order or of any of the Hunter Wise

Defendants' customers at any time to require performance of any provision of this Order shall in

no manner affect the right of the party or customer at a later time to enforce the same or any

other provision of this Order.   No waiver in one or more instances of the breach of any provision

contained in this Order shall be deemed to be or construed as a further or continuing waiver of

such breach or waiver of the breach of any other provision of this Order.

21.   Continuing Jurisdiction of this Court:   This Court shall retain jurisdiction of this

action to ensure compliance with this Order and for all other purposes related to this action,

including any motion by the Hunter Wise Defendants to modify or for relief from the terms of

this Order.

22.   Injunctive and Equitable Relief Provisions:   The injunctive and equitable relief

provisions of this Order shall be binding upon the Hunter Wise Defendants, upon any person

**Attachment G, p. 67**                          **EXHIBIT 16**
                                                 **FTC-VAST-000512**

under their authority or control, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Hunter Wise Defendants.

23. There being no just reason for delay, the Clerk of the Court is hereby directed to **ENTER** this Order of Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief against Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, Hunter Wise Trading, LLC, Harold Edward Martin, Jr., and Fred Jager.

24. All pending motions are **DENIED AS MOOT.**

25. The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this *15* day of May, 2014.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:     Counsel of Record
               Melanie E. Damian, Special Monitor and Corporate Manager
               John A. King, II, *pro se* Defendant
               Chadewick Hopkins, *pro se* Defendant



## Hunter Wise Commodities, LLC
2361 Campus Drive, Suite 140, Irvine, CA 92612

---

## ANTI-MONEY LAUNDERING PROGRAM

---

This is to certify that (Legal Name) ____Yorkshire bullion____ has a written anti-money laundering program of compliance and supervisory procedures that complies with the Interim Final Rule under the USA PATRIOT Act and the Bank Secrecy Act.

Our anti-money laundering program provides for staff training and for periodic audits to test the efficacy of the anti-money laundering program and its systems.

(Print Name) ____Jon-Paul Vasta____

(Signed Name) ____Jon Vasta____ (Date) ___9/16/09___



**Hunter Wise Commodities**

## AUTHORIZED TRADERS FORM

| Names of Authorized Traders |
| --- |

Name of Company: _Yorkshire Bullion, LLC_

Name of Authorized Traders: _Jordan Chibnick_

_Jon-Paul VASTA_

_Lisa-Pompile_

| Authorization Agreement |
| --- |

I hereby authorize the persons above to initiate trades on behalf of

_Yorkshire LLC_   (Company Name)

Principle's Authorized
Signature: _Jon Vasta_   Date: _9/16/09_

Hunter Wise Commodities, LLC
2361 Campus Drive, Suite 140
Irvine, CA 92612
Phone: 949-336-4405 Fax: 949-336-8746

Attachment H, p. 2

EXHIBIT 16
FTC-VAST-000515

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L09000088720
FILED 8:00 AM
September 15, 2009
Sec. Of State
clewis

## Article I

The name of the Limited Liability Company is:

YORKSHIRE BULLION, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

1001 YAMATO ROAD
SUITE 305
BOCA RATON, FL. 33431

The mailing address of the Limited Liability Company is:

1001 YAMATO ROAD
SUITE 305
BOCA RATON, FL. 33431

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

JON-PAUL VASTA
1001 YAMATO ROAD
SUITE 305
BOCA RATON, FL. 33431

Having been named as registered agent and to accept service of process
for the above stated limited liability company at the place designated
in this certificate, I hereby accept the appointment as registered agent
and agree to act in this capacity. I further agree to comply with the
provisions of all statutes relating to the proper and complete performance
of my duties, and I am familiar with and accept the obligations of my
position as registered agent.

Registered Agent Signature: JON-PAUL VASTA

## Article V

The name and address of managing members/managers are:

Title:  MGRM
JON-PAUL  VASTA
1001 YAMATO ROAD SUITE 305
BOCA RATON, FL.  33431

L09000088720
FILED 8:00 AM
September 15, 2009
Sec. Of State
clewis

## Article VI

The effective date for this Limited Liability Company shall be:

09/15/2009

Signature of member or an authorized representative of a member

Signature: JON-PAUL VASTA

**EXHIBIT 16**
**FTC-VAST-000517**

Sales Representative: _Joe DeDios_

#VDG #10129

# HW

## INFORMATION STATEMENT APPROVAL FOR :

_Jon-Paul Vasta_ / _Yorkshire Bullion, LLC_

Sales Manager ☐          Account Executive ☐          Principle ☒

| Verifying: | Verified By: | Date: |
|---|---|---|
| Information Statement: | Andrea | 9-18-09 |
| Employment History: | Andrea | 9-18-09 |
| Residence History: | Andrea | 9-18-09 |
| Legal History: | Andrea | 9-18-09 |
| Certification: | Andrea | 9-17-09 |
| Valid Photo Identification: | Andrea | 9-17-09 |
| NFA Futures www.nfa.futures.org: (312)781-1300 | NFA # ▮ ⇒ No Current Status — Andrea | 9-17-09 |
| FINRA www.finra.org: (800)289-9999 | No Results Andrea | 9-17-09 |
| Compliance Policy & Procedure Ack. Signed | N / A | |
| AML Procedure Acknowledgement Signed | Andrea | 9-17-09 |
| Independent Dealer Agreement Signed | N / A | |
| Super Dealer Purchase & Sale Agreement (p.7) | Andrea | 9-17-09 |
| Super Dealer Software Licensing Agree (p.5&6) | Andrea | 9-17-09 |
| Super Dealer Loan Sec. & Storage Agree (p. 10) | Andrea | 9-17-09 |
| Super Dealer Interest Rate Charges | Andrea | 9-18-09 |
| Super Dealer – Articles of Incorp & Resolution | Andrea | 9-17-09 |
| Super Dealer Financial Statement | Andrea | 9-17-09 |
| Authorized Traders list | Andrea | 9-17-09 |
| Attorney's Letter re: Lenders License (SD) | | |

To be completed by a manager only:

(Accept)          Decline

Approved By: _Andrea_____          Date: 9/18/09

Conditions of Approval and/or Comments:

**Attachment H, p. 5**          **EXHIBIT 16**
**FTC-VAST-000518**

JUN-15-2010  10:18AM  FROM-                                    T-600  P 002   F-079



# Hunter Wise Commodities, LLC

## DEALER SERVICES AGREEMENT

**1.     Parties to this Agreement.**

This agreement ("Agreement") is entered into between the Precious Metals Dealer ("Dealer") whose name and address appear at the end of this Agreement as one party and Hunter Wise Commodities, LLC, a Nevada limited liability company ("Hunter Wise") as the other party.

**2.     Confidentiality.**

2.1     Except as otherwise provided in this Agreement or as Hunter Wise may otherwise consent to in writing, Dealer will keep confidential and not disclose, or make any use of, except for Hunter Wise's benefit, at any time, either during or subsequent to Dealer's relationship with Hunter Wise, any trade secrets, formulae, methods, echniques, confidential information, computations, knowledge, data or other information of Hunter Wise relating to products, processes, know-how, marketing, merchandising, selling ideas, selling concepts, or other confidential information, forecasts, marketing plans, strategies, pricing strategies, computer programs, copyrightable materials, finances, or other subject matter pertaining to any of Hunter Wise's business, or any of its clients, customers, consultants, suppliers, or affiliates, which Dealer may produce, use, view, or otherwise acquire during its relationship with Hunter Wise ("Proprietary Property").

2.2     Dealer acknowledges and agrees that Proprietary Property is given to Dealer in confidence, and that such information derives actual or potential economic value by virtue of its confidentiality and nondisclosure to the public or other persons who could obtain economic value from their disclosure or use. Dealer shall not, under any circumstances, deliver, reproduce, or allow any Proprietary Property, or any documentation relating thereto, to be delivered to, or used by, any person or entity whatsoever other than Dealer without specific written consent of a duly authorized representative of Hunter Wise.

2.3     Except as may be required by applicable law, or by federal or state regulators, Dealer shall keep this Agreement, its terms and the business relationship created hereby strictly confidential from all third parties (including, without limitation, Dealer's customers and clients).

**3.     Return of Proprietary Property.**

In the event of the termination of this Agreement for any reason, Dealer will promptly surrender, and deliver to Hunter Wise, Proprietary Property, *including all copies thereof*. Upon termination of this Agreement, for whatever reason, any information required to be kept by any applicable laws and regulations pertaining to the physical commodity business may be retained by Dealer.

1/5/2010                                    1

4.      **Services Provided.**

    4.1      Hunter Wise will perform certain data entry required by Dealer to monitor client activity.

    4.2      Hunter Wise will provide Dealer with the following services (the "Services):
        a.      Preparation of client trade confirmations,
        b.      Preparation of client month-end statements,
        c.      Preparation of client equity call notices,
        d.      Preparation of year-end 1099's for clients & IRS,
        e.      Preparation of client title transfer notices,
        f.      Access to client & Dealer portals, and
        g.      Preparation of notices to Dealer's clients that they are at force liquidation levels.

5.      **Dealer Obligations.**

    5.1      Dealer acknowledges that it is responsible for complying with all applicable laws and regulations pertaining to the management of the Dealer's business. Dealer acknowledges responsibility for compliance with, among other things, al state and federal anti-fraud statutes and regulations, federal, state and local registration statutes and regulations, tax and labor laws, safety in the work place regulations, anti-discrimination laws, and all other laws of its state and/or country of its domicile that are applicable to the business contemplated by this Agreement.

    5.2      Dealer shall provide Hunter Wise with all necessary information and data necessary for the provisions of the Services.

    **5.3      DEALER SHALL BE FULLY RESPONSIBLE FOR THE FOLLOWING FUNCTIONS AS HUNTER WISE DISCLAIMS ANY RESPONSIBILITY AND LIABILITY THERE FOR: ACCEPTING, ACCOUNTING FOR AND DISBURSING CUSTOMER FUNDS, DISTRIBUTION OF ALL CONFIRMATION AND MONTH END STATEMENTS, TITLE TRANSFER NOTICES, CLIENT EQUITY CALL NOTICES, FORCE LIQUIDATION NOTICES, YEAR END 1099 FORMS TO CLIENTS/IRS, AND MAINTAINING A COMPREHENSIVE FILING SYSTEM FOR ALL CUSTOMER AND BUSINESS ACCOUNT DOCUMENTATION.**

6.      **Assignment and Delegation.**

    Dealer may not assign any rights hereunder without the prior written consent of a duly authorized officer of Hunter Wise. Dealer understands that the services provided as set forth in this Agreement are for a single office and will not to extend these services to any other office. Hunter Wise may assign its right and obligation hereunder in this contract with third parties to provide the Services on its behalf.

7.      **Termination.**

    This Agreement may be terminated by either party at any time and for any reason or for no reason at all by written notice to the other party. On any such termination, Hunter Wise shall have no further obligation to provide the Services.

8.      **Force Majeure.**

    In the event of adverse conditions in the marketplace or other factors beyond the control of Hunter Wise, including, but not limited to, acts of God, national and/or international emergencies, adverse governmental actions, suspension of trading by commodity exchanges, or the failure or delay of suppliers, the maximum time for delivery of commodities or payment by Hunter Wise may, except if prohibited by any applicable law, be extended indefinitely during the period of such adverse circumstances. Hunter Wise will not be responsible for delays or failure in the transmission, receipt or execution of orders, payments deliveries or information due to the

**Attachment H, p. 7**                              **EXHIBIT 16**
                                                    **FTC-VAST-000520**

incapacity or failure of computer, transmission or communication facilities that are beyond the control of Hunter Wise.

9.  **General Indemnification by Dealer.**

Dealer agrees to forever indemnify and hold harmless Hunter Wise and its principals, shareholders, officers, directors, Dealers, agents, and representatives from and against any and all claims, damages, costs (including but not limited to (i) reasonable attorney's expenses and (ii) any costs and expenses in connection with any investigation, inquiry, proceeding or correspondence with federal, state or local regulators or in responding to any claims made by customers of Dealer) that Hunter Wise may sustain or become liable or answerable for or shall pay, in connection with the Services or as a result of any alleged act, practice, conduct or omission of Dealer or its principals, shareholders, directors, officers, dealers, agents or representatives.

10.  **Limitation on Damages; No Liability for Consequential Damages.**

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL HUNTER WISE OR ITS AFFILIATES, PARENT COMPANIES, DEALERS, AGENTS, ATTORNEYS, OFFICERS, MANAGERS, DIRECTORS OR SUPPLIERS, BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR ANY OTHER PECUNIARY LOSS) ARISING IN CONNECTION WITH THE SERVICES, EVEN IF HUNTER WISE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. HUNTER WISE'S LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT OF THE SERVICE FEE PAID BY DEALER TO HUNTER WISE.

11.  **Representation and Limited Warranty.**

11.1   Each party represents and warrants that it has full power and authority to enter into this Agreement and neither party's performance of its obligation hereunder conflicts with or breaches the terms and conditions of any agreement with any third party.

11.2   Dealer acknowledges that the Services are provided to Dealer on a "best efforts" basis. HUNTER WISE DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, WITH RESPECT TO THE SERVICES, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. HUNTER WISE MAKES NO WARRANTY THAT THE SERVICES WILL MEET DEALER'S REQUIREMENTS, BE ERROR FREE, OR BE PROVIDED WITHOUT INTERRUPTION.

11.3   Dealer accepts that performance of the Services may be detrimentally affected by conditions such as data feed delays, interruption in communications links, electronic message traffic, market volatility, hardware failure, malfunction of contra parties, and other conditions not specified herein and Dealer agrees that Hunter Wise shall have no liability in any such event.

12.  **Amendments.**

This Agreement may be amended only upon execution of a subsequent written Agreement or upon Dealer's failure to object, within ten (10) days, to modifications contained in written material sent to Dealer by Hunter Wise. This Agreement shall supersede any oral representations between the parties.

**Attachment H, p. 8**

**EXHIBIT 16**
**FTC-VAST-000521**

13. **Governing Law.**

This Agreement is entered into in accordance with, and shall be governed by, the laws of the State of Nevada without regard to its conflict of law provisions.

14. **Location of Legal Proceedings.**

Any arbitration or other legal proceedings arising out of or relating to this Agreement or any dealings between Hunter Wise and Dealer, whether brought before or after any termination of this Agreement, shall be brought and heard only in Clark County, Nevada, and Dealer expressly waives any rights under any law or rule to cause any such proceedings to be brought or heard in any other location.

15. **No Agency Relationship.**

Nothing contained herein shall be construed as creating an agency relationship between Dealer and Hunter Wise or any of Hunter Wise's affiliates.

_____
Dealer Initials

16. With the exception of State or Federal Regulars Dealer shall keep this Agreement, its terms, and the business relationship created hereby strictly confidential from all third parties (including, without limitation, Dealer's customers and clients).

_____
Dealer Initials

17. **Severability.**

In the event that any provision of this Agreement shall be determined by a court of competent jurisdiction to be unenforceable in any jurisdiction, such provision shall be unenforceable in that jurisdiction and the remainder of this Agreement shall remain binding upon the parties as if such provision were not contained therein. The enforceability of such provision shall otherwise be unaffected and remain enforceable in all other jurisdictions.

18. **Errors.**

Dealer will be able to access a screen in The Dealer Portal that reflects a listing of all trades entered and executed on every trading day. Dealer is encouraged to print out the report and compare it with the daily order tickets. Any discrepancies must be brought to the immediate attention of the Hunter Wise Trading Department. Unless errors are reported to Hunter Wise by the end of the trading day, Hunter Wise will assume that all trades were executed correctly. Any financial consequences associated with subsequently reported trading errors, shall be the responsibility of Dealer.

19. **Fee**

Upon execution of this Agreement, Dealer shall pay to Hunter Wise a one-time fee of $2,500 (the "Service Fee") to set up a dealer data base.

20. **Arbitration and Court Actions.**

ALL CONTROVERSIES, CAUSES OF ACTION, AND EQUITABLE CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BUSINESS DEALINGS BETWEEN THE PARTIES, SHALL BE RESOLVED BY BINDING ARBITRATION IN CLARK COUNTY, NEVADA, BY JUDICIAL AND MEDIATION SERVICES, INC. ("JAMS") IN ACCORDANCE

1/5/2010

4

**Attachment H, p. 9**          **EXHIBIT 16**
                                **FTC-VAST-000522**

JUN-15-2010 10:18AM FROM-

T-600   P 006   F-079

WITH JAMS' RULES FOR RESOLVING COMMERCIAL DISPUTES. ALL AWARDS RENDERED IN ANY ARBITRATION SHALL BE FINAL, BINDING AND NON-APPEALABLE. JUDGMENT UPON ANY AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION OVER THE PARTIES; PROVIDED, HOWEVER, THAT HUNTER WISE MAY IN ITS SOLE DISCRETION, SEEK TO ENFORCE ITS RIGHTS UNDER PARAGRAPHS 2, 3, AND 4 HEREIN BY OBTAINING A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY AND INJUNCTIONS ISSUED BY ANY COURT OF COMPETENT JURISDICTION, ENJOINING OR RESTRAINING DEALER FROM CONTINUING TO DO ANY ACT OR COMMIT ANY VIOLATION OR THREATENED VIOLATION OF ANY SUCH SECTIONS. THE PREVAILING PARTY, AS DETERMINED BY THE COURT OR THE ARBITRATOR(S), SHALL BE ENTITLED TO RECOVER FROM THE OTHER PARTY ALL COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) INCURRED IN CONNECTION WITH THE COURT PROCEEDING OR ARBITRATION.

Jon-Paul Vasta  Yorkshire Bullion                6/15/10
Dealer Name                                       Date

1001 Yamato Rd. #305  Boca Raton, FL 33431
Address

Jon Vasta                           Managing Member
Dealer Signature                    Title

Andrea Rizzio                       6-15-2010
Hunter Wise Commodities, LLC        Date

1/5/2010

5

**Attachment H, p. 10**

**EXHIBIT 16**
**FTC-VAST-000523**

**The Commonwealth of Massachusetts**
William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

**Articles of Organization**
(General Laws Chapter 156D; Section 2.02; 950 C.M.R. 113.16)

### ARTICLE I

The exact name of the corporation is:

**Boost Software, Inc.**

### ARTICLE II

Unless the articles of organization otherwise provide, all corporations formed pursuant to G.L. c. 156D have the purpose of engaging in any lawful business. If you wish to specify more limited purposes, state them below.

### ARTICLE III

State the total number of shares and par value, if any, of each class of stock that the corporation is authorized to issue. All corporations must authorize stock. If only one class or series is authorized, it is not necessary to specify any particular designation.

| WITHOUT PAR VALUE | | WITH PAR VALUE | | |
|---|---|---|---|---|
| TYPE | NUMBER OF SHARES | TYPE | NUMBER OF SHARES | PAR VALUE |
| Common | 275,000 | | | |
| | | | | |
| | | | | |

### ARTICLE IV

Prior to the issuance of shares of any class or series, the articles of organization must set forth the preferences, limitations and relative rights of that class or series. The articles may also limit the type or specify the minimum amount of consideration for which shares of any class or series may be issued. Please set forth the preferences, limitations and relative rights of each class or series and, if desired, the required type and minimum amount of consideration to be received.

**Not applicable.**

### ARTICLE V

The restrictions, if any, imposed by the articles or organization upon the transfer of shares of any class or series of stock are:

**Attachment I, p. 1**

**EXHIBIT 16**
**FTC-VAST-000524**

Right of First Refusal. No shareholder of the corporation shall sell, assign, pledge or otherwise transfer (collectively, "transfer") any of the shares of stock of the corporation or any right or interest therein, whether voluntarily or by operation of law, or by gift or otherwise, except by a transfer which meets the following requirements:

a. If any shareholder (the "Selling Shareholder") proposes to transfer any shares of stock of the corporation (the "Offered Shares"), then the Selling Shareholder shall first give written notice of the proposed transfer (the "Transfer Notice") to the corporation. The Transfer Notice shall name the proposed transferee and state the number of Offered Shares, the price per share and all other material terms and conditions of the transfer.

b. For 15 days following its receipt of such Transfer Notice, the corporation shall have the option to purchase all or any lesser part of the Offered Shares at the price and upon the terms set forth in the Transfer Notice. In the event the corporation elects to purchase all of the Offered Shares, it shall give written notice of its election to the Selling Shareholder within such 15-day period, and the settlement of the sale of such Offered Shares shall be made as provided below in Section (d).

c. If the corporation does not elect to acquire all of the Offered Shares, the corporation shall, within 15 days after receipt of the Transfer Notice, give written notice of its decision to the holders of stock of the corporation other than the Selling Shareholder ("Eligible Shareholders"). Such notice shall state the number of Offered Shares available for purchase. Each Eligible Shareholder shall be entitled to purchase that proportion of the Offered Shares available for purchase as the number of shares of common stock owned by him or her bears to the total number of issued and outstanding shares of common stock of the corporation then owned by all Eligible Shareholders. For this purpose, any shares of convertible preferred stock of the corporation then outstanding shall be treated as if converted into the number of shares of common stock into which such shares may then be converted. Within ten days after mailing of such notice to the Eligible Shareholders, each Eligible Shareholder shall give written notice to the corporation and the Selling Shareholder stating how many shares of his or her pro rata allotment he or she will purchase and how many additional shares he or she will purchase if additional Offered Shares are made available. If an Eligible Shareholder fails to respond in writing within this ten-day period to the notice given by the corporation, the right of such Eligible Shareholder to acquire his or her proportionate part of the Offered Shares of the Selling Shareholder shall terminate. If one or more Eligible Shareholders do not elect to acquire his or her full pro rata shares of the Offered Shares available, these Offered Shares shall be allocated to each other Eligible Shareholder in the same proportion as the Eligible Shareholder's holdings of common stock bears to the aggregate of all Eligible Shareholders' holdings of common stock (treating all shares of convertible preferred stock as if converted into common stock). If any Eligible Shareholder is thereby given the right to purchase a greater number of Offered Shares than he or she has subscribed for, the excess shall be reallocated to the other Eligible Shareholders on the same proportionate basis described above. The corporation shall allocate and reallocate the shares available according to this procedure, but it shall have discretion to allocate amounts of less than 100 shares as it sees fit in its sole discretion. All allocations and reallocations pursuant to this Section (c) must be completed within 14 days after the end of the ten (10) day period referred to above.

d. If the corporation and/or Eligible Shareholders elect to acquire all, but not less than all, of the Offered Shares, the corporation shall so notify the Selling Shareholder and settlement shall be made at the principal office of the corporation in cash within 30 days after the corporation receives the Transfer Notice; *provided that* if the terms of payment set forth in the Transfer Notice were other than cash against delivery of such consideration, the

corporation and/or the Eligible Shareholders shall pay for the Offered Shares on the same terms and conditions set forth in the Transfer Notice.

e.  If the corporation and/or the Eligible Shareholders do not elect to acquire all of the Offered Shares, the Selling Shareholder may, within the 90-day period following the expiration of the option rights granted to the corporation and the Eligible Shareholders, transfer the Offered Shares to the proposed transferee or any other purchaser, *provided that* this sale shall not be on terms and conditions more favorable to the purchaser than those contained in the Transfer Notice. Notwithstanding any of the above, all Offered Shares transferred pursuant to this Section shall be subject to the provisions of this Section in the same manner and to the same extent as before the transfer.

f.  The following transactions shall be exempt from the provisions of this Section:

   1.  A shareholder's transfer of any or all of his or her shares either during his or her lifetime or on death by will or intestacy to his or her immediate family or to a trust the beneficiaries of which are exclusively one or more of the shareholder and a member or members of the shareholder's immediate family. "Immediate family" shall mean spouse, lineal descendant, father, mother, brother or sister of the shareholder making the transfer;

   2.  A shareholder's bona fide pledge or mortgage of his or her shares with a commercial lending institution;

   3.  A corporate shareholder's transfer of any or all of its shares pursuant to and in accordance with the terms of any merger, consolidation, share exchange, reclassification of shares or capital reorganization of the corporate shareholder, or pursuant to a sale of substantially all of the stock or assets of a corporate shareholder;

   4.  A corporate shareholder's transfer of any or all of its shares to any or all of its shareholders;

   5.  A transfer by a shareholder that is a partnership to any or all of its partners or retired partners, or to the estate of any partner or retired partner;

   6.  A transfer by a shareholder that is a limited liability company to any or all of its members or retired members, or to the estate of any member or retired member;

   7.  A transfer pursuant to an agreement among the shareholder and other shareholder(s) of the corporation providing for "take-me-along" or "co-sale" rights or any stock restriction agreement between the shareholder and the corporation;

   8.  A transfer to a person who is already a shareholder of the corporation;

   9.  A transfer to the guardian or conservator of the shareholder; and

   10. Any transfer pursuant to an effective registration statement filed by the corporation with the Securities and Exchange Commission;

*provided, however,* that in any such case, except as otherwise provided in Section (j) below, the transferee or other recipient shall receive and hold such shares of stock subject to

the provisions of this Section and there shall be no further transfer of such shares of stock except in accordance with this Section.

g.  A shareholder of the corporation shall be deemed to have given a Transfer Notice to the corporation and to have offered to sell all of the shares of stock of the corporation then held by such shareholder:

    1.  if such shareholder dies and as a result any transfer of stock is to be made other than as permitted by Subsection (f)(1) above;

    2.  if such shareholder applies for or consents to the appointment of a custodian, receiver, trustee or liquidator of any of his or her properties;

    3.  if such shareholder admits in writing his or her inability to pay his or her debts as they mature;

    4.  if there is a dissolution, termination of existence, liquidation, insolvency or business failure of the shareholder;

    5.  if there is a composition or an assignment or trust mortgage for the benefit of creditors by the shareholder;

    6.  upon the commencement by or against the shareholder of any proceeding under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, insolvency or other similar law affecting the rights of creditors generally; or

    7.  if that shareholder's shares are subject to (i) attachment or execution of a judgment or (ii) any other transfer by court order, operation of law, by gift or otherwise without consideration (other than pursuant to Section (f)).

If any offer is deemed to have been made under this Subsection (g), the corporation and/or the Eligible Shareholders may elect to purchase all or any portion of such Offered Shares, and the price to be paid by the corporation and/or the Eligible Shareholders for the Offered Shares so deemed to be offered shall be the most recent valuation for such shares of stock established by the Board of Directors. If the shares are not purchased by the corporation and/or the Eligible Shareholders but are transferred to other parties, the transferred shares shall thereafter be released from all restrictions under this Section.

h.  The corporation may assign its rights to purchase shares of stock in any particular transaction under this Section to one or more persons or entities.

i.  Any sale or transfer, or purported sale or transfer, of securities of the corporation shall be null and void unless the terms, conditions and provisions of this Section are strictly observed and followed.

j.  The foregoing right of first refusal shall terminate upon either of the following dates, whichever shall first occur:

    1.  Upon the closing of the first public offering of securities of the corporation that is effected pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under the Securities Act of 1933, as amended (other than an offering registered on Form S-4, Form S-8 or any succes-

sor forms) that results in aggregate gross proceeds to the corporation (aggregate sales price to the public less underwriters' discounts) of at least $1,000,00; or

   2.  upon the sale of all or substantially all of the shares or business of the corporation, by merger, consolidation, share exchange, sale of assets or otherwise.

k.  The following legend shall be noted conspicuously on the front or back of certificates representing certificated shares of stock of the corporation and shall be contained in the information statement required by Section 6.26(b) of the Massachusetts Business Corporation Act, as amended from time to time, for uncertificated shares of stock of the corporation:

   The shares represented by this certificate or described in this information statement are subject to a right of first refusal in favor of the corporation and its other shareholders, as provided in the Articles of Organization of the corporation, a copy of which can be obtained from the secretary of the corporation.

l.  Whenever the neuter, masculine or feminine gender or the plural or singular number is used herein, it shall be deemed to represent whatever gender or number the context or circumstances require.

## ARTICLE VI

Other Lawful Provisions; if there are no such provisions, this article may be left blank or state "None"

1.  *Minimum Number of Directors.* The board of directors may consist of one or more individuals, notwithstanding the number of shareholders.

2.  *Personal Liability of Directors to Corporation.* No director shall have personal liability to the corporation for monetary damages for breach of his or her fiduciary duty as a director notwithstanding any provision of law imposing such liability, provided that this provision shall not eliminate or limit the liability of a director (a) for any breach of the director's duty of loyalty to the corporation or its shareholders, (b) for Acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) for improper distributions under Section 6.40 of the General Laws of Massachusetts, or (d) for any transaction from which the director derived an improper personal benefit.

3.  *Authorization of Directors to Make, Amend or Repeal Bylaws.* The board of directors may make, amend or repeal the bylaws in whole or in part, except with respect to any provision thereof which by virtue of an express provision in Chapter 156D of the General Laws of Massachusetts, the Articles of Organization or the bylaws requires action by the shareholders.

## ARTICLE VII

Unless otherwise provided in the articles of organization, the effective date of organization of the corporation is the date and time the articles were received for filing if the articles are not rejected within the time prescribed by law. If a later effective date is desired, specify such date, which may not be later than the 90th day after the articles are received for filing.

## ARTICLE VIII

The information contained in this article is not a permanent part of the articles of organization.

a. The street address of the initial registered office of the corporation in the Commonwealth:

**360 Newbury Street, Unit 411, Boston, MA 02115**

b. The name of its initial registered agent at its registered office:

**Amit Mehta**

c. The names and addresses of the individuals who will serve as the initial directors, president, treasurer and secretary of the corporation:

|  | NAME | ADDRESS |
|---|---|---|
| President: | Amit Mehta | 360 Newbury Street, Unit 411 Boston, MA 02115 |
| Treasurer: | Amit Mehta | See above |
| Secretary: | Peter Dunbar | 109 Ambersweet Way, Suite 316 Davenport FL 33897 |
| Director(s): | Amit Mehta | See above |
|  | Peter Dunbar | See above |

d. The fiscal year end of the corporation: **June 30**

e. A brief description of the business in which the corporation will engage:

**software development**

f. The street address of the principal office of the corporation is:

**360 Newbury Street, Unit 411, Boston, MA 02115**

g.     The street address where the records of the corporation required to be kept in the commonwealth are located at:

360 Newbury Street, Unit 411, Boston, MA 02115, which is:
(number, street, city or town, state, zip code)

☒ its principal office;

☐ or an office of its transfer agent,

☐ its secretary/assistant secretary,

☐ or its registered agent.

Signed this 8th day of August, 20011 by the incorporator(s):

Signature:  _Amit Mehta_

Name:       Amit Mehta

Address:    360 Newbury Street, Unit 411, Boston, MA 02115

1242

# COMMONWEALTH OF MASSACHUSETTS

William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## Articles of Organization
(General Laws Chapter 156D, Section 2.02; 950 CMR 113.16)

I hereby certify that upon examination of these articles of organization, duly submitted to me, it appears that the provisions of the General Laws relative to the organization of corporations have been complied with, and I hereby approve said articles; and the filing fee in the amount of $275 having been paid, said articles are deemed to have been filed with me this ___th___ day of __August__, 20_11_, at __10:22__ a.m./p.m.

*time*

Effective date: _____
– *(must be within 90 days of date submitted)*

1150313



WILLIAM FRANCIS GALVIN
*Secretary of the Commonwealth*

Examiner

Name approval

C

M

Filing fee: $275 for up to 275,000 shares plus $100 for each additional 100,000 shares or any fraction thereof.

## TO BE FILLED IN BY CORPORATION
Contact Information:

Amit Mehta

360 Newbury St #411

Boston, MA 02115

Telephone: 617-272-6977

Email: apmfree@gmail.com

Upon filing, a copy of this filing will be available at www.sec.state.ma.us/cor.
If the document is rejected, a copy of the rejection sheet and rejected document will be available in the rejected queue.

A TRUE COPY ATTEST

WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH

DATE _____ CLERK _____

**Attachment B-3**

**EXHIBIT 16**

**FTC-VAST-000531**

MA SOC   Filing Number: 201212992110   Date: 12/28/2012 4:35:00 PM



# The Commonwealth of Massachusetts
## William Francis Galvin

No Fee

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

### Statement of Change of Registered Office Address by Registered Agent

(General Laws, Chapter 156D, Section 5.02 AND Section 15.08; 950 CMR 113.22)

Name of registered agent:  AMIT MEHTA

Exact name of corporation:  BOOST SOFTWARE, INC.

Current registered office address:   360 NEWBURY ST., UNIT 411   BOSTON , MA  02115

New registered office address:
No. and Street:   360 NEWBURY ST., UNIT 807
City or Town:   BOSTON   State: MA   Zip: 02115   Country: USA

The street address of the registered office of the corporation and the business address of the registered agent are identical as required by General Laws, Chapter 156D, Section 5.02.

This certificate is effective at the time and on the date approved by the Division, unless a *later* effective date not more than *ninety days* from the date and time of filing is specified:
 Time:

SIGNED, this 28 Day of December, 2012,
AMIT MEHTA , Signature of Registered Agent.

©2001 - 2012 Commonwealth of Massachusetts
All Rights Reserved

MA SOC   Filing Number: 201212992110   Date: 12/28/2012 4:35:00 PM

# THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears

that the provisions of the General Laws relative to corporations have been complied with,

and I hereby approve said articles; and the filing fee having been paid, said articles are

deemed to have been filed with me on:

December 28, 2012 04:35 PM

A TRUE COPY ATTEST

WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH
DATE 11/14 CLERK

**WILLIAM FRANCIS GALVIN**

*Secretary of the Commonwealth*

MA SOC   Filing Number: 201315331410   Date: 1/16/2013 11:35:00 AM



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

A TRUE COPY ATTEST
Minimum Fee: $100.00

*William Francis Galvin*
WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH

DATE 7/11/14 CLERK

### Annual Report
(General Laws, Chapter 156D, Section 16.22; 950 CMR 113.57)

**Federal Employer Identification Number:** <u>001059090</u> *(must be 9 digits)*

**1. Exact name of the corporation:** BOOST SOFTWARE, INC.

**2. Jurisdiction of Incorporation:** State: <u>MA</u>   Country:

**3,4. Street address of the corporation registered office in the commonwealth and the name of the registered agent at that office:**

| | |
|---|---|
| Name: | <u>AMIT MEHTA</u> |
| No. and Street: | <u>360 NEWBURY ST., UNIT 807</u> |
| City or Town: | <u>BOSTON</u>   State: <u>MA</u>   Zip: <u>02115</u>   Country: <u>USA</u> |

**5. Street address of the corporation's principal office:**

| | |
|---|---|
| No. and Street: | <u>75 ARLINGTON STREET, SUITE 500</u> |
| City or Town: | <u>BOSTON</u>   State: <u>MA</u>   Zip: <u>02116</u>   Country: <u>USA</u> |

**6. Provide the name and addresses of the corporation's board of directors and its president, treasurer, secretary, and if different, its chief executive officer and chief financial officer.**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code |
|---|---|---|
| PRESIDENT | AMIT MEHTA | 360 NEWBURY STREET, UNIT 807<br>BOSTON, MA 02115 USA |
| TREASURER | AMIT MEHTA | 360 NEWBURY STREET, UNIT 807<br>BOSTON, MA 02115 USA |
| SECRETARY | PETER DUNBAR | 2561 GLOVER STREET<br>GLOVER, VT 05839 USA |
| DIRECTOR | AMIT MEHTA | 360 NEWBURY STREET, UNIT 807<br>BOSTON, MA 02115 USA |
| DIRECTOR | PETER DUNBAR | 2561 GLOVER STREET<br>GLOVER, VT 05839 USA |

**7. Briefly describe the business of the corporation:**

<u>SOFTWARE DEVELOPMENT,MARKETING&RELATED ACTIVITIES</u>

**8. Capital stock of each class and series:**

| Class of Stock | Par Value Per Share<br>Enter 0 if no Par | Total Authorized by Articles<br>of Organization or Amendments | | Total Issued<br>and Outstanding |
|---|---|---|---|---|
| | | Num of Shares | Total Par Value | Num of Shares |
| CNP | $0.00000 | 275,000 | $0.00 | |

**Attachment I, p. 11**

**EXHIBIT 16**

FTC-VAST-000534

9. Check here if the stock of the corporation is publicly traded: ___

10. Report is filed for fiscal year ending: 06/30/ <u>2012</u>

Signed by   <u>AMIT MEHTA</u> , its   <u>PRESIDENT</u>
on this 16 Day of January, 2013

© 2001 - 2013 Commonwealth of Massachusetts
All Rights Reserved

MA SOC   Filing Number: 201315750950     Date: 1/18/2013 10:48:00 AM



## The Commonwealth of Massachusetts
## William Francis Galvin

No Fee

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

### Statement of Change of Supplemental Information
(General Laws, Chapter 156D, Section 2.02 AND Section 8.45, 950 CMR 113.17)

**1. Exact name of the corporation:** BOOST SOFTWARE, INC.

**2. Current registered office address:**

| | |
|---|---|
| Name: | AMIT MEHTA |
| No. and Street: | 360 NEWBURY ST., UNIT 807 |
| City or Town: | BOSTON     State: MA     Zip: 02115     Country: USA |

**3. The following supplemental information has changed:**

___ Names and street addresses of the directors, president, treasurer, secretary

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code |
|---|---|---|
| PRESIDENT | AMIT MEHTA | 360 NEWBURY STREET, UNIT 807<br>BOSTON, MA 02115 USA |
| TREASURER | AMIT MEHTA | 360 NEWBURY STREET, UNIT 807<br>BOSTON, MA 02115 USA |
| SECRETARY | PETER DUNBAR | 2561 GLOVER STREET<br>GLOVER, VT 05839 USA |
| DIRECTOR | AMIT MEHTA | 360 NEWBURY STREET, UNIT 807<br>BOSTON, MA 02115 USA |
| DIRECTOR | PETER DUNBAR | 2561 GLOVER STREET<br>GLOVER, VT 05839 USA |

 X  Fiscal year end:
December

___ Type of business in which the corporation intends to engage:

SOFTWARE DEVELOPMENT, MARKETING&RELATED ACTIVITIES

___ Principal office address:

| | |
|---|---|
| No. and Street: | 75 ARLINGTON STREET, SUITE 500 |
| City or Town: | BOSTON     State: MA     Zip: 02116     Country: USA |

 X  g. Street address where the records of the corporation required to be kept in the Commonwealth are located (post office boxes are not acceptable):

| | |
|---|---|
| No. and Street: | 360 NEWBURY ST., UNIT 807 |
| City or Town: | BOSTON   **Attachment 14 p. 13** Zip: 02115     C**EXHIBIT 16** |
| which is | |

| \_\_\_ its principal office | \_\_\_ an office of its transfer agent |
|---|---|
| \_\_\_ an office of its secretary/assistant secretary | **X** its registered office |

Signed by  __AMIT MEHTA__ , its  **PRESIDENT**
on this 18 Day of January, 2013

© 2001 - 2013 Commonwealth of Massachusetts
All Rights Reserved

MA SOC   Filing Number: 201315750950     Date: 1/18/2013 10:48:00 AM

## THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears

that the provisions of the General Laws relative to corporations have been complied with,

and I hereby approve said articles; and the filing fee having been paid, said articles are

deemed to have been filed with me on:

January 18, 2013 10:48 AM

A TRUE COPY ATTEST

WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH
DATE 1/11/14 CLERK

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

**Attachment I, p. 15**          **EXHIBIT 16**
FTC-VAST-000538

MA SOC  Filing Number: 201348206680   Date: 8/30/2013 11:33:00 AM



# The Commonwealth of Massachusetts
## William Francis Galvin

No Fee

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

### Statement of Change of Registered Agent/Registered Office
(General Laws, Chapter 156D, Section 5.02 AND Section 15.08; 950 CMR 113.21)

1. Exact name of the corporation:  BOOST SOFTWARE, INC.

2a. Current registered agent name:  AMIT MEHTA

2b. Current registered office address:  360 NEWBURY ST., UNIT 807  BOSTON , MA  02115

3. The street address of the corporation registered office in the commonwealth and the name of the appointed registered agent at that office:
(The corporation may not appoint itself registered agent. Registered agent may be an individual, including any officer of the corporation, or a different corporation.).

| | |
|---|---|
| Name: | CORPORATION SERVICE COMPANY |
| No. and Street: | 84 STATE STREET |
| City or Town: | BOSTON     State: MA     Zip: 02109     Country: USA |

The street address of the registered office of the corporation and the business address of the registered agent are identical as required by General Laws, Chapter 156D, Section 5.02.

I, CORPORATION SERVICE COMPANY , registered agent of the above corporation , consent to my appointment as the registered agent of the above corporation pursuant to G. L. c. 156D, Section 5.02.

This certificate is effective at the time and on the date approved by the Division, unless a *later* effective date not more than *ninety days* from the date and time of filing is specified:
 Time:

Signed by  AMIT MEHTA , its  PRESIDENT
on this 30 Day of August, 2013

© 2001 - 2013 Commonwealth of Massachusetts
All Rights Reserved

**Attachment I, p. 16**

**EXHIBIT 16**
**FTC-VAST-000539**

MA SOC   Filing Number: 201348206680    Date: 8/30/2013 11:33:00 AM

# THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears

that the provisions of the General Laws relative to corporations have been complied with,

and I hereby approve said articles; and the filing fee having been paid, said articles are

deemed to have been filed with me on:

August 30, 2013 11:33 AM

A TRUE COPY ATTEST

WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH
DATE _____ CLERK ____

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

**Attachment I, p. 17**

**EXHIBIT 16**
**FTC-VAST-000540**

MA SOC Filing Number: 201356516850 Date: 11/18/2013 11:50:00 AM



## The Commonwealth of Massachusetts
## William Francis Galvin

No Fee

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

**Statement of Change of Supplemental Information**
(General Laws, Chapter 156D, Section 2.02 AND Section 8.45; 950 CMR 113.17)

**1. Exact name of the corporation:** BOOST SOFTWARE, INC.

**2. Current registered office address:**
Name: CORPORATION SERVICE COMPANY
No. and Street: 84 STATE STREET
City or Town: BOSTON    State: MA    Zip: 02109    Country: USA

**3. The following supplemental information has changed:**

X Names and street addresses of the directors, president, treasurer, secretary

| Title | Individual Name First, Middle, Last, Suffix | Address (no PO Box) Address, City or Town, State, Zip Code |
|---|---|---|
| PRESIDENT | AMIT MEHTA | 11 NOD HILL RD. NEWTON, MA 02461 USA |
| TREASURER | AMIT MEHTA | 11 NOD HILL RD. NEWTON, MA 02461 USA |
| SECRETARY | PETER DUNBAR | 889 DEXTER MOUNTAIN ROAD GLOVER, VT 05839 USA |
| ASSISTANT SECRETARY | AMIT MEHTA | 11 NOD HILL RD. NEWTON, MA 02461 USA |
| DIRECTOR | PETER DUNBAR | 889 DEXTER MOUNTAIN ROAD GLOVER, VT 05839 USA |
| DIRECTOR | AMIT MEHTA | 11 NOD HILL RD. NEWTON, MA 02461 USA |

__ Fiscal year end:
December

__ Type of business in which the corporation intends to engage:

SOFTWARE DEVELOPMENT,MARKETING&RELATED ACTIVITIES

__ Principal office address:

No. and Street: 75 ARLINGTON ST., SUITE 500
City or Town: BOSTON    State: MA    Zip: 02116    Country: USA

X g. Street address where the records of the corporation required to be kept in the Commonwealth are located (post office boxes are not acceptable):

No. and Street: 11 NOD HILL ROAD

**Attachment I, p. 18**

**EXHIBIT 16**
FTC-VAST-000541

| City or Town: | NEWTON | State: MA | Zip: 02461 | Country: USA |
| --- | --- | --- | --- | --- |

which is

___ its principal office                    ___ an office of its transfer agent
_X_ an office of its secretary/assistant secretary        ___ its registered office

Signed by  AMIT MEHTA , its  PRESIDENT
on this 18 Day of November, 2013

© 2001 - 2013 Commonwealth of Massachusetts
All Rights Reserved

MA SOC   Filing Number: 201468226500     Date: 2/14/2014 10:00:00 AM



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

A TRUE COPY ATTEST

Minimum Fee: $125.00

WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH

DATE 7/11/14 CLERK

### Annual Report
(General Laws, Chapter 156D, Section 16.22, 950 CMR 113.57)

Federal Employer Identification Number: 001059090 *(must be 9 digits)*

**1. Exact name of the corporation:** BOOST SOFTWARE, INC.

**2. Jurisdiction of Incorporation:** State: MA   Country:

**3,4. Street address of the corporation registered office in the commonwealth and the name of the registered agent at that office:**
Name:                CORPORATION SERVICE COMPANY
No. and Street:      84 STATE STREET
City or Town:    BOSTON     State: MA     Zip: 02109     Country: USA

**5. Street address of the corporation's principal office:**
No. and Street:      75 ARLINGTON ST., SUITE 500
City or Town:    BOSTON     State: MA     Zip: 02116     Country: USA

**6. Provide the name and addresses of the corporation's board of directors and its president, treasurer, secretary, and if different, its chief executive officer and chief financial officer.**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code |
|---|---|---|
| PRESIDENT | AMIT MEHTA | 11 NOD HILL RD.<br>NEWTON, MA 02461 USA |
| TREASURER | AMIT MEHTA | 11 NOD HILL RD.<br>NEWTON, MA 02461 USA |
| SECRETARY | PETER DUNBAR | 889 DEXTER MOUNTAIN ROAD<br>GLOVER, VT 05839 USA |
| ASSISTANT SECRETARY | AMIT MEHTA | 11 NOD HILL RD.<br>NEWTON, MA 02461 USA |
| DIRECTOR | PETER DUNBAR | 889 DEXTER MOUNTAIN ROAD<br>GLOVER, VT 05839 USA |
| DIRECTOR | AMIT MEHTA | 11 NOD HILL RD.<br>NEWTON, MA 02461 USA |

**7. Briefly describe the business of the corporation:**

SOFTWARE DEVELOPMENT,MARKETING&RELATED ACTIVITIES

**8. Capital stock of each class and series:**

| Class of Stock | Par Value Per Share<br>Enter 0 if no Par | Total Authorized by Articles<br>of Organization or Amendments | Total Issued<br>and Outstanding |
|---|---|---|---|

Attachment 1, p. 20

**EXHIBIT 16**

FTC-VAST-000543

| | | Num of Shares | Total Par Value | Num of Shares |
|---|---|---|---|---|
| CNP | $0.00000 | 275,000 | $0.00 | 220,000 |

9. Check here if the stock of the corporation is publicly traded: __

10. Report is filed for fiscal year ending: 12/31/ 2013

Signed by   AMIT MEHTA , its   **PRESIDENT**
on this 14 Day of February, 2014

© 2001 - 2014 Commonwealth of Massachusetts
All Rights Reserved



**PC**

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

*00 1059000*

FORM MUST BE TYPED     **Statement of Change of Supplemental**     FORM MUST BE TYPED
**Information Contained in Article**
**VIII of Articles of Organization**
**(General Laws Chapter 156D, Section 2.02 and Section 8.45; 950 CMR 113.17)**

(1) Exact name of the corporation: Boost Software, Inc.

(2) Current registered office address: 84 State Street, Boston, MA 02109
*(number, street, city or town, state, zip code)*

(3) The following supplemental information has changed:

*(check appropriate box)*

☑ Names and addresses of the directors, president, treasurer and secretary (an address need not be specified if the business address of the officer or director is the same as the principal office location):

President: Amit Mehta, 11 Nod Hill Road, Newton, MA 02461

Treasurer: Amit Mehta, 11 Nod Hill Road, Newton, MA 02461

Secretary: Peter Dunbar, 2561 Glover Street, Glover, VT 05839

Director(s): Amit Mehta (same address as above) and Peter Dunbar (same address as above)

☐ Fiscal year end: _____
*(month, day)*

☐ Principal office address: _____
*(number, street, city or town, state, zip code)*

☐ Type of business in which the corporation intends to engage:

_____

☑ Other:

Records of the Corporation as required are now kept at 11 Nod Hill Road, Newton, MA 02461

This certificate is effective at the time and on the date approved by the Division, unless a later effective date not more than 90 days from the date of filing is specified: _____

P.C.

**Attachment I, p. 22**     **EXHIBIT 16**
**FTC-VAST-000545**

Signed by: _____
                                          *(signature of authorized individual)*

☐  Chairman of the board of directors,

☑  President,

☐  Other officer,

☐  Court-appointed fiduciary,

on this _____ *16* _____ day of *September* _____, *2013* _____

**Attachment I, p. 23**                    **EXHIBIT 16**
                                           **FTC-VAST-000546**

# COMMONWEALTH OF MASSACHUSETTS

William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## Statement of Change of Supplemental Information Contained in Article VIII of Articles of Organization

(General Laws Chapter 156D, Section 2.02 and
Section 8.45; 950 CMR 113.17)

2013 SEP 23  PH 2: 24

CORPORATIONS DIVISION

I hereby certify that upon examination of this statement of change, duly submitted to me, it appears that the provisions of the General Laws relative thereto have been complied with, and I hereby approve said statement; and the filing fee in the amount of $ _____
having been paid, said articles are deemed to have been filed with me this _____ day of _____, at _____ a.m./p.m.

time

Effective date: _____

*(must be within 90 days of date submitted)*

1206625

Examiner

WILLIAM FRANCIS GALVIN
*Secretary of the Commonwealth*

Filing fee: $25 for paper or fax filing.
No Fee if filed electronically.

A TRUE COPY ATTEST

WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH
DATE 7/11/16  CLERK

## TO BE FILLED IN BY CORPORATION
Contact Information:

Robin Stein-West Hill Technology Counsel

900 Cummings Center, Suite 215-U

Beverly, MA 01915

Telephone: 978-338-4082

Email: rstein@westhillcounsel.com

Upon filing, a copy of this filing will be available at www.sec.state.ma.us/cor.
If the document is rejected, a copy of the rejection sheet and rejected document will
be available in the rejected queue.



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the complete file of VAST TECH SUPPORT LLC, a limited liability company, organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this company is L12000059935.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-first day of July, 2014



Ken Detzner
Secretary of State

CR2EO22 (1-11)

FTC-VAST-000548

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

**L12000059935**
**FILED 8:00 AM**
**May 03, 2012**
**Sec. Of State**
**bkohr**

## Article I

The name of the Limited Liability Company is:

VAST TECH SUPPORT LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

7900 GLADES RD
SUITE120
BOCA RATON, FL.  33434

The mailing address of the Limited Liability Company is:

7900 GLADES RD
SUITE120
BOCA RATON, FL.  33434

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

DONALD CHEPOVSKY
7900 GLADES RD
120
BOCA RATON, FL.  33434

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:  DONALD CHEPOVSKY

## Article V

The name and address of managing members/managers are:

L12000059935
FILED 8:00 AM
May 03, 2012
Sec. Of State
bkohr

Title: MGRM
LISA R POMPILE
18317 FRESH LAKE WAY
BOCA RATON, FL. 33498

Title: MGRM
POWER SOURCE MARKETING
7900 GLADES RD SUITE 120
BOCA RATON, FL. 33434

## Article VI

The effective date for this Limited Liability Company shall be:

05/03/2012

Signature of member or an authorized representative of a member

Electronic Signature: ELLIOT LOEWENSTERN

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## 2013 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L12000059935

Entity Name: VAST TECH SUPPORT LLC

**FILED**
**Feb 10, 2013**
**Secretary of State**
**CC4003170710**

**Current Principal Place of Business:**

2855 CONGRESS AVE
DELRAY BEACH, FL  33445

**Current Mailing Address:**

2855 S CONGRESS AVE
DELRAY BEACH, FL  33445  US

FEI Number: 80-0812142

Certificate of Status Desired: No

**Name and Address of Current Registered Agent:**

PERRY, MARK
2400 EAST COMMERCIAL BLVD
201
FORT LAUDERDALE, FL  33308  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   MARK PERRY                                                                    02/10/2013

              Electronic Signature of Registered Agent                                                        Date

**Authorized Person(s) Detail :**

| Title | MGRM | | Title | MGRM |
|---|---|---|---|---|
| Name | JON PAUL HOLDINGS LLC | | Name | SUCCESS CAPITAL LLC |
| Address | 18317 FRESH LAKE WAY | | Address | 2855 S CONGRESS AVE |
| City-State-Zip: | BOCA RATON  FL  33498 | | City-State-Zip: | DELRAY BEACH  FL  33445 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 608, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ELLIOT LOEWENSTERN                        MANAGER              02/10/2013

           Electronic Signature of Signing Authorized Person(s) Detail                                            Date

**Attachment J, p. 4**

**EXHIBIT 16**
**FTC-VAST-000551**

# #L12000059935

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



200243656272

01/25/13--01007--006   **25.00

FILED
13 FEB 11 PM 3: 46
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

K. SALY
EXAMINER

FEB 12 2013

Attachment J, p. 5

**EXHIBIT 16**

FTC-VAST-000552



**FLORIDA DEPARTMENT OF STATE**
Division of Corporations

January 28, 2013

VAST TECH SUPPORT LLC
ELLIO LOEWENSTERN
2855 S CONGRESS AVE.
DELRAY BEACH, FL 33445

·SUBJECT: VAST TECH SUPPORT LLC
Ref. Number: L12000059935

We have received your document for VAST TECH SUPPORT LLC and your check(s) totaling $25.00. However, the enclosed document has not been filed and is being returned for the following correction(s):

A business entity may not serve as its own registered agent. Please designate an individual or another business entity with an active registration or filing with this office, having a Florida street address identical with that of the registered office.

The registered agent must sign accepting the designation.

If you have any questions concerning the filing of your document, please call (850) 245-6870.

Karen A Saly
Regulatory Specialist II                    Letter Number: 913A00002051

**Attachment J, p. 6**                    **EXHIBIT 16**
**FTC-VAST-000553**

# COVER LETTER

**TO:**   Registration Section
Division of Corporations

**SUBJECT:** Vast Tech Support LLC
_____
Name of Limited Liability Company

The enclosed Articles of Amendment and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

Elliot Loewenstern
_____
Name of Person

Vast Tech Support
_____
Firm/Company

2855 South Congress Ave #AB
_____
Address

Delray Beach FL 33445
_____
City/State and Zip Code

accounting@vastechsupport.com
_____
E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

Jordan Chitnick                at ( 561 ) 998-5915
_____     _____
Name of Person                   Area Code & Daytime Telephone Number

Enclosed is a check for the following amount:

❑ $25.00 Filing Fee    ❑$30.00 Filing Fee &      ❑$55.00 Filing Fee &       ❑$60.00 Filing Fee,
                       Certificate of Status      Certified Copy              Certificate of Status &
                                                  (additional copy is enclosed)   Certified Copy
                                                                              (additional copy is enclosed)

already paid

        **MAILING ADDRESS:**                    **STREET/COURIER ADDRESS:**
        Registration Section                    Registration Section
        Division of Corporations                Division of Corporations
        P.O. Box 6327                           Clifton Building
        Tallahassee, FL 32314                   2661 Executive Center Circle
                                                Tallahassee, FL 32301

# ARTICLES OF AMENDMENT
## TO
## ARTICLES OF ORGANIZATION
## OF



Vast Tech Support LLC
_____
**(Name of the Limited Liability Company as it now appears on our records.)**
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on 05/03/2012 _____ and assigned
Florida document number L12000059935 _____.

This amendment is submitted to amend the following:

**A. If amending name, <u>enter the new name of the limited liability company here</u>:**

_____
The new name must be distinguishable and end with the words "Limited Liability Company," the designation "LLC" or the abbreviation
"L.L.C."

**Enter new principal offices address, if applicable:**
*(Principal office address MUST BE A STREET ADDRESS)*

**Enter new mailing address, if applicable:**          2855 S. Congress Ave.
*(Mailing address MAY BE A POST OFFICE BOX)*          Suite AB

                                                       Delray Beach, FL 33445

**B. If amending the registered agent and/or registered office address on our records, <u>enter the name of the new
registered agent and/or the new registered office address here</u>:**

Name of New Registered Agent: _____

New Registered Office Address: _____
                                                     *Enter Florida street address*

_____, Florida _____
                     *City*                              *Zip Code*

<u>New Registered Agent's Signature, if changing Registered Agent</u>:

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with
the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and
accept the obligations of my position as registered agent as provided for in Chapter 608, F.S. Or, if this document is
being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability
company has been notified in writing of this change.*

                              _____
                              If Changing Registered Agent, <u>Signature of New Registered Agent</u>

**Page 1 of 3**

**Attachment J, p. 8**          **EXHIBIT 16**
                                 **FTC-VAST-000555**

If amending the Managers or Managing Members on our records, enter the title, name, and address of each Manager or Managing Member being added or removed from our records:

**MGR = Manager**
**MGRM = Managing Member**

| Title | Name | Address | Type of Action |
|-------|------|---------|----------------|
| _____ | _____ | _____ | ☐ Add |
|  |  | _____ | ☐ Remove |
|  |  | _____ |  |
| _____ | _____ | _____ | ☐ Add |
|  |  | _____ | ☐ Remove |
|  |  | _____ |  |
| _____ | _____ | _____ | ☐ Add |
|  |  | _____ | ☐ Remove |
|  |  | _____ |  |
| _____ | _____ | _____ | ☐ Add |
|  |  | _____ | ☐ Remove |
|  |  | _____ |  |
| _____ | _____ | _____ | ☐ Add |
|  |  | _____ | ☐ Remove |
|  |  | _____ |  |
| _____ | _____ | _____ | ☐ Add |
|  |  | _____ | ☐ Remove |
|  |  | _____ |  |

Page 2 of 3

**Attachment J, p. 9**                                     **EXHIBIT 16**
                                                            **FTC-VAST-000556**

**D.  If amending any other information, enter change(s) here:** *(Attach additional sheets, if necessary.)*

_____

_____

_____

_____

_____

Dated ___ Feb 5th _____ 2013 ___

_____

Signature of a member or authorized representative of a member

Elbot Loebenstein          Managing Partner

Typed or printed name of signee

Page 3 of 3

Filing Fee: $25.00

Attachment J, p. 10                    EXHIBIT 16

FTC-VAST-000557

## 2014  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L12000059935

**Entity Name:** VAST TECH SUPPORT LLC

**FILED
Jan 08, 2014
Secretary of State
CC3553561302**

**Current Principal  Place of Business:**

2855 CONGRESS AVE
DELRAY BEACH, FL  33445

**Current Mailing Address:**

2855 S CONGRESS AVE
DELRAY BEACH, FL  33445  US

**FEI Number:** 80-0812142

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

PERRY, MARK
2400 EAST COMMERCIAL BLVD
201
FORT LAUDERDALE, FL  33308  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   MARK PERRY                                                        01/08/2014
_____        _____
              Electronic Signature of Registered Agent                              Date

**Authorized Person(s) Detail :**

| | | | | |
|---|---|---|---|---|
| Title | MGRM | | Title | MGRM |
| Name | JON PAUL HOLDINGS LLC | | Name | SUCCESS CAPITAL LLC |
| Address | 18317 FRESH LAKE WAY | | Address | 2855 S CONGRESS AVE |
| City-State-Zip: | BOCA RATON  FL  33498 | | City-State-Zip: | DELRAY BEACH  FL  33445 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under
oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and
that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ELLIOT LOEWENSTERN                          MANAGING PARTNER          01/08/2014
_____        _____
           Electronic Signature of Signing Authorized Person(s) Detail                    Date

**Attachment J, p. 11**

**EXHIBIT 16
FTC-VAST-000558**

FLORIDA DEPARTMENT OF STATE
Division of Corporations

August 8, 2014

FEDERAL TRADE COMMISION
ATTN: JOHN AIKEN
600 PENNSYLVANIA AVE. NW H-286
WASHINGTON, DC  20580

Subject: DOWNLOADSOFTWARE.COM

**REGISTRATION NUMBER: G13000029261**

Pursuant to your request, we are enclosing a certified copy for the above fictitious name registration.

Should you have any questions regarding this matter you may contact our office at (850) 245-6058.

Yasemin Y Sulker
Certification Section
Division of Corporations          Letter No. 614A00017072



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the complete file of DOWNLOADSOFTWARE.COM, a Fictitious Name registered with the Department of State on March 26, 2013, as shown by the records of this office.

The registration number of this fictitious name is G13000029261.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Eighth day of August, 2014



Ken Detzner
Secretary of State

CR2EO22 (1-11)

FTC-VAST-000560

# APPLICATION FOR REGISTRATION OF FICTITIOUS NAME
Note: Acknowledgements/certificates will be sent to the address in Section 1 only.

**FILED**

13 MAR 26 AM 11: 28

SECRETARY OF STATE
TALLAHASSEE, FLORIDA

G13000029261
03/26/13--01014--001  **50.00

This space for office use only

**Section 1**

1.  Downloadsoftware.com
    Fictitious Name to be Registered  (see Instructions if name includes "Corp" or "Inc")

    2855 S. Congress Ave. Suite AB
    Mailing Address of Business
    Delray Beach        Florida        33445
    City                State          Zip Code

3.  Florida County of principal place of business:  Palm Beach

    (see instructions if more than one county)
    FEI Number:  80-0812142

**Section 2**

**A. Owner(s) of Fictitious Name if individual(s): (Use an attachment if necessary):**

| 1. | Last | First | M.I. | 2. | Last | First | M.I. |
|----|------|-------|------|----|------|-------|------|
|    | Address |    |    |    | Address |    |    |
|    | City | State | Zip Code |    | City | State | Zip Code |

**B. Owner(s) of Fictitious Name if other than an individual: (Use attachment if necessary):**

| 1. | Vast Tech Support *LLC* | | | 2. | | | |
|----|------|-------|------|----|------|-------|------|
|    | Entity Name | | | | Entity Name | | |
|    | 2855 S. Congress Ave. Suite AB | | | | | | |
|    | Address | | | | Address | | |
|    | Delray Beach | Florida | 33445 | | City | State | Zip Code |
|    | City | State | Zip Code | | | | |

Florida Document Number  L12000059935          Florida Document Number _____

FEI Number:  80-0812142                         FEI Number: _____

☐ Applied for   ☐ Not Applicable             ☐ Applied for   ☐ Not Applicable

**Section 3**

I the undersigned, being an owner in the above fictitious name, certify that the information indicated on this form is true and accurate. In accordance with Section 865.09, F.S., I further certify that the fictitious name to be registered has been advertised at least once in a newspaper as defined in chapter 50, Florida Statutes, in the county where the principal place of business is located. I understand that the signature below shall have the same legal effect as if made under oath and I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817-155, F.S.

_signature_        3/20/13        elliot@powersourcemarketing.com
Signature of Owner    Date         E-mail address: (to be used for future renewal notification)

Phone Number:  5617050012

**Section 4**

**FOR CANCELLATION COMPLETE SECTION 4 ONLY:**
**FOR FICTITIOUS NAME OR OWNERSHIP CHANGE COMPLETE SECTIONS 1 THROUGH 4:**

I (we) the undersigned, hereby cancel the fictitious name  Downloadsoftware.com

_____, which was registered on  6/25/12        and was assigned

registration number G12000062501                    MAR 27 2019

_signature_        3/20/13                          T. SCOTT
Signature of Owner   Date        Signature of Owner        Date

Mark the applicable boxes   ☐ Certificate of Status — $10   ☐ Certified Copy — $30
**NON-REFUNDABLE PROCESSING FEE: $50**

CR4E001 (9/10)

**FLORIDA DEPARTMENT OF STATE**
Division of Corporations

August 8, 2014

U.S FEDERAL TRADE COMMISSION
ATTN:JOHN AIKEN
600 PENNSYLVANIA AVE NW H-286
WASHINGTON, DC 20580

Subject: OMG BACKUP

**REGISTRATION NUMBER: G13000090297**

Pursuant to your request, we are enclosing a certified copy for the above fictitious name registration.

Should you have any questions regarding this matter you may contact our office at (850) 245-6058.

Yasemin Y Sulker
Certification Section
Division of Corporations          Letter No. 814A00017074



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the complete file of OMG BACKUP, a Fictitious Name registered with the Department of State on September 12, 2013, as shown by the records of this office.

The registration number of this fictitious name is G13000090297.



Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capital, this the
Eighth day of August, 2014



Ken Detzner
Secretary of State

CR2E022 (1-11)

FTC-VAST-000563

## APPLICATION FOR REGISTRATION OF FICTITIOUS NAME
Note: Acknowledgements/certificates will be sent to the address in Section 1 only.

**Section 1**

1. OMG Backup
   Fictitious Name to be Registered  (see instructions if name includes "Corp" or "Inc")

   2855 S. Congress Ave. Suite AB
   Mailing Address of Business

   | Delray Beach | FL | 33445 |
   | City | State | Zip Code |

3. Florida County of principal place of business:   Palm Beach

   (see instructions if more than one county)

   FEI Number: 80-0812142

FILED

13 SEP 12  PM 5: 32

SECRETARY OF STATE
TALLAHASSEE, FLORIDA

G13000090297
09/12/13--01028--021  **50.00

This space for office use only

**Section 2**

### A. Owner(s) of Fictitious Name if Individual(s): (Use an attachment if necessary):

1.
   | Last | First | M.I. |

   Address

   | City | State | Zip Code |

2.
   | Last | First | M.I. |

   Address

   | City | State | Zip Code |

### B. Owner(s) of Fictitious Name if other than an individual: (Use attachment if necessary):

1. Vast Tech Support LLC
   Entity Name

   2855 S. Congress Ave. Suite AB
   Address

   | Delray Beach | FL | 33445 |
   | City | State | Zip Code |

   Florida Document Number  L12000059935

   FEI Number:  80-0812142
   ☐ Applied for     ☐ Not Applicable

2.
   Entity Name

   Address

   | City | State | Zip Code |

   Florida Document Number

   FEI Number:
   ☐ Applied for     ☐ Not Applicable

**Section 3**

I the undersigned, being an owner in the above fictitious name, certify that the information indicated on this form is true and accurate. In accordance with Section 865.09, F.S. I further certify that the fictitious name to be registered has been advertised at least once in a newspaper as defined in chapter 50, Florida Statutes, in the county where the principal place of business is located. I understand that the signature below shall have the same legal effect as if made under oath; and I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

| Signature of Owner | 9/9/13 | accounting@vasttechsupport.com |
| | Date | E-mail address: (to be used for future renewal notification) |

Phone Number:  561-910-0301

**Section 4**

### FOR CANCELLATION COMPLETE SECTION 4 ONLY:
### FOR FICTITIOUS NAME OR OWNERSHIP CHANGE COMPLETE SECTIONS 1 THROUGH 4:

I (we) the undersigned, hereby cancel the fictitious name _____

_____ which was registered on _____ and was assigned

registration number _____

| Signature of Owner | Date | Signature of Owner | Date |

Mark the applicable boxes   ☐ Certificate of Status — $10     ☐ Certified Copy — $30
**NON-REFUNDABLE PROCESSING FEE: $50**

SEP 1 3 2013
CR2E031 (8/10)

C. CARROTHERS
**EXHIBIT 16**
**FTC-VAST-000564**

## FLORIDA DEPARTMENT OF STATE
### Division of Corporations

August 8, 2014

U.S FEDERAL TRADE COMMISSION
ATTN: JOHN AIKEN
600 PENNSYLVANIA AVE. NW H-286
WASHINGTON, DC  20580

Subject: OMG TOTAL PROTECTION

**REGISTRATION NUMBER: G13000090291**

Pursuant to your request, we are enclosing a certified copy for the above fictitious name registration.

Should you have any questions regarding this matter you may contact our office at (850) 245-6058.

Yasemin Y Sulker
Certification Section
Division of Corporations          Letter No. 014A00017074

Attachment 4, p. 18          **EXHIBIT 16**

**FTC-VAST-000565**



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the complete file of OMG TOTAL PROTECTION, a Fictitious Name registered with the Department of State on September 12, 2013, as shown by the records of this office.

The registration number of this fictitious name is G13000090291.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Eighth day of August, 2014



Ken Detzner
Secretary of State

CR2E022 (1-11)

# APPLICATION FOR REGISTRATION OF FICTITIOUS NAME
Note: Acknowledgments/certificates will be sent to the address in Section 1 only.

**Section 1**

1. OMG Total Protection
Fictitious Name to be Registered  (see instructions if name includes "Corp" or "Inc")

2855 S. Congress Ave. Suite AB
Mailing Address of Business

Delray Beach          FL              33445
City                  State           Zip Code

3. Florida County of principal place of business:  Palm Beach

(see instructions if more than one county)

FEI Number: 80-0812142

FILED
13 SEP 12  PM 6:00
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

G13000090291
09/12/13--01028--015  **50.00

This space for office use only

---

**Section 2**

## A. Owner(s) of Fictitious Name if Individual(s): (Use an attachment if necessary):

1.                                          2.
Last        First        M.I.                Last        First        M.I.

Address                                     Address

City        State        Zip Code           City        State        Zip Code

## B. Owner(s) of Fictitious Name if other than an Individual: (Use attachment if necessary):

1. Vast Tech Support LLC                    2.
Entity Name                                 Entity Name

2855 S. Congress Ave. Suite AB
Address                                     Address

Delray Beach          FL         33445
City          State          Zip Code       City          State          Zip Code

Florida Document Number  L12000059935       Florida Document Number

FEI Number:  80-0812142                     FEI Number:
☐ Applied for   ☐ Not Applicable           ☐ Applied for   ☐ Not Applicable

---

**Section 3**

I the undersigned, being an owner in the above fictitious name, certify that the information indicated on this form is true and accurate. In accordance with Section 865.09, F.S., I further certify that the fictitious name to be registered has been advertised at least once in a newspaper as defined in chapter 50, Florida Statutes, in the county where the principal place of business is located. I understand that the signature below shall have the same legal effect as if made under oath and I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

Signature of Owner          9/9/13          accounting@vasttechsupport.com
                            Date            E-mail address: (to be used for future renewal notification)

Phone Number:  561-910-0301

---

**Section 4**

FOR CANCELLATION COMPLETE SECTION 4 ONLY:
FOR FICTITIOUS NAME OR OWNERSHIP CHANGE COMPLETE SECTIONS 1 THROUGH 4:

I (we) the undersigned, hereby cancel the fictitious name _____

_____, which was registered on _____ and was assigned

registration number _____

Signature of Owner          Date            Signature of Owner          Date

---

Mark the applicable boxes   ☐ Certificate of Status — $10   ☐ Certified Copy — $30
**NON-REFUNDABLE PROCESSING FEE: $50**

SEP 13 2013
CR4E001 (8/10)

C. CARROTHERS
**Attachment J, p. 20**            **EXHIBIT 16**
                                   **FTC-VAST-000567**

FLORIDA DEPARTMENT OF STATE
Division of Corporations

August 8, 2014

U.S FEDERAL TRADE COMMISSION
ATTN: JOHN AIKEN
600 PENNSYLVANIA AVE NW H-286
WASHINGTON, DC  20580

Subject: SOFTWARETECHSUPPORT.COM

**REGISTRATION NUMBER: G13000028901**

Pursuant to your request, we are enclosing a certified copy for the above fictitious name registration.

Should you have any questions regarding this matter you may contact our office at (850) 245-6058.

Yasemin Y Sulker
Certification Section
Division of Corporations          Letter No. 614A00017075

Attachment J. p. 21

EXHIBIT 16
FTC-VAST-000568



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the complete file of SOFTWARETECHSUPPORT.COM, a Fictitious Name registered with the Department of State on March 25, 2013, as shown by the records of this office.

The registration number of this fictitious name is G13000028901.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Eighth day of August, 2014



CR2E022 (1-11)

Ken Detzner
Secretary of State

**APPLICATION FOR REGISTRATION OF FICTITIOUS NAME**
Note: Acknowledgements/certificates will be sent to the address in Section 1 only.

FILED
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

13 MAR 25 PM 2: 34

**Section 1**

1. Softwaretechsupport.com
   Fictitious Name to be Registered  (see instructions if name includes "Corp" or "Inc")

   2855 S. Congress Ave. Suite AB
   Mailing Address of Business
   Delray Beach          Florida          33445
   City                  State            Zip Code

3. Florida County of principal place of business:  Palm Beach

   (see instructions if more than one county)

   FEI Number:  80-0812142

G13000028901
03/25/13--01055--019.  **$50.00

This space for office use only.

**Section 2**

**A. Owner(s) of Fictitious Name If Individual(s): (Use an attachment if necessary):**

1. Last          First          M.I.        2. Last          First          M.I.

   Address                                     Address

   City       State       Zip Code            City       State       Zip Code

**B. Owner(s) of Fictitious Name If other than an individual: (Use attachment if necessary):**

1. Vast Tech Support                         2. Entity Name
   Entity Name

   2855 S. Congress Ave. Suite AB              Address
   Address

   Delray Beach       Florida       33445      City       State       Zip Code
   City               State         Zip Code

   Florida Document Number  L12000059935        Florida Document Number

   FEI Number:  80-0812142                      FEI Number:

   ☐ Applied for   ☐ Not Applicable             ☐ Applied for   ☐ Not Applicable

**Section 3**

I the undersigned, being an owner in the above fictitious name, certify that the information indicated on this form is true and accurate. In accordance with Section 865.09, F.S., I further certify that the fictitious name to be registered has been advertised at least once in a newspaper as defined in chapter 50, Florida Statutes, in the county where the principal place of business is located. I understand that the signature below shall have the same legal effect as if made under oath and I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

Signature of Owner          3/20/13                 elliot@powersourcemarketing.com
                            Date                    E-mail address: (to be used for future renewal notification)

Phone Number:  5617050012

**Section 4**

**FOR CANCELLATION COMPLETE SECTION 4 ONLY:**
**FOR FICTITIOUS NAME OR OWNERSHIP CHANGE COMPLETE SECTIONS 1 THROUGH 4:**

I (we) the undersigned, hereby cancel the fictitious name  Softwaretechsupport.com

_____, which was registered on  6/25/12      and was assigned

registration number G12000062502                          MAR 2 6 2013

                                                          T. CAULEY
Signature of Owner          3/20/13          Signature of Owner          Date
                            Date

Mark the applicable boxes   ☐ Certificate of Status — $10   ☐ Certified Copy — $30
**NON-REFUNDABLE PROCESSING FEE: $50**

CR4E001 (9/10)

**Attachment J, p. 23**                    **EXHIBIT 16**

FTC-VAST-000570

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L10000027673
FILED 8:00 AM
March 12, 2010
Sec. Of State
clewis

## Article I

The name of the Limited Liability Company is:

DOWNLOADSOFTWARE.COM,LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

20165 NE 39TH PL
402
AVENTURA, FL. US  33180

The mailing address of the Limited Liability Company is:

20165 NE 39TH PL
402
AVENTURA, FL. US  33180

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

MICHAEL  ZAPOLIN
20165 NE 39TH PL
402
AVENTURA, FL.  33180

Having been named as registered agent and to accept service of process
for the above stated limited liability company at the place designated
in this certificate, I hereby accept the appointment as registered agent
and agree to act in this capacity. I further agree to comply with the
provisions of all statutes relating to the proper and complete performance
of my duties, and I am familiar with and accept the obligations of my
position as registered agent.

Registered Agent Signature:  MICHAEL ZAPOLIN

# Article V

The name and address of managing members/managers are:

L10000027673
FILED 8:00 AM
March 12, 2010
Sec. Of State
clewis

Title:  MGR
MICHAEL  ZAPOLIN
20165 NE 39TH PL
AVENTURA, FL.  33180  US

Title:  MGR
RICHARD  HERTZ
2 INDIAN PONY
SANTA FE, NM.  87506  US

# Article VI

The effective date for this Limited Liability Company shall be:

03/11/2010

Signature of member or an authorized representative of a member

Signature: MICHAEL ZAPOLIN

**EXHIBIT 16**
**FTC-VAST-000572**

## 2014 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L10000027673

**FILED**
**Mar 19, 2014**
**Secretary of State**
**CC8350694562**

**Entity Name:** DOWNLOADSOFTWARE.COM,LLC

**Current Principal Place of Business:**

2855 S. CONGRESS AVE
SUITE AB
DELRAY BEACH, FL 33445

**Current Mailing Address:**

2855 S. CONGRESS AVE
SUITE AB
DELRAY BEACH, FL 33445 US

**FEI Number: NOT APPLICABLE**                    **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

PERRY, MARK
2400 E. COMMERCIAL BLVD SUITE 201
FT. LAUDERDALE, FL 33308 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   **MARK PERRY**                                03/19/2014

             Electronic Signature of Registered Agent                    Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | VAST TECH SUPPORT LLC |
| Address | 2855 S. CONGRESS AVE<br>SUITE AB |
| City-State-Zip: | DELRAU BEACH FL 33445 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ELLIOT LOEWENSTERN                    MANAGING PARTNER     03/19/2014

           Electronic Signature of Signing Authorized Person(s) Detail                    Date



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the complete file of OMG TECH HELP LLC, a limited liability company, organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this company is L13000048232.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-first day of July, 2014



CR2EO22 (1-11)

Ken Detzner
Secretary of State

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L13000048232
FILED 8:00 AM
April 02, 2013
Sec. Of State
clewis

## Article I

The name of the Limited Liability Company is:

OMG TECH HELP LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

2855 S CONGRESS AVE
BOCA RATON, FL.  33445

The mailing address of the Limited Liability Company is:

2855 S CONGRESS AVE
BOCA RATON, FL.  33445

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

MARK  PERRY
2400 EAST COMMERCIAL BLVD
SUITE 511
FORT LAUDERDALE, FL.  33308

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:  MARK PERRY

**Attachment L, p. 2**

**EXHIBIT 16**
**FTC-VAST-000575**

## Article V

The name and address of managing members/managers are:

L13000048232
FILED 8:00 AM
April 02, 2013
Sec. Of State
clewis

Title: MGRM
VAST TECH SUPPORT LLC
2855 S CONGRESS AVE
DELRAY BEACH, FL. 33445

## Article VI

The effective date for this Limited Liability Company shall be:

04/01/2013

Signature of member or an authorized representative of a member

Electronic Signature: ELLIOT LOEWENSTERN

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## 2014 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L13000048232

**Entity Name:** OMG TECH HELP LLC

**FILED**
**Jan 23, 2014**
**Secretary of State**
**CC3232899663**

**Current Principal Place of Business:**

2855 S CONGRESS AVE
BOCA RATON, FL 33445

**Current Mailing Address:**

2855 S CONGRESS AVE
BOCA RATON, FL 33445

**FEI Number: NOT APPLICABLE**          Certificate of Status Desired: No

**Name and Address of Current Registered Agent:**

PERRY, MARK
2400 EAST COMMERCIAL BLVD
SUITE 511
FORT LAUDERDALE, FL 33308 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

　　　　　　　　Electronic Signature of Registered Agent                                    Date

**Authorized Person(s) Detail :**

Title　　　　MGRM

Name　　　　VAST TECH SUPPORT LLC

Address　　　2855 S CONGRESS AVE

City-State-Zip:　DELRAY BEACH FL 33445

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ELLIOT LOEWENSTERN　　　　　　MANAGING PARTNER　　01/23/2014

　　　　Electronic Signature of Signing Authorized Person(s) Detail                                    Date

**Attachment L, p. 4**　　　　　　**EXHIBIT 16**
**FTC-VAST-000577**



## Department of State

I certify the attached is a true and correct copy of the complete file of SUCCESS CAPITAL LLC, a limited liability company, organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this company is L12000145760.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-first day of July, 2014



Ken Detzner
Secretary of State

CR2EO22 (1-11)

FTC-VAST-000578

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L12000145760
FILED 8:00 AM
November 19, 2012
Sec. Of State
gmcleod

## Article I

The name of the Limited Liability Company is:

SUCCESS CAPITAL LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

7900 GLADES RD SUITE 120
BOCA RATON, FL.  33434

The mailing address of the Limited Liability Company is:

18105 LONG LAKE DR
BOCA RATON, FL.  33496

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

MARK  PERRY
2400 EAST COMMERCIAL BLVD SUITE 201
FORT LAUDERDALE, FL.  33308

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:  MARK PERRY

# Article V

The name and address of managing members/managers are:

L12000145760
FILED 8:00 AM
November 19, 2012
Sec. Of State
gmcleod

Title: MGRM
ELLIOT LOEWENSTERN
18105 LONG LAKE DR
BOCA RATON, FL. 33496

Title: MGRM
JORDAN KARLICK
2044 ALATA MEADOWS LANE APT 1812
DELRAY BEACH, FL. 33444

Signature of member or an authorized representative of a member

Electronic Signature: ELLIOT LOEWENSTERN

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## 2013  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L12000145760

**Entity Name:** SUCCESS CAPITAL LLC

**FILED**
**Mar 22, 2013**
**Secretary of State**
**CC8635939501**

**Current Principal  Place of Business:**

2855 S. CONGRESS AVE
SUITE AB
DELRAY BEACH, FL  33445

**Current Mailing Address:**

18105 LONG LAKE DR
BOCA RATON, FL  33496

**FEI Number:** 46-1414527                                   **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

PERRY, MARK
2400 EAST COMMERCIAL BLVD SUITE 201
FORT LAUDERDALE, FL  33308  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____
Electronic Signature of Registered Agent                                                                Date

**Authorized Person(s) Detail :**

| | | | | |
|---|---|---|---|---|
| Title | MGRM | | Title | MGRM |
| Name | LOEWENSTERN, ELLIOT | | Name | KARLICK, JORDAN |
| Address | 18105 LONG LAKE DR | | Address | 2044 ALATA MEADOWS LANE APT 1812 |
| City-State-Zip: | BOCA RATON FL  33496 | | City-State-Zip: | DELRAY BEACH FL  33444 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 608, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ELLIOT LOEWENSTERN                          MANAGING PARTNER          03/22/2013
_____
Electronic Signature of Signing Authorized Person(s) Detail                                         Date

## 2014 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L12000145760

**Entity Name:** SUCCESS CAPITAL LLC

**FILED**
**Jan 08, 2014**
**Secretary of State**
**CC6262466097**

**Current Principal Place of Business:**

2855 S. CONGRESS AVE
SUITE AB
DELRAY BEACH, FL 33445

**Current Mailing Address:**

2855 S. CONGRESS AVE
SUITE AB
DELRAY BEACH, FL 33445 US

**FEI Number:** 46-1414527                          **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

PERRY, MARK
2400 EAST COMMERCIAL BLVD SUITE 201
FORT LAUDERDALE, FL 33308 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                      Date

**Authorized Person(s) Detail :**

| Title | MGRM | Title | MGRM |
|---|---|---|---|
| Name | LOEWENSTERN, ELLIOT | Name | KARLICK, JORDAN |
| Address | 18105 LONG LAKE DR | Address | 34 NW 7TH STREET |
| City-State-Zip: | BOCA RATON FL 33496 | City-State-Zip: | BOCA RATON FL 33432 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under
oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and
that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ELLIOT LOEWENSTERN                    MANAGING PARTNER          01/08/2014

Electronic Signature of Signing Authorized Person(s) Detail                           Date

**Attachment M, p. 5**

**EXHIBIT 16**
**FTC-VAST-000582**



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the complete file of JON PAUL HOLDINGS LLC, a limited liability company, organized under the laws of the State of Florida, as shown by the records of this office.

The document number of this company is L12000145218.

Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capital, this the
Eighth day of August, 2014



Ken Detzner
Secretary of State

CR2EO22 (1-11)

## Article V

The name and address of managing members/managers are:

L12000145218
FILED 8:00 AM
November 16, 2012
Sec. Of State
lsellers

Title: MGRM
LISA POMPILE
18317 FRESH LAKE WAY
BOCA RATON, FL. 33498

## Article VI

The effective date for this Limited Liability Company shall be:

11/16/2012

Signature of member or an authorized representative of a member

Electronic Signature: LISA POMPILE

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## 2013 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L12000145218

Entity Name: JON PAUL HOLDINGS LLC

**FILED**
**Feb 21, 2013**
**Secretary of State**
**CC0781167169**

Current Principal Place of Business:

18317 FRESH LAKE WAY
BOCA RATON, FL 33498

Current Mailing Address:

18317 FRESH LAKE WAY
BOCA RATON, FL 33498

FEI Number: 46-1413516

Certificate of Status Desired: No

Name and Address of Current Registered Agent:

POPMPILE, LISA
18317 FRESH LAKE WAY
BOCA RATON, FL 33498 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                                      Date

Authorized Person(s) Detail :

| | |
|---|---|
| Title | MGRM |
| Name | POMPILE, LISA |
| Address | 18317 FRESH LAKE WAY |
| City-State-Zip: | BOCA RATON FL 33498 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 608, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: LISA POMPILE                                    MGRM                    02/21/2013

Electronic Signature of Signing Authorized Person(s) Detail                                       Date

**Attachment N, p. 3**

**EXHIBIT 16**
**FTC-VAST-000585**

## 2014  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L12000145218

**Entity Name:** JON PAUL HOLDINGS LLC

**Current Principal Place of Business:**

18317 FRESH LAKE WAY
BOCA RATON, FL 33498

**Current Mailing Address:**

18317 FRESH LAKE WAY
BOCA RATON, FL 33498

**FEI Number:** 46-1413516

**Name and Address of Current Registered Agent:**

POMPILE, LISA
18317 FRESH LAKE WAY
BOCA RATON, FL 33498 US

**FILED**
**Mar 25, 2014**
**Secretary of State**
**CC7735053891**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: **LISA POMPILE**                                                                  03/25/2014

Electronic Signature of Registered Agent                                                   Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGRM |
| Name | POMPILE, LISA |
| Address | 18317 FRESH LAKE WAY |
| City-State-Zip: | BOCA RATON FL  33498 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: LISA POMPILE                                      MGMR                 03/25/2014

Electronic Signature of Signing Authorized Person(s) Detail                              Date

**Attachment N, p. 4**                    **EXHIBIT 16**

# Delray Beach Police Department

Incident Case Number:  13-012559

Reporting Agency:  Delray Beach Police

Print Date/Time:  09/15/2014 12:57:15

**Disclaimer: The information contained within this report is reflective of the investigation at the date and time of its printing.**

**INCIDENT/INVESTIGATION REPORT**

| | |
|---|---|
| Agency Name: Delray Beach Police Department | Case# 13-012559 |
| ORI FL 0500400 | Date / Time Reported 09/13/2013 12:13 Fri |

**INCIDENT DATA**

Location of Incident: 2855 S Congress Ave - A/B, Delray Beach FL 33445-

Premise Type: Commercial/office   Zone/Tract: 9

Last Known Secure: 09/12/2013 08:00 Thu
At Found: 09/13/2013 12:13 Fri

**#1** Crime Incident(s): Fraud - Obtaining Money/property By False Pretense - FROM   (Com) F
Weapon / Tools: NONE/NOT APPLICABLE   Activity:
Entry:   Exit:   Security:

**#2** Crime Incident: ( )
Weapon / Tools:   Activity:
Entry:   Exit:   Security:

**#3** Crime Incident: ( )
Weapon / Tools:   Activity:
Entry:   Exit:   Security:

**MO**

**VICTIM**

# of Victims: 1   Type: INDIVIDUAL/ NOT LAW   Injury:   Domestic: N

| V1 | Victim/Business Name (Last, First, Middle): JESKE, DEBORAH | Victim of Crime # 1. | DOB Age: ██ | Race W | Sex F | Relationship To Offender | Resident Status Non-Resid | Military Branch/Status |

Home Address: ████████████ WA 98837-   Home Phone:

Empl:   Business Phone:   Mobile Phone:

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |

**OTHERS INVOLVED**

CODES: V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

Type: INDIVIDUAL/ NOT LAW ENFORCEMENT   Injury:

| Code RP | Name (Last, First, Middle): LOEWENSTERN, ELLIOT A | Victim of Crime # | DOB Age: 50 | Race W | Sex M | Relationship To Offender | Resident Status Resident | Military Branch/Status |

Home Address: ████████████   Home Phone:

Omg Techhelp, 2855 S. Congress Ave (CEO)   Business Phone: 561-705-0012   Mobile Phone: ████

Type: INDIVIDUAL/ NOT LAW ENFORCEMENT   Injury:

| Code IO | Name (Last, First, Middle): DANASTOR, ZICO | Victim of Crime # | DOB Age: 35 | Race B | Sex M | Relationship To Offender | Resident Status | Military Branch/Status |

Home Address: ████████████   Home Phone:

Employer Name: ████████████   Business Phone:   Mobile Phone: ████

**PROPERTY**

L = Lost   S = Stolen   ████████ D = Damaged   Z = Seized   B = Burned   C = Counterfeit / Forged   F = Found
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Status**

Officer/ID# Warne, Matthew   (CPD, PTL) (0958)

Invest ID# Mead, Kimberly J.   (INVD, PROP) (1024)   Supervisor Eberhart, David   (CPD, PTL) (0306)

Complainant Signature   Case Status: Cleared By Arrest 05/06/2014   Case Disposition: Cleared By Warrant 04/24/2014   Page 2

Printed By: MEADK,   Sys#: 39040   09/15/2014 12:57:16

## INCIDENT/INVESTIGATION REPORT

By: MEADK,          09/15/2014 12:57

*Delray Beach Police Department*

Page 3

Case# *13-012559*

| Status Codes | | L = Lost   S = Stolen   R = Recovered   D = Damaged   Z = Seized   B = Burned   C = Counterfeit / Forged   F = Found | | | | |
|---|---|---|---|---|---|---|

| | UCR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| D | | | | | | |
| R | | | | | | |
| U | | | | | | |
| G | | | | | | |
| S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers
*WHITING, A. (0840)*

Suspect Hate / Bias Motivated:   *None*

Page 3

**NARRATIVE**

Complainant advised that his employee scamed a customer out of money.

## REPORTING OFFICER NARRATIVE

| *Delray Beach Police Department* | | OCA *13-012559* |
|---|---|---|
| Victim *JESKE, DEBORAH* | Offense *FRAUD - OBTAINING MONEY/PROPERTY BY* | Date / Time Reported *Fri 09/13/2013 12:13* |

On 09/13/13, I was dispatched to 2855 S. Congress Ave #A/B (OMG Tech Help) in reference to a fraud. Upon arrival, I made contact with the CEO, Elliot Loewenstern. Loewenstern advised me that he received a complaint from customer Deborah Jeske in reference to possible fraudulent activity. Jeske told Loewenstern she called OMG Tech Help and paid $249.99 but never received any tech help. Loewenstern conducted his own investigation and found that that his employee, Michael A. McArdle created a fake account (CPR Tech Help) based out of 375 SE 2nd Ave, Delray Beach, ████████ Loewenstern discovered that McArdle would receive a call on OMG Tech Helps line and speak with the customer. McArdle would hang up and call the customer back on his personal cell phone which is listed above. McArdle would take payment and promise tech help to the customer but the customer would never get the help they paid for. Loewenstern believes that there are other victims but could only find one victim at this time. When I looked up 375 SE 2nd Ave, it appears to belong to Garland Cox Welding, not CPR Tech Help. Loewenstern also said that McArdle is using his personal cell phone to complete these transactions and advised that his cell phone number is also attached to this fake company. The victim, Deborah Jeske actually received a receipt from CPR Tech Help for her payment of $249.99

CPR Tech Helps E-mail is as follows: system@paysimple.com

Deborah Jeskes credit card information was processed on 09/12/13, Customer ID: 3201229, Transaction ID: 9065890.

## Incident Report Suspect List

*Delray Beach Police Department*

OCA: *13-012559*

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **1** | **Name (Last, First, Middle)** *MCARDLE, MICHAEL A* | | | | | **Also Known As** | | | **Home Address** ██████ , *FL 33444* | |

**Business Address** *OMG TECH HELP*
*561-945-2789, ONLINE TECH, 2855 W LINTON BLVD, DELRAY*

| DOB. | Age | Race | Sex | Eth | Hgt | Wgt. | Hair | Eye | Skin | Driver's License / State. |
|---|---|---|---|---|---|---|---|---|---|---|
| ██████ | *34* | *W* | *M* | | *600* | *220* | *BRO* | *BRO* | *LGT* | ██████ |

Scars, Marks, Tattoos, or other distinguishing features.

| *Reported Suspect Detail* | Suspect Age | | Race | Sex | Eth | Height | | Weight | | SSN |
|---|---|---|---|---|---|---|---|---|---|---|
| Weapon, Type | Feature | Make. | | Model | | Color | Caliber | Dir of Travel | | |
| | | | | | | | | Mode of Travel | | |
| VehYr/Make/Model | | Drs | Style | | Color | | Lic/St | | VIN | |

| Notes | Physical Char |
|---|---|
| | *Build, MEDIUM* |
| | *Conversation, Polite* |
| | *Hair Facial, Clean Shaven* |
| | *Hair Length, Medium* |
| | *Pants/dress/skirt, Jeans* |
| | *Shirt/blouse, T-shirt* |
| | *Shoes, Tennis* |

## CASE SUPPLEMENTAL REPORT

Printed: 09/15/2014  12:57

*Delray Beach Police Department*                                                        OCA: *13012559*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*          **Case Mng Status:** *CLEARED BY ARREST*          **Occurred:** *09/12/2013*

**Offense:** *FRAUD - OBTAINING MONEY/PROPERTY BY FALSE PRETENSE*

**Investigator:** *MEAD, KIMBERLY J   (1024)*          **Date / Time:** *04/24/2014 15:42:09, Thursday*

**Supervisor:** *PALERMO, JOHN   (0477)*          **Supervisor Review Date / Time:** *04/28/2014 11:52:59, Monday*

**Contact:**          **Reference:** *Probable Cause*

---

On 09-15-13 I was assigned this case for follow up investigation.

On 09-13-13 complainant Elliot Loewenstern, owner of OMG Tech Help, reported that a former employee had been funneling customers to his own business, CPR Tech Help. Loewenstern stated that he received a call from a customer, Deborah Jeske, in reference to tech help that she purchased from OMG Tech Help. OMG did not have any record of Jeske's payment and therefore began investigating employee Michael McArdle.

On 09-16-13 I spoke with Loewenstern who told me that OMG receives calls from customers for tech help. McArdle was a sales technician and would receive the calls. He would assist a customer for a few minutes before telling them he would call them back. McArdle would then call the customer back from his personal cell phone ▮▮▮▮▮▮▮▮. Loewenstern stated that OMG Tech Help would provide the tech help, however, once McArdle called the customer back from his cell phone, he would have them send payment to his own company, CPR Tech Help. Loewenstern stated he only had one recording of this happening since only one customer had called back for additional tech help (Jeske). Loewenstern provided me with the call recording of McArdle assisting Jeske and then telling her he would call her back. He also provided me with the recording of Jeske calling OMG again for further tech help and being told there was no record of her payment to OMG. Loewenstern received a screen shot of the receipt Jeske was sent via email by CPR Tech Help for her $249.99 purchase which he also provided me. Both recordings and a copy of the screen shot were turned in to the DBPD Evidence Section.

On 09-17-13 I researched CPR Tech Help and discovered that the business is registered to Zico Danastor with an address of 375 SE 2nd Ave, Delray Beach. This location is actually a welding business (Garland Coyx Welding). Loewenstern advised that he discovered that the business has a PaySimple Merchant account to accept payments and provided me with a contact number. PaySimple verified the account but requested a subpoena for further information.

On 10-04-13 I spoke with Deborah Jeske via telephone who stated that she called OMG Tech Help for tech service. She said she was helped by someone named "Michael". She stated when she received a call back the name on the caller ID stated CPR Tech Help. She paid over the phone via her Visa Credit Card ending 9352. Jeske said after a while she realized the problem was not fixed so she called OMG again for further help and was told there was no record of her payment. She then stated she was never charged or had been reimbursed the funds; however, there is no record of her payment being reimbursed. I requested that Jeske write a statement which she agreed to; however, after not receiving a statement I attempted to follow up, but could no longer make contact with her. I made several more unsuccessful attempts to reach her but never received a formal statement.

On 10-21-13 a subpoena was issued to PaySimple for the CPR Tech Help account information and on 11-07-13 I

---

Investigator Signature                    Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 09/15/2014 12:57

*Delray Beach Police Department*

OCA: *13012559*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*   **Case Mng Status:** *CLEARED BY ARREST*   **Occurred:** *09/12/2013*

**Offense:** *FRAUD - OBTAINING MONEY/PROPERTY BY FALSE PRETENSE*

**Investigator:** *MEAD, KIMBERLY J    (1024)*     **Date / Time:** *04/24/2014 15:42:09, Thursday*

**Supervisor:** *PALERMO, JOHN     (0477)*     **Supervisor Review Date / Time:** *04/28/2014 11:52:59, Monday*

**Contact:**     **Reference:** *Probable Cause*

received the requested information. The PaySimple subpoenaed records show the account holder as Zico Danastor. It also shows approximately 13 sales transactions with a total of $2,363.92 deposited into the account. There is one deposit matching Jeske's payment of $249.99 listed on 09-09-13; however the receipt received by Jeske is dated 09-12-13 so it is unclear if this is the same transaction. The PaySimple account information was turned in to the DBPD Evidence Section.

On 11-18-13 McArdle responded to the DBPD for an interview where DBPD Det. Hunter (965) and I met with him in interview room number two in the investigative division. The following is a synopsis and is not verbatim. For a detailed account of the interview refer to the CD-R which was turned in to the DBPD Evidence Section.

McArdle stated he was working for OMG Tech Help when he decided to start his own business with a friend, "Dustin". He approached Danastor, who was a mutual friend, to see if he would invest in the company. Danastor agreed and put the company as well as the PaySimple account in his name. Another mutual friend allowed them to use the rear of the welding business at 375 SE 2nd Ave to set up computers.

McArdle explained that OMG has "homepage hi-jackers" which switch a user's homepage to another home page when a user clicks on a game or link. The new homepage flashes ads that state the computer has several problems and suggest the user purchase OMG software. Once the software is purchased the user is prompted to call OMG to initiate the software. When the user calls he/she is connected to a sales representative who upsells the user into tech help with OMG. McArdle stated that OMG thought he was stealing leads to start his company. He stated that was not true and that CPR Tech Help purchased their own Google ads. He stated once he received letters from OMG stating there was a non-compete and requesting him to dissolve the company he shut it down. He stated he realized he was in over his head anyways and was not making any money on the company.

In reference to Jekse, McArdle stated that she contacted CPR Tech Help and was not re-routed by him from OMG Tech Help. He stated that since several Google Ads may appear on a homepage, Jeske may not have realized which business she was contacting and may have accidentally contacted both OMG and CPR Tech Help.

On 11-26-13 I spoke with Danastor via telephone. He stated that he was approached by McArdle to invest in CPR Tech Help to which he agreed. He said he was not aware that McArdle was still working for OMG until they began receiving letters from the company to cease and desist. Danastor advised he was losing money on the investment anyways and agreed with McArdle to dissolve the company.

A subpoena was issued to Verizon for McArdle's call records and on 01-29-14 I received the requested information.

Investigator Signature     Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 09/15/2014 12:57

*Delray Beach Police Department*                                OCA: *13012559*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*    **Case Mng Status:** *CLEARED BY ARREST*    **Occurred:** *09/12/2013*

**Offense:** *FRAUD - OBTAINING MONEY/PROPERTY BY FALSE PRETENSE*

**Investigator:** *MEAD, KIMBERLY J    (1024)*    **Date / Time:** *04/24/2014 15:42:09, Thursday*

**Supervisor:** *PALERMO, JOHN    (0477)*    **Supervisor Review Date / Time:** *04/28/2014 11:52:59, Monday*

**Contact:**    **Reference:** *Probable Cause*

---

The records show two calls on 09-12-13 between Jeske and McArdle. The calls were inbound calls from Jeske to McArdle and the records do not show any calls made to Jeske. The records were turned into the DBPD Evidence Section.

A non-compete agreement was signed by McArdle stating he agreed not to engage in a business similar or in competition with OMG Tech during the time of his employment or for a period of two years upon termination of employment. Although the agreement was signed by McArdle, it was not dated and was not fully completed by OMG Tech.

Charges were filed with the SAO for Petit Theft.

---

Investigator Signature                    Supervisor Signature

Dec-04-2012 11:31 AM Bank of America 6175368626                                          21/26

## Bank of America

BANK OF AMERICA, N.A. (THE "BANK")

**Business Signature Card with Substitute Form W-9**

**Account Number:** ▋▋▋▋▋2251          **Bank Number:** ▋▋▋

**Account Type:** ☒ DDA   ☐ SAV   ☐ CD

**Account Title:** Boost Software Inc.

_____

_____

_____

**Legal Designation:**

☐ Individual/Sole Proprietor   ☐ Trust/Estate   ☐ Unincorporated Association   ☒ C Corp  ation   ☒ S Corporation

☐ Partnership  (Enter the type of partnership: General, LP, LLP or LLLP)  _____

☐ Limited Liability Company (Enter tax classification: C=C Corporation, S=S Corporation, P=Partnership o          t=Single Member Sole Proprietor) _____

☐ Other (Defined in W-9 Instructions)  _____

**Social Security Number** _____ **(or)  Employer Identification Number** ▋▋▋▋▋▋▋▋

By signing below, I/we acknowledge and agree that this account is and will be governed by the terms and c   ditions set forth in the account opening documents for my/our account, as they are amended from time to time. The account opening docume   include the Deposit Agreement and Disclosures and the Business Schedule of Fees. Furthermore, I/we acknowledge the receipt of these docume     By signing below, I/we acknowledge and agree that the signature(s) will serve as verification for any transactions in connection with   us account, and as the certification (set forth below) of the taxpayer identification number (TIN) to which I/we want interest reported. The Depo     Agreement includes a provision for alternative dispute resolution.

Substitute Form W-9, Certification - Under penalties of perjury, I certify that: (1) The number shown on thi   rm is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup w   hholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am su   t to backup withholding as a result of a failure to report all interest or dividends, or (C) The IRS has notified me that I am no longer subject to back   withholding, and (3) I am a US citizen or other US person (Defined in the W-9 instructions).

Certification Instructions:  You must cross out item 2 above if you have been notified by the IRS that you a   currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate tra   ctions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to   i individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certificatio   at you must provide your correct TIN. (Please refer to the IRS Instructions for Form W-9).

☐ Exempt Payee (check    applicable)

| The Internal Revenue Service does not require y   r consent to any provision of this document other than the certifications required   avoid backup withholding. |

☐ Nonresident Alien Status (if applicable) If the beneficial owner of this account is a foreign person   heck here, and complete and sign the applicable Form(s) W-8.

| Name (typed or printed) | Title (if applicable) | Signature | Date |
|---|---|---|---|
| 1  Amit Mehta | President | [signature] | 12/13/12 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

© 2012   ok of America, N.A. All Rights Reserved

NMA
00-14-9297M 08-2012

Page 1 of 2

**Attachment P, p. 1**

☐ Signature Card Addendum on    le

**ATM/Deposit/Debit Card Request**

Provided that the account referenced a...    ve is eligible to receive automated teller machine cards and/or Debit Cards, I (as authorized by the resolutions and/or court documents an...    r other agreements which authorize this account) hereby request the issuance of such cards to any of the authorized signers on this account.

| _(signature)_ | _(signature)_ | _President_ |
|---|---|---|
| Authorized Signer | | Title |

**Review Information**

**Customer 1:**

Name  Amit P Me    tG

[black redaction bar]

**Customer 2:**

Name _____

ID Type:_____    ID#:_____  ID Issuer:_____    Iss. Date:_____  Exp. Date:_____

ID Type:_____    ID#:_____  ID Issuer:_____    Iss. Date:_____  Exp. Date:_____

**Customer 3:**

Name _____

ID Type:_____    ID#:_____  ID Issuer:_____    Iss. Date:_____  Exp. Date:_____

ID Type:_____    ID#:_____  ID Issuer:_____    Iss. Date:_____  Exp. Date:_____

**Customer 4:**

Name _____

ID Type:_____    ID#:_____  ID Issuer:_____    Iss. Date:_____  Exp. Date:_____

ID Type:_____    ID#:_____  ID Issuer:_____    Iss. Date:_____  Exp. Date:_____

**Customer 5:**

Name _____

ID Type:_____    ID#:_____  ID Issuer:_____    Iss. Date:_____  Exp. Date:_____

ID Type:_____    ID#:_____  ID Issuer:_____    Iss. Date:_____  Exp. Date:_____

**Bank Information**

| Date | 12/03/1 |
|---|---|
| Banking Center Name | BOYL5   N STREET |
| Associate's Name | MARI    ORTIZ |
| Associate's Phone Number | 617-53   85 |

NMA
00-14-9297M  08-2012

Page 2 of 2

[black redaction bar]

**Attachment P, p. 2**

VT-B

FTC-VAST-000596

# Business Account Application

WELLS FARGO

| Bank Name: | Store Name: |
|---|---|
| WELLS FARGO BANK, N.A. | REGENCY COURT |

| Banker Name: | Officer/Portfolio Number: | Date: |
|---|---|---|
| VIVIEN D'ANGELO RICE | E2225 | 01/12/2013 |

| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 561/241-8066 | 10623 | 0066067 | Z6004-010 |

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

[X] New Deposit Account(s) Only          [ ] New Deposit Account(s) and Business Credit Card

Account 1 Product Name:

Business Market Rate Savings

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 287 | DDA | ████7551 | $150.00 | INTX |

New Account Kit:

Printed

## Related Customer Information

| Customer 1 Name: | Account Relationship: |
|---|---|
| DOWNLOADSOFTWARE.COM, LLC | Sole Owner |

Enterprise Customer Number (ECN):

████

| Customer 2 Name: | Account Relationship: |
|---|---|
| ELLIOT A LOEWENSTERN | Signer |

Enterprise Customer Number (ECN):

████



BBG2307 (5-12 5VP)
2W02-000520056187-01
**Attachment P, p. 3**

Page 1 of 5
Wells Fargo Confidential
**EXHIBIT 16**
FTC-VAST-000597

## Checking/Savings Statement Mailing Information

| Name(s) and Information Listed on Statement: | Statement Mailing Address: | |
|---|---|---|
| DOWNLOADSOFTWARE.COM, LLC | 7900 GLADES RD STE 120 | |
| | Address Line 2: | |
| | City: BOCA RATON | State: FL |
| | ZIP/Postal Code: 33434-4104 | Country: US |

## Customer 1 Information

| Customer Name: | | Street Address: | |
|---|---|---|---|
| DOWNLOADSOFTWARE.COM, LLC | | 7900 GLADES RD STE 120 | |
| Account Relationship: | | Address Line 2: | |
| Sole Owner | | | |
| Taxpayer Identification Number (TIN): ▇▇▇▇▇ | TIN Type: EIN | Address Line 3: | |
| Business Type: | | City: | State: |
| Limited Liability Company | | BOCA RATON | FL |
| Business Sub-Type/Tax Classification: Partnership | Non-Profit: No | ZIP/Postal Code: 33434-4104 | Country: US |
| Date Originally Established: 03/12/2010 | Current Ownership Since: | Number of Employees: 2 | Business Phone: 561/705-0012 | Fax: |
| Annual Gross Sales: $50,000.00 | Year Sales Reported: 01/01/2001 | Fiscal Year End: | Cellular Phone: | Pager: |
| Primary Financial Institution: | Number of Locations: 1 | | e-Mail Address: | |
| Primary State 1: | Primary State 2: | Primary State 3: | Website: | |
| Primary Country 1: | Primary Country 2: | Primary Country 3: | Sales Market: LOCAL | |
| Industry: Electrical/Appliance/Transportation/Furniture Manufacturing | | | | |
| Description of Business: | | | | |
| Major Suppliers/Customers: | | | | |

## Bank Use Only

| Name/Entity Verification: Articles of Organization | | Address Verification: | | BACC Reference Number: 613BAC0145012 |
|---|---|---|---|---|
| Document Filing Number/Description: 110000027673 | Filing Country: US | Filing State: FL | Filing Date: 03/12/2010 | Expiration Date: |
| Country of Registration: US | State of Registration: FL | International Transactions: | | Check Reporting: NO RECORD |
| Customer 1 Name: DOWNLOADSOFTWARE.COM, LLC | | Internet Gambling Business?: No | | |



2W02-000520056187-02

**Attachment P, p. 4**

**EXHIBIT 16**
**FTC-VAST-000598**

Business Account Application

## Owner/Key Individual 1 Information

Customer Name:
ELLIOT A LOEWENSTERN

Position/Title:
OWNER



## Owner/Key Individual 2 Information

Customer Name:
JAY G ROSEN

Position/Title:
OWNER



**Attachment P, p. 5**

**EXHIBIT 16**
**FTC-VAST-000599**

Business Account Application

## Certificate of Authority

Each person who signs the "Certified/Agreed To" section of this Application certifies that:

**A. The Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.**

B. Each person who signs the "Certified/Agreed To" section of this Application or whose name, any applicable title and specimen signature appear in the "Authorized Signers - Signature Capture" section of this Application is authorized on such terms as the Bank may require to:

  (1) Enter into, modify, terminate and otherwise in any manner act with respect to accounts at the Bank and agreements with the Bank or its affiliates for accounts and/or services offered by the Bank or its affiliates (other than letters of credit or loan agreements);

  (2) Authorize (by signing or otherwise) the payment of Items from the Customer's account(s) listed on this Business Account Application (including without limitation any Item payable to (a) the individual order of the person who authorized the Item or (b) the Bank or any other person for the benefit of the person who authorized the Item) and the endorsement of Deposited Items for deposit, cashing or collection (see the Bank's applicable account agreement for the definitions of "Item" and "Deposited Item");

  (3) Give instructions to the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp of an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by any electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services, and the Customer shall indemnify and hold the Bank harmless for acting in accordance with such instructions; and

  (4) Delegate the person's authority to another person(s) or revoke such delegation, in a separate signed writing delivered to the Bank.

C. If a code must be communicated to the Bank in order to authorize an Item, and the code is communicated, the Item will be binding on the Customer regardless of who communicated the code.

D. Each transaction described in this Certificate of Authority conducted by or on behalf of the Customer prior to delivery of this Certificate is in all respects ratified.

E. If the Customer is a tribal government or tribal government agency, the Customer waives sovereign immunity from suit with respect to the Customer's use of any Bank account, product or service referred to in this Certificate.

F. The information provided in this Application is correct and complete, each person who signs the "Certified/Agreed To" section of this Application and each person whose name appears in the "Authorized Signers-Signature Capture" section of this Application holds any position indicated, and the signature appearing opposite the person's name is authentic.

G. The Customer has approved this Certificate of Authority or granted each person who signs the "Certified/Agreed To" section of this Application the authority to do so on the Customer's behalf by:

  (1) resolution, agreement or other legally sufficient action of the governing body of the Customer, if the Customer is not a trust or a sole proprietor;

  (2) the signature of each of the Customer's trustee(s), if the Customer is a trust; or

  (3) the signature of the Customer, if the Customer is a sole proprietor.

## Certified/Agreed To

Owner/Key Individual 1 Name
ELLIOT A LOEWENSTERN

Position/Title:
OWNER

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:
01/12/2013

Owner/Key Individual 2 Name
JAY G ROSEN

Position/Title:
OWNER

Owner/Key Individual 2 Signature

☒ Submit manually
☐ Signature not required

Date:
01/12/2013



BBG2307 (5-12 SVP)

2W02-000520056187-04

**Attachment P, p. 6**

Page 4 of 5
Wells Fargo Confidential

**EXHIBIT 16**
**FTC-VAST-000600**

Business Account Application

## Request for Taxpayer Identification Number and Certification

(Substitute Form W-9)

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an Individual Retirement Arrangement (IRA), and payment other than interest and dividends).

3. I am a U.S. citizen or other U.S. person.        ☐ I am subject to backup withholding        ☒ I am exempt from backup withholding

**Note: The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

Tax Responsible Customer Name:
DOWNLOADSOFTWARE.COM, LLC

Taxpayer Identification Number (TIN):
████████

TIN Certification Signature:

☒ Submit manually
☐ Signature not required

Date:

## Authorized Signers – Signature Capture

Authorized Signer 1 Name
ELLIOT A LOEWENSTERN

Position/Title:
OWNER

Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:
01/12/2013



2W02-000520056187-05

**Attachment P, p. 7**

Page 5 of 5
Wells Fargo Confidential

**EXHIBIT 16**
FTC-VAST-000601

## Certified/Agreed To

Owner/Key Individual 1 Name

ELLIOT A LOEWENSTERN

Position/Title:

OWNER

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:
08/14/2012

## Signature Capture - New Authorized Signers

New Authorized Signer 1 Name

JAY G ROSEN

Position/Title:

New Authorized Signer 1 Signature

☐ Submit manually
☐ Signature not required

Date:
08/14/2012

BBG5351 (8-07 SVP)

© 2007 Wells Fargo Bank, N.A. All rights reserved.

2W02-000496314037-02

**Attachment P, p. 8**

Page 2 of 2

Wells Fargo Confidential

**EXHIBIT 16**

**FTC-VAST-000602**

# Business Account Application



**WELLS FARGO**

| Bank Name: | | | Store Name: | |
|---|---|---|---|---|
| WELLS FARGO BANK, N.A. | | | REGENCY COURT | |

| Banker Name: | | | Officer/Portfolio Number: | Date: |
|---|---|---|---|---|
| VIVIEN D'ANGELO RICE | | | E2225 | 09/05/2013 |

| Banker Phone: | | Store Number: | Banker AU: | Banker MAC: |
|---|---|---|---|---|
| 561/241-8066 | | 10623 | 0066067 | Z6004-010 |

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

[X] New Deposit Account(s) Only          [ ] New Deposit Account(s) and Business Credit Card

Account 1 Product Name:
Gold Business Services Package

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 287 | DDA | ████4846 | $50.00 | INTX |

Account 2 Product Name:
Wells Fargo Business High Yield Savings

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 287 | DDA | ███2899 | $85,000.00 | INTX |

New Account Kit:
Printed

## Related Customer Information

| Customer 1 Name: | Account Relationship: |
|---|---|
| SUCCESS CAPITAL LLC | Sole Owner |

Enterprise Customer Number (ECN):
████████

| Customer 2 Name: | Account Relationship: |
|---|---|
| ELLIOT A LOEWENSTERN | Signer |

Enterprise Customer Number (ECN):
████████

BBG2307 (5-12 SVP)          2W02-0005675605439 01          Attachment P, p.9          EXHIBIT 16          FTC Confidential

FTC-VAST-000603

Business Account Application

## Checking/Savings Statement Mailing Information

| Name(s) and Information Listed on Statement: | Statement Mailing Address: |
|---|---|
| SUCCESS CAPITAL LLC | 7900 GLADES RD STE 120 |

Address Line 2:

| City: | State: |
|---|---|
| BOCA RATON | FL |

| ZIP/Postal Code: | Country: |
|---|---|
| 33434-4104 | US |

## Customer 1 Information

| Customer Name: | Street Address: |
|---|---|
| SUCCESS CAPITAL LLC | 7900 GLADES RD STE 120 |

| Account Relationship: | Address Line 2: |
|---|---|
| Sole Owner | |

| Taxpayer Identification Number (TIN): | TIN Type: | Address Line 3: |
|---|---|---|
| 4▮▮▮▮ | | |

| Business Type: | City: | State: |
|---|---|---|
| Limited Liability Company | BOCA RATON | FL |

| Business Sub-Type/Tax Classification: | Non-Profit: | ZIP/Postal Code: | Country: |
|---|---|---|---|
| Partnership | No | 33434-4104 | US |

| Date Originally Established: | Current Ownership Since: | Number of Employees: | Business Phone: | Fax: |
|---|---|---|---|---|
| 11/19/2012 | | 2 | 561/251-4764 | |

| Annual Gross Sales: | Year Sales Reported: | Fiscal Year End: | Cellular Phone: | Pager: |
|---|---|---|---|---|
| $100,000.00 | 01/01/2012 | | | |

| Primary Financial Institution: | Number of Locations: | e-Mail Address: |
|---|---|---|
| | 1 | |

| Primary State 1: | Primary State 2: | Primary State 3: | Website: |
|---|---|---|---|
| | | | |

| Primary Country 1: | Primary Country 2: | Primary Country 3: | Sales Market: |
|---|---|---|---|
| | | | LOCAL |

Industry:
Other Services (except Public Administration)

Description of Business:

Major Suppliers/Customers:

## Bank Use Only

| Name/Entity Verification: | Address Verification: | BACC Reference Number: |
|---|---|---|
| Articles of Organization | | 6132480000938 |

| Document Filing Number/Description: | Filing Country: | Filing State: | Filing Date: | Expiration Date: |
|---|---|---|---|---|
| 112000145760 | US | FL | 11/19/2012 | |

| Country of Registration: | State of Registration: | International Transactions: | Check Reporting: |
|---|---|---|---|
| US | FL | | NO RECORD |

| Customer 1 Name: | Internet Gambling Business?: |
|---|---|
| SUCCESS CAPITAL LLC | No |



2W02-0005675560543-02
Attachment P, p. 10

EXHIBIT 16   Confidential

FTC-VAST-000604

Business Account Application

## Owner/Key Individual 1 Information

Customer Name:
ELLIOT A LOEWENSTERN

Position/Title:
OWNER



BBG2307 (5-12 SVP)

2W02-000567560543-03

**Attachment P, p. 11**

**EXHIBIT 16**

Confidential

**FTC-VAST-000605**

## Certificate of Authority

Each person who signs the "Certified/Agreed To" section of this Application certifies that:

A. **The Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.**

B. Each person who signs the "Certified/Agreed To" section of this Application or whose name, any applicable title and specimen signature appear in the "Authorized Signers - Signature Capture" section of this Application is authorized on such terms as the Bank may require to:

(1) Enter into, modify, terminate and otherwise in any manner act with respect to accounts at the Bank and agreements with the Bank or its affiliates for accounts and/or services offered by the Bank or its affiliates (other than letters of credit or loan agreements);

(2) Authorize (by signing or otherwise) the payment of Items from the Customer's account(s) listed on this Business Account Application (including without limitation any Item payable to (a) the individual order of the person who authorized the Item or (b) the Bank or any other person for the benefit of the person who authorized the Item) and the endorsement of Deposited Items for deposit, cashing or collection (see the Bank's applicable account agreement for the definitions of "Item" and "Deposited Item");

(3) Give instructions to the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp of an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by any electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services, and the Customer shall indemnify and hold the Bank harmless for acting in accordance with such instructions; and

(4) Delegate the person's authority to another person(s) or revoke such delegation, in a separate signed writing delivered to the Bank.

C. If a code must be communicated to the Bank in order to authorize an Item, and the code is communicated, the Item will be binding on the Customer regardless of who communicated the code.

D. Each transaction described in this Certificate of Authority conducted by or on behalf of the Customer prior to delivery of this Certificate is in all respects ratified.

E. If the Customer is a tribal government or tribal government agency, the Customer waives sovereign immunity from suit with respect to the Customer's use of any Bank account, product or service referred to in this Certificate.

F. The information provided in this Application is correct and complete, each person who signs the "Certified/Agreed To" section of this Application and each person whose name appears in the "Authorized Signers-Signature Capture" section of this Application holds any position indicated, and the signature appearing opposite the person's name is authentic.

G. The Customer has approved this Certificate of Authority or granted each person who signs the "Certified/Agreed To" section of this Application the authority to do so on the Customer's behalf by:

(1) resolution, agreement or other legally sufficient action of the governing body of the Customer, if the Customer is not a trust or a sole proprietor;

(2) the signature of each of the Customer's trustee(s), if the Customer is a trust; or

(3) the signature of the Customer, if the Customer is a sole proprietor.

## Certified/Agreed To

| Owner/Key Individual 1 Name | Position/Title: |
|---|---|
| ELLIOT A LOEWENSTERN | OWNER |

Owner/Key Individual 1 Signature



☒ Submit manually
☐ Signature not required

Date:
09/05/2013

2W02-000567560543-04
**Attachment P, p: 12**

**EXHIBIT 16** Highly Confidential

**FTC-VAST-000606**

Business Account Application

## Request for Taxpayer Identification Number and Certification

(Substitute Form W-9)

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an Individual Retirement Arrangement (IRA), and payment other than interest and dividends).

3. I am a U.S. citizen or other U.S. person.  ☐ I am subject to backup withholding  ☒ I am exempt from backup withholding

Note: The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

Tax Responsible Customer Name:  
SUCCESS CAPITAL LLC

Taxpayer Identification Number (TIN):

TIN Certification Signature:

☒ Submit manually  
☐ Signature not required

Date:

## Authorized Signers - Signature Capture

Authorized Signer 1 Name:  
ELLIOT A LOEWENSTERN

Position/Title:  
OWNER

Authorized Signer 1 Signature

☒ Submit manually  
☐ Signature not required

Date:  
09/05/2013

2W02-000567560543-05  
Attachment P, p. 13

Page 5 of 5

EXHIBIT 16

FTC-VAST-000607

# Business Account Application


**WELLS FARGO**

| Bank Name: | Store Name: | |
|---|---|---|
| WELLS FARGO BANK, N.A. | REGENCY COURT | |
| Banker Name: | Officer/Portfolio Number: | Date: |
| VIVIEN D'ANGELO RICE | E2225 | 03/22/2013 |

| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 561/241-8066 | 10623 | 0066067 | Z6004-010 |

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

[X] New Deposit Account(s) Only        [ ] New Deposit Account(s) and Business Credit Card

Account 1 Product Name:

GOLD BUSINESS SERVICES PACKAGE

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 287 | DDA | ████4531 | | |

## Related Customer Information

| Customer 1 Name: | Account Relationship: |
|---|---|
| VAST TECH SUPPORT LLC | Sole Owner |

Enterprise Customer Number (ECN):
████████

| Customer 2 Name: | Account Relationship: |
|---|---|
| MARK A DONOHUE | Signer |

Enterprise Customer Number (ECN):
████████



**Attachment P, p. 14**        **EXHIBIT 16**        Wells Fargo Confidential

**FTC-VAST-000608**

Business Account Application

| Customer 3 Name: | Account Relationship: |
|---|---|
| ELLIOT A LOEWENSTERN | Signer |

Enterprise Customer Number (ECN):

## Checking/Savings Statement Mailing Information

| Name(s) and Information Listed on Statement: | Statement Mailing Address: | |
|---|---|---|
| VAST TECH SUPPORT LLC | 2855 S CONGRESS AVE | |
| | Address Line 2: | |
| | City:<br>DELRAY BEACH | State:<br>FL |
| | ZIP/Postal Code:<br>334457312 | Country: |



2W02-000534244659-02
**Attachment P, p. 15**

Wells Fargo Confidential

**EXHIBIT 6**
FTC-VAST-000609

Business Account Application

## Customer 1 Information

| | |
|---|---|
| Customer Name: VAST TECH SUPPORT LLC | Street Address: 2855 S CONGRESS AVE |
| Account Relationship: Sole Owner | Address Line 2: |
| Taxpayer Identification Number (TIN):        TIN Type: ██████ | Address Line 3: |
| Business Type: Limited Liability Company | City: DELRAY BEACH        State: FL |
| Business Sub-Type/Tax Classification:        Non-Profit: No | ZIP/Postal Code: 33445-7312        Country: US |
| Date Originally Established: 05/03/2012    Current Ownership Since:    Number of Employees: 115 | Business Phone: 561/251-7254        Fax: |
| Annual Gross Sales: $100,000.00    Year Sales Reported: 01/01/2012    Fiscal Year End: | Cellular Phone:        Pager: |
| Primary Financial Institution:    Number of Locations: 1 | e-Mail Address: |
| Primary State 1:    Primary State 2:    Primary State 3: | Website: |
| Primary Country 1:    Primary Country 2:    Primary Country 3: | Sales Market: LOCAL |

Industry: Professional, Scientific, and Technical Services

Description of Business:

Major Suppliers/Customers:

## Bank Use Only

| | | |
|---|---|---|
| Name/Entity Verification: AO | Address Verification: | BACC Reference Number: |
| Document Filing Number/Description: 112000059935 | Filing Country: US    Filing State: FL    Filing Date: 05/03/2012 | Expiration Date: |
| Country of Registration: US    State of Registration: FL | International Transactions: | Check Reporting: |
| Customer 1 Name: | Internet Gambling Business?: | |

## Overdraft Protection Plan from Savings

For the terms of the Bank's Overdraft Protection Plan from Savings, see the Bank's current Business Account Agreement.

| New Checking Account Number: ██████4531 | Savings Account Providing Overdraft Protection: ██████7668 |
|---|---|



**Attachment P, p. 16**

**EXHIBIT 16**

**FTC-VAST-000610**

Business Account Application

## Owner/Key Individual 1 Information

Customer Name:
MARK A DONOHUE

Position/Title:
OWNER



## Owner/Key Individual 2 Information

Customer Name:
ELLIOT A LOEWENSTERN

Position/Title:
OWNER



BBG2307 (5-12 SVP)

2W02-000534244659-04

**Attachment P, p. 17**

Page 4 of 6

Highly Confidential

**EXHIBIT 16**

FTC-VAST-000611

Business Account Application

## Certificate of Authority

Each person who signs the "Certified/Agreed To" section of this Application certifies that:

A. **The Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.**

B. Each person who signs the "Certified/Agreed To" section of this Application or whose name, any applicable title and specimen signature appear in the "Authorized Signers - Signature Capture" section of this Application is authorized on such terms as the Bank may require to:

(1) Enter into, modify, terminate and otherwise in any manner act with respect to accounts at the Bank and agreements with the Bank or its affiliates for accounts and/or services offered by the Bank or its affiliates (other than letters of credit or loan agreements);

(2) Authorize (by signing or otherwise) the payment of Items from the Customer's account(s) listed on this Business Account Application (including without limitation any Item payable to (a) the individual order of the person who authorized the Item or (b) the Bank or any other person for the benefit of the person who authorized the Item) and the endorsement of Deposited Items for deposit, cashing or collection (see the Bank's applicable account agreement for the definitions of "Item" and "Deposited Item");

(3) Give instructions to the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp of an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by any electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services, and the Customer shall indemnify and hold the Bank harmless for acting in accordance with such instructions; and

(4) Delegate the person's authority to another person(s) or revoke such delegation, in a separate signed writing delivered to the Bank.

C. If a code must be communicated to the Bank in order to authorize an Item, and the code is communicated, the Item will be binding on the Customer regardless of who communicated the code.

D. Each transaction described in this Certificate of Authority conducted by or on behalf of the Customer prior to delivery of this Certificate is in all respects ratified.

E. If the Customer is a tribal government or tribal government agency, the Customer waives sovereign immunity from suit with respect to the Customer's use of any Bank account, product or service referred to in this Certificate.

F. The information provided in this Application is correct and complete, each person who signs the "Certified/Agreed To" section of this Application and each person whose name appears in the "Authorized Signers-Signature Capture" section of this Application holds any position indicated, and the signature appearing opposite the person's name is authentic.

G. The Customer has approved this Certificate of Authority or granted each person who signs the "Certified/Agreed To" section of this Application the authority to do so on the Customer's behalf by:

(1) resolution, agreement or other legally sufficient action of the governing body of the Customer, if the Customer is not a trust or a sole proprietor;

(2) the signature of each of the Customer's trustee(s), if the Customer is a trust; or

(3) the signature of the Customer, if the Customer is a sole proprietor.

## Certified/Agreed To

| Owner/Key Individual 1 Name | Position/Title: |
|---|---|
| MARK A DONOHUE | OWNER |

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:
03/22/2013

| Owner/Key Individual 2 Name | Position/Title: |
|---|---|
| ELLIOT A LOEWENSTERN | OWNER |

Owner/Key Individual 2 Signature

☒ Submit manually
☐ Signature not required

Date:
03/22/2013



BBG2307 (5-12 SVP)

2W02-000534244659-05

**Attachment F, p. 18**

**EXHIBIT 16**

Page 5 of 6

Confidential

**FTC-VAST-000612**

Business Account Application

## Request for Taxpayer Identification Number and Certification

(Substitute Form W-9)

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an Individual Retirement Arrangement (IRA), and payment other than interest and dividends).

3. I am a U.S. citizen or other U.S. person.     ☐ I am subject to backup withholding     ☐ I am exempt from backup withholding

**Note:  The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

Tax Responsible Customer Name:

VAST TECH SUPPORT LLC

Taxpayer Identification Number (TIN):

▮▮▮▮▮▮▮

TIN Certification Signature:

☒ Submit manually
☐ Signature not required

Date:

## Authorized Signers - Certificate of Authority Cross Reference

Existing Customers - New Accounts

For use when persons identified as authorized signers on the customer's existing Business Account Application/Certificate of Authority are identical to the persons designated as authorized signers for the accounts listed on this Business Account Application. Please refer to the Business Account Application/Certificate of Authority currently on file for the following account.

Existing Account Number to be Cross Referenced:

▮▮▮▮6883

## Authorized Signers - Signature Capture

Authorized Signer 1 Name:

MARK A DONOHUE

Position/Title:

OWNER

Authorized Signer 1 Signature:

☒ Submit manually
☐ Signature not required

Date:

03/22/2013

Authorized Signer 2 Name:

ELLIOT A LOEWENSTERN

Position/Title:

OWNER

Authorized Signer 2 Signature:

☒ Submit manually
☐ Signature not required

Date:

03/22/2013



2W02-000534244659-06
**Attachment P, p. 19**

**EXHIBIT 16**

Page 6 of 6
Wells Fargo Confidential

FTC-VAST-000613

# Business Account Application

WELLS FARGO

**Bank Name:**
WELLS FARGO BANK, N.A.

**Store Name:**
REGENCY COURT

**Banker Name:**
VIVIEN D'ANGELO RICE

**Office/Portfolio Number:**
E2225

**Date:**
10/18/2013

**Banker Phone:**
561/241-8066

**Store Number:**
10623

**Banker AU:**
0066067

**Banker MAC:**
26004-010

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

[X] New Deposit Account(s) Only          [ ] New Deposit Account(s) and Business Credit Card

**Account 1 Product Name:**
Gold Business Services Package

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|-------|----------|-----------------|------------------|----------------|
| 287 | DDA | ███ 9883 | $150.00 | INTX |

**Account 2 Product Name:**
Business Market Rate Savings

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|-------|----------|-----------------|------------------|----------------|
| 287 | DDA | ███ 3389 | $150.00 | INTX |

**New Account Kit:**
Printed

## Related Customer Information

**Customer 1 Name:**
VAST TECH SUPPORT LLC

**Account Relationship:**
Sole Owner

**Enterprise Customer Number (ECN):**
████████

**Customer 2 Name:**
ELLIOT A LOEWENSTERN

**Account Relationship:**
Signer

**Enterprise Customer Number (ECN):**
████████



BBG2307 (5-12 SVP)

2W02-000576452003-01

Page 1 of 7
Wells Fargo Confidential

**Attachment P, p. 20**

**EXHIBIT 16**
**FTC-VAST-000614**

Business Account Application

Customer 3 Name:
JON-PAUL VASTA

Account Relationship:
Signer

Enterprise Customer Number (ECN):
██████████

## Checking/Savings Statement Mailing Information

| Name(s) and Information Listed on Statement: | Statement Mailing Address: | |
|---|---|---|
| VAST TECH SUPPORT LLC | 2855 S CONGRESS AVE STE A | |
| | Address Line 2: | |
| | City:<br>DELRAY BEACH | State:<br>FL |
| | ZIP/Postal Code:<br>33445-7312 | Country:<br>US |

BBG2307 (5-12 SVP)

2W02-000576452003-02

**Attachment P, p. 21**

Page 2 of 7
Wells Fargo Confidential

**EXHIBIT 16**
**FTC-VAST-000615**

## Customer 1 Information

| Customer Name: | Street Address: |
|---|---|
| VAST TECH SUPPORT LLC | 2855 S CONGRESS AVE STE A |

| Account Relationship: | Address Line 2: |
|---|---|
| Sole Owner | |

| Taxpayer Identification Number (TIN): TIN Type: | Address Line 3: |
|---|---|
| ████ | |

| Business Type: | City: | State: |
|---|---|---|
| Limited Liability Company | DELRAY BEACH | FL |

| Business Sub-Type/Tax Classification: | Non-Profit: | ZIP/Postal Code: | Country: |
|---|---|---|---|
| S Corporation | No | 33445-7312 | US |

| Date Originally Established: | Current Ownership Since: | Number of Employees: | Business Phone: | Fax: |
|---|---|---|---|---|
| 05/03/2012 | | 250 | 561/251-7254 | |

| Annual Gross Sales: | Year Sales Reported: | Fiscal Year End: | Cellular Phone: | Pager: |
|---|---|---|---|---|
| $100,000.00 | 01/01/2012 | | | |

| Primary Financial Institution: | Number of Locations: | e-Mail Address: |
|---|---|---|
| | 1 | |

| Primary State 1: | Primary State 2: | Primary State 3: | Website: |
|---|---|---|---|
| | | | |

| Primary Country 1: | Primary Country 2: | Primary Country 3: | Sales Market: |
|---|---|---|---|
| | | | LOCAL |

| Industry: |
|---|
| Professional, Scientific, and Technical Services |

| Description of Business: |
|---|
| |

| Major Suppliers/Customers: |
|---|
| |

## Bank Use Only

| Name/Entity Verification: | Address Verification: | BACC Reference Number: |
|---|---|---|
| Articles of Organization | | 613BAC0024291 |

| Document Filing Number/Description: | Filing Country: | Filing State: | Filing Date: | Expiration Date: |
|---|---|---|---|---|
| 112000059935 | US | FL | 05/03/2012 | |

| Country of Registration: | State of Registration: | International Transactions: | Check Reporting: |
|---|---|---|---|
| US | FL | | NO RECORD |

| Customer 1 Name: | Internet Gambling Business?: |
|---|---|
| VAST TECH SUPPORT LLC | No |

2W02-000576452003-03

**Attachment P, p. 22**

**EXHIBIT 16**
**FTC-VAST-000616**

Business Account Application

## Owner/Key Individual 1 Information

Customer Name:
ELLIOT A LOEWENSTERN

Position/Title:
OWNER

Taxpayer Identification Number/T

## Owner/Key Individual 2 Information

Customer Name:
JON-PAUL VASTA

Position/Title:
owner

2W02-000576452003-04

**Attachment P, p. 23**

**EXHIBIT 16**
**FTC-VAST-000617**

Business Account Application

**Owner/Key Individual 3 Information**

Customer Name:

MARK A DONOHUE

Position/Title:

OWNER

**Attachment P, p. 24**

**EXHIBIT 16**
**FTC-VAST-000618**

## Certificate of Authority

Each person who signs the "Certified/Agreed "o" section of this Application certifies that:

A. The Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.

B. Each person who signs the "Certified/Agreed To" section of this Application or whose name, any applicable title and specimen signature appear in the "Authorized Signers - Signature Capture" section of this Application is authorized on such terms as the Bank may require to:

(1) Enter into, modify, terminate and otherwise in any manner act with respect to accounts at the Bank and agreements with the Bank or its affiliates for accounts and/or services offered by the Bank or its affiliates (other than letters of credit or loan agreements);

(2) Authorize (by signing or otherwise) the payment of Items from the Customer's account(s) listed on this Business Account Application (including without limitation any Item payable to (a) the individual order of the person who authorized the Item or (b) the Bank or any other person for the benefit of the person who authorized the Item) and the endorsement of Deposited Items for deposit, cashing or collection (see the Bank's applicable account agreement for the definitions of "Item" and "Deposited Item");

(3) Give instructions to the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp of an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by any electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services, and the Customer shall indemnify and hold the Bank harmless for acting in accordance with such instructions; and

(4) Delegate the person's authority to another person(s) or revoke such delegation, in a separate signed writing delivered to the Bank.

C. If a code must be communicated to the Bank in order to authorize an Item, and the code is communicated, the Item will be binding on the Customer regardless of who communicated the code.

D. Each transaction described in this Certificate of Authority conducted by or on behalf of the Customer prior to delivery of this Certificate is in all respects ratified.

E. If the Customer is a tribal government or tribal government agency, the Customer waives sovereign immunity from suit with respect to the Customer's use of any Bank account, product or service referred to in this Certificate.

F. The information provided in this Application is correct and complete, each person who signs the "Certified/Agreed To" section of this Application and each person whose name appears in the "Authorized Signers - Signature Capture" section of this Application holds any position indicated, and the signature appearing opposite the person's name is authentic.

G. The Customer has approved this Certificate of Authority or granted each person who signs the "Certified/Agreed To" section of this Application the authority to do so on the Customer's behalf by:

(1) resolution, agreement or other legally sufficient action of the governing body of the Customer, if the Customer is not a trust or a sole proprietor;

(2) the signature of each of the Customer's trustee(s), if the Customer is a trust; or

(3) the signature of the Customer, if the Customer is a sole proprietor.

## Certified/Agreed To

| Owner/Key Individual 1 Name | Position/Title: |
|---|---|
| ELLIOT A LOEWENSTERN | OWNER |

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:
10/18/2013

| Owner/Key Individual 2 Name | Position/Title: |
|---|---|
| JON-PAUL VASTA | owner |

Owner/Key Individual 2 Signature

☒ Submit manually
☐ Signature not required

Date:
10/18/2013

2W02-000576452003-06
**Attachment P, p. 25**

Page 6 of 7
Wells Fargo Confidential

**EXHIBIT 16**
**FTC-VAST-000619**

Business Account Application

## Request for Taxpayer Identification Number and Certification

(Substitute Form W-9)

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an Individual Retirement Arrangement (IRA), and payment other than interest and dividends).

3. I am a U.S. citizen or other U.S. person.   ☐ I am subject to backup withholding   ☒ I am exempt from backup withholding

**Note: The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

| Tax Responsible Customer Name: | Taxpayer Identification Number (TIN): |
|---|---|
| VAST TECH SUPPORT LLC | ▉ |

TIN Certification Signature:

☒ Submit manually
☐ Signature not required

Date: 11/25/13

## Authorized Signers - Signature Capture

| Authorized Signer 1 Name | Position/Title |
|---|---|
| ELLIOT A LOEWENSTERN | OWNER |

Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date: 10/18/2013

| Authorized Signer 2 Name | Position/Title |
|---|---|
| JON-PAUL VASTA | owner |

Authorized Signer 2 Signature

☒ Submit manually
☐ Signature not required

Date: 10/18/2013



BBG2307 (5-12 SVP)

2W02-000576452003-07

Page 7 of 7
Wells Fargo Confidential

**Attachment P, p. 26**

**EXHIBIT 16**
**FTC-VAST-000620**

# Business Account Application



| Bank Name: | | Store Name: | |
|---|---|---|---|
| WELLS FARGO BANK, N.A. | | REGENCY COURT | |

| Banker Name: | | Officer/Portfolio Number: | Date: |
|---|---|---|---|
| VIVIEN D'ANGELO RICE | | E2225 | 05/29/2012 |

| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 561/241-8066 | 10623 | 0066067 | Z6004-010 |

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

[X] New Deposit Account(s) Only          [ ] New Deposit Account(s) and Business Credit Card

**Account 1 Product Name:**

Gold Business Services Package

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 287 | DDA | ████6883 | $100.00 | CKS |

**Account 2 Product Name:**

Business Market Rate Savings

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 287 | DDA | ████3978 | $150.00 | INTX |

**New Account Kit:**

## Related Customer Information

| Customer 1 Name: | Account Relationship: |
|---|---|
| VAST TECH SUPPORT LLC | Sole Owner |

Enterprise Customer Number (ECN):

| Customer 2 Name: | Account Relationship: |
|---|---|
| ELLIOT A LOEWENSTERN | Signer |

Enterprise Customer Number (ECN):



BBG2307 (5-12 SVP)

2W02-000486822619-01
**Attachment P, p. 27**

Page 1 of 5

Wells Fargo Confidential

**EXHIBIT 16**

FTC-VAST-000621

Business Account Application

## Checking/Savings Statement Mailing Information

| Name(s) and Information Listed on Statement: | Statement Mailing Address: | |
|---|---|---|
| VAST TECH SUPPORT LLC | 7900 GLADES RD STE 120 | |
| | **Address Line 2:** | |
| | | |
| | **City:** BOCA RATON | **State:** FL |
| | **ZIP/Postal Code:** 33434-4104 | **Country:** US |

## Customer 1 Information

| Customer Name: | Street Address: | |
|---|---|---|
| VAST TECH SUPPORT LLC | 7900 GLADES RD STE 120 | |
| **Account Relationship:** Sole Owner | **Address Line 2:** | |
| **Taxpayer Identification Number (TIN):** ▮▮▮▮ **TIN Type:** | **Address Line 3:** | |
| **Business Type:** Limited Liability Company | **City:** BOCA RATON | **State:** FL |
| **Business Sub-Type/Tax Classification:** | **Non-Profit:** No | **ZIP/Postal Code:** 33434-4104 | **Country:** US |

| Date Originally Established: 05/03/2012 | Current Ownership Since: | Number of Employees: 2 | Business Phone: 561/251-7254 | Fax: |
|---|---|---|---|---|
| Annual Gross Sales: $100,000.00 | Year Sales Reported: 01/01/2012 | Fiscal Year End: | Cellular Phone: | Pager: |
| Primary Financial Institution: | Number of Locations: 1 | | e-Mail Address: | |
| Primary State 1: | Primary State 2: | Primary State 3: | Website: | |
| Primary Country 1: | Primary Country 2: | Primary Country 3: | Sales Market: LOCAL | |

**Industry:** Professional, Scientific, and Technical Services

**Description of Business:** tech surport

**Major Suppliers/Customers:**

## Bank Use Only

| Name/Entity Verification: Articles of Organization | Address Verification: | BACC Reference Number: 612BAC0492150 |
|---|---|---|
| **Document Filing Number/Description:** 112000059935 | **Filing Country:** US | **Filing State:** FL | **Filing Date:** 05/03/2012 | **Expiration Date:** |
| **Country of Registration:** US | **State of Registration:** FL | **International Transactions:** | | **Check Reporting:** NO RECORD |
| **Customer 1 Name:** VAST TECH SUPPORT LLC | | **Internet Gambling Business?:** No | | |



2W02-000486822619-02
**Attachment P, p. 28**

Page 2 of 5
Wells Fargo Confidential
**EXHIBIT 16**
**FTC-VAST-000622**

## Owner/Key Individual 1 Information

Customer Name:
ELLIOT A LOEWENSTERN

Position/Title:
OWNER





2W02-000486822619-03
**Attachment P, p. 29**

**EXHIBIT 16**
**FTC-VAST-000623**

Business Account Application

## Certificate of Authority

Each person who signs the "Certified/Agreed To" section of this Application certifies that:

**A. The Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.**

B. Each person who signs the "Certified/Agreed To" section of this Application or whose name, any applicable title and specimen signature appear in the "Authorized Signers - Signature Capture" section of this Application is authorized on such terms as the Bank may require to:

   (1) Enter into, modify, terminate and otherwise in any manner act with respect to accounts at the Bank and agreements with the Bank or its affiliates for accounts and/or services offered by the Bank or its affiliates (other than letters of credit or loan agreements);

   (2) Authorize (by signing or otherwise) the payment of Items from the Customer's account(s) listed on this Business Account Application (including without limitation any Item payable to (a) the individual order of the person who authorized the Item or (b) the Bank or any other person for the benefit of the person who authorized the Item) and the endorsement of Deposited Items for deposit, cashing or collection (see the Bank's applicable account agreement for the definitions of "Item" and "Deposited Item");

   (3) Give instructions to the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp of an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by any electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services, and the Customer shall indemnify and hold the Bank harmless for acting in accordance with such instructions; and

   (4) Delegate the person's authority to another person(s) or revoke such delegation, in a separate signed writing delivered to the Bank.

C. If a code must be communicated to the Bank in order to authorize an Item, and the code is communicated, the Item will be binding on the Customer regardless of who communicated the code.

D. Each transaction described in this Certificate of Authority conducted by or on behalf of the Customer prior to delivery of this Certificate is in all respects ratified.

E. If the Customer is a tribal government or tribal government agency, the Customer waives sovereign immunity from suit with respect to the Customer's use of any Bank account, product or service referred to in this Certificate.

F. The information provided in this Application is correct and complete, each person who signs the "Certified/Agreed To" section of this Application and each person whose name appears in the "Authorized Signers-Signature Capture" section of this Application holds any position indicated, and the signature appearing opposite the person's name is authentic.

G. The Customer has approved this Certificate of Authority or granted each person who signs the "Certified/Agreed To" section of this Application the authority to do so on the Customer's behalf by:

   (1) resolution, agreement or other legally sufficient action of the governing body of the Customer, if the Customer is not a trust or a sole proprietor;

   (2) the signature of each of the Customer's trustee(s), if the Customer is a trust; or

   (3) the signature of the Customer, if the Customer is a sole proprietor.

## Certified/Agreed To

| Owner/Key Individual 1 Name | Position/Title: |
|---|---|
| ELLIOT A LOEWENSTERN | OWNER |

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/29/2012



BBG2307 (5-12 SVP)
2W02-000486822619-04
**Attachment P, p. 30**
Page 4 of 5
Wells Fargo Confidential
**EXHIBIT 16**
**FTC-VAST-000624**

Business Account Application

## Request for Taxpayer Identification Number and Certification

(Substitute Form W-9)

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an Individual Retirement Arrangement (IRA), and payment other than interest and dividends).

3. I am a U.S. citizen or other U.S. person.   ☐ I am subject to backup withholding   ☒ I am exempt from backup withholding

**Note: The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

Tax Responsible Customer Name:
VAST TECH SUPPORT LLC

Taxpayer Identification Number (TIN):
████████████████

TIN Certification Signature:

☒ Submit manually
☐ Signature not required

Date:

## Authorized Signers - Signature Capture

Authorized Signer 1 Name
ELLIOT A LOEWENSTERN

Position/Title:
OWNER

Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/29/2012



BBG2307 (5-12 SVP)

2W02-000486822619-05
**Attachment P, p. 31**

Page 5 of 5
Wells Fargo Confidential

**EXHIBIT 16**
**FTC-VAST-000625**

# Business Account Application

**WELLS FARGO**

| Bank Name: | | Store Name: | |
|---|---|---|---|
| WELLS FARGO BANK, N.A. | | REGENCY COURT | |

| Banker Name: | | Officer/Portfolio Number: | Date: |
|---|---|---|---|
| VIVIEN D'ANGELO RICE | | E2225 | 10/18/2013 |

| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 561/241-8066 | 10623 | 0066067 | Z6004-010 |

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

[X] New Deposit Account(s) Only       [ ] New Deposit Account(s) and Business Credit Card

Account 1 Product Name:

Gold Business Services Package

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 287 | DDA | ▆883 | $150.00 | INTX |

Account 2 Product Name:

Business Market Rate Savings

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 287 | DDA | ▆3389 | $150.00 | INTX |

New Account Kit:

Printed

### Related Customer Information

| Customer 1 Name: | Account Relationship: |
|---|---|
| VAST TECH SUPPORT LLC | Sole Owner |

Enterprise Customer Number (ECN):

| Customer 2 Name: | Account Relationship: |
|---|---|
| ELLIOT A LOEWENSTERN | Signer |

Enterprise Customer Number (ECN):

BBG2307 (5-12 SVP)

2T02-00057645200201

Attachment P, p. 32

Wells Fargo Confidential

**EXHIBIT 16**

**FTC-VAST-000626**

Business Account Application

| Customer 3 Name: | Account Relationship: |
|---|---|
| JON-PAUL VASTA | Signer |

Enterprise Customer Number (ECN):

## Checking/Savings Statement Mailing Information

| Name(s) and Information Listed on Statement: | Statement Mailing Address: | |
|---|---|---|
| VAST TECH SUPPORT LLC | 2855 S CONGRESS AVE STE A | |
| | Address Line 2: | |
| | City: | State: |
| | DELRAY BEACH | FL |
| | ZIP/Postal Code: | Country: |
| | 33445-7312 | US |



BBG2307 (5-12 SVP)

2W02-000576452003-02

Page 2 of 7

EXHIBIT 16

FTC-VAST-000627

Business Account Application

## Customer 1 Information

| Customer Name: | Street Address: |
|---|---|
| VAST TECH SUPPORT LLC | 2855 S CONGRESS AVE STE A |

| Account Relationship: | Address Line 2: |
|---|---|
| Sole Owner | |

| Taxpayer Identification Number (TIN): ██████ | Address Line 3: |
|---|---|
| | |

| Business Type: | City: | State: |
|---|---|---|
| Limited Liability Company | DELRAY BEACH | FL |

| Business Sub-Type/Tax Classification: | Non-Profit: | ZIP/Postal Code: | Country: |
|---|---|---|---|
| S Corporation | No | 33445-7312 | US |

| Date Originally Established: | Current Ownership Since: | Number of Employees: | Business Phone: | Fax: |
|---|---|---|---|---|
| 05/03/2012 | | 250 | 561/251-7254 | |

| Annual Gross Sales: | Year Sales Reported: | Fiscal Year End: | Cellular Phone: | Pager: |
|---|---|---|---|---|
| $100,000.00 | 01/01/2012 | | | |

| Primary Financial Institution: | Number of Locations: | e-Mail Address: |
|---|---|---|
| | 1 | |

| Primary State 1: | Primary State 2: | Primary State 3: | Website: |
|---|---|---|---|
| | | | |

| Primary Country 1: | Primary Country 2: | Primary Country 3: | Sales Market: |
|---|---|---|---|
| | | | LOCAL |

| Industry: |
|---|
| Professional, Scientific, and Technical Services |

| Description of Business: |
|---|
| |

| Major Suppliers/Customers: |
|---|
| |

## Bank Use Only

| Name/Entity Verification: | Address Verification: | BACC Reference Number: |
|---|---|---|
| Articles of Organization | | 613BAC0024291 |

| Document Filing Number/Description: | Filing Country: | Filing State: | Filing Date: | Expiration Date: |
|---|---|---|---|---|
| 112000059935 | US | FL | 05/03/2012 | |

| Country of Registration: | State of Registration: | International Transactions: | Check Reporting: |
|---|---|---|---|
| US | FL | | NO RECORD |

| Customer 1 Name: | Internet Gambling Business?: |
|---|---|
| VAST TECH SUPPORT LLC | No |



2W02-000576452003-03

Attachment P, p. 34

EXHIBIT 16

Page 3 of 7

Wells Fargo Confidential

FTC-VAST-000628

Business Account Application

## Owner/Key Individual 1 Information

Customer Name:
ELLIOT A LOEWENSTERN

Position/Title:
OWNER



## Owner/Key Individual 2 Information

Customer Name:
JON-PAUL VASTA

Position/Title:
owner



Business Account Application

**Owner/Key Individual 3 Information**



Customer Name:
MARK A DONOHUE

Position/Title:
OWNER



**Attachment P, p. 36**          **EXHIBIT 16**

FTC-VAST-000630

Business Account Application

## Certificate of Authority

Each person who signs the "Certified/Agreed To" section of this Application certifies that:

A. **The Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.**

B. Each person who signs the "Certified/Agreed To" section of this Application or whose name, any applicable title and specimen signature appear in the "Authorized Signers-Signature Capture" section of this Application is authorized on such terms as the Bank may require to:

(1) Enter into, modify, terminate and otherwise in any manner act with respect to accounts at the Bank and agreements with the Bank or its affiliates for accounts and/or services offered by the Bank or its affiliates (other than letters of credit or loan agreements);

(2) Authorize (by signing or otherwise) the payment of Items from the Customer's account(s) listed on this Business Account Application (including without limitation any Item payable to (a) the individual order of the person who authorized the Item or (b) the Bank or any other person for the benefit of the person who authorized the Item) and the endorsement of Deposited Items for deposit, cashing or collection (see the Bank's applicable account agreement for the definitions of "Item" and "Deposited Item");

(3) Give instructions to the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp of an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by any electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services, and the Customer shall indemnify and hold the Bank harmless for acting in accordance with such instructions; and

(4) Delegate the person's authority to another person(s) or revoke such delegation, in a separate signed writing delivered to the Bank.

C. If a code must be communicated to the Bank in order to authorize an Item, and the code is communicated, the Item will be binding on the Customer regardless of who communicated the code.

D. Each transaction described in this Certificate of Authority conducted by or on behalf of the Customer prior to delivery of this Certificate is in all respects ratified.

E. If the Customer is a tribal government or tribal government agency, the Customer waives sovereign immunity from suit with respect to the Customer's use of any Bank account, product or service referred to in this Certificate.

F. The information provided in this Application is correct and complete, each person who signs the "Certified/Agreed To" section of this Application and each person whose name appears in the "Authorized Signers-Signature Capture" section of this Application holds any position indicated, and the signature appearing opposite the person's name is authentic.

G. The Customer has approved this Certificate of Authority or granted each person who signs the "Certified/Agreed To" section of this Application the authority to do so on the Customer's behalf by:

(1) resolution, agreement or other legally sufficient action of the governing body of the Customer, if the Customer is not a trust or a sole proprietor;

(2) the signature of each of the Customer's trustee(s), if the Customer is a trust; or

(3) the signature of the Customer, if the Customer is a sole proprietor.

## Certified/Agreed To

Owner/Key Individual 1 Name
| ELLIOT A LOEWENSTERN

Position/Title:
| OWNER

Owner/Key Individual 1 Signature

[X] Submit manually
[ ] Signature not required

Date:
| 10/18/2013

Owner/Key Individual 2 Name
| JON-PAUL VASTA

Position/Title:
| owner

Owner/Key Individual 2 Signature

[X] Submit manually
[ ] Signature not required

Date:
| 10/18/2013



**Attachment P, p. 37**

**EXHIBIT 16**          Proprietary and Confidential

**FTC-VAST-000631**

Business Account Application

## Request for Taxpayer Identification Number and Certification

(Substitute Form W-9)

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an Individual Retirement Arrangement (IRA), and payment other than interest and dividends).

3. I am a U.S. citizen or other U.S. person.          ☐ I am subject to backup withholding          ☒ I am exempt from backup withholding

**Note: The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

| Tax Responsible Customer Name: | Taxpayer Identification Number (TIN): |
|---|---|
| VAST TECH SUPPORT LLC | ▮▮▮▮▮▮ |

TIN Certification Signature:

☒ Submit manually
☐ Signature not required

Date:

## Authorized Signers - Signature Capture

| Authorized Signer 1 Name | Position/Title: |
|---|---|
| ELLIOT A LOEWENSTERN | OWNER |

Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:
10/18/2013

| Authorized Signer 2 Name | Position/Title: |
|---|---|
| JON-PAUL VASTA | owner |

Authorized Signer 2 Signature

☒ Submit manually
☐ Signature not required

Date:
10/18/2013



BBG2307 (5-12 SVP)

2W02-000576452003-07
Attachment P, p. 38

Page 7 of 7
EXHIBIT 16 Confidential
FTC-VAST-000632

E A LOEWENSTERN

**DUPLICATE COPY**
Account Ending 0-51001

*500  5/001*

p. 16/23

| | Detail Continued | ♦ - denotes Pay Over Time activity |
|---|---|---|

| | | Amount |
|---|---|---|
| 05/14/13 | STAPLES FRAMINGHAM. STAPLES<br>STAPLES<br>ORD 7100149533-000-0;REQ JORDAN CHIBNICK<br>IT1 BROTHER TZE;UPI 27.9900;QTY1<br>IT2 WATER PURFI;UPI 5.9900;QTY2<br>FRT 0.00;HDL 0.00;ITM2 | $41.65 |
| 05/14/13 | AD TECH EXPO NY  LARKSUR     CA<br>4613852034 | $50.00 |
| 05/14/13 | PAYROLL 882100037990RENO      CA<br>8667292925 | $565.20 ♦ |
| | OPEN EXTENDED PAYMENT OPTION | |
| 05/15/13 | AMAZON MKTPLACE PMTSAMZN.COM/BILL    WA<br>MERCHANDISE | $28.79 |
| 05/15/13 | GODADDY.COM      (480)505-8855<br>(480)505-8855 | $290.26 ♦ |
| | OPEN EXTENDED PAYMENT OPTION | |
| 05/15/13 | POPPIES RESTAURANT &DELRAY BEACH    FL<br>561-498-4900<br>FOOD                                    $54.06<br>TIP                                        $9.94 | $64.00 |
| 05/16/13 | STAPLES FRAMINGHAM STAPLES<br>STAPLES<br>ORD 7100279676-000-0;REQ JORDAN CHIBNICK<br>IT1 WATER PURFI;UPI 5.9900;QTY1<br>IT2 SPLS 8.5X11;UPI 30.9900;QTY1<br>FRT 0.00;HDL 0.00;ITM5 | $62.63 |
| 05/16/13 | FEDEX INV ▓▓▓1-800-622-1147<br>1-800-622-1147<br>VAST TECH SUPPORT FL.<br>DIRECT BILLING TRANSACTION<br>FEDEX INV#▓▓▓▓<br>FedEx #1-800-622-1147 | $133.74 ♦ |
| | OPEN EXTENDED PAYMENT OPTION | |
| 05/16/13 | IS3*888-348-4282 000BOCA RATON     FL<br>8883484282<br>Description<br>REFER TO RECEIPT | $5,250.00 ♦ |
| | OPEN EXTENDED PAYMENT OPTION | |
| 05/16/13 | ASI*4ALLDEALS.HOSTED866-335-1355     WA<br>MERCHANDISE | $67.12 |
| 05/16/13 | NETTECH CORP 2715000BOULDER      CO<br>7209325607 | $1,310.08 ♦ |
| | OPEN EXTENDED PAYMENT OPTION | |
| 05/16/13 | TIGERDIRECTINC   HRDWR/SFTWR<br>J41033160101 98406 | $214.75 ♦ |
| | OPEN EXTENDED PAYMENT OPTION | |
| 05/16/13 | AFFILIATESUMMIT.COM BERKELY HEIGHT    NJ<br>9087715574 | $99.00 |
| 05/16/13 | TIGERDIRECTINC   HRDWR/SFTWR<br>J41036800101 33445 | $3,654.55 ♦ |
| | OPEN EXTENDED PAYMENT OPTION | |

**Attachment Q, p. 1**

**EXHIBIT 16**

**FTC-VAST-000633**

# Legal Receipt for Shopper ID 33019384

| | |
|---|---|
| Shopper ID: | 33019384 |
| Receipt ID: | 548264632 |
| Reseller: | GoDaddy |
| Date: | 5/15/2013 10:32:14 AM By customer via Online |
| Source Code: | GDBB146365 |

| **Shipping Information** | **Billing Information** |
|---|---|
| Elliot Loewenstern | Elliot Loewenstern |
| Long Lake Ventures.com | Long Lake Ventures.com |
| 18105 Long Lake dr | 18105 Long Lake dr |
| Boca Raton, FL 33496 US | Boca Raton, FL 33496 US |
| Daytime Phone: 5612517254 | Daytime Phone: 5612517254 |
| Evening Phone: 5612517254 | elliot@powersourcemarketing.com |
| Fax: 5614314127 | |
| elliot@powersourcemarketing.com | |

IP: ▮

**Transaction Occurred as: United States Dollar (USD)**

*Payment 1: $290.26*

| | |
|---|---|
| Paid: | Credit Card |
| Name: | Elliot Loewenstern |
| Creditcard Number: | ▮ |
| Creditcard Information: | ▮ |

| Row | Label | Name | Unit Price | Today's Price | Qty | Extra Disc. | Total Price |
|---|---|---|---|---|---|---|---|
| 0 | 105-1 | .COM Domain Name Registration - 5 Years (recurring) Length: 1 year(s) OMGAV.COM This a service item. | $74.95 | $72.95 | 1 | $13.60 | $60.25 |
| 1 | 105-1 | .COM Domain Name Registration - 5 Years (recurring) Length: 1 year(s) OMGTOTALPROTECTION.COM This a service item. | $74.95 | $72.95 | 1 | $13.60 | $60.25 |
| 2 | 105-1 | .COM Domain Name Registration - 5 Years (recurring) Length: 1 year(s) OMGPREMIUMPROTECTION.COM This a service item. | $74.95 | $72.95 | 1 | $13.60 | $60.25 |
| 3 | 186-1 | Certified Domain - 5 Year Length: 1 year(s) OMGAV.COM This a service item. | $24.95 | $24.95 | 1 | $2.50 | $22.45 |
| 4 | 186-1 | Certified Domain - 5 Year Length: 1 year(s) OMGTOTALPROTECTION.COM This a service item. | $24.95 | $24.95 | 1 | $2.50 | $22.45 |
| 5 | 186-1 | Certified Domain - 5 Year Length: 1 year(s) OMGPREMIUMPROTECTION.COM This a service item. | $24.95 | $24.95 | 1 | $2.50 | $22.45 |
| 6 | 10102-1 | .COM Domain Name Renewal - 2 Years (recurring) Length: 1 year(s) OMGTECHHELP.COM This a service item. | $29.98 | $29.98 | 1 | $4.90 | $25.44 |

Confidential Treatment Requested By Go Daddy Operating Company, LLC.

GD 000347

**Attachment Q, p. 2**

**EXHIBIT 16**
**FTC-VAST-000634**

## Legal Receipt for Shopper ID 33019384

| Row | Label | Name | Unit Price | Today's Price | Qty | Extra Disc. | Total Price |
|---|---|---|---|---|---|---|---|
| 7 | 17001-1 | Private Registration Services - Renewal Length: 2 year(s) OMGTECHHELP.COM This a service item. | $9.99 | $9.99 | 1 | $3.26 | $16.72 |

| Subtotal | Shipping & Handling | Tax | Total |
|---|---|---|---|
| $290.26 | $0.00 | $0.00 | $290.26 |

Confidential Treatment
Requested By
Go Daddy Operating Company, LLC

**Attachment Q, p. 3**
GD 000348

**EXHIBIT 16**
**FTC-VAST-000635**

# Legal Receipt for Shopper ID 33019384

| | |
|---|---|
| Shopper ID: | 33019384 |
| Receipt ID: | 546377812 |
| Reseller: | GoDaddy |
| Date: | 5/10/2013 10:25:21 AM By Jonathan H Stoker via Phone |
| Source Code: | ?SR from_app: crmcatalog |

**Shipping Information**

Elliot Loewenstern

Long Lake Ventures.com

18105 Long Lake dr

Boca Raton, FL 33496 US

Daytime Phone: 5612517254

Evening Phone: 5612517254

Fax: 5614314127

elliot@powersourcemarketing.com

**Billing Information**

Elliot Loewenstern

Long Lake Ventures.com

18105 Long Lake dr

Boca Raton, FL 33496 US

Daytime Phone: 5612517254

elliot@powersourcemarketing.com

IP:

Transaction Occurred as: United States Dollar (USD)

*Payment 1: $91.34*

Paid:                                                    In Store Credit

*Payment 1: $358.06*

Paid:                                                    paypal

Account:

| Row | Label | Name | Unit Price | Today's Price | Qty | Extra Disc. | Total Price |
|---|---|---|---|---|---|---|---|
| 0 | 7606-1 | Hosting - Web - Ultimate Secure - Linux - US Region - 5 years (recurring) Length: 1 year(s) This a service item. | $764.40 | $449.40 | 1 | $0.00 | $449.40 |
| 1 | 2682-1 | Standard SSL MultiYear - 5 Years Length: 1 year(s)  This a service item. | $178.47 | $0.00 | 1 | $0.00 | $0.00 |

| Subtotal | Shipping & Handling | Tax | Total |
|---|---|---|---|
| $449.40 | $0.00 | $0.00 | $449.40 |

Confidential Treatment

Requested By

Go Daddy Operating Company, LLC

**Attachment Q, p. 4**

GD 000349

**EXHIBIT 16**

**FTC-VAST-000636**

# Legal Receipt for Shopper ID 33019384

| | |
|---|---|
| Shopper ID: | 33019384 |
| Receipt ID: | 544383088R |
| Reseller: | GoDaddy |
| Date: | 5/10/2013 10:22:11 AM By Jonathan H Stoker via Phone |
| Source Code: | ROHB from_app: wsc_dr |

**Shipping Information**

**Billing Information**

Jordan Karlick

7900 Glades Road

Suite 120

Boca Raton, FL 33434 US

Daytime Phone: 5619485917

jkarlick@powersourcemarketing.com

IP:

**Transaction Occurred as: United States Dollar (USD)**

*Payment 1: $-8.99*

Paid:                          In Store Credit

| Row | Label | Name | Unit Price | Today's Price | Qty | Extra Disc. | Total Price |
|---|---|---|---|---|---|---|---|
| 0 | 52011-1 | Hosting – Web - Deluxe - Linux - US Region - Renewal - Monthly (recurring) Length: 1 month(s) | $8.99 | $8.99 | -1 | $0.00 | $-8.99 |
| 1 | 10067-1 | Bandwidth Renewal (recurring) Length: 1 month(s) | $0.00 | $0.00 | -1 | $0.00 | $0.00 |

| Subtotal | Shipping & Handling | Tax | Total |
|---|---|---|---|
| $-8.99 | $0.00 | $0.00 | $-8.99 |

Confidential Treatment
Requested By
Go Daddy Operating Company, LLC

**EXHIBIT 16**
**FTC-VAST-000637**

```
<<< TRN: 140522-036160 >>>
**** MESSAGE ENVELOPE ****            ( Bank : 121 )
                                              SND DATE: 14/05/23
SRC:PHN CALLER:LOEWENSTERN, ELLIOTT      EXT:
RPT#1002      AMT:84,960.58         CUR:USD RATE: 1.          TRDR#
TEST: VAL:                   TYP:FTR/1000 FNDS:S CHG:DB:B CD:W COM:N
CBL:N
DBT ███████████531/           CDT A/021000021
ADV:FED
DEBIT VAL: 14/05/23           CREDIT VAL: 14/05/23
AMT:84,960.58 CUR:USD         AMT:84,960.58 CUR:USD
GL RECON: 287287              GL RECON: ████
DEPT:0066067                  DEPT:████
VAST TECH SUPPORT LLC         JPMORGAN CHASE BANK, N.A.
2855 S CONGRESS AVE STE A     4 NEW YORK PLAZA
DELRAY BEACH FL 33445-7312    FLOOR 15
                              NEW YORK, NY, US
                              COUNTRY OF RESIDENCY: US
                              BNF:/████████          CHG:
BK?N
                              EBUS INC
                              SKYRISE 2, 12TH FLOOR CEBU IT PARK
                              CEBU, PHILIPPINES
                              BNF MAILING COUNTRY: US
*****Remittance Data Unavailable*****

=========== End of Transaction Information ===========
```

VT-WF-007311
**EXHIBIT 16**
FTC-VAST-000638

```
<<< TRN: 140623-046555 >>>
**** MESSAGE ENVELOPE ****                ( Bank : 121 )
                                                   SND DATE: 14/06/23
SRC:VRU CALLER:LOEWENSTERN, ELLIOTT           EXT:
RPT#1002      AMT:93,411.79          CUR:USD RATE: 1.          TRDR#
TEST: VAL:                       TYP:FTR/1000 FNDS:S CHG:DB:B CD:W COM:N
CBL:N
DBT D.████████4531          CDT A/021000021
ADV:FED
DEBIT VAL: 14/06/23          CREDIT VAL: 14/06/23
AMT:93,411.79 CUR:USD        AMT:93,411.79 CUR:USD
GL RECON: 287287             GL RECON: ████
DEPT:0066067                 DEPT:████
VAST TECH SUPPORT LLC        JPMORGAN CHASE BANK, N.A.
2855 S CONGRESS AVE STE A    4 NEW YORK PLAZA
DELRAY BEACH FL 33445-7312   FLOOR 15
                             NEW YORK, NY, US
                             COUNTRY OF RESIDENCY: US
                             BNF:/█████          CHG:
BK?N
                             EBUS INC
                             SKYRISE 2, 12TH FLOOR CEBU IT PARK
                             CEBU, PHILIPPINES
                             BNF MAILING COUNTRY: US

============ End of Transaction Information ============
```

```
<<< TRN: 140609-035837 >>>
**** MESSAGE ENVELOPE ****          ( Bank : 121 )
                                          SND DATE: 14/06/09
SRC:VRU CALLER:LOEWENSTERN, ELLIOTT       EXT:
RPT#1002      AMT:96,623.34          CUR:USD RATE: 1.         TRDR#
TEST: VAL:                           TYP:FTR/1000 FNDS:S CHG:DB:B CD:W COM:N
CBL:N
DBT     ████████4531             CDT A/021000021
ADV:FED
DEBIT VAL: 14/06/09                  CREDIT VAL: 14/06/09
AMT:96,623.34 CUR:USD                AMT:96,623.34 CUR:USD
GL RECON: 287287                     GL RECON: ██████
DEPT:0066067                         DEPT:████
VAST TECH SUPPORT LLC                JPMORGAN CHASE BANK, N.A.
2855 S CONGRESS AVE STE A            4 NEW YORK PLAZA
DELRAY BEACH FL 33445-7312           FLOOR 15
                                     NEW YORK, NY, US
                                     COUNTRY OF RESIDENCY: US
                                     BNF:/████████          CHG:
BK?N
                                     EBUS INC
                                     SKYRISE 2, 12TH FLOOR CEBU IT PARK
                                     CEBU, PHILIPPINES
                                     BNF MAILING COUNTRY: US

============= End of Transaction Information =============
```

VT-WF-007318
**EXHIBIT 16**
FTC-VAST-000640

```
<<< TRN: 140708-029884 >>>
**** MESSAGE ENVELOPE ****          ( Bank : 121 )
                                            SND DATE: 14/07/08
SRC:VRU CALLER:LOEWENSTERN, ELLIOTT       EXT:
RPT#1002      AMT:95,841.17        CUR:USD RATE: 1.           TRDR#
TEST: VAL:                    TYP:FTR/1000 FNDS:S CHG:DB:B CD:W COM:N
CBL:N
DBT ████████████4531            CDT A/021000021
ADV:FED
DEBIT VAL: 14/07/08            CREDIT VAL: 14/07/08
AMT:95,841.17 CUR:USD          AMT:95,841.17 CUR:USD
GL RECON: 287287               GL RECON: ██████
DEPT:0066067                   DEPT ████████
VAST TECH SUPPORT LLC          JPMORGAN CHASE BANK, N.A.
2855 S CONGRESS AVE STE A      4 NEW YORK PLAZA
DELRAY BEACH FL 33445-7312     FLOOR 15
                               NEW YORK, NY, US
                               COUNTRY OF RESIDENCY: US
                               BNF:/████████        CHG:
BK?N
                               EBUS INC
                               SKYRISE 2, 12TH FLOOR CEBU IT PARK
                               CEBU, PHILIPPINES
                               BNF MAILING COUNTRY: US

============== End of Transaction Information ============
```

**VT-WF-007330**
**EXHIBIT 16**
**FTC-VAST-000641**

EXHIBIT 16
FTC-VAST-000642



December 17, 2013

Colleen Robbins
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mailstop H-286
Washington, DC 20580

**RE:    Response to FTC Civil Investigative Demand**

This letter shall serve as LogMeIn, Inc.'s ("LMI") response to the FTC Civil Investigative Demand (the "CID") dated November 14, 2013, which was received by LMI on or about November 22, 2013.

As discussed, after conducting a commercially reasonable search for the information sought in the CID, LMI is producing the enclosed information in response to your request. Although it is impossible for LMI to know whether all of the information you consider to be covered by the CID has been produced.

Based on the "omgtechhelp.com, OMG Tech Help and Vast Tech" email addresses provided in the CID, LMI was able to identify the enclosed information. LMI preserves, and does not in any way waive, any applicable objections regarding the CID, including, without limitation any objections relating to the breadth or scope of the CID or the validity or applicability of the CID.

Of course, if you have any further requests, please let me know and LMI will try to accommodate them.

Please feel free to call me with any questions at (781) 897-0651.

LOGMEIN, INC.

Patrick J. Murphy
Senior Counsel

LogMeIn, Inc., 320 Summer Street, Suite 100 · Boston, MA  02210
Phone (800) 993-1790  Fax (781) 998-7792  www.LogMeIn.com

Attachment S, p. 1

**EXHIBIT 16**

**FTC-VAST-000643**

Attachment S, p. 2

LogMeIn, Inc., 320 Summer Street, Suite 100 – Boston, MA 02210
Phone (800) 993-1790 Fax (781) 998-7792 www.LogMeIn.com

# LogMeln

**Company:** OMG TECH HELP
**Email:** mark@vasttechsupport.com
**Contact Name:** Mark Donahue
**Telephone On File:** 561.289.3664
**Address:** 2855 S congress Ave Suite AB
**City:** Delray Beach
**State:** FL
**Postal Code:** 33445
**Paid Seats:** 358
**Paid Seats Assigned to Technicians:** 303
**Payment Type:** Credit Card
**CC Number:** XXXX-XXXX-XXXX-1001

**Company:** Vast Tech
**Email:** mark@omgtechhelp.com
**Contact Name:** Mark alexander
**Telephone On File:** 561.289.3664
**Address:** N/A
**State:** FL
**Paid Seats:** None
**Paid Seats Assigned to Technicians:** 0

**Company:** Vast Tech Support
**Email:** lbeame@omgtechhelp.com
**Contact Name:** Lazer Beame
**Telephone On File:** 954.358.7032
**Address:** N/A
**State:** FL
**Paid Seats:** None
**Paid Seats Assigned to Technicians:** 0

**KELLEY DRYE & WARREN LLP**

A LIMITED LIABILITY PARTNERSHIP

WASHINGTON HARBOUR, SUITE 400

NEW YORK, NY

LOS ANGELES, CA

CHICAGO, IL

STAMFORD, CT

PARSIPPANY, NJ

———

BRUSSELS, BELGIUM

———

AFFILIATE OFFICE

MUMBAI, INDIA

3050 K STREET, NW

WASHINGTON, D.C. 20007-5108

(202) 342-8400

FACSIMILE

(202) 342-8451

www.kelleydrye.com

MATTHEW P. SULLIVAN

DIRECT LINE: (202) 342-8869

EMAIL: msullivan@kelleydrye.com

November 27, 2013

**VIA EMAIL**                                                                                             **CONFIDENTIAL**

Colleen Robbins, Esq.
Federal Trade Commission
600 Pennsylvania Ave, NW, H-286
Washington, DC 20580

Re:     <u>Response to the FTC's November 14, 2013 Civil Investigative Demand</u>

Dear Colleen:

This letter responds, in part, to the Civil Investigative Demand ("CID") issued to Five9, Inc. ("Five9") by the FTC on November 14, 2013 in connection with the phone numbers 855-316-8324 and 855-249-8392.[1] Pursuant to the request in the CID for an initial response that includes the name, address, and phone numbers for the customer(s) associated with the two phone numbers, this letter responds to Specifications A1, A2, A4 and A5.

---

[1]     Please note that we expect that all of the materials and information submitted will be exempt from a Freedom of Information Act request, pursuant to Section 21(f) of the Federal Trade Commission Act, 15 U.S.C. § 57b-2(f), and will be maintained strictly in accordance with the custodial obligations set forth in Section 21(b), 15 U.S.C. § 57b-2(b), and the U.S. SAFE WEB Act of 2006. To the extent that the FTC shares any information relating to this submission with a foreign law enforcement agency under the limited circumstances permitted by the U.S. SAFE WEB Act of 2006, we request prior written notice of at least 10 business days and expect that the FTC will comply strictly with all applicable procedures to ensure confidentiality and usage for law enforcement purposes only. In all other circumstances, we do not grant the Commission permission to disclose any information relating to this submission to any third party for any purpose. We request that the FTC return all documents at the conclusion of this investigation.

Colleen Robbins, Esq.
November 27, 2013
Page 2

## SPECIFICATIONS

A.   *Produce the following information relating to the customer(s) or subscriber(s) associated with the telephone numbers 855-316-8324 and 855-249-8392, and any other telephone number(s) or account(s) held by the same customer(s) or subscriber(s), during the applicable time period:*

    1.   *Name*

    2.   *Address*

Vast Tech Support (formerly Power Source Marketing)
7900 Glades Road, Suite 120
Boca Raton, FL 33434

Elliot Loewenstern
Elliot@powersourcemarketing.com
(561) 705-0012

    4.   *Length of service (including start date) and types of service utilized;*

Vast Tech Support signed a customer license agreement to use the Five9 software in February 2012.  The company uses both the inbound and outbound calling features of the Five9 software (categorized as a blended service).

    5.   *Telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address*

The following list includes all other telephone numbers associated with Vast Tech Support:

<u>Toll Free Numbers</u>

| | | |
|---|---|---|
| (800) 269-0305 | (800) 269-0877 | (855) 226-3915 |
| (855) 249-8390 | (855) 249-8391 | (855) 249-8392 |
| (855) 249-8393 | (855) 245-8972 | (855) 585-8951 |
| (855) 585-8952 | (855) 585-8953 | (855) 629-8780 |
| (855) 629-8781 | (855) 897-8772 | (855) 902-2746 |
| (855) 923-5650 | (855) 953-7822 | (855) 961-5201 |
| (855) 968-3030 | (855) 969-0764 | (855) 969-0765 |
| (855) 969-0790 | (855) 969-0791 | (855) 969-0792 |
| (855) 969-0793 | (855) 969-0794 | (855) 969-0795 |
| (855) 969-0796 | (855) 969-0797 | (855) 226-8208 |
| (855) 414-6208 | (855) 414-6209 | (855) 414-6210 |

**Attachment T, p. 2**

**EXHIBIT 16**
**FTC-VAST-000645**

Colleen Robbins, Esq.
November 27, 2013
Page 3

| | | |
|---|---|---|
| (855) 414-6211 | (855) 414-6212 | (855) 414-6213 |
| (855) 414-6214 | (855) 414-6215 | (855) 414-6216 |
| (855) 414-6217 | (855) 316-8324 | (855) 393-4310 |
| (855) 393-4312 | (855) 393-4313 | (855) 393-4315 |
| (855) 393-4316 | (855) 277-0890 | (855) 277-0891 |
| (855) 277-0893 | (855) 277-0894 | (855) 277-5003 |
| (855) 277-5004 | (855) 277-5005 | (855) 277-5007 |
| (855) 277-5008 | (855) 277-5009 | (855) 650-5015 |
| (855) 650-5016 | (855) 650-5019 | (855) 650-5020 |
| (855) 650-5021 | (855) 650-5022 | (855) 653-8112 |
| (855) 653-8113 | (855) 653-8114 | (855) 653-8115 |
| (855) 897-3902 | (855) 897-3904 | (855) 897-3997 |
| (855) 897-4003 | (855) 290-9306 | (855) 290-9305 |
| (855) 290-9304 | (855) 290-9303 | (855) 290-9302 |
| | (855) 264-0874 | |

## Local Inbound Numbers

| | | |
|---|---|---|
| (925) 203-3341 | (925) 203-3342 | (925) 203-3343 |
| (195) 033-6763 | (195) 034-6947 | (195) 039-8706 |
| (195) 041-0064 | (195) 044-1876 | (195) 064-5532 |
| (195) 351-7115 | (195) 210-7581 | (195) 210-7582 |
| (195) 210-7583 | (195) 210-7584 | (180) 028-3494 |
| (195) 210-0108 | (180) 028-9074 | (195) 210-0111 |
| (180) 024-7956 | (195) 210-0114 | (195) 210-7297 |
| | (925) 529-6515   (925) 529-6516 | |

\*       \*       \*

Please let me know if you have any questions regarding the enclosed information.

Sincerely,

Matthew Sullivan

**Attachment T, p. 3**                    **EXHIBIT 16**
FTC-VAST-000646

Vast Tech Support
7900 Glades Road, Suite 120
Boca Raton FL 33434

Toll Free Numbers

(877) 663-9027,(877) 663-9034,(877) 587-3388
(877) 484-7721,(877) 484-7722,(877) 484-4791
(877) 484-4793,(877) 484-4794,(877) 484-4795
(877) 484-4796,(877) 484-4797,(877) 484-4798
(877) 484-4799,(877) 484-8390,(877) 484-8391
(877) 484-8392,(877) 484-8393,(877) 484-8394
(877) 484-8395,(877) 484-8396,(800) 269-0305
(800) 269-0877,(800) 353-4698,(800) 353-5160
(800) 583-5698,(800) 583-9928,(800) 583-5591
(800) 228-8139,(800) 228-9143,(800) 229-0043
(800) 229-0102,(800) 229-0162,(800) 229-0364
(800) 229-0386,(800) 229-1415,(800) 229-2521
(800) 229-3818,(800) 229-4834,(800) 229-5144
(800) 229-5313,(800) 229-5578,(800) 229-5586
(800) 229-6184,(800) 229-6778,(800) 229-6790
(800) 229-6805,(800) 229-6967,(800) 229-7205
(800) 229-7241,(800) 229-7542,(800) 229-7958
(800) 229-8013,(800) 504-7145,(855) 226-3915
(855) 249-8390,(855) 249-8391,(855) 249-8392
(855) 249-8393,(855) 245-8972,(855) 585-8951
(855) 585-8952,(855) 585-8953,(855) 629-8780
(855) 629-8781,(855) 897-8772,(855) 902-2746
(855) 923-5650,(855) 953-7822,(855) 961-5201
(855) 968-3030,(855) 969-0764,(855) 969-0765
(855) 969-0790,(855) 969-0791,(855) 969-0792
(855) 969-0793,(855) 969-0794,(855) 969-0795
(855) 969-0796,(855) 969-0797,(855) 226-8208
(855) 414-6208,(855) 414-6209,(855) 414-6210
(855) 414-6211,(855) 414-6212,(855) 414-6213
(855) 414-6214,(855) 414-6215,(855) 414-6216
(855) 414-6217,(855) 316-8324,(855) 393-4310
(855) 393-4312,(855) 393-4313,(855) 393-4315
(855) 393-4316,(855) 277-0890,(855) 277-0891
(855) 277-0893,(855) 277-0894,(855) 277-5003
(855) 277-5004,(855) 277-5005,(855) 277-5007
(855) 277-5008,(855) 277-5009,(855) 650-5015
(855) 650-5016,(855) 650-5019,(855) 650-5020
(855) 650-5021,(855) 650-5022,(855) 653-8112
(855) 653-8113,(855) 653-8114,(855) 653-8115
(855) 897-3902,(855) 897-3904,(855) 897-3997
(855) 897-4003,(855) 290-9306,(855) 290-9305
(855) 290-9304,(855) 290-9303,(855) 290-9302
(855) 264-0874,(855) 679-7529,(855) 680-1717

**Attachment T, p. 4**

**EXHIBIT 16**
FTC-VAST-000647

(855) 680-9555,(855) 681-9555,(855) 682-1217
(855) 684-8399,(855) 687-6067,(855) 688-0880
(855) 688-0881,(855) 688-0882,(844) 927-9161
(844) 927-9162,(844) 927-9163,(844) 927-9164
(844) 927-9167,(844) 927-9168,(844) 927-9169
(844) 927-9170,(844) 927-9174,(844) 927-9175
(855) 427-5128,(855) 430-4454,(855) 434-6822
(855) 435-8873,(855) 439-5329,(855) 440-5329
(855) 441-5329,(855) 442-4286,(855) 449-3019
(855) 449-5329,(855) 950-5196,(855) 951-3220
(855) 952-5152,(855) 952-6684,(855) 955-6366
(855) 956-8140,(855) 956-9648,(855) 957-4358
(855) 960-9599,(855) 966-5665,(855) 444-9375
(855) 444-9483,(855) 444-9635,(855) 444-9851
(855) 445-0971,(855) 445-0978,(855) 445-0982
(855) 445-0985,(855) 445-1215,(855) 445-1223
(855) 445-1228,(855) 445-1232,(855) 445-1233
(855) 445-1239,(855) 445-1240,(855) 791-4488
(855) 791-4489,(855) 791-4490,(855) 791-4491
(855) 791-4492
(800) 765-1509,(800) 773-8125,(800) 786-4902
(800) 787-6705,(800) 793-6239,(855) 633-9030


Local Inbound Numbers            (925) 203-3341,(925) 203-3342,(925) 203-3343
                                 448081680047, 448081680048, 448081685526
                                  80001590159,(195) 033-6763,(195) 034-6947
                                 (195) 039-8706,(195) 041-0064,(195) 044-1876
                                 (195) 064-5532,(195) 351-7115,448081692318
                                 448081692319, 448081692295, 448081692296
                                  800083421,(195) 210-7581,800086420
                                 (195) 210-7582,800085859,(195) 210-7583
                                  800087057,(195) 210-7584,448081692297
                                 448081692298, 448081692315, 448081692316
                                 448081692317,(448) 081-6923,448081692308
                                 448081692309, 448081692310, 448081692311
                                 448081692312, 448081692313, 448081692314
                                 (180) 028-3494,(195) 210-0108,(180) 028-9074
                                 (195) 210-0111,(180) 024-7956,(195) 210-0114
                                  800286304,(195) 210-7297,448081780855
                                 448081780854, 448081780853, 448081780852
                                 448081780851, 448081780839, 448081780836
                                 448081780835, 448081780834, 448081780833
                                  800023557,(195) 210-0304,800023564
                                 (195) 210-0305,800023682,(195) 210-0306
                                  800023805,(195) 210-0307,800023806
                                 (195) 210-0308,800023354,(195) 210-0310

**Attachment T, p. 5**                          **EXHIBIT 16**
                                                **FTC-VAST-000648**

800061373,(195) 210-0311,800023369
(195) 210-0313,800023474,(195) 210-0314
8001803985, 448081780390, 448081780387
448081780386, 448081780385, 448081780378
(195) 210-0396,(195) 210-0397,(195) 210-0399
(195) 210-0400,(195) 210-0401,08004359725
(180) 094-7170,800947170,(080) 045-3084
800453084,(925) 732-4810,(925) 732-4811
(925) 732-4812,(925) 278-5280,(925) 278-5281
(925) 278-5282,(925) 278-5283,(925) 278-5284
(925) 278-5285,(925) 278-5286,(925) 278-5287
(925) 278-5288,(925) 278-5289,(925) 364-6386
(925) 364-8953,(925) 364-8954,(925) 364-8955
(925) 364-8956,(925) 364-8957,(925) 364-8958
(925) 364-8959,(925) 364-8960,(925) 364-8961
(925) 364-8962,(925) 364-8963,(925) 364-8964
(925) 364-8965,(925) 364-8966,(925) 364-8967
(925) 364-8968,(925) 364-8969,(925) 364-8970
(925) 364-8971,(925) 359-2315,(925) 359-2316
(925) 359-2317,(925) 359-2318,(925) 359-2319
(925) 359-2320,(925) 359-2321,(925) 359-2322
(925) 359-2323,(925) 359-2324
(210) 515-4500,(925) 529-6515,(925) 529-6516
(925) 732-4319,(925) 732-4320,(925) 732-4321
(925) 732-4322,(925) 732-4323,(561) 692-4367
(623) 299-4537,(714) 783-4431,(760) 992-3155
(415) 633-1253,(213) 330-2221,(303) 551-0506
(203) 497-3086,(302) 526-5156,(954) 745-0854
(321) 354-0608,(678) 365-0853,(478) 257-3918
(317) 664-5039,(913) 905-0337,(502) 716-7320
(504) 799-0013,(763) 567-5001,(314) 236-6390
(716) 796-0331,(607) 216-6035,(914) 401-8215
(513) 699-0587,(405) 415-0012,(503) 820-2706
(215) 282-3185,(865) 293-0887,(972) 807-1719
(713) 292-1023,(802) 922-9237,(304) 988-4306
(501) 725-7181,(216) 912-2278,(312) 894-1043
(205) 421-9711,(202) 715-6360,(515) 346-3911
(667) 205-3824,(601) 882-9003,(919) 325-7465
(402) 875-7618,(518) 545-3105,(718) 885-4128
(412) 208-0143,(843) 614-3920,(901) 248-1218
(806) 318-9577,(915) 242-4677,(804) 298-3919
(414) 944-6919,(510) 982-0516

| | | Percentage of Settled Transactions with Specified Soft Descriptors Including Chargebacks for the Time Period 1/1/2014 - 7/31/2014 | | | | | |
| | | Sorted by Activity Month, Division, and Soft Descriptor | | | | | |
| | | Excerpt of Spreadsheet Created by Reeve Tyndall, Investigator, Federal Trade Commission | | | | | |
| Activity Month | Division | Billing Descriptor | # of Transactions per Billing Descriptor | Dollar Amount of Transactions per Billing Descriptor | # of Chargebacks per Billing Descriptor | Dollar Amount of Chargebacks per Billing Descriptor | % of Chargebacks |
|---|---|---|---|---|---|---|---|
| 2014-01 January 2014 | 49936 | SAFECART.COM*PC HEALTH | 10,180 | $424,217.40 | 68 | $2,875.50 | 0.67% |
| 2014-01 January 2014 | 65225 | SAFECART.COM*PC HEALTH | 3,599 | $165,275.38 | 6 | $240.37 | 0.17% |
| 2014-01 January 2014 | 65228 | SAFECART.COM*PC HEALTH | 1,573 | $52,258.04 | 24 | $799.87 | 1.53% |
| 2014-01 January 2014 | 65412 | SAFECART.COM*PC HEALTH | 619 | $28,060.02 | 3 | $127.12 | 0.48% |
| 2014-01 January 2014 | 49936 | SAFECART.COM*PC HEALTH | 8,707 | $365,095.32 | 67 | $2,853.59 | 0.77% |
| 2014-02 February 2014 | 65225 | SAFECART.COM*PC HEALTH | 3,472 | $156,344.00 | 5 | $234.69 | 0.14% |
| 2014-02 February 2014 | 65228 | SAFECART.COM*PC HEALTH | 1,592 | $54,235.05 | 17 | $607.78 | 1.07% |
| 2014-02 February 2014 | 65412 | SAFECART.COM*PC HEALTH | 584 | $26,142.06 | 7 | $291.10 | 1.20% |
| 2014-02 February 2014 | 187952 | SAFECART.COM*PC HEALTH | 9 | $314.07 | | | 0.00% |
| 2014-02 February 2014 | 220992 | SAFECART.COM*PC HEALTH | 2 | $5,998.00 | | | 0.00% |
| 2014-03 March 2014 | 49936 | SAFECART.COM*PC HEALTH | 5,975 | $256,386.27 | 53 | $2,309.13 | 0.89% |
| 2014-03 March 2014 | 65225 | SAFECART.COM*PC HEALTH | 647 | $28,815.98 | 2 | $91.91 | 0.31% |
| 2014-03 March 2014 | 65228 | SAFECART.COM*PC HEALTH | 1,295 | $43,891.75 | 10 | $335.07 | 0.77% |
| 2014-03 March 2014 | 65412 | SAFECART.COM*PC HEALTH | 260 | $12,037.69 | 4 | $196.83 | 1.54% |
| 2014-03 March 2014 | 187952 | SAFECART.COM*PC HEALTH | 19 | $668.04 | | | 0.00% |
| 2014-04 April 2014 | 49936 | SAFECART.COM*PC HEALTH | 5,306 | $251,464.81 | 46 | $2,236.70 | 0.87% |
| 2014-04 April 2014 | 65225 | SAFECART.COM*PC HEALTH | 131 | $6,663.98 | 2 | $109.12 | 1.53% |
| 2014-04 April 2014 | 65228 | SAFECART.COM*PC HEALTH | 867 | $36,012.82 | 14 | $562.84 | 1.61% |
| 2014-04 April 2014 | 65412 | SAFECART.COM*PC HEALTH | 282 | $14,936.70 | 5 | $278.74 | 1.77% |
| 2014-04 April 2014 | 187952 | SAFECART.COM*PC HEALTH | 23 | $972.63 | | | 0.00% |
| 2014-04 April 2014 | 220992 | SAFECART.COM*PC HEALTH | 1 | $2,999.00 | | | 0.00% |
| 2014-05 May 2014 | 49936 | SAFECART.COM*PC HEALTH | 5,970 | $267,987.42 | 55 | $2,545.95 | 0.92% |
| 2014-05 May 2014 | 65225 | SAFECART.COM*PC HEALTH | 67 | $3,393.69 | | | 0.00% |
| 2014-05 May 2014 | 65228 | SAFECART.COM*PC HEALTH | 754 | $30,841.09 | 5 | $210.44 | 0.66% |
| 2014-05 May 2014 | 65412 | SAFECART.COM*PC HEALTH | 242 | $12,855.41 | 3 | $210.20 | 1.24% |
| 2014-05 May 2014 | 187952 | SAFECART.COM*PC HEALTH | 56 | $2,364.24 | | | 0.00% |
| 2014-06 June 2014 | 49936 | SAFECART.COM*PC HEALTH | 4,503 | $193,414.47 | 44 | $2,046.81 | 0.98% |
| 2014-06 June 2014 | 65225 | SAFECART.COM*PC HEALTH | 37 | $1,884.83 | | | 0.00% |
| 2014-06 June 2014 | 65228 | SAFECART.COM*PC HEALTH | 609 | $24,514.54 | 9 | $366.90 | 1.48% |
| 2014-06 June 2014 | 65412 | SAFECART.COM*PC HEALTH | 172 | $8,761.87 | 4 | $224.10 | 2.33% |
| 2014-06 June 2014 | 187952 | SAFECART.COM*PC HEALTH | 37 | $1,576.18 | 1 | $39.83 | 2.70% |
| 2014-06 June 2014 | 220992 | SAFECART.COM*PC HEALTH | 1 | $2,999.00 | | | 0.00% |
| 2014-07 July 2014 | 49936 | SAFECART.COM*PC HEALTH | 2,566 | $105,040.56 | 24 | $1,009.71 | 0.94% |
| 2014-07 July 2014 | 65225 | SAFECART.COM*PC HEALTH | 30 | $1,395.16 | | | 0.00% |
| 2014-07 July 2014 | 65228 | SAFECART.COM*PC HEALTH | 737 | $24,977.47 | 1 | $35.83 | 0.14% |
| 2014-07 July 2014 | 65412 | SAFECART.COM*PC HEALTH | 114 | $5,210.11 | | | 0.00% |
| Totals | | | 61,038 | $2,620,005.05 | 479 | $20,840.13 | |

EXHIBIT 16
FTC-VAST-000650

Attachment U, p. 1



See **WWW.SAFECART.COM** on your credit card statement?





### Secure Internet Payments for Downloadable Products



Need Help?

### New: The SafeCart Help Center
SafeCart Customer Care
Questions & Answers
Contact Details
And More!
Go to the Help Center >>

### Global Credit Card Acceptance



### Now Featuring Paypal Support

 Safe And Easy!





# About RevenueWire's SafeCart

RevenueWire's SafeCart is one of the internet's leading credit card payment systems, providing a secure and easy-to-use method for internet shoppers to purchase downloadable software, ebooks, membership website access and other digital products. We've worked tirelessly to achieve the highest levels of e-commerce industry certification including the TRUSTe privacy award, VeriSign Extended Validation SSL status. When you purchase through SafeCart you can be sure your privacy and security are cared for.

With SafeCart you have the option to pay by Visa, MasterCard, American Express, Discover, Diners Club, or JCB. We're also integrated with PayPal for shoppers who prefer that payment option. RevenueWire Inc. is headquartered in Victoria, BC Canada.



# Contact Us

SafeCart Customer Care
1-800-209-6437
Office Hours: M-F 9am-5pm PT

# RevenueWire Head Office

*780 Tolmie ave.*
*Suite 201*
*Victoria, BC V8X 3W4*
*Canada*



# Resources

RevenueWire is concerned with your online shopping safety. Our shopping cart and checkout was developed on, and continues to incorporate industry-leading security and encryption standards to ensure that your privacy and personal information is protected.

An important factor in keeping yourself safe online is understanding what security measures are available to you and how to verify the reliability of online merchants. To help you out, we've put together a list of resources providing more information on ecommerce and online shopping safety.



## Third Party Verification

### VeriSign Extended Validation



As the leading provider of the most powerful SSL encryption commercially available today, VeriSign provides SSL Certificates for over 93% of the Fortune 500 and the world's 40 major banks.
Learn more about VeriSign

### TRUSTe's Web Privacy Seal



TRUSTe ® is an independent, nonprofit organization focused on providing a means for Internet users to identify companies that have agreed to abide with certain principles regarding user privacy.
Learn more about the specific requirements for the TRUSTe ® Web Privacy Seal

## Understanding Online Security

The following sites offer definitions of the most common ecommerce and online security terms:
Microsoft Security Glossary
VeriSign Dictionary of Terms
OnGuard Online

Stay Smart Online

# Tips for Protecting Yourself

## OnGuard Online



Using tips from the US Federal Government and the technology industry, this site offer a comprehensive library of tips on protecting your personal information, guarding against Internet fraud and securing your computer.
http://www.onguardonline.gov

## VeriSign Education – How to Tell a Web Site is Secure

VeriSign details four methods to determine whether or not you're safe online.
http://www.verisignsecured.com/education.aspx

## Royal Canadian Mounted Police - Personal Information and Scams Protection

The RCMP created this guide to educate and generate awareness about the need to protect personal information and to protect personal identity and financial information.
http://www.rcmp-grc.gc.ca/scams/canadian_practical_guide_e.htm

## Safeshopping.org

The American Bar Association created this informational web site that includes a list of tips for safe online shopping.
http://www.safeshopping.org/tips.shtml

## AARP.org - Online Shopping: A Safety Checklist

Visit the site of the American Association of Retired Persons to view their detailed Online Shopping Safety Checklist.
http://www.aarp.org/money/wise_consumer/smartshopping/a2002-10-03-WiseConsumerCybershopping.html

## The major credit card companies also provide information on how to keep your information secure:

Visa

MasterCard
Discover
American Express

**Attachment U, p. 6**

**EXHIBIT 16**

4/30/2009

**FTC-VAST-000655**

SafeCart - Help Center

# Help Center

**Search The SafeCart Help Center**

*example: credit card charge or need technical support*



**Purchase Lookup**
Need to check on your purchase? Click here.

**Publisher Contacts**
Contact your product's publisher directly Click here.

**New! Call Us Toll Free**
1-800-209-6437

**Top 5 Questions & Answers**

1. What is SafeCart Payments?
2. How can I contact the publisher whose product I purchased?
3. I haven't received my license key or product registration key. How do I get one?
4. How can I get a refund for product I purchased from one of your publisher?
5. What are your Customer Care hours of operation?

## Questions & Answers

view all | close all

**General Questions**

Is my purchase really coming from RevenueWire's SafeCart?
RevenueWire's SafeCart card-processing service is used in connection with the sale of a wide range of downloadable products. Our name

http://www.safecart.com/help-center/?answer=82

5/5/2009

Attachment U, p. 7

EXHIBIT 16
FTC-VAST-000656

SafeCart - Help Center

appears on your credit card or Paypal statement, but the product you've purchased may not be delivered directly by RevenueWire. Typically, downloadable products are updated regularly by the original purchaser, and we don't normally store the products that we resell on our servers.

**How can I contact the publisher whose product I purchased?**

Our Purchase Look-up Tool provides you with the merchant or publisher's contact information. You can also look up their contact information via our product publisher's directory. Receipts emailed to you immediately following your purchase also detail this information. When you contact a merchant directly, please check your spam or junk folder in case your anti-spam filter has accidentally re-routed your merchant's reply to one of these folders.

**I don't recall buying anything from SafeCart, yet my credit card statement or PayPal account shows a transaction from WWW.SAFECART.COM?**

When a purchase is made through RevenueWire's SafeCart online checkout for a downloadable product, you'll see WWW.SAFECART.COM USA on your credit card statement. If PayPal was used, SAFECART is displayed, while American Express shows "Bibit Internet Payments", which references our credit card processing bank for Amex.

To help you reference a purchase, we provide an easy-to-use Purchase Lookup Tool. This tool is available 24/7 here on our website and provides quick access to your receipt, the publisher's original order confirmation page, in addition to technical support contacts for the publisher of the product you've purchased.

**What is SafeCart Payments?**

RevenueWire is one of the Internet's leading resellers of software and other downloadable products. With support for over 26 currencies, we provide downloadable product publishers a way to reach global customers with their products.

Built on military-grade security and encryption standards, RevenueWire's SafeCart features industry-leading privacy assurance and data integrity. We accept Visa, MasterCard, American Express, Discover, Maestro, Diners Club, and JCB. SafeCart now also accepts PayPal.

**I'm getting an error when I try to purchase indicating my credit card has been 'refused.' I'm pretty sure I have available credit on that card, what's happening?**

If you are receiving the message, "Sorry, your payment was refused by the financial institution. Your card will NOT be debited.", please contact your credit card issuer to see if they are preventing online purchases for reasons other than exceeded credit limits. If they indicate the purchase should be going through, it's possible our risk system may have identified a security factor that is temporarily preventing the completion of your purchase. Please try a different credit card to complete your transaction.

**I don't have a credit card or PayPal account. Does SafeCart give me the option to pay by check or money order?**

We do not currently accept payments by money order or check. If you do not have access to either a major credit card or Paypal, you can certainly contact the merchant or publisher of the product you'd like to purchase and see if they will accept payment directly either by check or money order.

**I haven't received my item yet. Can I track the shipment or confirm my physical mailing address?**

All of the products sold using SafeCart are delivered electronically. Nothing will be mailed or shipped to you. Information regarding downloading products, logins or license keys is provided immediately following your purchase via the "Thank You" page you see immediately after your purchase, as well as via a post-purchase confirmation email.

If you do not have a printout of the "Thank You" page or the email containing your license key/product registration information, please contact us directly at 1-800-209-6437, as this represents the quickest way to have this information resent.

**Attachment U, p. 8**

**EXHIBIT 16**

**FTC-VAST-000657**

SafeCart - Help Center

Page 3 of 5

**What is a license or registration key?**

A license key or registration key is a unique code required to access product features that become available after registration and purchase. If you need assistance with a license/registration key, please contact us at 1-800-209-6437 and our support staff will work to quickly resolve the issue.

**I haven't received my license key or product registration key. How do I get one?**

License keys and product registration details are provided in two ways:

1. Via the "Thank You" or confirmation page you see when you've completed the checkout process.
2. In a post-purchase email message sent to you by RevenueWire, or on behalf of RevenueWire by the original publisher of the product.

If you need assistance with a license/registration key please call us at 1-800-209-6437 and we will work to quickly assist you with registration or installation. For technical support, you can also quickly access a Publisher's contact information using our Publisher Look-up Tool.

**I don't think the product I just purchased is working correctly. How do I get technical help?**

If you're unable to download or access your product or have questions about how to use your software or product, please contact your product's publisher directly. They are your best resource for quickly resolving any technical or download issues. You can quickly access their contact information using our Publisher Look-up Tool. Please allow your product's publisher 48 hours to respond to your inquiry.

**I think I paid a different amount than was advertised. Can you clarify the reason for the difference?**

Our checkout displays the suggested retail price as determined by the product's publisher. As such, your publisher is most familiar with the pricing of the products they offer and will be the best able to answer any questions you may have regarding cost. You can quickly access their contact information using our Publisher Look-up Tool.

**I contacted the publisher directly but haven't received a response. What do I do now?**

Initially, you may want to be sure that your response from the publisher hasn't been accidentally re-routed to your spam or junk folder. Please note that we require publishers to respond to customer inquiries within 48 hours. If it's been more than 48 hours since you contacted the publisher, and you've confirmed that replies from the publisher haven't accidentally been re-routed to your spam or junk mail folder, please contact us at 1-800-209-6437 and we will contact the publisher on your behalf with the highest level of priority.

**I sent a question to your Customer Care but haven't received a reply yet. How can I get in touch with you?**

We are committed to providing the best customer service possible and this includes responding in a timely manner. Please check your spam or junk folder just in case the email response was incorrectly routed to either of those folders. If you sent your message over a weekend, we will respond to you as soon as possible on the next business day. Our Customer Care is available Monday through Friday (excluding holidays), 9 a.m. to 5 p.m. Pacific Time at 1-800-209-6437.

**What are your Customer Care hours of operation?**

Our Customer Care is available Monday through Friday (excluding holidays), 9 a.m. to 5 p.m. Pacific Time at 1-800-209-6437.

**Privacy and Security**

How do I know SafeCart is a secure way to make a purchase online?

5/5/2009

**Attachment U, p. 9**

**EXHIBIT 16**
**FTC-VAST-000658**

SafeCart - Help Center

To demonstrate our commitment to user privacy and security, we've undergone rigorous third party privacy audits to achieve the most highly recognizable security designations for online shoppers. RevenueWire's SafeCart meets the stringent standards of ScanAlert HACKER SAFE, VeriSign™ Extended Validation, and TRUSTe™ Privacy Certification.

Please also review our Privacy Statement which explains how we carefully handle and protect your personal information.

**What is HACKER SAFE?**

Hacker Safe is a third-party verification program that confirms that SafeCart transactions are safe from unauthorized access by unauthorized intrusion, keeping you safe from identity theft and credit fraud.

ScanAlert™ HACKER SAFE conducts daily, thorough six-step network security audits, continually evaluating the security of the SafeCart shopping cart and platform. The first three steps are a test for vulnerabilities, while the fourth and fifth steps are alerts and solution management if any vulnerability is detected.

Learn more on the HACKER SAFE web site.

**What is VeriSign Extended Validation?**

In order to encrypt personal and financial information transmitted over the Internet, many web sites employ Secure Sockets Layer (SSL). Extended Validation SSL Certificates provide high security Internet browsers information to authenticate the organizational identity of a web site, thus providing a third-party verification. For example, if you use MS Internet Explorer 7, the address bar turns green and displays the name of the Extended Validation certificate owner to let you know that your transaction is encrypted and the organization has been authenticated. (Future releases of Firefox and Opera will also support this visual gauge.) Older browsers show a padlock icon at the bottom of the page and a web site address starting with "https" when you're on a SSL secured page. e.g. https://login.yahoo.com/config/mail?.intl=us

Learn more about VeriSign™.

**What is TRUSTe Privacy Certification?**

Bearing the TRUSTe™ Web Privacy Seal means a company adheres to TRUSTe™'s strict privacy principles including:

Having a privacy policy that is reviewed for compliance to privacy best practices by TRUSTe™

Posting notice and disclosure informing you how your personally identifiable information is collected and handled

Providing you with choice and consent regarding how your information is used and shared

Employing a third party to mediate disputes relating to the handling of your personally identifiable information

Due to the extensive certification process that an organization must go through, privacy seals are the most difficult to obtain. They are also the only seals that investigate what happens "behind the scenes", carefully inspecting internal data collection and usage procedures. Once a privacy seal has been obtained, the seal program continues to monitor the organization, and consumers can contact the issuing authority regarding any complaints if they feel there has been any misconduct.

Learn more about the specific requirements for the TRUSTe™ Web Privacy Seal

**Where can I learn more about online shopping safety?**

Please visit our resource page for a list of useful links to web sites that provide more information about Internet security, online shopping safety, and protecting your personal information.

**Questions about Refunds**

http://www.safecart.com/help-center/?answer=82

Attachment U, p. 10

EXHIBIT 16
FTC-VAST-000659

SafeCart - Help Center

Page 5 of 5

How can I get a refund for a product I purchased from one of your publisher?

To request a refund for a product purchased using RevenueWire's SafeCart, please contact our Customer Care at 1-800-209-6437

How will I get my refund?

The credit card I used to purchase my product is no longer valid or has expired. How will I get my refund?

All refunds will be sent to the same card or account that was used at the time of purchase. As such, if the card used to make your purchase has been canceled, we recommend you contact your credit card provider and confirm where your refund will appear.

Typically, your card issuer will carry forward any outstanding credits to your new card. Unfortunately, our online system is unable to issue refund checks at this time.

How long will it take for the refunded funds to appear in my account?

Due to differences in processing times by the major credit card issuing banks, in some instances refund times may extend to 15 business days. If your refund is taking an abnormally long period of time to process with your card issuing bank, please let us know and we'll do our best to provide you with any additional information on the status of your refund.

If you used PayPal to make your original purchase, please sign into your PayPal account and review your account history. Please note that depending upon your Paypal account preferences, you may need to transfer funds from PayPal to your bank account.

**Attachment U, p. 11**          **EXHIBIT 16**
                               **FTC-VAST-000660**

# CREDIT APPROVAL MEMORANDUM

| | |
|---|---|
| TO: | Lynn Heck |
| CC: | Sales Administration |
| | Contract Administration |
| | Legal Department— Rohoni.Singh-Doubleday@ChasePaymentech.com |
| FROM: | Amy Pelham, Portfolio Analyst |
| DATE: | June 4, 2009 |

The purpose of this memorandum is to inform you that the following merchant has been credit approved to process transactions on the Salem Platform, subject to the following terms and conditions:

| | |
|---|---|
| **Credit Approved Merchant:** | RevenueWire, Inc. |
| **Approved DBA's:** | n/a |
| **Contract Holder (s):** | RevenueWire, Inc. |
| **Entities Added via Addendum:** | n/a |
| **Corporate/Personal Guaranty:** | n/a |
| **Approved URL:** | www.safecart.com (customers log onto the publishers website and shopping cart brings them to www.safecart.com) |
| **Processing Type:** | US CC Processing |
| **Annual Transaction Volume (#):** | 2,491,000 trx/yearly |
| **Annual Transaction Volume ($):** | $97,500,000 |
| **Reserve Amount/Terms:** | 5% |
| **Reason:** | financials |
| **Product Lines Approved:** | payment processor of downloadable products |
| **Marketing Lines Approved:** | Internet |
| **Other Approval Conditions:** | welcome letter |

## ADDITIONAL PRODUCT LINES OR MARKETING METHODS REQUIRE CREDIT APPROVAL

| | | |
|---|---|---|
| Approved: | Amy Pelham _____ | **June 3, 2009** |
| | Amy Pelham | Date |
| | Portfolio Analyst | |
| Concur: | **_DM** _____ _____ | **06-04-09**_____ |
| | David Miller              Date | |
| | Manager, Multi-Channel & National Credit Underwriting | |
| | **Kyle Salvati** | **06-04-09** |
| | Group Manager | |

**Attachment U, p. 12**

**EXHIBIT 16**

FTC-VAST-000661

CHA...E PAYMENTECH SOLUTIONS, LL...
SUMMARY ANALYSIS APPROVAL REQUEST

| Company Name: | RevenueWire Inc. | Date: | May 18, 2009 |
|---|---|---|---|
| DB Key #: | 58164 | Analyst: | Amy Pelham |
| Address: | 33530 1st Way S<br>Suite 102<br>Federal Way, WA 98003 | Ownership: | Elton Pereira, 15%<br>Adrian Pereira, 20%<br>Don Wharton, 20% |
| Management: | Havind Sehmi, President<br>Elton, Pereira, CFO | Approval Level Needed: | CCO |
| URL: | www.safecart.com (customers log onto the publishers website and shopping cart bring them to www.safecart.com | Salesperson: | Lynn Heck |
| Business Activity: | Payment processor | Platform: | Salem |
| Legal Structure: | C Corp | Review Requirements: | Annual |
| Date of Incorporation: | 06-15-07 | Credit Risk Rating: | CII |
| NAICS Code: | 518210 | MIRC: | Moderate |
| Moody's Rating: | n/a | Watch Status? | No |
| PCI Compliant: | Yes, through Orbital Gateway | | |

| Approval Request:<br><br>Summary: | US CC Processing<br><br>RevenueWire's SafeCart is one of the internet's leading credit card payment systems, providing a secure and easy-to-use method for internet shoppers to purchase downloadable software, eBooks, and other digital products.<br><br>When a purchase is made through the SafeCart online checkout for a downloadable product, customers will see www.safecart.com on their credit card statement. The cardholder is able to reference a charge though SafeCart's Purchase Lookup Tool. Customers go onto the www.safecart.com website, type in name, zip code and last four numbers of their credit card. The cardholder is able to get access to their receipt and the publisher's original order confirmation page.<br>All products sold on SafeCart are delivered electronically; no product will be shipped. Customer service and technical issues are handled by the publisher of the software, refunds are handled by SafeCart.<br><br>RevenueWire will be structured under the IPSP/MSP model.<br><br>Proposed Framework:<br>   • All merchants that RevenueWire will be processing for and/or submitting transactions to CPS will be domiciled in the US.<br>   • RevenueWire must fully comply with CPS's Credit Policy with regards to merchant acceptance and compliance (including but not limited to restricted and prohibited merchants).<br>   • RevenueWire must fully comply with Visa's IPSP program and MasterCard's MSP program if processing/settling Visa and MasterCard transactions (note that both programs have certain restrictions MCC codes that can be processed and unacceptable/prohibited merchant types that are unique to these programs).<br>   • RevenueWire must fully comply with all due diligence as required by CPS's credit policy, Association regulations and applicable law, including but not limited to fully documented and date stamped web site reviews, KYC/USA Patriot Act, MATCH file checking, etc. |
|---|---|

*(handwritten annotation: Revised approval, 5% Term of, 3month rebate, cycle)*

RevenueWire will need to be approved and sponsored by CPS with MasterCard and Visa as an IPSP and MSP and upon such acceptance into the program will be required to pay all fees associated with those programs on an ongoing basis.

## Processing History & Risk Exposure Assumptions

RevenueWire holds the liability of the transactions within its merchant portfolio, while Chase Paymentech's services will be utilized for the front and back end authorization and settlement of those transactions.  Payments coming through this processing account are downloadable software. RevenueWire will need to be approved and sponsored by CPS with MasterCard and Visa as an IPSP and MSP and upon such acceptance into the program will be required to pay all fees associated with those programs on an ongoing basis.

RevenueWire will set up one bank account, all monies will go directly to RevenueWire's USD bank account at Bank of America, and this will be an FBO account. Per the Terms and Conditions between RevenueWire and their Client, monies will be paid to their Client on the 1st and the 16th day of each month.  Used 22 NDX to account for unpaid revenue to their clients.

The majority of their Payables (over 95%) are to affiliates and merchants.  Per the Controller, William Ng, a report is run from their system to pay their affiliates/merchants within 7 to 10 days after each cut-off.

## Contract Provisions

- RevenueWire is fully liable for all transactions processed under this agreement including all levels of "Sponsored Merchants" and "Commercial Entities".
- RevenueWire must within the contract accept all the terms and conditions required of CPS's US Credit Policy.
- RevenueWire must commit to minimum due diligence standards on all "Sponsored Merchants" and "Commercial Entities", along with a concurrence process for acceptance of "Commercial Entities" by CPS for "Commercial Entities" will annual sales volume that exceeds $100k (settled).
- Monthly reporting requirements within specified timeframes for all "Commercial Entity" merchants processed through RevenueWire.
- Full rights and abilities (unedited) to obtain collateral reserves against RevenueWire.
- Full rights to terminate any "Sponsored Merchant" or "Commercial Entity" processed on behalf of RevenueWire that CPS has sufficient cause to do so (i.e. default of agreement, excessive CB's and fraud, prohibited merchant, illegal activity).
- For all merchants less than $100k in annual settled sales, these merchants will be deemed "Sponsored Merchants" by CPS and a basic agreement between RevenueWire, CPS and the merchant must be obtained.  This agreement should at a minimum ensure the merchants compliance with all Association programs.
- For all merchants above $100k in annual settled sales volume, they will be deemed "Commercial Entities" under Visa's IPSP program and as such, CPS must contain a comprehensive (Full) processing agreement with the "Commercial Entity" itself.  RevenueWire can be a party to this agreement, but is not required to.  This agreement will need to be boiler plate and

negotiated with RevenueWire in advance, not upon the acceptance of each "Commercial Entity" in the normal process.

### D. IPSP/Merchant Funding

CPS will allow the IPSP be to funded for all "Sponsored Merchant" and "Sponsored Merchant Level II" volume so long as the account that CPS funds for these transactions is at a minimum legally structured as an FBO (for the benefit of) account. In this account, all the aggregate "Sponsored Merchant" funds will be deposited by CPS. RevenueWire must not account (under GAAP) for these funds as their own funds.

For all "Commercial Entity" volume, there will be two options available. Upon acceptance and execution of a CE agreement, the merchant will have the option of designating an account for CPS to fund. That can either be the "Commercial Entities" own bank account in their own name or the FBO account established by RevenueWire on behalf of the merchants in the program. Those will be the only two acceptable options available. A "Commercial Entity" is defined by MasterCard as a company that has a URL. Paymentech is currently investigating the impact of this new definition and discussing it internally with Payment Relations as well as MasterCard.

## FINANCIAL STATEMENT ANALYSIS

Unaudited financial statements were received for RevenueWire Inc., for FYE 12/31/08 and 12/31/07. The financials were prepared in CAD but converted to USD.

### A. Income Statement:

Select Income Statement Data:

| '000's | 12/31/08 | 12/31/07 |
|---|---|---|
| Revenues | $4,015 | $340 |
| Gross Profit | $3,704 | $327 |
| Net Profit | $45 | ($3) |
| EBITDA | $247 | $56 |

Revenues greatly increase over the past year, growing by 1000%. Operating Profit turned positive in 2008 at $45M. Their largest expense is Management fees which totaled $2.5MM, up from $220M in 2007. The company had a total of $4.2MM in Expenses and ended the year with a Net Profit of $45M and EBITDA of $247M.

### B. Ratio / Balance Sheet Analysis:

Select Balance Sheet Data:

| '000's | 12/31/08 | 12/31/07 |
|---|---|---|
| Total Cash | $5,811 | $647 |
| S/T Investments | $818 | $0 |
| Current Ratio | .97 | .90 |
| Funds Payable to Affiliates and Merchants (short-term) | $5,271 | $429 |
| Working Capital | ($233) | ($76) |
| Equity | $43 | ($3) |
| Debt-to-equity | 187.69 | (254.00) |
| Ttl Liab / Ttl Assets | .99 | 1.00 |

|  |  |
|---|---|
| **Recommendation:** | The company has quite a bit of Cash at $5.8MM, although Working Capital is negative and C/R is just below 1 at .97. Equity turned positive in 2008 at $43M compared to ($3M) in 2007. Their largest liability by far is their Funds Payable to Affiliates and Merchants with $5.2MM owed. The majority of their Payables (over 95%) are to affiliates and merchants. Per the Controller, William Ng, a report is run from their system to pay their affiliates/merchants within 7 to 10 days after each cut-off (the 1st and the 16th day of each month). For instance, their Payables relating to December 15th were paid on December 23rd.<br><br>Recommendation for RevenueWire is for approval with reserve terms of 5% with a rebate period of three months instead of the standard six month to be competitive with terms offered to RevenueWire by PayPal. This would provide for an estimated reserve of $1.2MM on exposure of $6.5MM. Recommendation is also for a CII risk rating and semi-annual review. Chargebacks and refunds are fairly low, and the ATP is also low at $39. The risk to Paymentech would be RevenueWire using the amounts owed to customers to pay for working capital needs rather than their clients. However, the FBO account will help to mitigate this risk. An NDX of 22 days will be used to account for the delay in RevenueWire paying their clients. |

| | |
|---|---|
| **CA Amount (000's):** | $6,500 |
| **Net Revenue (000's):** | $549 |
| **Collateral Amt (000's):** | $1,218 |
| **Return on Net Exposure:** | 8.4% |
| **Policy Exceptions:** | none |

### PROCESSING HISTORY / EXPOSURE CALCULATION SUMMARY:

| *Processing Stats* | Historical | *Exposure Calc.* | In $000's |
|---|---|---|---|
| Chargeback % (#): | .49% | Annual BC Sales: | $97,500 |
| Chargeback % ($): | .49% | Chargeback: | $184 |
| Refund: | 5% | Refund: | $400 |
| NDX: | 22 days | NDX: | $5,876 |
| ATP: | $39 | | |
| | | Total Exposure: | $6,460 |

### APPROVAL TERMS & CONDITIONS:

| Collateral Type: | 5% with 3 month rebates |
|---|---|
| Amount ($000's): | $1,218 |
| Corp. Guaranty: | - |
| Other Conditions: | - |

### RELATED ENTITIES EXPOSURE

| Merchant Name | In $000's |
|---|---|
| - | - |
| - | - |
| Total Related Exposure: | - |

FTC-VAST-000665

**CREDIT REFERENCES:**

| Business Report: | Rating | Paydex | Condition | Litigation | UCC's | Date |
|---|---|---|---|---|---|---|
| n/a | | | | | | |
| Lending Bank: | Type | HC | O/S | Expires | Security | Rating |
| Non borrowing | | | | | | |
| Deposit Bank: | Since | Avg. DDA | Rating | #NSF | Ref. Date | |
| Bank of America | 6/07 | High 6 | Good | - | 05-06-09 | |
| Trade: | Since | HC | O/S | Terms | Ref. Date | Rating |
| KPMG | 10-07 | $8M | $0 | N30 | 05-07-09 | Good |
| Credit Report: | Score | Pmt History | # Past Due | In File Date | Suits/Liens | |
| | | | | | | |

**APPROVAL AUTHORITY:**

_Amy Pollam_      6/18/09

*Portfolio Credit Analyst*      Date

_David Miller_      6-16-07

*David Miller,*
*Managing Director of*
*Underwriting & Portfolio*
*Management*      Date

_Kyle Salvati_      6/16/09

*Kyle J. Salvati,*
*GM and Senior Director of*
*Credit Risk Management*      Date

_William C. Matos_      6/17/09

*William C. Matos,*
*Chief Credit Officer*      Date

_____      _____

*Chris Trunks,*      Date      *Credit Committee*      Date
*Executive Vice President,*
*Credit Risk Management*

## Web Site Review Checklist

Merchant Name: ___**RevenueWire Inc.**___  DBA: ____n/a

Does the merchant name match the name on the website: **Yes**

Description of the goods or service: downloadable
(Ensure merchandise matches the application)

Reviewed website links to ensure that the merchant is selling what is disclosed on the merchant application:
**YES**          NO

Refund Policy:    **YES**     NO     EXPLAIN: **Satisfaction guaranteed!**
Our 60 day money-back guarantee is in full effect for all orders. Your satisfaction is our #1 goal. If you are not satisfied with your purchase, just let us know and we will be happy to provide you with a full refund.

Phone Number          **YES**          NO

E-Mail Address          **YES**          NO **multiple (shopping cart bring customer to <u>www.safecart.com</u>)**

Transaction Currency:  **US CC Processing**

Export or legal restrictions (Age appropriate merchandise)    YES     **NO**
Delivery Policy:    **YES**          NO    **Concerned about online credit card transactions?**
Your order will be processed through "SafeCart" ensuring that your transaction will be secured by 128bit SSL encryption. All your information remains private and secure. We guarantee the safety and protection of your personal information.

Address of the merchant's outlet      33530 1st Way S, Ste 102, Federal Way, WA 98002

Consumer Data Privacy Policy:      **YES**     No

SSL for Transmitting Data:          **YES**     NO

Vendor/Application _____

Review Completed By: ___apelham_____  _____  ___06-04-09
                                          Name                                    Signature                              Date

**Tyndall, Reeve**

| | |
|---|---|
| **From:** | Mark Harris <mharris@malwarebytes.org> |
| **Sent:** | Tuesday, October 14, 2014 9:22 PM |
| **To:** | Brooke, J. Ronnie |
| **Cc:** | Jerome Segura |
| **Subject:** | FW: Confidential Request RE Non-Public Matter |
| **Attachments:** | Copy of Vat Tech CB Sales Orders 8_2007 to 9_2014.xls; FW: Confidential Request RE Non-Public Matter; Figure1.png; Figure2.png; Figure3.png; Figure3b.png; Figure4.png; Figure5.png; Figure6.png; FW: Malwarebytes Inquiry - Vast Tech Support (FL) DBA OMG Tech Help; OMG_Tech_Support_Case_Revised.pdf; omgtech.zip |
| | |
| **Importance:** | High |

Ron,

Here is what we have by your request categories below.  Hopefully this is helpful:

1. Any Malwarebytes consumer complaints related to Vast Tech;
2. Malwarebytes reseller application/registration information for Vast
3. Malwarebytes termination of Vast Tech as a reseller; and
4. Communications from Vast Tech regarding the termination of the the Malwarebyte's blog post that references them.

   1. **Complaints**
   Jerome's narrative which I believe you already have a copy (attached for completeness).   It seems Jerome was alerted to the issue by complaints to the Florida Better Business Bureau, not complaints via our customer support line.

   2. **Reseller Information**
   Per our Senior Channel Director Dave Allison'se-mail (attached) it appears they had sales activity in 2013 but not recently and did not opt to sign up for our new channel program announce in June 2014. We have NOT received any contract back from Vast Tech nor from OMG re the new program prior to their termination as a reseller, see item 3.

   Going back to 2007 we have a total revenue of $91.7K with the last order Q2 2013 (detailed attached).  They are in a rejected status right now and not able to order any product.

   3. **Termination of VastTech as a reseller**
   Our Channel Sales Rep Larry Wright's e-mail communicated the termination of the relationship and includes a response from them (attached).

   4. **Communication re Termination**
   See 3 above.

Regards,

Mark Harris | Chief Financial Officer

1

**Attachment V, p. 1**

**EXHIBIT 16**
**FTC-VAST-000668**

Malwarebytes Inc. | 10 Almaden Blvd. | Tenth Floor | San Jose, CA 95113, USA |
Cell: +1.650.889.0006 | www.malwarebytes.org | mharris@malwarebytes.org



This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

Please consider the environment before printing this email.

---

**From:** Brooke, J. Ronnie [mailto:JBROOKE@ftc.gov]
**Sent:** Tuesday, October 07, 2014 11:26 AM
**To:** Mark Harris
**Subject:** RE: Confidential Request RE Non-Public Matter

Mark,

Thank you very much.

Ron Brooke

---

**From:** Mark Harris [mailto:mharris@malwarebytes.org]
**Sent:** Tuesday, October 07, 2014 2:24 PM
**To:** Brooke, J. Ronnie
**Subject:** RE: Confidential Request RE Non-Public Matter

Ron,

Let me chased this up.  I thought this had been taken care of in my absence whilst on vacation.  I know the problem we were having was a lack of documentation in our systems.

Regards,

Mark Harris | Chief Financial Officer

Malwarebytes Inc. | 10 Almaden Blvd. | Tenth Floor | San Jose, CA 95113, USA |
Cell: +1.650.889.0006 | www.malwarebytes.org | mharris@malwarebytes.org

**EXHIBIT 16**
**FTC-VAST-000669**



This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

Please consider the environment before printing this email.

---

**From:** Brooke, J. Ronnie [mailto:JBROOKE@ftc.gov]
**Sent:** Monday, October 06, 2014 2:01 PM
**To:** Mark Harris
**Cc:** Brooke, J. Ronnie
**Subject:** RE: Confidential Request RE Non-Public Matter

Mark,

Can you give me a call, if possible?

Thanks,

Ron Brooke
Federal Trade Commission
Division of Marketing Practices
600 Pennsylvania Ave., NW
Washington, DC  20580
Tel (202) 326-3484
Fax (202) 326-3395

---

**From:** Mark Harris [mailto:mharris@malwarebytes.org]
**Sent:** Thursday, August 28, 2014 5:11 PM
**To:** Brooke, J. Ronnie
**Subject:** RE: Confidential Request RE Non-Public Matter

I look forward to talking to you.

Regards,

Mark Harris | Chief Financial Officer

Malwarebytes Inc. | 10 Almaden Blvd. | Tenth Floor | San Jose, CA 95113, USA |
Cell: +1.650.889.0006 | www.malwarebytes.org | mharris@malwarebytes.org

**EXHIBIT 16**
**FTC-VAST-000670**



**Malwarebytes**
Crushes malware, Restores confidence.

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.

Please consider the environment before printing this email.

**From:** Brooke, J. Ronnie [mailto:JBROOKE@ftc.gov]
**Sent:** Thursday, August 28, 2014 1:37 PM
**To:** Malwarebytes - Contracts and Legal
**Cc:** Jerome Segura; Brooke, J. Ronnie; Deitch, Russell S.
**Subject:** Confidential Request RE Non-Public Matter

To whom it may concern:

Hello, my colleagues and I have been in communications with Mr. Segura regarding his independent investigations of apparent tech support schemes. Could someone from Malwarebytes legal please contact me at (202) 326-3484 to discuss at least one of the entities Mr. Segura investigated?

Due to the nature of FTC non-public inquiries, I request that Malwarebytes please treat this matter as confidential. Thank you in advance,

Regards,

Ron Brooke
Federal Trade Commission
Division of Marketing Practices
600 Pennsylvania Ave., NW
Washington, DC  20580
Tel (202) 326-3484
Fax (202) 326-3395

**EXHIBIT 16**
**FTC-VAST-000671**

**Tyndall, Reeve**

| | |
|---|---|
| **From:** | Mark Harris <mharris@malwarebytes.org> |
| **Sent:** | Tuesday, October 07, 2014 2:48 PM |
| **To:** | Mark Harris |
| **Subject:** | FW: Malwarebytes Inquiry - Vast Tech Support (FL) DBA OMG Tech Help |

---

**From:** Larry Wright <lwright@malwarebytes.org>
**Date:** Thursday, August 14, 2014 at 2:06 PM
**To:** Rebecca Kline <rkline@malwarebytes.org>
**Cc:** "Dave \"Hoops\" Allison" <dallison@malwarebytes.org>
**Subject:** FW: Malwarebytes Inquiry - Vast Tech Support (FL) DBA OMG Tech Help

Elliott Loewensterm
elliot@omgtechhelp.com
(561) 251-7254 contact me and asked to be removed from this list as this is 'inflammatory and inaccurate'.

https://blog.malwarebytes.org/tech-support-scams/

He asked for our contact information for legal, I provided those details.

Best regards,
-Larry

---

**From:** Elliot Loewenstern [mailto:elliot@omgtechhelp.com]
**Sent:** Thursday, August 14, 2014 1:58 PM
**To:** Larry Wright; jp@vasttechsupport.com; mark@vasttechsupport.com
**Subject:** RE: Malwarebytes Inquiry - Vast Tech Support (FL)

This link is on your blog. We do not use scare tactics or advertise our tech support company. It blacklists our business.

http://blog.malwarebytes.org/tech-support-scams/

The RIGHT thought + the RIGHT people in the RIGHT environment at the RIGHT time for the RIGHT reason = the RIGHT result !

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this communication by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission. If verification is required, please request a hard-copy version

---

**From:** Larry Wright [mailto:lwright@malwarebytes.org]
**Sent:** Thursday, August 14, 2014 4:46 PM
**To:** jp@vasttechsupport.com; mark@vasttechsupport.com; elliot@omgtechhelp.com
**Subject:** Malwarebytes Inquiry - Vast Tech Support (FL)

1

**Attachment V, p. 5**

**EXHIBIT 16**
**FTC-VAST-000672**



Hello VAST & OMG Tech Support Teams,

I wanted to notify you that your purchase access has been suspended. We have received an abnormally large number of customer complaints and we are researching each of these cases.

Best Regards,
-Larry

**Larry Wright**
Channel Sales Manager

Malwarebytes Corporation
**Crushes malware. Restores confidence.**
P: +1 (800) 778-1082 x114
www.malwarebytes.org

NOTE - This message may contain privileged and confidential information intended only for the use of the addressee named above. All pricing information is considered valid for the recipient company for 30 days from the date sent unless specified otherwise. If you are not the intended recipient of this message you are hereby notified that any use, dissemination, distribution or reproduction of this message is prohibited. If you have received this message in error please notify Malwarebytes Corp. immediately.