

FILED BY _____ D.C.

NOV 1 0 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. _14CV8139 7 KLK/JmH_

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and STATE OF FLORIDA <br>      Plaintiffs, <br>     v. <br> Boost Software, Inc., a Massachusetts Corporation, <br><br> Vast Tech Support, LLC, a Florida limited liability company, <br><br> OMG Tech Help, LLC, a Florida limited liability company, <br><br> Success Capital, LLC, a Florida limited liability company, <br><br> Jon Paul Holdings, LLC, a Florida limited liability company, <br><br> Amit Mehta, individually and as an officer of Boost Software, Inc. , <br><br> Elliot Loewenstern, individually and as a Member of Vast Tech Support, OMG Tech Help, and Success Capital <br><br> Jon-Paul Vasta, individually and as a member/officer of Vast Tech Support and OMG Tech Help, <br><br> Mark Donohue, individually and as an owner or officer of Vast Tech Support, <br><br> Defendants. | **CERTIFICATION OF PLAINTIFF FEDERAL TRADE COMMISSION COUNSEL J. RONALD BROOKE, JR., PURSUANT TO FED. R. CIV. P. 65(B)(1) IN SUPPORT OF PLAINTIFF'S _EX PARTE_ MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION TO SEAL TEMPORARILY THE DOCKET AND ENTIRE FILE** |

I, J. Ronald Brooke, Jr., hereby declare as follows:

1.    I am over twenty-one years of age and am a citizen of the United States. I am one of the attorneys representing the Federal Trade Commission ("FTC") in this action against:

      a.    Vast Tech Support, LLC, OMG Tech Help LLC, Success Capital, LLC, Jon Paul Holdings, LLC, Elliot Loewenstern, Jon-Paul Vasta and Mark Donohue (collectively "Vast Defendants"); and

      b.    Boost Software, Inc., and Amit Mehta (collectively "Boost Defendants").

2.    I am a member in good standing of the bar of the State of Maryland (Bar No. 0202280002). My work address is Federal Trade Commission, Division of Marketing Practices, 600 Pennsylvania Avenue, N.W., Mail Stop CC-8528, Washington, D.C. 20580. Unless indicated otherwise, I have personal knowledge of the facts stated herein and if called as a witness, would competently testify thereto.

3.    I submit this certification pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1746, and S.D. Fla. Local Rule 7.1(e) in support of the FTC's *Ex Parte* Motion for a Temporary Restraining Order, Asset Freeze, Other Equitable Relief, an Order to Show Cause Why Preliminary Injunction Should Not Issue, and Memorandum in Support Thereof ("TRO Motion") and in support of the FTC's request that the Temporary Restraining Order ("TRO") be issued without notice to Defendants.  I also submit this certification in support of the FTC's *Ex Parte* Motion to Temporarily Seal the Docket and Entire File, filed contemporaneously with the TRO Motion.

4.     Pursuant to Rule 65(b)(1), this Court may issue a TRO without notice to Defendants if "(A) specific facts in an affidavit … clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  For the reasons discussed below, the FTC has *not* provided Defendants with notice of the filing of this action or the TRO Motion.  The interests of justice require that these filings be heard *ex parte*.

## DEFENDANT'S SCHEME

5.     The evidence set forth in the TRO Motion and supporting exhibits, filed concurrently herewith, demonstrates that Defendants have engaged in a multi-million dollar computer repair scheme using a variety of deceptive practices to separate consumers from their money.   The Defendants perpetrate this scheme through various websites and inbound telemarketers.  Their computer repair scheme has caused millions of dollars of economic injury to consumers, including many seniors, throughout the United States.

6.     The Defendants scheme starts with internet advertising for PC HealthBoost software which the Defendants' claim dramatically speeds up PCs and prevents crashes. These claims trick consumers into downloading and running a free version of PC HealthBoost software.  Upon downloading the free product, the software automatically initiates a bogus computer system scan that invariably detects hundreds or thousands of purported "errors" in need of repair.  PC HealthBoost's bogus free scan falsely identifies innocuous and helpful files as "errors."  The Defendants then offer consumers the opportunity to "fix" these errors by downloading the paid version of the software for $29.97.

3

After duping consumers into purchasing the paid version of PC HealthBoost, the software instructs consumers to call a toll free phone number to activate the product.

7.      When consumers call to register the software they have been duped into purchasing, they telemarketers are lying in wait.  The Vast Defendants' telemarketers extract additional money from frightened consumers, using scare tactics and telling more lies in order to convince consumers that their computer is in dire need of repair.  For example, while performing their bogus diagnostic scan, the Vast Defendants' telemarketers show consumers a series of screens and falsely claim that the screens depict evidence of malware or "trace damage" to consumers' computers.  The telemarketers also falsely assert that the purported problems they have identified represent an immediate threat to the computers that can only be resolved by a trained technician.

8.      Having duped consumers into believing that their computers are riddled with problems and in imminent danger of crashing, the telemarketers then pitch the services of technicians, including repairs and long-term maintenance programs.  The Vast Corporate Defendants' recommend and charge for repairs (as much as $500) even when computers are in good working order and have no issues.  Through the course of the scheme, the proposed Defendants have caused more than $22 million in consumer injury.

9.      Defendants process their payments through a Canadian-based payment processing entity, RevenueWire, dba SafeCart.

## THE PROPOSED TRO

10.      The proposed TRO would:  (1) immediately halt defendants' unlawful acts and practices; (2) freeze the Vast Defendants' assets to preserve them for potential restitution

4

to victims; (3) appoint a temporary receiver over the Vast Corporate Defendants; (4) grant the FTC and the temporary receiver immediate access to the Vast Corporate Defendants' premises and records; (5) allow for limited expedited discovery; (6) provide other equitable relief; and (7) require Defendants to show cause why this Court should not issue a preliminary injunction extending such temporary relief pending an adjudication on the merits.

## REASONS WHY *EX PARTE* FILING IS NECESSARY

11.     There is ample evidence that Vast Defendants have the motivation and opportunity to conceal and dissipate assets and destroy important documents, as demonstrated by, among other things: (i) the Vast Defendants possession of sensitive consumer information, including bank account information; (ii) the Vast Defendants surreptitious use of Canadian payment processor RevenueWire, dba SafeCart.com  to gain access to the credit/debit card system without having a merchant account; (iii) the egregious nature of the Vast Defendants scheme, including their accepting leads through obviously bogus pop up warnings that pretend to be Windows messages and the fact that they specifically target senior citizen whom they know are less tech savvy; (iv) the history of Elliot Loewenstern and Jon-Paul Vasta, who have migrated from one telemarketing scam to another; (v) and prior FTC experience with analogous circumstances of defendants facing financial liability for unlawful business practices, especially telemarketing scams, and the relative ease with which critical electronic evidence can be destroyed.

12.     As detailed in Section II of Plaintiffs' Motion for an Ex Parte Temporary Restraining Order and Memorandum in Support Thereof ("TRO Memo"), evidence adduced

during the FTC's investigation indicates that the Defendants possess consumer's sensitive personal information.  If the Vast Defendants are provided notice of the FTC's action, there is a substantial risk that the Vast Defendants will conceal such sensitive personal information, or worse, commoditize it for financial gain.

13.     In addition, as demonstrated in Section II of the TRO memo, evidence indicates that the Vast Defendants do not process payments via a merchant account in their own name, but instead, use RevenueWire, dba SafeCart.com that aggregates their telemarketing-generated charges with other online merchants.

14.     Also, as noted in Section II of the TRO memo, significant evidence exists detailing the egregious nature of the Vast Defendants' scheme.  For example, in addition to victims who call to "register" PC HealthBoost, the Vast Defendants also receive calls from consumers, many of whom are senior citizens, generated by bogus warning pop up messages that claim that a virus or Trojan has been detected on their computer or the consumer's malware protection software is out of date.  The Vast Defendants treat these bogus warning pop up messages as if they were legitimate in order to sell their services. Furthermore, the Vast Defendants specifically target senior citizens as being most susceptible to their scare tactics.  In their trainers' own words, "We target seniors."

15.     And, evidence indicates that two principals of the Vast Corporate Defendants, Elliot Loewenstern and Jon-Paul Vasta, are inveterate telemarketing scammers.  As noted in Section II of the TRO memo, Elliot Loewenstern has been the subject of actions by the Securities and Exchange Commission and the Financial Industry Regulatory Authority.  He is permanently barred from acting as a broker or otherwise associating with firms that sell

6

securities to the public and been a defendant in two criminal cases relating to the telemarketing of securities.  And, Jon-Paul Vasta, Loewenstern's partner, has spent the last eleven years involved in some type of telemarketing scam.  Such prior illicit activities indicate a substantial risk that they may dissipate or conceal illicit funds or destroy or conceal crucial evidence.

## **RELEVANT PRECEDENT**

16.     It has been the FTC's experience that defendants involved in deceptive acts and practices that receive notice of the filing of an action by the FTC, or of the FTC's intent to file an action, often attempt to undermine the FTC's efforts to preserve the *status quo* by immediately dissipating or concealing assets or destroying documents.

17.     For example, in this District and in the Eleventh Circuit, the following has occurred since the year 2000:

a.     In *FTC v. Prime Legal Plans, et al*, Case No. 12-61872-Civ-SCOLA (S.D. Fla. 2012), upon hearing that the TRO had been granted, the Defendants went straight to the bank and transferred $1.7 million in assets to a girlfriend and a mother.  The bank was able to claw most of it back, but the Commission, and thus consumers, ended up losing about $200,000.

b.     In *FTC v. Hargrave & Associates*, No. 09-0006 (M.D. Fla. 2012), the FTC sought and obtained an *ex parte* TRO with an asset freeze in conjunction with a motion to show cause why the defendants should not be held in contempt.  After being personally served with the TRO,

one defendant withdrew $17,800 from a frozen bank account the same day. To avoid being held in contempt of the TRO, the defendant returned all but a few thousand dollars.

c.    In *FTC v. Fereidoun "Fred" Khalilian*, No. 10-21788 (S.D. Fla. 2010), the FTC sought and obtained an *ex parte* TRO with an asset freeze.  Before the asset freeze could be processed by the banks, one of the defendant's employees withdrew large amounts of money from the company's bank accounts.  The defendant eventually returned some, but not all, of the money.  Additionally, the defendant attempted to remove assets located in his personal residence.  The receiver, however, was monitoring the defendant's residence, and, after observing people taking a number of items from the defendant's residence at night, was able to halt the defendant's activities;

a.    In *FTC v. Group One Networks, Inc.*, No. 8:09-CV-0352-T-26-MAP (M.D. Fla. Feb. 25, 2009) the court granted an FTC's *ex parte* motion for a TRO with an asset freeze, which the FTC served on banks known to hold accounts of defendants.  After being served with the order, one of the defendants successfully cashed two $10,000 checks that were installment payments for an undisclosed $50,000 loan.  The FTC, however, through expedited asset-related discovery, was able to identify the loan payments and the individual defendant subsequently deposited the $20,000 into a frozen bank account to cure any possible

8

contempt of the asset freeze.

b.  In *FTC v. Global Mktg. Group, Inc.*, No. 06-2272 (M.D. Fla. 2006),
the court granted the FTC's *ex parte* motion for a TRO with an asset
freeze, which the FTC served on banks known to hold accounts of
defendants.  After being served with the order, one of the defendants
successfully withdrew over $500,000 from accounts previously
unknown to the FTC.  Most of these funds were wired to offshore bank
accounts.  This defendant was ultimately held in contempt of court and
fled the country after failing to appear at a show cause hearing;

c.  In *FTC v. American Entertainment Distribs., Inc.*, No. 04-22431 (S.D.
Fla. 2004), the Court entered an asset freeze that froze assets of ten
corporate and individual defendants.  Within hours of receiving notice
of the asset freeze, one of the individual defendants withdrew $39,500
from his bank.  Because the asset freeze had been in place, the FTC
was able to compel the individual defendant to return the money;

d.  In *FTC v. Access Res. Servs., Inc.,* No. 02-60226 (S.D. Fla. 2002), a
defendant who learned about the FTC's action attempted to dissipate
$579,600 by paying off the mortgage on his residence, which was
protected by Florida's homestead protection laws; andIn *FTC v.
Leisure Time Mktg., Inc. et al.*, Civ. No. 00-1057 (M.D. Fla. 2000), the
court entered a TRO against the defendants with immediate access to
the business premises.  After an individual defendant was served and

9

acknowledged his understanding that he was to preserve all assets and documents, that defendant ordered individuals to remove boxes of documents from one of the business premises. Fortunately, a police officer assisting the FTC in the immediate access saw this activity, and the FTC was able to contact the defendant's counsel and have the documents returned. That individual defendant also attempted to hide certain documents on the business premises in a room where FTC staff was informed that no business records were stored. Because the FTC had immediate access to the business premises, the FTC found these documents.

18.    Examples from Districts outside the Eleventh Circuit include the following:

a.    In *FTC v. Asset & Capital Management Group,* No. 8:13-cv-01107-DSF-JC (C.D. Calif. 2013), fully one week after the Court granted, and the FTC served upon all defendants, an *ex parte* TRO that froze defendants' assets and appointed a Receiver, the Receiver identified an additional business site that defendants had failed to disclose. The undisclosed site turned out to be the defendants' headquarters and contained extensive business records, including corporate and tax records, bank statements, and personnel files for dozens of defendants' entities. The Receiver arrived at the site unannounced, after receiving repeated assurances from defendants that they had disclosed all of their business locations. He found a defendant and his colleague carrying

10

folded bankers boxes from their car to the site, clearly intent on

removing materials from the premises.  When the Receiver gained

entry to the site, he found evidence that desktop computers and records

recently had been removed.  The FTC subsequently learned that more

than 60 servers and extensive records had been taken.

b.     In *FTC v. E.M.A. Nationwide, Inc.*, Case No. 1:12-cv-02394 (N.D.

Ohio September 28, 2012), the court denied the FTC's motion for an

*ex parte* TRO and corporate asset freeze. The Judge required notice to

the defendants, which was done on September 28th.  By October 4th,

the individual defendants had withdrawn more than $152,000 from a

corporate bank account.

c.     In  *FTC v. Jeremy Johnson, et al.*, Civ. No. 10-2203-MMD-GWF (D.

Nev. Mar. 25, 2013), an individual defendant who learned about the

FTC's investigation of his company enlisted nominees to create

dozens of legal entities used to hold and conceal from authorities

millions of dollars in assets, including assets connected to illegal

online poker payment processing.

d.     In *FTC v. Data Med. Capital, Inc.*, No. 99-1266 (C.D. Cal. 2009), the

FTC moved for contempt and obtained an *ex parte* TRO and asset

freeze against certain defendants.  The defendants learned of the

FTC's contempt investigation and one of the defendants transferred

approximately $1 million to a personal bank account prior to the

FTC's filing.  The receiver, who was appointed pursuant to the *ex*

*parte* TRO, traced these assets and returned them to the receivership

estate.  The receiver's compensation for these tasks, however, reduced

the amount available for redress to the defendants' victims.

e.    In *FTC v. Transcon. Warranty, Inc.*, No. 09-2927 (N.D. Ill. 2009), the

FTC moved for a TRO with notice to the Defendants.  The notice was

given, and then the Court granted the FTC's motion for a TRO,

freezing Defendants' assets and appointing a receiver.  However, when

the receiver and counsel for the FTC arrived at the corporate

defendant's premises pursuant to the court's order, hundreds of folders

with labels indicating that they contained records of defendants' most

recent transactions were found empty.  In addition, five computers,

including that of the corporate defendant's CFO, were allegedly stolen

the night before the receiver and counsel for the FTC arrived at the

premises, and various third-party trade debtors of the corporate

defendant froze payments due to the corporate defendant, which

resulted in extensive litigation over these assets and ultimately cost the

receivership estate tens of thousands of dollars;

f.    In *FTC v. Enternet Media, Inc.,* CV 05-7777 CAS (C.D. Cal., Aug. 22,

2006), The FTC discovered that after the court issued the TRO and the

FTC served it on all defendants, defendants remotely accessed an

offsite  server and deleted all of the marketing materials stored on the server.

g.     On August 9, 2006, in *FTC v. Connelly*, SACV-06-701 DOC (RNBx) (C.D. Cal. 2006), the court issued an *ex parte* TRO with an asset freeze against one defendant, but issued a noticed Order to Show Cause to two other defendants, ordering them to show cause as to why their assets should not be frozen.  Having notice that the FTC sought to freeze their assets, the defendants nevertheless withdrew at least $800,000, some of which was subject to the asset freeze, and most of which was never recovered;

h.     In *FTC v. Universal Premium Servs., Inc.*, No. 06-849 (C.D. Cal. 2006), a defendant and his wife withdrew over $45,000 from their joint personal bank account, which the bank had not yet frozen, hours after he was personally served with an *ex parte* TRO that included an asset freeze.  Subsequently, the defendant withdrew over $4,700 via electronic debit or check, also in violation of the TRO;

i.     In *FTC v. World Traders Ass'n*, No. 05-591 (C.D. Cal. 2005), notwithstanding an *ex parte* TRO, including an asset freeze, the lead defendants appropriated $90,459 from a frozen bank account within one day of being served with the TRO.  Although the contempt resulted in subsequent criminal indictments, the money was never recovered;

j.     In *FTC v. Nat'l Consumer Counsel*, No. 04-0474 (C.D. Cal. 2004), the court granted the FTC's *ex parte* application for a TRO with asset freeze and the appointment of a temporary receiver against all but one of the corporate defendants.  One of the individual defendants then deleted key electronic files on defendants' shared network server by accessing his account through a computer under the control of the corporate defendant that was not under the receivership;

k.     In *FTC v. Unicyber Tech. Inc.*, CV-04-1569 LGB (C.D. Cal. 2004), the FTC obtained an *ex parte* TRO with asset freeze and appointment of a receiver.  Shortly after the defendant was served with the TRO, he directed his wife to violate the asset freeze by transferring $405,000 of corporate funds to her father.  With the assistance of the receiver, the FTC was able to recover these funds;

l.     In *FTC v. 4049705 Canada Inc.*, No. 04-4694 (N.D. Ill. 2004), Canadian authorities executed a search warrant on the business premises of Canadian defendants who were engaged in telemarketing fraud.  Thereafter, the FTC filed a complaint and motion for a TRO with an asset freeze, providing notice to defendants.  The FTC subsequently discovered that the defendants had made several substantial money transfers after receiving notice of the FTC's action, but before the asset freeze was imposed;

14

m.    In *FTC v. Assail Inc.*, No. 03-007 (W.D. Tex. 2003), the court issued

an *ex parte* TRO, including an asset freeze.  The lead defendant

nonetheless transferred $200,000 within hours of being served with the

TRO, which, after contempt proceedings and a lengthy appeal, the

defendant was required to repay;

n.    In *FTC v. QT, Inc.,* No. 03-3578 (N.D. Ill. 2003), defendants, after

notice of a TRO with an asset freeze, withdrew and transferred more

than $2 million dollars from banks that had not yet received notice of

the asset freeze;

o.    In *FTC v. Physicians Healthcare Dev., Inc.*, CV-02-2936 RMT (JWJx)

(C.D. Cal. 2002), after the court issued the TRO and served it on all

counsel, including defense counsel, Commission staff served it on

defendants by facsimile.  The next day, when Commission staff went

to the defendants' offices to review the business records, staff found

that documents had been shredded and that the computer and other

business records had been removed from the premises.  Witnesses

advised Commission staff that, on the day of the hearing, they

observed defendants' employees removing computers and other items

from the business premises.  The removed records were never

recovered;

p.    In *FTC v. Hanson Publ'ns, Inc.*, Civ. No. 02-2205 (N.D. Ohio 2002),

Canadian respondents transferred $105,000 from a U.S. account to a

Canadian account within two days of receiving service of the TRO with asset freeze.  This money was later returned as a precondition to the release of attorney's fees;

q.   In *FTC v. The Tungsten Group,* No. 2:01-CV-00773 RAJ (E.D. Va. 2001), the FTC obtained an *ex parte* TRO with an asset freeze.  One defendant wired money out of a frozen account before the freeze could be imposed by the bank, but later returned it on advice of counsel. Another defendant tried to withdraw cash from a frozen account immediately after being served with the TRO, but he was blocked by the asset freeze;

r.   In *FTC v. SkyBiz.com, Inc.*, No. 01-CV-396(K) (N.D. Okla. 2001), within days of the service of the TRO with an asset freeze provision, one of the primary defendants convinced an overseas trustee to withdraw $1 million from the offshore account of a foreign affiliate. Because a domestic correspondent bank had been served with the TRO, it refused to transfer the funds.  The money in the offshore account was preserved, and ultimately used to help provide $20 million for consumer redress;

s.   In *FTC v. Consumer Repair Servs., Inc.*, CV-00-11218 CM (C.D. Cal. 2000), the FTC obtained an *ex parte* TRO with asset freeze.  Although all three individual defendants had been served with the TRO and were aware of the asset freeze, they all violated this order by withdrawing

16

over $17,000 from accounts that were subject to the TRO, but had not yet been frozen by the banks. None of this money was ever recovered; and

t.   In *FTC v. Mediworks, Inc.*, CV-00-01079 CAS (MANx) (C.D. Cal. 2000), the FTC obtained an *ex parte* TRO with asset freeze. Even after being served with the TRO, defendants violated the order by withdrawing $31,000 from a bank account. The full amount removed by the defendants was not recovered.

19.   In the FTC's experience, defendants may also learn about a case against them from a docket monitoring service. For example, in *FTC v. Wazzu Corp., et al.*, SAV CV 99-762 (S.D. Cal. 1999), when FTC staff arrived at defendants' business premises to serve a temporary restraining order, it learned that defendants had already learned about the action against them from a monitoring service to which their counsel subscribed. The monitoring service would not have learned of the action at the time of filing if the file and docket had been temporarily sealed.

## DISTRICT COURTS HAVE ENTERED EX PARTE TEMPORARY RESTRAINING ORDERS IN FACTUALLY SIMILAR CASES

20.   The FTC has filed at least a half dozen cases against perpetrators of tech support scams, like that perpetrated by the Vast Defendants, and districts courts regularly have entered *ex parte* temporary restraining orders like that requested here. For example, *see FTC v. Pecon Software Ltd, et al.*, 12-cv-7186-PAE (S.D.N.Y. September 25, 2012); *FTC v. Virtual PC Solutions (Mikael Marczak a/k/a Michael Marczak), et al.*, 12-cv-7192-PAE (S.D.N.Y. September 25, 2012); *FTC v. Finmaestros, LLC, et al.*, 12-cv-7195-PAE

(S.D.N.Y. September 25, 2012); *FTC v. Lakshmi Infosoul Services Pvt Ltd., et al.*, 12-cv-7191-PAE (S.D.N.Y. September 25, 2012); *FTC v. PCCare247 Inc., et al.,* 12-cv-7189-PAE (S.D.N.Y. September 25, 2012); and *FTC v. Pairsys, Inc.,* 14-cv-1192 TJM-CFH  (N.D.N.Y. September 14, 2014).[1]

21.    For all the above reasons, as contemplated by Fed. R. Civ. Pro. 65(b), there is good cause to believe that immediate and irreparable damage will result to consumers from the dissipation of assets, and from the concealment, transfer or destruction of Defendants' records, if Defendants receive advance notice of the FTC's Complaint and TRO Motion. Thus, it is in the interests of justice that this Court grant the FTC's *ex parte* TRO Motion and Motion to Seal Temporarily the Docket and Entire File.

22.    The FTC has not made a previous application for similar relief in this matter.

---

[1] In addition, in cases brought by the FTC under Section 5 of the FTC Act to shut down other types of scams, district courts in this District and throughout the Eleventh Circuit regularly have entered ex parte temporary restraining orders like that requested here. *See, e.g., FTC v. Info. Mgmt. Forum, Inc.* , No. 6:12-cv-00986-GAP-KRS (M.D. Fla. June 28, 2012), ECF No. 8; *FTC v. VGC Corp.*, No. 1: 11-cv-21757-JEM (S.D. Fla. May 17, 2011), ECF No. 16; *FTC v. U.S. Mortg. Funding, Inc.*, No. 9: 11-cv-80 155-TIC (S.D. Fla. Feb. 9, 2011), ECF No. 20; *FTC v. JPM Accelerated Servs., Inc.*, No. 6:09-cv-2021-K.RS (M.D. Fla. Nov. 30, 2009), ECF No. 9; *FTC v. 1st Guaranty Mortg. Corp.*, No. 0:09-cv-61840-JJO (S.D. Fla. Nov. 25, 2009), ECF No. 31; *FTC v. Kirkland Young, LLC,* No. 1 :09-cv-23507-ASG (S.D. Fla. Nov. 19, 2009), ECF No. 19; *FTC v. Washington Data Res., Inc.*, No. 8:09-cv-02309-SDM-TBM (M.D. Fla. Nov. 13, 2009), ECF No. 19; *FTC v. Home Assure, LLC*, No. 8:09-cv-00547-SDM-TBM (M.D. Fla. Mar. 26, 2009), ECF No. 66; *FTC v. Integrity Afktg. Team, Inc.*, No. 0:07-cv-61152-PCH (S.D. Fla. Aug. 29, 2007), ECF No. 15; *FTC v. FTN Promotions, Inc.*, No. 8:07-cv-1279-JSM-TGW (M.D. Fla. July 23, 2007), ECF No. 10.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 16, 2014

J. Ronald Brooke, Jr, MD # 0202280002
Federal Trade Commission
600 Pennsylvania Avenue, N.W. CC-8528
Washington, D.C. 20580
(202) 326-3043
(202) 326-3395 (facsimile)
Attorney for Plaintiff
FEDERAL TRADE COMMISSION